# EXHIBIT 1

Hearing Date: 9/2/2025 9:45 AM
Location: Court Room 2405
Judge: Reilly, Eve M

For updated information about your case, including hearings, subsequent filings
and other case information, please visit our Online Case Search
and search for your case: https://casesearch.cookcountyclerkofcourt.org

FILED
7/1/2025 3:23 PM
Mariyana T. Spyropoulos
CIRCUIT CLERK
COOK COUNTY, IL
2025CH06932
Calendar, 7
33389797

## IN THE CIRCUIT COURT OF COOK COUNTY
## COUNTY DEPARTMENT, CHANCERY DIVISION

| | | |
|---|---|---|
| **ROBERT SCHUMANN**, individually and on behalf of others similarly situated, | ) ) ) ) | No. 2025CH06932 |
| Plaintiff, | ) ) ) | |
| v. | ) | CLASS ACTION COMPLAINT |
| **AMERICAN EXPRESS COMPANY**; and **AMERICAN EXPRESS NATIONAL BANK**, Successor by merger to American Express Bank, FSB, | ) ) ) ) ) | **JURY DEMAND** |
| Defendants. | ) | |

## COMPLAINT – CLASS ACTION

### INTRODUCTION

1.      This action arises from Defendant's unfair business practices in how it handles disputed charges and collection actions against cardholders.

### NATURE OF THE ACTION

2.      Plaintiff alleges that this conduct is in violation of the  Illinois Consumer Fraud and Deceptive Business Practices Act, codified at 815 ILCS 505/1 et seq.

3.      Upon information, this conduct is widespread and impacts many cardholders, including those who have been with the company as loyal customers for many years.

### JURISDICTION AND VENUE

4.      Personal jurisdiction in Cook County, Illinois is proper because this is where Plaintiff resides and where he entered into the credit card agreement with Defendant.

5.      Venue in this county is proper pursuant to 735 ILCS 5/2-101 because the Plaintiff resides here and the transactions at issue took place here.

FILED DATE: 7/1/2025 3:23 PM   2025CH06932

## PARTIES

6.      Plaintiff, Robert Schumann ("**Plaintiff**" or "**Robert**") is a natural person residing in Cook County, Illinois.

7.      Defendant, American Express Company ("**AmEx**") is a bank holding company and global financial services corporation based in New York, New York. AmEx, through its subsidiaries, sells and issues charge and credit payment card products, as well as wire transfer products. AmEx's subsidiaries include Defendant, American Express National Bank, Successor by merger to American Express Bank, FSB,  ("**AmEx Bank**"), a federally insured financial institution with its headquarters located in the state of Texas.

## FACTUAL BACKGROUND

8.      Robert was a loyal AmEx Bank customer for several decades.

9.      In or around 2018, Robert became aware of fraudulent activity in his account.

10.     Specifically, the Experian credit bureau was charging him for services it never provided and also sending duplicate invoices for bills that had already been paid.

11.     He notified AmEx Bank about this activity and disputed the charges by Experian.

12.     After several interactions with agents of AmEx Bank, Robert was told the charges were removed and that account was now closed. He was issued a new card with a new account number and believed everything had been taken care of.

13.     However, Experian continued attempting to collect these improper charges and eventually sent the account to collections.

14.     This activity caused AmEx Bank to create a new account number, placing these previously forgiven charges back onto an account associated with Robert.

FILED DATE: 7/1/2025 3:23 PM    2025CH06932

15.     Although AmEx Bank onboarded this as a new account, in reality it was actually reinstating an old balance that it had agreed to forgive and were now trying to collect once again from Plaintiff.

16.     In March 2020, AmEx Bank contacted Robert regarding an outstanding balance on the closed account ending in 72008. A true and correct copy of this correspondence is attached hereto as **Exhibit A.**

17.     In May 2020, AmEx Bank again sent correspondence about past due amounts for the newer account ending in 65004.  A true and correct copy of this correspondence is attached hereto as **Exhibit B.**

18.     It seemed to Robert that instead of removing the prior fraudulent charges as he had been told, AmEx Bank had simply moved them onto this new account and was now telling him that they must be paid.

19.     Robert disputed the amounts due and made it clear he did not believe he owed the amounts they were claiming.

20.     AmEx Bank acknowledged that they had received his dispute of the charges in January 2021. A true and correct copy of that correspondence is attached hereto as **Exhibit C.**

21.     AmEx Bank then acknowledged several times starting in February 2021 that the balance for account 01006 was also disputed.

22.     In June 2021, AmEx Bank sent Robert a letter stating they made an error in issuing monthly statements and calculating late fees. A true and correct copy of that correspondence is attached hereto as **Exhibit D.**

FILED DATE: 7/1/2025 3:23 PM   2025CH06932

23.     Again in June 2021, AmEx Bank sent Robert a past-due notice for the balance on the account ending 65004. A true and correct copy of that correspondence is attached hereto as **Exhibit E.**

24.     In September 2021, AmEx Bank mailed Robert about account 65004 and $2,603.54 being disputed. A true and correct copy of that correspondence is attached hereto as **Exhibit F.**

25.     In December 2021, AmEx Bank sent Robert a letter stating it had removed the disputed debt for 65004, but had then apparently decided to add it back to his account. No explanation or context was provided for this confusing decision. A true and correct copy of that correspondence is attached hereto as **Exhibit G.**

26.     After hearing nothing further for almost two years, Robert assumed this had been resolved. Then, in October 2023, he received a notice from a collections law firm stating AmEx Bank had referred his delinquent account to them for collections. A true and correct copy of this correspondence is attached hereto as **Exhibit H.**

27.     The next thing he received was in January 2024, when AmEx Bank sent a check to "make it right" A true and correct copy of this correspondence is attached hereto as **Exhibit I.**

28.     In April 2024, Citi denied Robert's credit card application. Among the reasons given was negative reporting about other credit obligations. This was the false reporting done by AmEx Bank in connection with the debt Robert had been disputing for years. A true and correct copy of the credit denial correspondence is attached hereto as **Exhibit J.**

29.     In July 2024, Bank of America told Robert it was closing his credit card account with them. This decision was based largely on negative credit reporting made against him by AmEx Bank in connection with this disputed debt. A true and correct copy of the credit denial correspondence is attached hereto as **Exhibit K.**

FILED DATE: 7/1/2025 3:23 PM   2025CH06832

30.     Also in July 2024, AmEx Bank filed a collection lawsuit against Robert, alleging that he owed a balance of $2,556.83. The Affidavit attached to the Complaint shows that the last 4 digits of the account number had allegedly changed from 1003 to 6002. A true and correct copy of the Complaint is attached hereto as **Exhibit L.**

### COUNT I: AMERICAN EXPRESS BANK'S ACTIONS CONSTITUTE AN UNFAIR AND DECEPTIVE BUSINESS PRACTICE AND ARE IN VIOLATION OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT (ICFA)

31.     The Plaintiff restates and realleges Paragraphs 1-30  above is if set forth fully herein.

### UNFAIR BUSINESS PRACTICE

32.     Robert alleges that AmEx Bank engaged in an unfair business practice by continuing to try and collect a sum from him that it knew or should have known was based on fraud or mistake and that it had previously treated as charged off.

33.     Robert has now spent years trying unsuccessfully to get this matter resolved with AmEx Bank and their agents. He has repeatedly explained the situation to them and sent reams of documentation to demonstrate the errors that occurred.

34.     Unfortunately, none of these efforts have been successful and he is still dealing with serious credit damage as well as a pending collection lawsuit.

35.     Robert alleges that AmEx Bank continuing to charge him for charges that he was not responsible for and that had previously been treated as forgiven, is unfair and in violation of the ICFA. He has suffered actual damages as a result of this misconduct.

36.     It is against Illinois public policy to let companies like AmEx Bank treat people in this manner.

FILED DATE: 7/1/2025 3:23 PM   2025CH06932

37.     AmEx Bank is in a position of power and strength over a consumer like Robert. There is an asymmetry of information and resources that greatly benefits the company when situations like this arise.

38.     They refuse to admit or acknowledge an error and use their position of power to make people feel like there is no choice but to pay a balance they know they do not rightfully owe.

## DECEPTIVE STATEMENTS AND CONDUCT BY AGENTS OF DEFENDANT

39.     As discussed above, Robert had reported fraudulent activity on one of his accounts. He was eventually told that those amounts had been written off and that he would not be responsible for paying charges that he was not actually responsible for.

40.     That appeared to be true for a time, but then AmEx Bank started collection activities all over again, refusing to acknowledge its prior decision to write these charges off and insisting that Robert owed this money.

41.     When Robert reached out to agents of AmEx Bank to correct this error, he was met with consistent obfuscation and outright misleading statements.

42.     In spite of his clear explanations about what happened and the mistakes that were being made, he was told over and over again, both by phone and through the mail, that he did in fact owe these charges.

43.     None of this was accurate and the agents he spoke with knew or the agents that authored the letters he was sent knew or should have known that.

44.     Instead of providing him with the accurate information and reasonable explanations he deserved, these agents attempted to turn things around and make him feel responsible for this situation.

FILED DATE: 7/1/2025 3:23 PM   2025CH06932

45. This was done with the intent that he rely on these false statements and eventually just agree to pay the fraudulent balance rather than keep trying to get the error corrected.

46. These acts took place in the course of commerce. Specifically, Defendant AmEx Bank is an entity who sought to collect an alleged credit card debt from an Illinois consumer.

## ECONOMIC DAMAGES

47. Robert has suffered economic damages as a direct and proximate result of these unfair and deceptive acts committed by Defendant AmEx Bank.

48. These damages include the improper amounts he was charged and any late fees or interest that may have accrued on the balance since this issue arose.

49. He also suffered serious credit damage as a result of this issue. AmEx Bank has reported this alleged debt to the credit bureaus and Robert has been denied credit on multiple occasions as a direct result. *See* **Exhibits J & K.**

50. Robert has spent a substantial of amount of time and money on preparing documents and sending them over and over again to AmEx Bank and their collection law firm. He has incurred costs for copying and postage trying unsuccessfully to resolve this erroneous collection activity.

51. He has also incurred legal fees for an attorney to investigate this issue and provide advice on the situation.

## EMOTIONAL IMPACT

52. In addition to the economic harms, Robert has also suffered emotional distress based on the violations.

FILED DATE: 7/1/2025 3:23 PM   2025CH06932

53.     Specifically, he has suffered aggravation, anger and anxiety as he has been forced to spend hours dealing with this wrongful collection activity.

54.     His first reaction to receiving collection notices for a debt he knew was previously resolved, was shock and disbelief.

55.     He became angrier and more frustrated as the agents he spoke with told him it was not an error on their end and they were going to keep the charges in place.

56.     This whole situation has made him feel trapped and helpless at times.

57.     He has been made to feel like AmEx Bank could overcharge his accounts at any time and he would have no recourse.

58.     Having his creditworthiness negatively impacted has brought on feelings of sadness. It has harmed his reputation and made him feel like he might not be able to support his family in the manner that he has been accustomed to.

59.     This pervasive anger and anxiety has also led to continued stress on his personal relationships.

**WHEREFORE**, the Plaintiff, Robert Schumann, requests that this Honorable Court:

A)  Find that Defendant American Express Bank is liable under the ICFA for all of the reasons stated above;

B)  Award all available remedies under the ICFA, including actual damages, punitive damages, equitable relief and attorney's fees;

C)  Grant any other further relief that this Honorable Court deems just and equitable.

## JURY DEMAND

**PLAINTIFF DEMANDS A TRIAL BY JURY**

FILED DATE: 7/1/2025 3:23 PM    2025CH06932

## COUNT II- DEFENDANT AMERICAN EXPRESS COMPANY IS LIABLE FOR THE ICFA VIOLATIONS OF ITS AGENT AMERICAN EXPRESS BANK THROUGH THE DOCTRINE OF RESPONDEAT SUPERIOR

60.     The Plaintiff restates and realleges Paragraphs 1-59 above is if set forth fully herein.

### *Respondeat Superior Liability*

61.     The acts and omissions by Defendant American Express Bank were committed specifically within the time and space limits of its agency relationship with their principal, Defendant American Express Company.

62.     The acts and omissions by AmEx Bank were incidental to, or of the same general nature as, the responsibilities they are authorized to engage in by their owner and principal, American Express Company.

63.     By committing these acts and omissions against the Plaintiff,  AmEx Bank was motivated to benefit its principal, American Express Company.

64.     American Express Company is therefore also liable to Plaintiff through the Doctrine of Respondeat Superior for the intentional and negligent acts, errors, and omissions done in violation of Illinois law by its agent AmEx Bank, in its improper attempts to collect this debt from Plaintiff.

**WHEREFORE**, the Plaintiff, Robert Schumann, requests that this Honorable Court:

A)      Find that Defendant American Express Company is liable under the ICFA for all of the reasons stated above;

B)      Award all available remedies under the ICFA, including actual damages, punitive damages, equitable relief and attorney's fees;

C)      Grant any other further relief that this Honorable Court deems just and equitable.

FILED DATE: 7/1/2025 3:23 PM   2025CH06932

## JURY DEMAND

## PLAINTIFF DEMANDS A TRIAL BY JURY

## CLASS ALLEGATIONS AGAINST DEFENDANTS

65.    Plaintiff Robert Schumann seeks to bring this claim on behalf of a class.

66.    The potential class consists of (a) all individuals since 2020 (b) that AmEx has improperly overcharged and pursued for charges that had previously been charged off or otherwise forgiven based on allegations of fraud or mistake by the original vendor.

67.    Plaintiff may alter the class definition to conform to developments in the case and discovery.

68.     On information and belief, based on the size of Defendant's business operations, there are more than 40 members of the class, and the class is so numerous that joinder of all members is not practicable.

69.    There are questions of law and fact common to the class members, which common questions predominate over any questions relating to individual class members. The predominant common questions are:

a. Whether Defendant AmEx Bank engages in the practices described;

b. Whether the practices described above violate the ICFA.

10

FILED DATE: 7/1/2025 3:23 PM   2025CH06932

70.     Plaintiff will fairly and adequately represent the class members. Plaintiff has retained counsel experienced in ICFA litigation. Plaintiff's claim is typical of the claims of the class members. All are based on the same factual and legal theories.

71.     A class action is appropriate for the fair and efficient adjudication of this matter,

in that:

a. Individual actions are not economically feasible.

b. Members of the class are likely to be unaware of their rights;

c. This action will fairly and adequately represent the rights of the class.

**WHEREFORE**, the Plaintiff, Robert Schumann requests that this Honorable Court:

   A)  Certify this as a class action claim to proceed against the Defendants;

   B)  Find that Defendants violated the ICFA for all of the reasons stated above;

   C)  Award Plaintiff and the class members all available remedies under the ICFA, including actual damages, punitive damages, equitable relief and reasonable attorney's fees;

   D)  Any other further relief that this Honorable Court deems just and equitable.

Respectfully submitted,

EV Häs, LLC

By: /s/Damon Ritenhouse
One of its Attorneys

EV Häs, LLC-(#56565)
Attorney for Plaintiff – Robert Schumann
11757 SW Highway
Palos Heights, IL 60463
Telephone:  312.775.0980
**dritenhouse@evlawgroup.com**

FILED DATE: 7/1/2025 2:23 PM   2025CH06936

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
**COUNTY DEPARTMENT - CHANCERY DIVISION**

FILED
7/1/2025 2:23 PM
Mariyana T. Spyropoulos
CIRCUIT CLERK
COOK COUNTY, IL
2025CH06936
Calendar, 63
33387483

FEDERAL HOME LOAN MORTGAGE
CORPORATION, AS TRUSTEE FOR THE
BENEFIT OF THE FREDDIE MAC
SEASONED CREDIT RISK TRANSFER
TRUST, SERIES 2024-2,

        PLAINTIFF,

        vs.

SHELTON L. O' LIDGE; LENA C. O' LIDGE;
ASHLEY O'LIDGE; SHELBEY O'LIDGE;
UNKNOWN OWNERS AND NON-RECORD
CLAIMANTS,

        DEFENDANTS,

NO. 2025CH06936

Address:    15330 Ever Street
               Dolton, Illinois 60419

## COMPLAINT TO FORECLOSE MORTGAGE

NOW COMES the Plaintiff, FEDERAL HOME LOAN MORTGAGE CORPORATION, AS
TRUSTEE FOR THE BENEFIT OF THE FREDDIE MAC SEASONED CREDIT RISK TRANSFER
TRUST, SERIES 2024-2, by and through its attorneys, Johnson, Blumberg & Associates, LLC, and
pursuant to 735 ILCS 5/15-1101 et seq., alleges the following cause of action for foreclosure:

1. Plaintiff files this Complaint to Foreclose the mortgage, trust deed or other conveyance in the nature
   of a mortgage (hereinafter called "mortgage") hereinafter described, and joins the following persons
   as defendant:

       -SHELTON L. O' LIDGE;

       -LENA C. O' LIDGE;

       -ASHLEY O'LIDGE;

       -SHELBEY O'LIDGE;

       -UNKNOWN OWNERS AND NON-RECORD CLAIMANTS

2. Attached as EXHIBIT 'A' is a copy of the mortgage.  Attached as EXHIBIT 'B' is a copy of the
   note secured thereby.  Attached as EXHIBIT 'C' are copies of the assignments of mortgage.

3. Information concerning said mortgage:

       (A)    Nature of the instrument: Mortgage

       (B)    Date of the Mortgage: December 8, 1998

       (C)    Name of Mortgagor(s): SHELTON L. O' LIDGE and LENA C. O' LIDGE

       (D)    Name of the mortgage: EAGLE MORTGAGE AND CONSULTANTS

FILED DATE: 7/1/2025 2:23 PM   2025CH06936

(E)     Date and Place of Recording: December 21, 1998, in the Office of the Recorder of Deeds of Cook County, Illinois

(F)     Identification of Recording: Document Number 08157353

(G)     Interest subject to the mortgage: Fee Simple.

(H)     Amount of original indebtedness, including subsequent advances made under the mortgage: $108,000.00

(I)     Both the legal description of the mortgaged real estate and the common address or other information sufficient to identify it with reasonable certainty:

**LEGAL DESCRIPTION:**

LOT 31 IN BLOCK 9 IN CALUMET CENTER GARDENS FIRST ADDITION, SECTION 10, TOWNSHIP 36 NORTH, RANGE 14, EAST OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS.

**COMMON ADDRESS:**

15330 EVER STREET, DOLTON, ILLINOIS 60419

**P.I.N.:**

29-10-424-021-0000

(J)     Statement as to defaults: Mortgagor(s) have not paid the monthly installments of principal, interest, taxes and/or insurance for January 2025 through the present; the principal balance due on the note and the mortgage is $133,488.41, plus interest, costs, advances and fees.  Interest accrues at a per diem rate of $9.41.

(K)     Name of present owner(s) of the real estate: LENA C. O' LIDGE

(L)     Names of Other Persons who are joined as defendants and whose interest in or lien on the mortgaged real estate is sought to be terminated:

ASHLEY O'LIDGE by reason of having a possible interest in the mortgaged real estate pursuant to a Transfer on Death Instrument recorded on June 27, 2018, as Document Number 1817819029 with the Cook County Recorder of Deeds.

SHELBEY O'LIDGE by reason of having a possible interest in the mortgaged real estate pursuant to a Transfer on Death Instrument recorded on June 27, 2018, as Document Number 1817819029 with the Cook County Recorder of Deeds.

Plaintiff avers that in addition to the persons designated by name as Defendants herein, there are other unknown persons who are interested in this action and who have or claim some right, title, interest or lien in, to or upon the real estate, or some part thereof, in this Complaint described and that the name of each of such persons is unknown to Plaintiff and on diligent inquiry cannot be ascertained, and all such persons are therefore made party defendants to this action by the name and description of UNKNOWN OWNERS.

FILED DATE: 7/1/2025 2:23 PM   2025CH06936

Plaintiff further avers that in addition to persons designated by name as Defendants herein, there are other persons who are interested in this action and who have or claim some right, title, interest or lien in, to or upon the real estate, or some part thereof, in this Complaint described, and pursuant to 735 ILCS 5/15-1210, is not disclosed of record and falls in any of the following categories: (1) right of homestead, (2) judgment creditor, (3) beneficial interest under any trust in actual possession of all or part of the real estate or (4) mechanics' lien claim.  That the name of each of such persons is unknown to Plaintiff and on diligent inquiry cannot be ascertained, and all such persons are therefore made party defendants to this action by the name and description of NONRECORD CLAIMANTS.

(M)     Names of defendants that are personally liable for a deficiency, if any, unless said personal liability has been discharged in a U.S. Bankruptcy Court proceeding or has been otherwise released: SHELTON L. O' LIDGE

(N)     Capacity in which Plaintiff brings this foreclosure:

Plaintiff is the legal holder of the note, mortgage and indebtedness.  Plaintiff has designated NewRez LLC, F/K/A New Penn Financial, LLC d/b/a Shellpoint Mortgage Servicing (Shellpoint"), as servicer for the Plaintiff, pursuant to a Limited Power of Attorney.

(O)     Facts in support of a redemption period shorter than the longer of (i) 7 months from the date of the mortgagor or, if more than one, all the mortgagors (I) have been served with summons or by publication or (II) have otherwise submitted to the jurisdiction of the court, or (ii) 3 months from the entry of the judgment of foreclosure, whichever is later, if sought:

At the time of the filing of this complaint, Plaintiff does not offer facts in support of a shortened redemption period.  However, during the pendency of this foreclosure action, Plaintiff may petition the court to shorten the redemption period if facts arise supporting such a finding pursuant to 735 ILCS 5/15-1603.

(P)     Statement that the right of redemption has been waived by all owners of redemption, if applicable:

The owners of redemption have not waived their right of redemption at the time of the filing of this complaint.

(Q)     Facts in support of request for attorneys' fees and of costs and expenses, if applicable:

The terms of the subject note and mortgage provide for payment of attorneys' fees, court costs, and expenses in the event of default by the mortgagor(s).  Plaintiff has been compelled to retain counsel for the prosecution of this foreclosure action and to incur substantial attorneys' fees, court costs, title insurance and other expenses which Plaintiff is entitled to recover.

(R)     Facts in support of a request for appointment of mortgagee in possession or for appointment of a receiver, and identity of such receiver, if sought:

FILED DATE: 7/1/2025 2:23 PM   2025CH06936

At the time of the filing of this complaint, Plaintiff does not seek to appoint a mortgagee in possession and/or a receiver.  However, after the filing of this complaint, Plaintiff may request said relief by separate petition, if such relief is sought.

(S)     Offer to the mortgagor in accordance with Section 15-1402 to accept title to the real estate in satisfaction of all indebtedness and obligations secured by the mortgage without judicial sale, if sought:

No allegation of an offer is made at the time of the filing of this complaint.  However, Plaintiff alleges that it is not precluded from making or accepting such an offer by filing this complaint.

(T)     Name or names of defendants whose rights to possess the mortgaged real estate, after the confirmation of a foreclosure sale, are sought to be terminated and, if not elsewhere stated, the facts in support thereof: SHELTON L. O' LIDGE AND LENA C. O' LIDGE AND ASHLEY O'LIDGE AND SHELBEY O'LIDGE

## REQUEST FOR RELIEF

**WHEREFORE, PLAINTIFF REQUESTS THE FOLLOWING:**

i. A judgment of foreclosure and sale.

ii. A sale by any means allowed by statute and ordered by the Court.

iii. An order granting a shortened redemption period, if sought.

iv. A personal judgment for a deficiency, if sought and authorized by law.

v. An order granting possession, if sought.

vi. An order placing the mortgagee in possession or appointing a receiver, if sought.

vii. A judgment for attorneys' fees, costs and expenses, if sought.

viii. Such other and further relief as the Court deems just.

FILED DATE: 7/1/2025 2:23 PM   2025CH06936

Respectfully submitted,

Federal Home Loan Mortgage Corporation, as Trustee for the
benefit of the Freddie Mac Seasoned Credit Risk Transfer Trust,
Series 2024-2

By:   /S/Joseph M. Herbas
      Joseph M. Herbas IL ARDC #6277645
      Johnson, Blumberg & Associates, LLC
      Its Attorney

Johnson, Blumberg & Associates, LLC
30 N. LaSalle St., Suite 3650
Chicago, Illinois 60602
Email: ilpleadings@johnsonblumberg.com
Ph. 312-541-9710 / Fax 312-541-9711
JB&A # IL 25 1444
Cook County No.: 40342

FILED DATE: 7/1/2025 2:23 PM   2025CH06936

# EXHIBIT A

FILED DATE: 7/1/2025 2:23 PM    2025CH06936

RECORD AND RETURN TO:
EAGLE MORTGAGE AND CONSULTANTS

1955 BERNICE ROAD-SUITE 2
LANSING, ILLINOIS  60438

08157353

8544/0054 48 001 Page 1 of    6
1998-12-21 10:28:56
Cook County Recorder        31.50

Prepared by:
BARBARA A. SMITH
LANSING, IL  60438

# MORTGAGE

THIS MORTGAGE ("Security Instrument") is given on   DECEMBER  8, 1998          . The mortgagor is
SHELTON L. O'LIDGE
AND LENA C. O'LIDGE, HUSBAND AND WIFE

("Borrower"). This Security Instrument is given to
EAGLE MORTGAGE AND CONSULTANTS
                                                                    ,
which is organized and existing under the laws of  THE STATE OF ILLINOIS          , and whose
address is 1955 BERNICE ROAD-SUITE 2
LANSING, ILLINOIS  60438                      ("Lender"). Borrower owes Lender the principal sum of
ONE HUNDRED EIGHT THOUSAND AND 00/100
                                        Dollars (U.S. $   108,000.00     ).
This debt is evidenced by Borrower's note dated the same date as this Security Instrument ("Note"), which provides for
monthly payments, with the full debt, if not paid earlier, due and payable on  JANUARY  1, 2029              .
This Security Instrument secures to Lender: (a) the repayment of the debt evidenced by the Note, with interest, and all renewals,
extensions and modifications of the Note; (b) the payment of all other sums, with interest, advanced under paragraph 7 to
protect the security of this Security Instrument; and (c) the performance of Borrower's covenants and agreements under this
Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to Lender the following
described property located in   COOK                                          County, Illinois:
LOT 31 IN BLOCK 9 IN CALUMET CENTER GARDENS FIRST ADDITION SECTION 10,
TOWNSHIP 36 NORTH, RANGE 14 EAST OF THE THIRD PRINCIPAL MERIDIAN IN
COOK COUNTY, ILLINOIS.

Lawyers Title Insurance Corporation

Parcel ID #: 29-10-424-021
which has the address of   15330 EVER , DOLTON                              Street, City ,
Illinois      60419                    Zip Code    ("Property Address");
ILLINOIS-Single Family-FNMA/FHLMC UNIFORM
  Initials:                INSTRUMENT Form 3014  9/90
                                   Amended 8/96
  -6R(IL) (9608)
Page 1 of 6              VMP MORTGAGE FORMS - (800)521-7291                              DPS 1089

FILED DATE: 7/1/2025 2:23 PM   2025CH06936

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal and Interest; Prepayment and Late Charges.** Borrower shall promptly pay when due the principal of and interest on the debt evidenced by the Note and any prepayment and late charges due under the Note.

**2. Funds for Taxes and Insurance.** Subject to applicable law or to a written waiver by Lender, Borrower shall pay to Lender on the day monthly payments are due under the Note, until the Note is paid in full, a sum ("Funds") for: (a) yearly taxes and assessments which may attain priority over this Security Instrument as a lien on the Property; (b) yearly leasehold payments or ground rents on the Property, if any; (c) yearly hazard or property insurance premiums; (d) yearly flood insurance premiums, if any; (e) yearly mortgage insurance premiums, if any; and (f) any sums payable by Borrower to Lender, in accordance with the provisions of paragraph 8, in lieu of the payment of mortgage insurance premiums. These items are called "Escrow Items." Lender may, at any time, collect and hold Funds in an amount not to exceed the maximum amount a lender for a federally related mortgage loan may require for Borrower's escrow account under the federal Real Estate Settlement Procedures Act of 1974 as amended from time to time, 12 U.S.C. Section 2601 *et seq.* ("RESPA"), unless another law that applies to the Funds sets a lesser amount. If so, Lender may, at any time, collect and hold Funds in an amount not to exceed the lesser amount. Lender may estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with applicable law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is such an institution) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items. Lender may not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and applicable law permits Lender to make such a charge. However, Lender may require Borrower to pay a one-time charge for an independent real estate tax reporting service used by Lender in connection with this loan, unless applicable law provides otherwise. Unless an agreement is made or applicable law requires interest to be paid, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender may agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds, showing credits and debits to the Funds and the purpose for which each debit to the Funds was made. The Funds are pledged as additional security for all sums secured by this Security Instrument.

If the Funds held by Lender exceed the amounts permitted to be held by applicable law, Lender shall account to Borrower for the excess Funds in accordance with the requirements of applicable law. If the amount of the Funds held by Lender at any time is not sufficient to pay the Escrow Items when due, Lender may so notify Borrower in writing, and, in such case Borrower shall pay to Lender the amount necessary to make up the deficiency. Borrower shall make up the deficiency in no more than twelve monthly payments, at Lender's sole discretion.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender. If, under paragraph 21, Lender shall acquire or sell the Property, Lender, prior to the acquisition or sale of the Property, shall apply any Funds held by Lender at the time of acquisition or sale as a credit against the sums secured by this Security Instrument.

**3. Application of Payments.** Unless applicable law provides otherwise, all payments received by Lender under paragraphs 1 and 2 shall be applied: first, to any prepayment charges due under the Note; second, to amounts payable under paragraph 2; third, to interest due; fourth, to principal due; and last, to any late charges due under the Note.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines and impositions attributable to the Property which may attain priority over this Security Instrument, and leasehold payments or ground rents, if any. Borrower shall pay these obligations in the manner provided in paragraph 2, or if not paid in that manner, Borrower shall pay them on time directly to the person owed payment. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this paragraph. If Borrower makes these payments directly, Borrower shall promptly furnish to Lender receipts evidencing the payments.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender; (b) contests in good faith the lien by, or defends against enforcement of the lien in, legal proceedings which in the Lender's opinion operate to prevent the enforcement of the lien; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which may attain priority over

08157353

FILED DATE: 7/1/2025 2:23 PM   2025CH06936

obtain coverage substantially equivalent to the mortgage insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the mortgage insurance previously in effect, from an alternate mortgage insurer approved by Lender. If substantially equivalent mortgage insurance coverage is not available, Borrower shall pay to Lender each month a sum equal to one-twelfth of the yearly mortgage insurance premium being paid by Borrower when the insurance coverage lapsed or ceased to be in effect. Lender will accept, use and retain these payments as a loss reserve in lieu of mortgage insurance. Loss reserve payments may no longer be required, at the option of Lender, if mortgage insurance coverage (in the amount and for the period that Lender requires) provided by an insurer approved by Lender again becomes available and is obtained. Borrower shall pay the premiums required to maintain mortgage insurance in effect, or to provide a loss reserve, until the requirement for mortgage insurance ends in accordance with any written agreement between Borrower and Lender or applicable law.

**9. Inspection.** Lender or its agent may make reasonable entries upon and inspections of the Property. Lender shall give Borrower notice at the time of or prior to an inspection specifying reasonable cause for the inspection.

**10. Condemnation.** The proceeds of any award or claim for damages, direct or consequential, in connection with any condemnation or other taking of any part of the Property, or for conveyance in lieu of condemnation, are hereby assigned and shall be paid to Lender.

In the event of a total taking of the Property, the proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with any excess paid to Borrower. In the event of a partial taking of the Property in which the fair market value of the Property immediately before the taking is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the taking, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the taking, divided by (b) the fair market value of the Property immediately before the taking. Any balance shall be paid to Borrower. In the event of a partial taking of the Property in which the fair market value of the Property immediately before the taking is less than the amount of the sums secured immediately before the taking, unless Borrower and Lender otherwise agree in writing or unless applicable law otherwise provides, the proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the condemnor offers to make an award or settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the proceeds, at its option, either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due.

Unless Lender and Borrower otherwise agree in writing, any application of proceeds to principal shall not extend or postpone the due date of the monthly payments referred to in paragraphs 1 and 2 or change the amount of such payments.

**11. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to any successor in interest of Borrower shall not operate to release the liability of the original Borrower or Borrower's successors in interest. Lender shall not be required to commence proceedings against any successor in interest or refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or Borrower's successors in interest. Any forbearance by Lender in exercising any right or remedy shall not be a waiver of or preclude the exercise of any right or remedy.

**12. Successors and Assigns Bound; Joint and Several Liability; Co-signers.** The covenants and agreements of this Security Instrument shall bind and benefit the successors and assigns of Lender and Borrower, subject to the provisions of paragraph 17. Borrower's covenants and agreements shall be joint and several. Any Borrower who co-signs this Security Instrument but does not execute the Note: (a) is co-signing this Security Instrument only to mortgage, grant and convey that Borrower's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower may agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without that Borrower's consent.

**13. Loan Charges.** If the loan secured by this Security Instrument is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge under the Note.

**14. Notices.** Any notice to Borrower provided for in this Security Instrument shall be given by delivering it or by mailing it by first class mail unless applicable law requires use of another method. The notice shall be directed to the Property Address or any other address Borrower designates by notice to Lender. Any notice to Lender shall be given by first class mail to

Initials: _____

DPS 1092

08157353

this Security Instrument, Lender may give Borrower a notice identifying the lien. Borrower shall satisfy the lien or take one or more of the actions set forth above within 10 days of the giving of notice.

**5. Hazard or Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage" and any other hazards, including floods or flooding, for which Lender requires insurance. This insurance shall be maintained in the amounts and for the periods that Lender requires. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's approval which shall not be unreasonably withheld. If Borrower fails to maintain coverage described above, Lender may, at Lender's option, obtain coverage to protect Lender's rights in the Property in accordance with paragraph 7.

All insurance policies and renewals shall be acceptable to Lender and shall include a standard mortgage clause. Lender shall have the right to hold the policies and renewals. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower.

Unless Lender and Borrower otherwise agree in writing, insurance proceeds shall be applied to restoration or repair of the Property damaged, if the restoration or repair is economically feasible and Lender's security is not lessened. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with any excess paid to Borrower. If Borrower abandons the Property, or does not answer within 30 days a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may collect the insurance proceeds. Lender may use the proceeds to repair or restore the Property or to pay sums secured by this Security Instrument, whether or not then due. The 30-day period will begin when the notice is given.

Unless Lender and Borrower otherwise agree in writing, any application of proceeds to principal shall not extend or postpone the due date of the monthly payments referred to in paragraphs 1 and 2 or change the amount of the payments. If under paragraph 21 the Property is acquired by Lender, Borrower's right to any insurance policies and proceeds resulting from damage to the Property prior to the acquisition shall pass to Lender to the extent of the sums secured by this Security Instrument immediately prior to the acquisition.

**6. Occupancy, Preservation, Maintenance and Protection of the Property; Borrower's Loan Application; Leaseholds.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within sixty days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control. Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate, or commit waste on the Property. Borrower shall be in default if any forfeiture action or proceeding, whether civil or criminal, is begun that in Lender's good faith judgment could result in forfeiture of the Property or otherwise materially impair the lien created by this Security Instrument or Lender's security interest. Borrower may cure such a default and reinstate, as provided in paragraph 18, by causing the action or proceeding to be dismissed with a ruling that, in Lender's good faith determination, precludes forfeiture of the Borrower's interest in the Property or other material impairment of the lien created by this Security Instrument or Lender's security interest. Borrower shall also be in default if Borrower, during the loan application process, gave materially false or inaccurate information or statements to Lender (or failed to provide Lender with any material information) in connection with the loan evidenced by the Note, including, but not limited to, representations concerning Borrower's occupancy of the Property as a principal residence. If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**7. Protection of Lender's Rights in the Property.** If Borrower fails to perform the covenants and agreements contained in this Security Instrument, or there is a legal proceeding that may significantly affect Lender's rights in the Property (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture or to enforce laws or regulations), then Lender may do and pay for whatever is necessary to protect the value of the Property and Lender's rights in the Property. Lender's actions may include paying any sums secured by a lien which has priority over this Security Instrument, appearing in court, paying reasonable attorneys' fees and entering on the Property to make repairs. Although Lender may take action under this paragraph 7, Lender does not have to do so.

Any amounts disbursed by Lender under this paragraph 7 shall become additional debt of Borrower secured by this Security Instrument. Unless Borrower and Lender agree to other terms of payment, these amounts shall bear interest from the date of disbursement at the Note rate and shall be payable, with interest, upon notice from Lender to Borrower requesting payment.

**8. Mortgage Insurance.** If Lender required mortgage insurance as a condition of making the loan secured by this Security Instrument, Borrower shall pay the premiums required to maintain the mortgage insurance in effect. If, for any reason, the mortgage insurance coverage required by Lender lapses or ceases to be in effect, Borrower shall pay the premiums required to

FILED DATE: 7/1/2025 2:23 PM   2025CH06936

FILED DATE: 7/1/2025 2:23 PM   2025CH06936

Lender's address stated herein or any other address Lender designates by notice to Borrower. Any notice provided for in this Security Instrument shall be deemed to have been given to Borrower or Lender when given as provided in this paragraph.

**15. Governing Law; Severability.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. In the event that any provision or clause of this Security Instrument or the Note conflicts with applicable law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision. To this end the provisions of this Security Instrument and the Note are declared to be severable.

**16. Borrower's Copy.** Borrower shall be given one conformed copy of the Note and of this Security Instrument.

**17. Transfer of the Property or a Beneficial Interest in Borrower.** If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of this Security Instrument.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**18. Borrower's Right to Reinstate.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earlier of: (a) 5 days (or such other period as applicable law may specify for reinstatement) before sale of the Property pursuant to any power of sale contained in this Security Instrument; or (b) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees; and (d) takes such action as Lender may reasonably require to assure that the lien of this Security Instrument, Lender's rights in the Property and Borrower's obligation to pay the sums secured by this Security Instrument shall continue unchanged. Upon reinstatement by Borrower, this Security Instrument and the obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under paragraph 17.

**19. Sale of Note; Change of Loan Servicer.** The Note or a partial interest in the Note (together with this Security Instrument) may be sold one or more times without prior notice to Borrower. A sale may result in a change in the entity (known as the "Loan Servicer") that collects monthly payments due under the Note and this Security Instrument. There also may be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change in accordance with paragraph 14 above and applicable law. The notice will state the name and address of the new Loan Servicer and the address to which payments should be made. The notice will also contain any other information required by applicable law.

**20. Hazardous Substances.** Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property that is in violation of any Environmental Law. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property.

Borrower shall promptly give Lender written notice of any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge. If Borrower learns, or is notified by any governmental or regulatory authority, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law.

As used in this paragraph 20, "Hazardous Substances" are those substances defined as toxic or hazardous substances by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials. As used in this paragraph 20, "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**21. Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under paragraph 17 unless

Initials: _____



08157053

FILED DATE: 7/1/2025 2:23 PM   2025CH06936

applicable law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure. If the default is not cured on or before the date specified in the notice, Lender, at its option, may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this paragraph 21, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

**22. Release.** Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument without charge to Borrower. Borrower shall pay any recordation costs.

**23. Waiver of Homestead.** Borrower waives all right of homestead exemption in the Property.

**24. Riders to this Security Instrument.** If one or more riders are executed by Borrower and recorded together with this Security Instrument, the covenants and agreements of each such rider shall be incorporated into and shall amend and supplement the covenants and agreements of this Security Instrument as if the rider(s) were a part of this Security Instrument. [Check applicable box(es)]

| | | |
|---|---|---|
| ☐ Adjustable Rate Rider | ☐ Condominium Rider | ☐ 1-4 Family Rider |
| ☐ Graduated Payment Rider | ☐ Planned Unit Development Rider | ☐ Biweekly Payment Rider |
| ☐ Balloon Rider | ☐ Rate Improvement Rider | ☐ Second Home Rider |
| ☐ VA Rider | ☐ Other(s) [specify] | |

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any rider(s) executed by Borrower and recorded with it.
Witnesses:

_____

_____                    _____ (Seal)
SHELTON L. O'LIDGE                                              —Borrower

_____                    _____ (Seal)
LENA C. O'LIDGE                                                  —Borrower

_____ (Seal)                _____ (Seal)
—Borrower                                                        —Borrower

STATE OF ILLINOIS,        COOK                              County ss:
   I,   THE UNDERSIGNED                    , a Notary Public in and for said county and state do hereby certify
that
SHELTON L. O'LIDGE AND LENA C. O'LIDGE, HUSBAND AND WIFE

, personally known to me to be the same person(s) whose name(s)
subscribed to the foregoing instrument, appeared before me this day in person, and acknowledged that    THEY
signed and delivered the said instrument as        THEIR      free and voluntary act, for the uses and purposes therein set forth.
   Given under my hand and official seal, this        8        day of  XRDEC1998

My Commission Expires: _____

_____
Notary Public

OFFICIAL SEAL
CONTESSA GREEN
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES:08/12/01

FILED DATE: 7/1/2025 2:23 PM   2025CH06936

# EXHIBIT B

# NOTE

LOAN NO.:

DECEMBER 8, 1998        DOLTON        ILLINOIS
                            *(City)*           *(State)*

     15330 EVER, DOLTON, ILLINOIS   60419
                     *(Property Address)*

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $ 108,000.00 (this amount is called "principal"), plus interest, to the order of the Lender. The Lender is
EAGLE MORTGAGE AND CONSULTANTS

                                           I understand
that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder".

## 2. INTEREST

Interest will be charged on unpaid principal until the full amount of principal has been paid. I will pay interest at a yearly rate of   6.5000   %.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 6(B) of this Note.

## 3. PAYMENTS

### (A) Time and place of Payments

I will pay principal and interest by making payments every month.

I will make my monthly payments on the 1ST day of each month beginning on FEBRUARY 1, 1999. I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. My monthly payments will be applied to interest before principal. If, on JANUARY 1, 2029, I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "maturity date".

I will make my monthly payments at 1955 BERNICE ROAD-SUITE 2
LANSING, ILLINOIS 60438          or at a different place if required by the Note Holder.

### (B) Amount of monthly Payments

My monthly payment will be in the amount of U.S. $   682.63.

## 4. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of principal at any time before they are due. A payment of principal only is known as a "prepayment". When I make a prepayment, I will tell the Note Holder in writing that I am doing so.

I may make a full prepayment or partial prepayments without paying any prepayment charge. The Note Holder will use all of my prepayments to reduce the amount of principal that I owe under this Note. If I make a partial prepayment, there will be no changes in the due date or in the amount of my monthly payment unless the Note Holder agrees in writing to those changes.

## 5. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (i) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (ii) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the principal I owe under this Note or by making a direct payment to me. If a refund reduces principal, the reduction will be treated as a partial prepayment.

## 6. BORROWER'S FAILURE TO PAY AS REQUIRED

### (A) Late Charge for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of   15   calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be   5.0000 % of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

### (B) Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

### (C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is delivered or mailed to me.

### (D) No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

### (E) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

## 7. GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

MULTISTATE FIXED RATE NOTE - Single Family - FNMA/FHLMC UNIFORM INSTRUMENT      Form 3200 12/83
                                                          Amended 5/91
MB-750 REV. 5/86   2750   Previous Editions Obsolete

**8. OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

**9. WAIVERS**

I and any other person who has obligations under this note waive the rights of presentment and notice of dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

**10. UNIFORM SECURED NOTE**

This note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person), without Lender's prior written consent, Lender may, at its option require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of this Security Instrument.

If lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.**

_Shelton L. O'Lidge_ (Seal) - Borrower
SHELTON L. O'LIDGE
SSN:

_Lena C. O'Lidge_ (Seal) - Borrower
LENA C. O'LIDGE
SSN:

_____ (Seal) - Borrower
SSN:

_____ (Seal) - Borrower
SSN:

WITHOUT RECOURSE PAY TO
THE ORDER OF:

CHASE MANHATTAN
MORTGAGE CORPORATION
BY: _Belinda Clark_
TITLE: BELINDA CLARK
Assistant Secretary

*(Sign Original Only)*

Pay to the order of FLAGSTAR BANK, FSB
without recourse
This 14TH day of DECEMBER, 1998.
EAGLE MORTGAGE AND CONSULTANTS

By: _____

PAY TO THE ORDER OF
FLAGSTAR BANK, FSB
_Eagle Mortgage & Consultants, Inc._
AS FLAGSTAR BANK, FSB IT'S ATTORNEY IN FACT
L/P/A DATED 2-27-98
BY:
Chuck Schatzley
Assistant Vice President

PAY TO THE ORDER OF
CHASE MANHATTAN MORTGAGE CORPORATION

Rev. 11/07/95

FILED DATE: 7/1/2025 2:23 PM   2025CH06936

# EXHIBIT C

FILED DATE: 7/1/2025 2:23 PM  2025CH06936

Prepared By:

BARBARA A. SMITH
1955 BERNICE ROAD-SUITE 2
LANSING, ILLINOIS 60438

**99047335**

9054/0021 10 001 Page 1 of    3
**1999-01-15 09:54:16**
Cook County Recorder         25.50

99047335

and When Recorded Mail To

EAGLE MORTGAGE AND CONSULTANTS
1955 BERNICE ROAD-SUITE 2
LANSING
ILLINOIS 60438

SPACE ABOVE THIS LINE FOR RECORDER'S USE

# Corporation Assignment of Real Estate Mortgage

LOAN NO.:

FOR VALUE RECEIVED the undersigned hereby grants, assigns and transfers to

**FLAGSTAR BANK, FSB**
**2600 TELEGRAPH ROAD-SUITE 100**
**BLOOMFIELD HILLS, MICHIGAN  48302-0953**

all the rights, title and interest of undersigned in and to that certain Real Estate Mortgage dated     **DECEMBER  8, 1998**
executed by  **SHELTON L. O'LIDGE AND**
**LENA C. O'LIDGE, HUSBAND AND WIFE**
to  **EAGLE MORTGAGE AND CONSULTANTS**
a corporation organized under the laws of     **THE STATE OF ILLINOIS**
and whose principal place of business is    **1955 BERNICE ROAD-SUITE 2**                  *08157353*
**LANSING, ILLINOIS  60438**
and recorded in Book/Volume No.                      , page(s)                              , as Document
No. 08157353 **COOK**              County   Records,   State   of       **ILLINOIS**          described
hereinafter as follows:              **(See Reverse for Legal Description)**
Commonly known as **15330 EVER, DOLTON, ILLINOIS  60419**

TOGETHER with the note or notes therein described or referred to, the money due and to become due thereon with interest,
and all rights accrued or to accrue under said Real Estate Mortgage.

STATE OF  **ILLINOIS**              **EAGLE MORTGAGE AND CONSULTANTS**
COUNTY OF

On  **DECEMBER 14, 1998**            before
         (Date of Execution)
me, the undersigned a Notary Public in and for said     By: *President  Von Johnson*
County and State, personally appeared             Its:

known to me to be the
and
known to me to be                            By:
of  the  corporation  herein  which  executed  the  within     Its:
instrument, that the seal affixed to said instrument is the
corporate seal of said corporation:  that said instrument     Witness:
was  signed  and  sealed  on  behalf  of  said  corporation
pursuant to its by-laws or a resolution of its Board of
Directors and that he/she acknowledges said instrument to
be the free act and deed of said corporation.               "OFFICIAL SEAL"
Notary Public  *James Johnson*   *Cook*                JAMES JOHNSON
                                    County,          Notary Public, State of Illinois
My Commission Expires                                 My Commission Expires  (NOTARIAL SEAL)

                                                      Rev. 8/21/95        DPS 171

FILED DATE: 7/1/2025 2:23 PM   2025CH06936



99047335

## RIDER - LEGAL DESCRIPTION

LOT 31 IN BLOCK 9 IN CALUMET CENTER GARDENS FIRST ADDITION SECTION 10,
TOWNSHIP 36 NORTH, RANGE 14 EAST OF THE THIRD PRINCIPAL MERIDIAN IN
COOK COUNTY, ILLINOIS.

Rev. 05/05/97   DPS 049

.WYERS TITLE INSURANCE CORPORATION

SCHEDULE A CONTINUED - CASE NO. ███████

GAL DESCRIPTION:
T 31 IN BLOCK 9 IN CALUMET CENTER GARDENS FIRST ADDITION SECTION 10, TOWNSHIP 36 NORTH,
NGE 14 EAST OF THE THIRD PRINCIPAL MERIDIAN IN COOK COUNTY, ILLINOIS.

P.I.N.    29-10-424-021

99047335

SCHEDULE A - PAGE 2



FILED DATE: 7/1/2025 2:23 PM  2025CH06936

# ILLINOIS

COUNTY OF *COOK (A)*
POOL NO.
LOAN NO. █████████████



8554/0053 55 001 Page 1 of   2
**2001-10-25 09:41:05**
Cook County Recorder        23.50

0010997812

████████████

*Assignment-Interv.-Recorded*

PREPARED BY SECURITY
CONNECTIONS, INC.
WHEN RECORDED MAIL TO:
*Security Connections, Inc.*
*620 S. Woodruff Ave.*
*Idaho Falls, ID 83401*

## CORPORATION ASSIGNMENT OF REAL ESTATE MORTGAGE

FOR VALUE RECEIVED, *FLAGSTAR BANK, FSB A FEDERALLY CHARTERED SAVINGS BANK, A MICHIGAN CORPORATION*

located at *2600 TELEGRAPH ROAD, BLOOMFIELD HILLS, MI  48302*
hereby grants, assigns, and transfers to *CHASE MANHATTAN MORTGAGE CORPORATION, A NEW JERSEY CORPORATION*

located at *1500 NORTH 19TH STREET, MONROE, LA  71201*
all the rights, title and interest of undersigned in and to that certain
Real Estate Mortgage dated *DECEMBER 8, 1998* , executed by   *SHELTON L.*
*O'LIDGE AND LENA C. O'LIDGE, HUSBAND AND WIFE*

to *EAGLE MORTGAGE AND CONSULTANTS*

and recorded on *DECEMBER 21, 1998*    , in liber/cabinet      at page(s)/
drawer _____ document/instrument no. *08157353* _____ microfilm
number _____ pin number *29-10-424-021* _____
*in the* _____ plat of *COOK* _____ County
Illinois described hereinafter as follows:
*LOT 31 IN BLOCK 9 IN CALUMET CENTER GARDENS FIRST ADDITION SECTION 10, TOWNSHIP 36 NORTH,*
*RANGE 14 EAST OF THE THIRD PRINCIPAL MERIDIAN IN COOK COUNTY, ILLINOIS.*

**Property Address:**  *15330 EVER  DOLTON, IL 60419*

██████████████
Loan No.
*J=*███████

001099781Z Page 2 of 2

Loan No. ▮▮▮▮▮▮▮

FILED DATE: 7/1/2025 2:23 PM  2025CH06936

Together with the note or notes therein described or referred to, the money due and to become due thereon with interest, and all rights accrued or to accrue under said Real Estate Mortgage.

Dated *OCTOBER 1, 2001*_____, but effective *JULY 16, 1999*_____.

FLAGSTAR BANK, FSB A FEDERALLY CHARTERED SAVINGS BANK FORMERLY KNOWN AS FIRST SECURITY SAVINGS BANK, FSB A FEDERAL *CHARTERED SAVINGS BANK*

BY _____

M.L. MARCUM
*VICE PRESIDENT*

BY _____

DIANA ANDERSON
*SECRETARY*

STATE OF *IDAHO*_____ )

COUNTY OF *BINGHAM*_____ )

On *OCTOBER 1, 2001*_____, before me *JOAN COOK*_____ personally appeared *M.L. MARCUM*_____ and *DIANA ANDERSON*_____ personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) who executed the within instrument as _____ *VICE PRESIDENT*_____ and *SECRETARY*_____ and acknowledged to me the corporation executed it.

_____

*JOAN COOK (COMMISSION EXP. 02-16-07)*
Notary public

JOAN COOK
NOTARY PUBLIC
STATE OF IDAHO

*PREPARED BY:*

*KARLEEN MAUGHAN*
*520 SOUTH WOODRUFF AVE*
*IDAHO FALLS, ID  83401*

P= ▮▮▮▮▮▮        J= ▮▮▮▮▮▮▮▮▮
C= ▮▮▮▮▮▮
(NMRI.IL)                    Page 2 of 2

FILED DATE: 7/1/2025 2:23 PM   2025CH06936

Doc#. 1628528026 Fee: $50.00
Karen A.Yarbrough
Cook County Recorder of Deeds
Date: 10/11/2016 10:31 AM Pg: 1 of 2

After recording please mail to:
PEIRSONPATTERSON, LLP
ATTN: RECORDING DEPT.
13750 OMEGA ROAD
DALLAS, TX 75244-4505

This instrument was prepared by:
PEIRSONPATTERSON, LLP
13750 OMEGA ROAD
DALLAS, TX 75244-4505

Permanent Index Number: 29-10-424-021-0000

————————————[Space Above This Line For Recording Data]————————————

Loan No.: ▮

# ILLINOIS ASSIGNMENT OF MORTGAGE

For Value Received, **JPMorgan Chase Bank, N.A., S/B/M Chase Home Finance LLC, S/B/M to Chase Manhattan Mortgage Corporation**, the undersigned holder of a Mortgage (herein "Assignor") does hereby grant, sell, assign, transfer and convey, unto **Statebridge Company LLC**, (herein "Assignee"), whose address is **5680 Greenwood Plaza Blvd., Suite 100S, Greenwood Village, CO 80111**, a certain Mortgage dated **December 8, 1998** and recorded on **December 21, 1998**, made and executed by **SHELTON L O'LIDGE LENA C O'LIDGE** to and in favor of **EAGLE MORTGAGE AND CONSULTANTS**, upon the following described property situated in **COOK** County, State of Illinois:
Property Address: **15330 EVERS ST, DOLTON, IL 60419**

**LOT 31 IN BLOCK 9 IN CALUMET CENTER GARDENS FIRST ADDITION SECTION 10, TOWNSHIP 36 NORTH, RANGE 14 EAST OF THE THIRD PRINCIPAL MERIDIAN IN COOK COUNTY, ILLINOIS.**

such Mortgage having been given to secure payment of **One Hundred Eight Thousand and 00/100ths ($108,000.00)**, which Mortgage is of record in Book, Volume or Liber No. N/A, at Page N/A (or as No. 08157353), in the Recorder's Office of **COOK** County, State of Illinois.

TO HAVE AND TO HOLD, the same unto Assignee, its successor and assigns, forever, subject only to the terms and conditions of the above-described Mortgage.

FILED DATE: 7/1/2025 2:23 PM   2025CH06936

IN WITNESS WHEREOF, the undersigned Assignor has executed this Assignment of Mortgage on **7-14-2016**.

Assignor:

**JPMorgan Chase Bank, N.A., S/B/M Chase Home Finance LLC, S/B/M to Chase Manhattan Mortgage Corporation**

By: _____

Katasha R. Gilbert

**VICE PRESIDENT**

Its: _____

## ACKNOWLEDGMENT

State of **Louisiana**      §
               §
Parish of **Ouachita**      §

On this **14** day of **July 2016** before me appeared Katasha R. Gilbert, to me personally known, who, being by me duly sworn (or affirmed) did say that he/she is the **VICE PRESIDENT**, of **JPMorgan Chase Bank, N.A., S/B/M Chase Home Finance LLC, S/B/M to Chase Manhattan Mortgage Corporation**, and that the seal affixed to said instrument is the corporate seal of said entity and that the instrument was signed and sealed on behalf of the said entity by authority of its board of directors and that Katasha R. Gilbert _____ acknowledged the instrument to be the free act and deed of the said entity.

_____
Signature of Person Taking Acknowledgment

**YOLANDA A. DIAZ**
Printed Name

**NOTARY PUBLIC**
Title or Rank

(Seal)

Serial Number, if any: **N/A**

---

Illinois Assignment of Mortgage
JPMorgan Chase Bank N.A. Project W3325      Page 2 of 2      01/12 Rev. 02/14

Doc#. 2000825022 Fee: $98.00
Edward M. Moody
Cook County Recorder of Deeds
Date: 01/08/2020 10:42 AM Pg: 1 of 1

**ILLINOIS**
COUNTY OF **COOK** (A)
LOAN NO.: ▮▮▮▮▮▮▮

PREPARED BY: **FIRST AMERICAN MORTGAGE**
**SOLUTIONS**
**1795 INTERNATIONAL WAY**
**IDAHO FALLS, ID 83402**
WHEN RECORDED MAIL TO:
**FIRST AMERICAN MORTGAGE SOLUTIONS**
**1795 INTERNATIONAL WAY**
**IDAHO FALLS, ID 83402**
PH. **208-528-9895**
PARCEL NO. **29-10-424-021**

# CORPORATION ASSIGNMENT OF REAL ESTATE MORTGAGE

FOR VALUE RECEIVED, **STATEBRIDGE COMPANY, LLC** located at **6061 S. WILLOW DR SUITE 300, GREENWOOD VILLAGE, CO 80111**, Assignor, does hereby grant, assign, and transfer to **BAYVIEW LOAN SERVICING, LLC** located at **4425 PONCE DE LEON BLVD, SUITE #500, CORAL GABLES, FL 33146**, Assignee, its successors and assigns, that certain Real Estate Mortgage dated **DECEMBER 08, 1998**, executed by **SHELTON L. O'LIDGE AND LENA C. O'LIDGE, HUSBAND AND WIFE**, Mortgagor, to **EAGLE MORTGAGE AND CONSULTANTS**, Original Mortgagee, and recorded on **DECEMBER 21, 1998** as Document/Instrument No. **08157353** in the Office of the Recorder of Deeds for **COOK** (A) County, State of **ILLINOIS**.

LEGAL DESCRIPTION: **LOT 31 IN BLOCK 9 IN CALUMET CENTER GARDENS FIRST ADDITION SECTION 10, TOWNSHIP 36 NORTH, RANGE 14 EAST OF THE THIRD PRINCIPAL MERIDIAN IN COOK COUNTY, ILLINOIS.**

PROPERTY ADDRESS: **15330 EVER ST, DOLTON, IL 60419**

TOGETHER WITH all rights, title and interest, accrued or to accrue under said real estate Mortgage.

IN WITNESS WHEREOF, the undersigned has caused this Instrument to be executed on **JANUARY 03, 2020**.

**STATEBRIDGE COMPANY, LLC**

**REBECCA HIGLEY, ASSISTANT SECRETARY**

STATE OF **IDAHO**            COUNTY OF **BONNEVILLE**     ) ss.

On **JANUARY 03, 2020**, before me, **ADDISON RICE**, personally appeared **REBECCA HIGLEY** known to me to be the **ASSISTANT SECRETARY** of **STATEBRIDGE COMPANY, LLC** the corporation that executed the instrument or the person who executed the instrument on behalf of said corporation, and acknowledged to me that such corporation executed the same.

**ADDISON RICE (COMMISSION EXP. 06/15/2024)**
NOTARY PUBLIC

ADDISON RICE
Notary Public - State of Idaho
Commission Number 20181118
My Commission Expires Jun 15, 2024

**Page 1 of 1**

FILED DATE: 7/1/2025 2:23 PM   2025CH06936

When Recorded Return To:
Community Loan Servicing, LLC
C/O Nationwide Title Clearing,
LLC 2100 Alt. 19 North
Palm Harbor, FL 34683

**Loan Number** ███████

Doc#. 2218901343 Fee: $98.00
Karen A. Yarbrough
Cook County Clerk
Date: 07/08/2022 01:22 PM Pg: 1 of 1

## ASSIGNMENT OF MORTGAGE

**FOR GOOD AND VALUABLE CONSIDERATION,** the sufficiency of which is hereby acknowledged, the undersigned, **COMMUNITY LOAN SERVICING, LLC FKA BAYVIEW LOAN SERVICING, LLC, WHOSE ADDRESS IS 4425 PONCE DE LEON BLVD, CORAL GABLES, FL 33146, (ASSIGNOR),** by these presents does convey, grant, assign, transfer and set over the described Mortgage with all interest secured thereby, all liens, and any rights due or to become due thereon to **NATIONSTAR MORTGAGE LLC, WHOSE ADDRESS IS 8950 CYPRESS WATERS BLVD., COPPELL, TX 75019 (469)549-2000, ITS SUCCESSORS AND ASSIGNS, (ASSIGNEE).**

Said Mortgage is dated 12/08/1998, and made by **SHELTON L. O'LIDGE AND LENA C. O'LIDGE** to **EAGLE MORTGAGE AND CONSULTANTS** and recorded 12/21/1998 in the records of the Office of the Recorder of **COOK** County, **Illinois**, in **Document # 08157353**.

Upon the property situated in said State and County as more fully described in said Mortgage or herein to wit:

LOT 31 IN BLOCK 9 IN CALUMET CENTER GARDENS FIRST ADDITION SECTION 10, TOWNSHIP 36 NORTH, RANGE 14 EAST OF THE THIRD PRINCIPAL MERIDIAN IN COOK COUNTY, ILLINOIS.

Parcel ID Number 29-10-424-021-0000

Property is commonly known as: 15330 EVER, DOLTON, IL 60419.

**Dated this 08th day of July in the year 2022**
**COMMUNITY LOAN SERVICING, LLC FKA BAYVIEW LOAN SERVICING, LLC**

**SUSAN HICKS**
**VICE PRESIDENT**

All persons whose signatures appear above are employed by NTC, have qualified authority to sign and have reviewed this document and supporting documentation prior to signing.

STATE OF FLORIDA      COUNTY OF PINELLAS

The foregoing instrument was acknowledged before me by means of [X] physical presence or [ ] online notarization on this 08th day of July in the year 2022, by Susan Hicks as VICE PRESIDENT of COMMUNITY LOAN SERVICING, LLC FKA BAYVIEW LOAN SERVICING, LLC, who, as such VICE PRESIDENT being authorized to do so, executed the foregoing instrument for the purposes therein contained. He/she/they is (are) personally known to me.

**JULIE MARTENS**
**COMM EXPIRES: 5/22/2026**

JULIE MARTENS
Notary Public - State of Florida
Commission # HH 243030
My Comm. Expires May 22, 2026
Bonded through National Notary Assn.

**Document Prepared By: Dave LaRose/NTC, 2100 Alt. 19 North, Palm Harbor, FL 34683 (800)346-9152**
FREDDIE 30    DOCR

FILED DATE: 7/1/2025 2:23 PM    2025CH06936

FILED DATE: 7/1/2025 2:23 PM   2025CH06936

**Doc#. 2500820281 Fee: $107.00**
MONICA GORDON
COOK COUNTY CLERK'S OFFICE
Date 1/8/2025 11:46 AM Pg: 1 of 3

Prepared By and Return To:
**Murat Deniz**
Meridian Asset Services, LLC
140 Fountain Parkway N Suite 100
St. Petersburg, FL 33716
(239) 351-2442

**APN/PIN# 29-10-424-021**

Loan No: ███████

Space above for Recorder's use

## ASSIGNMENT OF MORTGAGE

FOR GOOD AND VALUABLE CONSIDERATION, the sufficiency of which is hereby acknowledged, the undersigned, **NATIONSTAR MORTGAGE LLC**, whose address is **8950 CYPRESS WATERS BLVD., COPPELL, TX 75019**, (ASSIGNOR), does hereby grant, assign and transfer to **NEWREZ LLC D/B/A SHELLPOINT MORTGAGE SERVICING**, whose address is **75 BEATTIE PLACE, SUITE 300, GREENVILLE, SC 29601**, (ASSIGNEE), its successors, transferees and assigns forever, all beneficial interest under that certain mortgage, together with the certain note(s) described therein with all interest, all liens, and any rights due or to become due thereon.

Date of Mortgage: **12/8/1998**
Original Loan Amount: **$108,000.00**
Executed by (Borrower(s)): **SHELTON L. O' LIDGE & LENA C. O' LIDGE**
Original Lender: **EAGLE MORTGAGE AND CONSULTANTS**
Filed of Record:  In Book/Liber/Volume **N/A**, Page **N/A**
Document/Instrument No: **08157353** in the Recording District of **Cook, IL**, Recorded on **12/21/1998**.

Legal Description:  SEE EXHIBIT "A" ATTACHED
Property more commonly described as: **15330 EVER, DOLTON, ILLINOIS 60419**

IN WITNESS WHEREOF, the undersigned by its duly elected officers and pursuant to proper authority of its board of directors has duly executed, sealed, acknowledged and delivered this assignment.

Date:  **12/20/2024**

**NATIONSTAR MORTGAGE LLC, BY MERIDIAN ASSET SERVICES, LLC, ITS ATTORNEY-IN-FACT**

By: **MARIO REYES**
Title: **VICE PRESIDENT**

Witness Name: **ELLIS SWEETING III**

When Recorded Return To:
Shellpoint Mortgage Servicing
C/O Nationwide Title Clearing,
LLC 2100 Alt. 19 North
Palm Harbor, FL 34683

Loan Number ▮▮▮▮▮▮▮▮▮

Doc#. 2508418042 Fee: $107.00
MONICA GORDON
COOK COUNTY CLERK'S OFFICE
Date 3/25/2025 9:47 AM Pg: 1 of 1

# ASSIGNMENT OF MORTGAGE

SEND ALL OTHER BORROWER OR LOAN RELATED CORRESPONDENCE TO: Shellpoint Mortgage Servicing, P.O. Box 10826, Greenville, SC 29603-0826, Toll-free Phone: (800) 365-7107

FOR GOOD AND VALUABLE CONSIDERATION, the sufficiency of which is hereby acknowledged, the undersigned, NEWREZ LLC F/K/A NEW PENN FINANCIAL LLC D/B/A SHELLPOINT MORTGAGE SERVICING, WHOSE ADDRESS IS 75 BEATTIE PLACE SUITE 300, GREENVILLE, SC 29601, (ASSIGNOR) by these presents does convey, grant, assign, transfer and set over the described Mortgage with all interest secured thereby, all liens, and any rights due or to become due thereon to FEDERAL HOME LOAN MORTGAGE CORPORATION, AS TRUSTEE FOR THE BENEFIT OF THE FREDDIE MAC SEASONED CREDIT RISK TRANSFER TRUST, SERIES 2024-2, WHOSE ADDRESS IS 8200 JONES BRANCH DRIVE, MCLEAN, VA 22102, ITS SUCCESSORS AND ASSIGNS, (ASSIGNEE).

Said Mortgage is dated 12/08/1998, and made by SHELTON L. O'LIDGE AND LENA C. O'LIDGE to EAGLE MORTGAGE AND CONSULTANTS and recorded 12/21/1998 in the records of the Office of the Recorder of COOK County, Illinois, in Document # 08157353.

Upon the property situated in said State and County as more fully described in said Mortgage or herein to wit:
LOT 31 IN BLOCK 9 IN CALUMET CENTER GARDENS FIRST ADDITION SECTION 10, TOWNSHIP 36 NORTH, RANGE 14 EAST OF THE THIRD PRINCIPAL MERIDIAN IN COOK COUNTY, ILLINOIS.
Parcel ID Number 29-10-424-021-0000
Property is commonly known as: 15330 EVER, DOLTON, IL 60419.

Dated this 24th day of March in the year 2025
NEWREZ LLC F/K/A NEW PENN FINANCIAL LLC D/B/A SHELLPOINT MORTGAGE SERVICING

ALAN BAKER
VICE PRESIDENT

All persons whose signatures appear above are employed by NTC, have qualified authority to sign and have reviewed this document and supporting documentation prior to signing.

STATE OF FLORIDA      COUNTY OF PINELLAS
The foregoing instrument was acknowledged before me by means of [X] physical presence or [ ] online notarization on this 24th day of March in the year 2025, by Alan Baker as VICE PRESIDENT of NEWREZ LLC F/K/A NEW PENN FINANCIAL LLC D/B/A SHELLPOINT MORTGAGE SERVICING, who, as such VICE PRESIDENT being authorized to do so, executed the foregoing instrument for the purposes therein contained. He/she/they is (are) personally known to me.

AARON BURDICK
COMM EXPIRES: 11/22/2028

AARON BURDICK
Notary Public - State of Florida
Commission # HH 606524
My Comm. Expires Nov 22, 2028
Bonded through National Notary Assn.

Document Prepared By: Jennifer Zak/NTC, 2100 Alt. 19 North, Palm Harbor, FL 34683 (800)346-9152
PRE-REFERRAL    DOCR

FILED DATE: 7/1/2025 2:23 PM   2025CH06936

2500820281 Page: 2 of 3

FILED DATE: 7/1/2025 2:23 PM   2025CH06936

> A NOTARY PUBLIC OR OTHER OFFICER COMPLETING THIS CERTIFICATE VERIFIES ONLY THE IDENTITY OF
> THE INDIVIDUAL WHO SIGNED THE DOCUMENT TO WHICH THIS CERTIFICATE IS ATTACHED, AND NOT THE
> TRUTHFULNESS, ACCURACY, OR VALIDITY OF THAT DOCUMENT

State of        **FLORIDA**
County of       **PINELLAS**

On **12/20/2024**, before me, **ROBERT MESSER II**, a Notary Public, personally appeared **MARIO REYES, VICE PRESIDENT** of/for **MERIDIAN ASSET SERVICES, LLC, AS ATTORNEY-IN-FACT FOR NATIONSTAR MORTGAGE LLC**, personally known to me, or who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.  I certify under PENALTY OF PERJURY under the laws of the State of **FLORIDA** that the foregoing paragraph is true and correct.  I further certify the foregoing instrument was acknowledged before me by means of ☑ physical presence or ☐ online notarization and that MARIO REYES, signed, sealed, attested and delivered this document as a voluntary act in my presence.

Witness my hand and official seal.

_____

(Notary Name): **ROBERT MESSER II**
My commission expires: **09/03/2028**

ROBERT MESSER II
Notary Public
State of Florida
Comm# HH589361
Expires 9/3/2028

FILED DATE: 7/1/2025 2:23 PM    2025CH06936

### EXHIBIT "A"

LOT 31 IN BLOCK 9 IN CALUMET CENTER GARDENS FIRST ADDITION SECTION 10, TOWNSHIP 36 NORTH, RANGE 14 EAST OF THE THIRD PRINCIPAL MERIDIAN IN COOK COUNTY, ILLINOIS.

FILED DATE: 7/1/2025 2:23 PM   2025CH06936

# EXHIBIT D

Loan Number ███████

# LOAN MODIFICATION AGREEMENT

Borrower ("I")[1]: **SHELTON L O'LIDGE and LENA C O'LIDGE**
Lender ("Lender"): **JPMORGAN CHASE BANK, N.A.**
Date of First Lien Security Instrument (the "Mortgage") and Note (the "Note"): **DECEMBER 08, 1998**
Loan Number: ███████ (the "Loan")
Property Address: **15330 EVER, DOLTON, ILLINOIS 60419**  (the "Property")

If my representations in Section 1 continue to be true in all material respects, then the provisions of Section 2 of this Loan Modification Agreement ("Agreement") will, as set forth in Section 2, amend and supplement (i) the Mortgage on the Property, and (ii) the Note secured by the Mortgage. The Mortgage and Note together, as may previously have been amended, are referred to as the "Loan Documents." Capitalized terms used in this Agreement have the meaning given to them in the Loan Documents.

I have provided confirmation of my financial hardship and documents to permit verification of all of my income to determine whether I qualify for the offer described in this Agreement. This Agreement will not take effect unless and until the Lender signs it.

1. **My Representations**. I represent to the Lender and agree:

    A. I am experiencing a financial hardship, and as a result, am either in default under the Loan Documents or a default is imminent.

    B. The Property is neither in a state of disrepair, nor condemned.

    C. There has been no change in the ownership of the Property since I signed the Loan Documents.

    D. I am not a party to any litigation involving the Loan Documents, except to the extent I may be a defendant in a foreclosure action.

    E. I have provided documentation for **all** income that I earn.

    F. All documents and information I provide pursuant to this Agreement are true and correct.

2. **The Modification**. The Loan Documents are hereby modified as of **FEBRUARY 01, 2013** (the "Modification Effective Date"), and all unpaid late charges are waived. The Lender agrees to suspend any foreclosure activities so long as I comply with the terms of the Loan Documents, as modified by this Agreement. The Loan Documents will be modified, and the first modified payment will be due on the date set forth in this Section 2:

    A. The Maturity Date will be: **JANUARY 01, 2053**.

    B. The modified principal balance of my Note will include all amounts and arrearages that will be past due (excluding unpaid late charges) and may include amounts towards taxes, insurance,

---

[1] If there is more than one Borrower or Mortgagor executing this document, each is referred to as "I". For purposes of this document words signifying the singular (such as "I") shall include the plural (such as "we") and vice versa where appropriate.

FILED DATE: 7/1/2025 2:23 PM   2025CH06936

FILED DATE: 7/1/2025 2:23 PM 2025CH06936

Loan Number [REDACTED]

or other assessments. The new principal balance of my Note is **$130,973.21** (the "New Principal Balance").

C.  **$39,291.96** of the New Principal Balance shall be deferred (the "Deferred Principal Balance"), and I will not pay interest or make monthly payments on this amount. The New Principal Balance less the Deferred Principal Balance shall be referred to as the "Interest Bearing Principal Balance," and this amount is **$91,681.25**. The Interest Bearing Principal Balance will re-amortize over **480** months.

Interest will begin to accrue as of **JANUARY 01, 2013**. The first new monthly payment on the New Principal Balance will be due on **FEBRUARY 01, 2013**, and monthly on the same date thereafter.

This Section 2.C does Not apply To the repayment of any Deferred Principal Balance And such a balance will be repaid In accordance With Section 2.D. My payment schedule For the modified Loan Is As follows:

I promise to pay interest on the Interest Bearing Principal Balance at the rate of **4.250%** annually. I promise to make consecutive monthly payments of principal and interest in the amount of **$397.55**, which is an amount sufficient to amortize the Interest Bearing Principal Balance over a period of **480** months.

The Deferred Principal Balance of **$39,291.96** will be due on the maturity date unless due earlier in accordance with Section 2.D.

The above terms in this Section 2.C shall supersede any provisions to the contrary in the Loan Documents, including but not limited to provisions for an adjustable or step interest rate.

D.  I agree to pay in full (i) the Deferred Principal Balance, if any; and (ii) any other amounts still owed under the Loan Documents, by the earliest of the date I sell or transfer an interest in the Property, subject to Section 3.E below, the date I pay the entire Interest Bearing Principal Balance, or the Maturity Date.

E.  I will be in default if I do not (i) pay the full amount of a monthly payment on the date it is due, or (ii) comply with the terms of the Loan Documents, as modified by this Agreement. If a default rate of interest is permitted under the current Loan Documents, then in the event of default, the interest that will be due on the Interest Bearing Principal Balance will be the rate set forth in Section 2.C, and there will be no interest payable on the Deferred Principal Balance, if any.

F.  If I make a partial prepayment of principal, the Lender may apply that partial prepayment first to any remaining Deferred Principal Balance before applying such partial prepayment to other amounts due under this Agreement or the Loan Documents.

3.  **Additional Agreements.** I agree to the following:

    A.  That this Agreement shall supersede the terms of any modification, forbearance, or workout plan, if any, that I previously entered into with the Lender.

WF101 V2 2-23-10 LOAN MODIFICATION AGREEMENT - CHAMP   ver. 01_16_2013_12_11_03         Page 2 of 6 pages

B. To comply, except to the extent that they are modified by this Agreement, or by the U.S. Bankruptcy Code, with all covenants, agreements, and requirements of the Loan Documents including my agreement to make all payments of taxes, insurance premiums, assessments, impounds, and all other payments, the amount of which may change periodically over the term of my Loan. This Agreement does not waive future escrow requirements. If the Loan includes collection for tax and insurance premiums, this collection will continue for the life of the Loan.

C. That the Loan Documents are composed of valid, binding agreements, enforceable in accordance with their terms.

D. That all terms and provisions of the Loan Documents, except as expressly modified by this Agreement, or by the U.S. Bankruptcy Code, remain in full force and effect; nothing in this Agreement shall be understood or construed to be a satisfaction or release in whole or in part of the obligations contained in the Loan Documents; and that except as otherwise specifically provided in, and as expressly modified by, this Agreement, or by the U.S. Bankruptcy Code, the Lender and I will be bound by, and will comply with, all of the terms and provisions of the Loan Documents.

E. That, as of the Modification Effective Date, notwithstanding any other provision of the Loan Documents, I agree as follows: If all or any part of the Property or any interest in it is sold or transferred without the Lender's prior written consent, the Lender may, at its option, require immediate payment in full of all sums secured by the Mortgage. However, the Lender shall not exercise this option if federal law prohibits the exercise of such option as of the date of such sale or transfer. If the Lender exercises this option, the Lender shall give me notice of acceleration. The notice shall provide a period of not less than thirty (30) days from the date the notice is delivered or mailed within which I must pay all sums secured by the Mortgage. If I fail to pay these sums prior to the expiration of this period, the Lender may invoke any remedies permitted by the Mortgage without further notice or demand on me.

F. That, as of the Modification Effective Date, a buyer or transferee of the Property will not be permitted, under any circumstance, to assume the Loan. In any event, this Agreement may not be assigned to, or assumed by, a buyer of the Property.

G. If any document is lost, misplaced, misstated, or inaccurately reflects the true and correct terms and conditions of the Loan Documents as amended by this Agreement, within ten (10) days after my receipt of the Lender's request, I will execute, acknowledge, initial, and deliver to the Lender any documentation the Lender deems necessary to replace or correct the lost, misplaced, misstated or inaccurate document(s). If I fail to do so, I will be liable for any and all loss or damage which the Lender reasonably sustains as a result of my failure.

H. All payment amounts specified in this Agreement assume that payments will be made as scheduled.

I. That, if Borrower is in bankruptcy upon execution of this document, Borrower will cooperate fully with Lender in obtaining any required bankruptcy court and trustee approvals in accordance with local court rules and procedures. Borrower understands that if such approvals are not received, then the terms of this Agreement will be null and void.

FILED DATE: 7/1/2025 2:23 PM   2025CH06936

Loan Number ████████

If this Agreement becomes null and void, the terms of the original Loan Documents shall continue in full force and effect and such terms shall not be modified by this Agreement.

J.  If the Borrower(s) received a discharge in a Chapter 7 bankruptcy subsequent to the execution of the Loan Documents, the Lender agrees that such Borrower(s) will not have personal liability on the debt pursuant to this Agreement.

K.  That in agreeing to the changes to the original Loan Documents as reflected in this Agreement, the Lender has relied upon the truth and accuracy of all of the representations made by the Borrower(s), both in this Agreement and in any documentation provided by or on behalf of the Borrower(s) in connection with this Agreement. If the Lender subsequently determines that such representations or documentation were not truthful or accurate, the Lender may, at its option, rescind this Agreement and reinstate the original terms of the Loan Documents as if this Agreement never occurred.

L.  I acknowledge and agree that if the Lender executing this Agreement is not the current holder or owner of the Note and Mortgage, that such party is the authorized servicing agent for such holder or owner, or its successor in interest, and has full power and authority to bind itself and such holder and owner to the terms of this modification.

**THIS WRITTEN LOAN AGREEMENT REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.**

(SIGNATURES CONTINUE ON FOLLOWING PAGES)

WF101 V2 2-23-10 LOAN MODIFICATION AGREEMENT - CHAMP    ver. 01_16_2013_12_11_03        Page 4 of 6 pages

FILED DATE: 7/1/2025 2:23 PM   2025CH06936

FILED DATE: 7/1/2025 2:23 PM   2025CH06936

Loan Number █████████

## TO BE SIGNED BY BORROWER ONLY

**BORROWER** SIGNATURE PAGE TO MODIFICATION AGREEMENT BETWEEN JPMORGAN CHASE BANK, N.A. And SHELTON L O'LIDGE and LENA C O'LIDGE, LOAN NUMBER ████████ WITH A MODIFICATION EFFECTIVE DATE OF February 01, 2013

In Witness Whereof, the Borrower(s) have executed this agreement.

_Shelton L. O'Lidge_                                    Date: 01 / 31 / 2013
Borrower - SHELTON L O'LIDGE

_Lena C O'Lidge_                                    Date: 1 /3/13
Borrower - LENA C O'LIDGE

WF101 V2 2-23-10 LOAN MODIFICATION AGREEMENT - CHAMP   ver. 01_16_2013_12_11_03          Page 5 of 6 pages

Loan Number ████████

**TO BE SIGNED BY LENDER ONLY**

**LENDER** SIGNATURE PAGE TO MODIFICATION AGREEMENT BETWEEN JPMORGAN CHASE BANK, N.A. And SHELTON L O'LIDGE and LENA C O'LIDGE, LOAN NUMBER ████████ WITH A MODIFICATION EFFECTIVE DATE OF February 01, 2013

In Witness Whereof, the Lender has executed this Agreement.

Lender

**JPMORGAN CHASE BANK, N.A.**

By: _____

Printed Name:
    **Brenda Nevarez-Quiroga**
    Vice President

Date: _____2·13·13_____

WF101 V2 2-23-10 LOAN MODIFICATION AGREEMENT - CHAMP    ver. 01_16_2013_12_11_03      Page 6 of 6 pages

FILED DATE: 7/1/2025 2:23 PM   2025CH06936

FILED
7/1/2025 3:23 PM
Mariyana T. Spyropoulos
CIRCUIT CLERK
COOK COUNTY, IL
2025CH06932
Calendar, 7
33389797

# EXHIBIT A

**SimplyCash® Business Credit Card**

p. 1/4

FAX 623-444-3000

USAA

5-6-20
DISPUTE BALANCE
old CARD
BAL. Ø

03/03/20

ROBERT G SCHUMANN
R R S INC
18505 S STEWART AVE
HOMEWOOD IL 60430-3035

FAXED
5-5-20

Account: old
XXXX-XXXXX0-72008
SAME ACCOUNT New
New # 65004
CARD

Dear ROBERT G SCHUMANN,

We are writing to provide you with an important notice regarding the account referenced above. You can find this information on the back of this letter or on the additional page(s) enclosed. Please review and keep this notice for your reference.

As a reminder, you can always manage your account by logging in to **americanexpress.com**. If you have any questions, call us at the number on the back of your Card or at **1-800-528-4800**.

We hope you find this information helpful.

Sincerely,
American Express Customer Care

4-1-20

Acct #72008 BALANCE IS ZERO Ø. New Acct # ENDING IN #65004 SHOULD ALSO BE ZERO Ø

MB 01 020038 77201 B 78 A
ROBERT G SCHUMANN
R R S INC
18505 S STEWART AVE
HOMEWOOD IL 60430-3035

PLEASE ADJUST BALANCE TO Ø ON Acct # 65004,
THANK YOU

PLEASE CALL
# 708-609-3500

X R Schumann

4999223286616640303

FILED DATE: 7/11/2025 3:23 PM   2025CH06932

020008 1/2

1253

R0158W1  08320

000000372

[4901]

FILED
7/1/2025 3:23 PM
Mariyana T. Spyropoulos
CIRCUIT CLERK
COOK COUNTY, IL
2025CH06932
Calendar, 7
33389797

# EXHIBIT B

American Express
P.O. Box 297879
Ft. Lauderdale, FL 33329-7879

*6-11-20 CORONA - 19 Deferred* (handwritten)

www.americanexpress.com

May 21, 2020

MB 01 003001 67921 B 12 A

1-800-592-1160

Robert Schumann
R R S Inc
18505 Stewart Avenue
Homewood IL 60430-3035

*American Express® on-line customers
may receive this notice at both their
mailing and email addresses.*

Dear Robert Schumann:

**It's important for you to know that your account is past due. Payment is due by the payment due date as reflected on your most recent billing statement.**
Account Ending 013004 SimplyCash® Plus Card
Account Ending 013004 SimplyCash® Plus Card
072008 SimplyCash® Business Card
765004 SimplyCash® Business Card

While your billing inquiry is being researched, you do not have to pay the amount in question. However, you still are responsible to pay any undisputed amount, as indicated in the Account Summary.

The condition of any one of your American Express® Accounts impacts our credit decision on any other account that you have with us. This includes the accounts below.
072008 SimplyCash® Business Card
765004 SimplyCash® Business Card

Any new charges on your account(s) listed in the account summary below will be declined as well as charges on any other card products associated with this account(s). You should advise any additional Card Members that their new charges will also be declined.

**Make a payment for any past due amount immediately.** If you are unable to make a payment for at least the past due amount or have any questions, please call us today.

We offer several convenient ways to make a payment:

**Online -** You can make immediate or scheduled payments online at **americanexpress.com/pbc**

**Online without Logging in -** Use RSVP code(s) on the reverse to make a payment at **americanexpress.com/paybyrsvp**. The code(s) are only valid until 06/20/2020.

### Account Summary

| Account | Ending | Past Due | Total Due |
|---|---|---|---|
| SimplyCash® Plus Card | 013004 | $35.00 | $35.00 |
| SimplyCash® Business Card | 072008 | $0.00 | $0.00 |
| SimplyCash® Business Card | 765004 | $0.00 | $70.00 |
| | Total | $35.00 | $105.00 |

NFPIDR C90

NFPIDR

FILED DATE: 7/1/2025 3:23 PM   2025CH06932

003001 1/2

6917

FILED DATE: 7/1/2025 3:23 PM    2025CH06932

For account ending in 013004, RSVP code CR9PVCC36GFD81
For account ending in 765004, RSVP code 4M1G9S0W28C5R1

We have different billing addresses on file for you. A copy of this communication has been sent to each different address. If you wish to have a single address on file, please contact us at 1-800-592-1160 so we can update our records accordingly.

Sincerely,

American Express Account Services

Hearing Date: 9/2/2025 9:45 AM
Location: Court Room 2405
Judge: Reilly, Eve M

FILED
7/1/2025 3:23 PM
Mariyana T. Spyropoulos
CIRCUIT CLERK
COOK COUNTY, IL
2025CH06932
Calendar, 7
33389797

FILED DATE: 7/1/2025 3:23 PM   2025CH06932

# EXHIBIT C

American Express 

**American Express**
PO Box 981532
El Paso, TX 79998

www.americanexpress.com

January 01, 2021

MB 01 002874 34446 B 9 A
ıllıılılıⁿılıılılılılı␣␣␣␣ıllıılı␣␣ılılıⁿıⁿıllıⁿlı
Robert G Schumann
18505 S Stewart Avenue
Homewood IL 604303035N

Account Ending In: 65004

Dear Robert G Schumann,

While we investigate this for you, you won't be responsible for the $2,369.10 under review. If necessary, we'll adjust any interest charges or American Express fees associated with the disputed amount.

We'll try to resolve the matter in less than a month. However, complex cases may require additional time. During this time, we'll review the details of your inquiry (and may contact the merchant, if necessary). You will hear from us if we have an update or once this investigation has been resolved. You can check the status of your inquiry at any time by visiting **americanexpress.com/inquirycenter.**

You can receive future Account communications from us by e-mail. To set up this option, please visit Account Services at **americanexpress.com** and go to the Communication Preferences tab.

Please refer to the Frequently Asked Questions on the reverse page for other important information.

Thank you for your Card Membership.

Sincerely,

American Express Customer Care

Dispute Reference Number: OZI0858

The issuer of this Card is American Express National Bank.

FILED DATE: 7/1/2025 3:23 PM   2025CH06932

002874 1/1

Hearing Date: 8/29/2025 9:45 AM
Location: Court Room 2405
Judge: Reilly, Eve M

FILED
7/1/2025 3:23 PM
Mariyana T. Spyropoulos
CIRCUIT CLERK
COOK COUNTY, IL
2025CH06932
Calendar, 7
33389797

FILED DATE: 7/1/2025 3:23 PM    2025CH06932

# EXHIBIT D

**American Express**
PO Box 297800
Ft Lauderdale, FL 33329-7800



www.americanexpress.com

June 10, 2021

MB 01 005529 21499 E 18 A
||ıılııılı|||ıılı|lıııılıılılılllılıılıılıllıılılıılıılı
Robert G Schumann
917 Ridge Road
Unit 3333
Munster IN 46321-7017

*Dipute Dipute*
*877·877-0987*
*× 3*
*844 528 1532*
*× 4*

Account Ending In: 13004

Dear Robert G Schumann,

We're writing to let you know that we issued a statement credit to your account listed above. Making sure you know about any mistakes we find is important, so we'd like to explain what happened and what we've done to make it right.

**What happened**
Because of a technical error, we may not have sent statements you requested. We apologize for any inconvenience this may have caused.

**We issued a credit**
To make things right, we've issued a credit for the Late Payment Fee we charged to your account. If applicable, this credit also includes any other fees or interest charges that may have resulted from this error. This credit can be seen on an upcoming statement.

*6-17-2)  collection Department*

**We've taken care of everything for you**
While there's nothing further you need to do, you can track your credits, manage your account, or reach us anytime online at **americanexpress.com**.

*1800-921-6490*

Thank you for your Card Membership.

*Debbie*
*TOWN*

Sincerely,

*1300Y # 556.42  6·3·21*
*Duplicate statements*

American Express Customer Care

*AMERICAN EXPRESS*
*CUSTOMER SERVICE*
*7-11-21  82.06*
*CORP*
*DAL*
*BOX 981535*

*Am Xp Compny*
*Am Xpns Tower*
*WORLD FINAN'C*
*CENTER*
*200 VESEY St*
*EL PASO, TX  79998*
*NY NY  10285*

CP-008321
The issuer of this card is American Express National Bank.

FILED
7/1/2025 3:23 PM
Mariyana T. Spyropoulos
CIRCUIT CLERK
COOK COUNTY, IL
2025CH06932
Calendar, 7
33389797

FILED DATE: 7/1/2025 3:23 PM   2025CH06932

# EXHIBIT E

American Express
P.O. Box 297879
Ft. Lauderdale, FL 33329-7879



www.americanexpress.com

June 17, 2021

MB 01 002621 45071 E 11 A
ıʰlıılllllᵉlllⁱᵐʰⁱlᵗlˑlᵗlᵉlᵗⁱˑllllⁱᵗˑⁱₙₙₗⁱˑllⁱⱼˑⱼˑₗₗᵢⱼⁱl

1-800-592-1160

Robert Schumann
R R S Inc
18505 Stewart Avenue
Homewood IL 60430-3035

*American Express® on-line customers
may receive this notice at both their
mailing and email addresses.*

Dear Robert Schumann:

**It's important for you to know that your account is past due. Payment is due by the payment due date as reflected on your most recent billing statement.**
Account Ending 765004 SimplyCash® Business Card
Account Ending 765004 SimplyCash® Business Card
072008 SimplyCash® Business Card
013004 SimplyCash® Plus Card

While your billing inquiry is being researched, you do not have to pay the amount in question. However, you still are responsible to pay any undisputed amount, as indicated in the Account Summary.

The condition of any one of your American Express® Accounts impacts our credit decision on any other account that you have with us. This includes the accounts below.
072008 SimplyCash® Business Card
013004 SimplyCash® Plus Card

Any new charges on your account(s) listed in the account summary below will be declined as well as charges on any other card products associated with this account(s). You should advise any additional Card Members that their new charges will also be declined.

**Make a payment for any past due amount immediately.** If you are unable to make a payment for at least the past due amount or have any questions, please call us today.

We offer several convenient ways to make a payment:

**Online** - You can make immediate or scheduled payments online at **americanexpress.com/pbc**

**Online without Logging in** - Use RSVP code(s) below to make a payment at **americanexpress.com/paybyrsvp**. The code(s) are only valid until 07/17/2021.

## Account Summary

| Account | | Ending | Past Due | Total Due |
|---|---|---|---|---|
| SimplyCash® Business Card | ✗ | 765004 | $82.00 | $82.00 |
| SimplyCash® Business Card | | 072008 | $0.00 | $0.00 |
| SimplyCash® Plus Card | | 013004 | $0.00 | $0.00 |
| | | Total | $82.00 | $82.00 |

NFPIDR C90                                                                 NFPIDR

FILED DATE: 7/1/2025 3:23 PM   2025CH06932

002621 1/1

FILED
7/1/2025 3:23 PM
Mariyana T. Spyropoulos
CIRCUIT CLERK
COOK COUNTY, IL
2025CH06932
Calendar, 7
33389797

# EXHIBIT F

**American Express**
PO Box 981532
El Paso, TX 79998

www.americanexpress.com

September 18, 2021

MB 01 002971 60058 E 12 A
Robert G Schumann
18505 S Stewart Avenue
Homewood IL 604303035N

Account Ending In: 65004

Dear Robert G Schumann,

While we investigate this for you, you won't be responsible for the $2,603.54 under review. If necessary, we'll adjust any interest charges or American Express fees associated with the disputed amount.

We'll try to resolve the matter in less than a month. However, complex cases may require additional time. During this time, we'll review the details of your inquiry (and may contact the merchant, if necessary). You will hear from us if we have an update or once this investigation has been resolved. You can check the status of your inquiry at any time by visiting **americanexpress.com/inquirycenter**.

You can receive future Account communications from us by e-mail. To set up this option, please visit Account Services at **americanexpress.com** and go to the Communication Preferences tab.

Please refer to the Frequently Asked Questions on the reverse page for other important information.

Thank you for your Card Membership.

Sincerely,

American Express Customer Care

Dispute Reference Number: O5L0741

The issuer of this Card is American Express National Bank.

3F23

CPLW01B    O5L0741    TRMUNDHS0020001    N    N

FILED DATE: 7/1/2025 3:23 PM   2025CH06932

002971 1/1

6419

Hearing Date: 8/29/2025 9:45 AM
Location: Court Room 2405
Judge: Reilly, Eve M

FILED
7/1/2025 3:23 PM
Mariyana T. Spyropoulos
CIRCUIT CLERK
COOK COUNTY, IL
2025CH06932
Calendar, 7
33389797

FILED DATE: 7/1/2025 3:23 PM   2025CH06932

# EXHIBIT G

**American Express**
PO Box 981532
El Paso, TX 79998



www.americanexpress.com

December 14, 2021

MB 01 005736 76166 E 19 A
|||||||||||||||||||||||||||||||||||||||||||||||||||||||
Robert G Schumann
18505 S Stewart Avenue
Homewood IL 604303035N

Account Ending In: 65004

Dear ROBERT G SCHUMANN,

We're writing to give you an update about your inquiry regarding a charge from EXPERIAN on your account listed above. We removed the $2,603.54 under review from your account during our investigation.

As a result, we reapplied the amount under review to your account. You can expect to see this change on an upcoming statement.

Thank you for your Card Membership.

Sincerely,

American Express Customer Care

Dispute Reference Number: O7A5702

The issuer of this Card is American Express National Bank.

| 3A01-10 | IND | 101U | CMS | IO8796A | O7A5702 | TRMUNCS20004001 | N | N |

FILED DATE: 7/1/2025 3:23 PM   2025CH06932

005736 1/1

FILED
7/1/2025 3:23 PM
Mariyana T. Spyropoulos
CIRCUIT CLERK
COOK COUNTY, IL
2025CH06932
Calendar, 7
33389797

FILED DATE: 7/1/2025 3:23 PM   2025CH06932

# EXHIBIT H

FILED DATE: 7/1/2025 3:23 PM   2025CH0682

**Zwicker & Associates**
Attorneys at Law
80 Minuteman Road, Andover, MA 01810-1008
Tel. (800) 363-3359   TTY (877) 249-1914
www.zwickerpc.com

To:   ROBERT SCHUMANN
      18505 S STEWART AVE
      HOMEWOOD, IL 60430

      **File ID:6307053**

October 4, 2023

**Zwicker & Associates, P.C. is a debt collector.** We are trying to collect a debt that you owe to AMERICAN EXPRESS. We will use any information you give us to help collect the debt.

## Our information shows:

You had an AMERICAN EXPRESS account with account number ending in 66002.

| | | |
|---|---|---|
| As of December 16, 2022, you owed: | | $ 2,556.83 |
| Between December 16, 2022 and today: | | |
| You were charged this amount in interest: | + | $ 0.00 |
| You were charged this amount in fees: | + | $ 0.00 |
| You paid or were credited this amount toward the debt: | - | $ 0.00 |
| **Total amount of the debt now:** | | **$ 2,556.83** |

## How can you dispute the debt?

- **Call or write to us by November 15, 2023, to dispute all or part of the debt.** If you do not, we will assume that our information is correct.

- **If you write to us by November 15, 2023, we must stop** collection on any amount you dispute until we send you information that shows you owe the debt. You may use the form below or write to us without the form. You may also include supporting documents.

## What else can you do?

- **Write to ask for the name and address of the original creditor,** if different from the current creditor. If you write by November 15, 2023, we must stop collection until we send you that information. You may use the form below or write to us without the form.

- **Go to www.cfpb.gov/debt-collection to learn more** about your rights under federal law. For instance, you have the right to stop or limit how we contact you.

- Contact us about your payment options.

<u>**Notice:** See reverse side for important information.</u>



- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -



**Mail this form to:**
Zwicker & Associates, P.C.
80 Minuteman Road
Andover, MA 01810-1008


ROBERT SCHUMANN
18505 S STEWART AVE
HOMEWOOD, IL 60430

## How do you want to respond?

*Check all that apply:*
☐ **I want to dispute the debt because I think:**

    ☐ This is not my debt.
    ☐ The amount is wrong.
    ☐ Other (please describe on reverse or attach additional information).

☐ **I want you to send me the name and address of the original creditor.**

☐ **I enclosed this amount:** | $ |

Make your check payable to *Zwicker & Associates, P.C.*
Include the File ID number 6307053.

Hearing Date: 9/2/2025 9:45 AM
Location: Court Room 2405
Judge: Reilly, Eve M

FILED
7/1/2025 3:23 PM
Mariyana T. Spyropoulos
CIRCUIT CLERK
COOK COUNTY, IL
2025CH06932
Calendar, 7
33389797

FILED DATE: 7/1/2025 3:23 PM   2025CH06932

# EXHIBIT I

FILED DATE: 7/1/2025 3:23 PM   2025CH06932



*AXP0315004979*



American Express
P.O. Box 10544
Dublin, OH 43017-0200

Claim Number: 3526900
Check Number: 3150049
Check Date: 01/12/2024
Check Amount: $1.00

000 0008393 00000000 0001 0001 08393 INS: 0 0
ROBERT SCHUMANN
917 RIDGE RD
UNIT 3333
MUNSTER, IN 46321-7017

January 12, 2024

Y1171 v.14

Account Ending in: 13004

Dear ROBERT SCHUMANN,

We're writing because we've enclosed a check to refund your account listed above. Making sure you know about any mistakes we find is important, so we'd like to explain what happened and what we've done to make it right.

**What happened**
We discovered that we owe you a refund on your above referenced account that we did not previously process due to a system error. This was a credit balance of less than $1.00 that was removed after pending on your account for five months. We sincerely apologize for this error and any confusion it may have caused.

**We've enclosed a check**
To make things right, we've issued the enclosed check as reimbursement for the value of the credit balance that was removed, along with any residual interest, if applicable. Please treat this check as you would a personal check, and deposit or cash it within 180 days of the date it was issued.

**We've taken care of everything for you**
Thank you for your understanding. While there's nothing further you need to do, if you have any questions, visit **americanexpress.com/contactus** to find the many ways to reach us.

Sincerely,

American Express Customer Care
CP-011033.1

This program is managed by American Express Travel Related Services Company, Inc. with assistance from Epiq Class Action & Claims Solutions, Inc. Epiq Class Action & Claims Solutions, Inc. is a program administrator retained by American Express for this purpose. **Please direct all mailed correspondence intended for American Express to the following address: American Express P.O. Box 981540 El Paso, TX 79998-1540.**



FILED
7/1/2025 3:23 PM
Mariyana T. Spyropoulos
CIRCUIT CLERK
COOK COUNTY, IL
2025CH06932
Calendar, 7
33389797

# EXHIBIT J

**citi**

April 28, 2024

PO BOX 6761
Sioux Falls, SD 57117

FILED DATE: 7/1/2025 3:23 PM 2025CH06932

## ⓘ UPDATE

00001251 1      57501057 DTF 00001251
ROBERT G SCHUMANN                    **N0023001
10505 STEWART AVE
HOMEWOOD IL 60430

Robert G Schumann
Application ID 240427653717719



# ⓘ We're unable to approve your application

Hi, Robert. Thank you for your interest in the Citi® Diamond Preferred® Mastercard®
account. We're unable to approve your application because:

- A delinquent credit obligation(s), either paid **or** unpaid, was recorded on your
  credit bureau report.

Please note, our decision was based in whole or in part on information in a report from
the following consumer reporting agency:

Equifax Credit Information Services
PO Box 740241
Atlanta, GA 30374-0241
1-800-685-1111
www.equifax.com

Even though the reporting agency provided the information, it had no part in our decision
and will not be able to provide specific reasons why we denied your request.

Under the Fair Credit Reporting Act, you have the right to know the information
contained in your credit file at the consumer reporting agency. You also have the right to
a free copy of your credit report if you request it from the consumer reporting agency no
later than 60 days after you receive this letter.

If you find any information in your credit report that is inaccurate or incomplete, you have
the right to dispute the matter by contacting the reporting agency at the address or





0.L0CD6501001.I2024042800007321.257.H.ZZ.SY.8000.SYSTEMB7654329937682514.Y.Y

FILED
7/1/2025 3:23 PM
Mariyana T. Spyropoulos
CIRCUIT CLERK
COOK COUNTY, IL
2025CH06932
Calendar, 7
33389797

FILED DATE: 7/1/2025 3:23 PM   2025CH06932

# EXHIBIT K

**BANK OF AMERICA** 

PO Box 660441
Dallas, TX 75266-0441



Account Closure

LV 0725    087 514    32215 #⬛01 AB 0.593
ROBERT G SCHUMANN
18505 STEWART AVE
HOMEWOOD IL 60430-3035

Credit card ending in
4439
Date
July 20, 2024

Robert G Schumann:

# We've made the decision to close your credit card — here's what you need to know.

We want to make sure you understand why we made our decision and how this change could affect you.

## How we made this decision

We carefully reviewed your account history, along with economic and loss trends and the report(s) provided by the consumer reporting agency(ies) listed below.

We also considered your relationship with us and, unfortunately, we had to close your account because of the following reasons:

Inactivity on this account
Current or past delinquency, derogatory public record(s), and/or collection account(s)
Current or past delinquency with one or more of your creditors

## Things you need to do

- **Destroy any credit cards and cash advance checks associated with this account** — we won't process any more transactions on this account.
- **Keep making your monthly payments** — you'll continue to get a monthly statement until your account balance is paid in full. You can still use Mobile and Online Banking to see your account and make your payments.
- **Cancel any recurring payments** — contact any businesses that are billing your account to cancel the payments and make other payment arrangements. This will help you avoid fees or service interruptions.
- **Make other arrangements for overdraft protection** — if your account is enrolled in Balance Connect™ for overdraft protection, it can no longer be used to provide this service.

## Want to know more?

There are steps you can take to better understand your information. Since you have the right to a free copy of your consumer report, we recommend you start there.

Bank of America and the Bank of America logo are registered trademarks of the Bank of America Corporation.
Bank of America, N.A. Member FDIC.

UPDOCUWCLS CR9_XM04

FILED
7/1/2025 3:23 PM
Mariyana T. Spyropoulos
CIRCUIT CLERK
COOK COUNTY, IL
2025CH06932
Calendar, 7
33389797

FILED DATE: 7/1/2025 3:23 PM   2025CH06932

# EXHIBIT L

System Generated Hearing Date: No hearing information was found.
Location: No hearing information was found.
Judge: No hearing information was found.

FILED
7/24/2024 6:50 PM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
20246007630
Courtroom, 0209
28653536

# STATE OF ILLINOIS
## IN THE CIRCUIT COURT OF COOK COUNTY
## MUNICIPAL DEPARTMENT, SIXTH MUNICIPAL DISTRICT

AMERICAN EXPRESS NATIONAL BANK,

    Plaintiff

v.

ROBERT SCHUMANN AKA ROBERT G SCHUMANN,

    Defendant(s)

No. 20246007630

Amount Claimed: $2,556.83

## COMPLAINT

NOW COMES the Plaintiff, AMERICAN EXPRESS NATIONAL BANK, by and through its Attorneys, Zwicker and Associates, P.C. and complaining of the Defendant(s), ROBERT SCHUMANN AKA ROBERT G SCHUMANN, states as follows:

### COUNT I – BREACH OF CONTRACT

1.    Plaintiff is a National Bank located in Utah.

2.    The Defendant(s), ROBERT SCHUMANN AKA ROBERT G SCHUMANN, is/are a natural person(s) presently residing at 18505 S STEWART AVE, HOMEWOOD, IL 60430.

3.    The Plaintiff established a credit account ("Account") in the name of the Defendant(s).  The Account is identified as ending in 6002.

267053030630

4.      Plaintiff issued, at the same time as, or prior to issuing said credit account, an Account Agreement ("Agreement") to the Defendant(s).

5.      The Agreement offered Defendant(s) use of the Account pursuant to the terms set forth therein.

6.      The establishment of the Account in conjunction with the delivery of the Agreement served as an offer of terms extended to Defendant(s).

7.      Defendant(s) received the credit card and the Agreement.

8.      Plaintiff, from time to time, modifies the Agreement and the modification applies to any existing balance on the Account as well as any future balance on the account.  The attached Agreement terms were communicated to Defendant(s), sent via USPS mail to the address(es) provided by the Defendant(s) or otherwise made available electronically or provided to Defendant(s) in the manner designated by Defendant(s).

9.      By the terms set forth in the Agreement, upon the Defendant(s)' use of the Account, a contract was entered into between the Plaintiff and the Defendant(s), the terms and conditions of said contract as being set forth in the Agreement. (See attached Exhibit A, the Cardmember Agreement).

10.     Defendant(s) used the account.

11.     Plaintiff honored the charges to the account pursuant to the terms of the Agreement.

12.     The terms of the Agreement further provided, in summary, that the Defendant(s) would pay the Plaintiff for all charges made on his/her account, as more fully set forth therein.

13.     Thereafter, Defendant(s) defaulted on said account by failing to make

payments pursuant to the terms of the Agreement.

14. There is a balance due on said account in the amount of $2,556.83.

15. Due demand has been made on Defendant(s) for the payment of this sum.

16. Defendant(s) has/have failed and continues to fail to pay.

17. This suit was filed within the relevant statute of limitations.

18. Pursuant to the Agreement, Plaintiff is entitled to court costs.


Wherefore, Plaintiff demands judgment in the amount of $2,556.83 against

Defendant(s), and court costs to the extent permitted by applicable law.

Respectfully submitted,

*J. Everett Karbin*

[ ] R. RYAN SCARFONE, ESQ. ARDC# 6315718
[ ] THOMAS MARCH, ESQ. ARDC# 6330082
[X] J. EVERETT KARBIN, ESQ. ARDC# 6337700
[ ] ALYSSA M. ROSCH, ESQ. ARDC# 6325833
[ ] ROBERT E. HANEY, ESQ. ARDC# 6189905
[ ] JEREMIAH SHAVERS, ESQ. ARDC# 6330425
One of its Attorneys

Zwicker and Associates, P.C.
A Law Firm Engaged in Debt Collection
R. RYAN SCARFONE, ESQ. as Lead Attorney for Plaintiff
5500 PEARL ST. SUITE 105
ROSEMONT, IL 60018
(847)678 9925
(800)370 2251
ILLINOISLITIGATION@ZWICKERPC.COM
Dupage: 229977, Winnebago: 7614, Cook: 44826

FILED DATE: 7/24/2025 3:52 PM

AMERICAN EXPRESS NATIONAL BANK,     )

Plaintiff         )
         )
     v.     )    CASE NUMBER:
         )

ROBERT SCHUMANN AKA ROBERT G     )

SCHUMANN,         )

Defendant(s)         )

### CREDIT CARD OR DEBT BUYER COLLECTION ACTION AFFIDAVIT
### (SUPREME COURT RULE 280.2)

INSTRUCTIONS: Provide the following information and documents. Supreme Court Rule 280.1 provides the definitions of the terms in this Affidavit.

Comes now affiant, and states:

I am a designated Agent of AMERICAN EXPRESS NATIONAL BANK successor by merger to AMERICAN EXPRESS BANK, FSB  (Plaintiff).

I am of adult age and am fully authorized by Plaintiff to make the following representations. I am familiar with the record keeping practices of Plaintiff. The following representations are true according to documents kept in the normal course of Plaintiffs business and/or my personal knowledge:

1.    IDENTIFICATION ABOUT THE CONSUMER DEBT OR ACCOUNT

    Complete the tables.

    a.  As of charge-off date:

| Full name of the creditor | Full name of the defendant as it appears on the account | Last four digits of the account number | Date the account was opened or the debt originated | Nature of the debt, (credit card debt, payday loan, retail installment loan, etc.) |
|---|---|---|---|---|
| AMERICAN EXPRESS NATIONAL BANK successor by merger to AMERICAN EXPRESS BANK, FSB | ROBERT SCHUMANN AKA ROBERT G SCHUMANN | 6002 (previously 1003) | 02/22/16 | credit card debt |

ZAIL

IL_AENB_001                        Page 1

b.  The most recent activity on the account prior to or after charge-off, includes:

| Amount of Original Debt or Charge-off Balance | Charge-off Date | Date of Last Payment | Amount of Last Payment | Total Amount of Credits and/or Payments Since Charge-off Date** |
|---|---|---|---|---|
| $2,556.83 | 12/16/2022 | 9/17/2021 | $282.00 | $0.00 |

\* Last payment on the account, pre- or post-charge off.
\*\*Credits or payments made within 30 days of signing of this affidavit may not be reflected.

c.  For a revolving credit account, Plaintiff further certifies that it has in its possession and can produce on request the most recent monthly statement recording a purchase, transaction, last payment or balance transfer.

2.  PROOF OF OWNERSHIP OR RIGHT TO SUE FOR DEBT BUYERS

Complete the table and list the prior owners or creditors since the charge-off date. Start with the first assignment through the current creditor or owner of the consumer debt. List in chronological order, beginning with the first assignment:

| From (Name) | To (Name) | Date of Assignment (On or About) |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

☒ Does not apply — Plaintiff is the charge-off creditor.

3.  ADDITIONAL ACCOUNT INFORMATION AFTER CHARGE-OFF

Plaintiff is seeking additional amounts after the charge-off date:

☒ No *

☐ Yes. If yes, as the charge-off date and within the last 30 days:

☐ Total amount of interest accrued: $ _____;

☐ Total amount of non-interest charges or fee accrued $ _____;

☐ Plaintiff is seeking attorney's fees in the amount of $ _____.

☐ Returned payment(s) in the amount of $ _____.

**Balance due and owing as of date of affidavit: $2,556.83**
\*Costs prayed for in the Complaint will not be reflected.

ZAIL
IL_AENB_001                                   Page **2**

Affiants may certify their statements pursuant to section 109 of the Code of Civil Procedure or have their signature notarized in the manner required by law.

Under penalties as provided by law under section 1-109 of the Code of Civil Procedure, the undersigned certifies that the statements set forth in this instrument are true and correct, except as to matters therein stated to be on information and belief and as to such matters the undersigned certifies as aforesaid that [s]he verily believes the same to be true.

**Vivian Hinds**
_____
Name of Affiant

_Vivian Hinds_
_____
Signature of Affiant

7/17/24
_____
Date

STATE OF ARIZONA
COUNTY OF MARICOPA

Subscribed and sworn (or affirmed) before me this ___17___ day of ___July___, 2024

(Seal)



_____
Notary

ARIEL EVANS
Notary Public - Arizona
Maricopa County
Commission # 599937
My Comm. Expires Mar 27, 2025

Department of Defense Manpower Data Center

Results as of : Jul-12-2024 12:13:39 PM

SCRA 5.21



## Status Report
## Pursuant to Servicemembers Civil Relief Act

SSN: XXX-XX-9682
Birth Date:
Last Name: SCHUMANN
First Name: ROBERT
Middle Name:
Status As Of: Jul-12-2024
Certificate ID: RSTZXX1MCRL4H02

| On Active Duty On Active Duty Status Date | | | |
|---|---|---|---|
| Active Duty Start Date | Active Duty End Date | Status | Service Component |
| NA | NA | No | NA |
| This response reflects the individuals' active duty status based on the Active Duty Status Date | | | |

| Left Active Duty Within 367 Days of Active Duty Status Date | | | |
|---|---|---|---|
| Active Duty Start Date | Active Duty End Date | Status | Service Component |
| NA | NA | No | NA |
| This response reflects where the individual left active duty status within 367 days preceding the Active Duty Status Date | | | |

| The Member or His/Her Unit Was Notified of a Future Call-Up to Active Duty on Active Duty Status Date | | | |
|---|---|---|---|
| Order Notification Start Date | Order Notification End Date | Status | Service Component |
| NA | NA | No | NA |
| This response reflects whether the individual or his/her unit has received early notification to report for active duty | | | |

Upon searching the data banks of the Department of Defense Manpower Data Center, based on the information that you provided, the above is the status of the individual on the active duty status date as to all branches of the Uniformed Services (Army, Navy, Marine Corps, Air Force, Space Force, NOAA, Public Health, and Coast Guard). This status includes information on a Servicemember or his/her unit receiving notification of future orders to report for Active Duty.

*Sam Yousefzadeh*

Sam Yousefzadeh, Director
Department of Defense - Manpower Data Center
4800 Mark Center Drive, Suite 04E25
Alexandria, VA 22350

The Defense Manpower Data Center (DMDC) is an organization of the Department of Defense (DoD) that maintains the Defense Enrollment and Eligibility Reporting System (DEERS) database which is the official source of data on eligibility for military medical care and other eligibility systems.

The DoD strongly supports the enforcement of the Servicemembers Civil Relief Act (50 USC App. § 3901 et seq, as amended) (SCRA) (formerly known as the Soldiers' and Sailors' Civil Relief Act of 1940). DMDC has issued hundreds of thousands of "does not possess any information indicating that the individual is currently on active duty" responses, and has experienced only a small error rate. In the event the individual referenced above, or any family member, friend, or representative asserts in any manner that the individual was on active duty for the active duty status date, or is otherwise entitled to the protections of the SCRA, you are strongly encouraged to obtain further verification of the person's status by contacting that person's Service. Service contact information can be found on the SCRA website's FAQ page (Q35) via this URL: https://scra.dmdc.osd.mil/scra/#/faqs. If you have evidence the person was on active duty for the active duty status date and you fail to obtain this additional Service verification, punitive provisions of the SCRA may be invoked against you. See 50 USC App. § 3921(c).

This response reflects the following information: (1) The individual's Active Duty status on the Active Duty Status Date (2) Whether the individual left Active Duty status within 367 days preceding the Active Duty Status Date (3) Whether the individual or his/her unit received early notification to report for active duty on the Active Duty Status Date.

## More information on "Active Duty Status"

Active duty status as reported in this certificate is defined in accordance with 10 USC § 101(d) (1). Prior to 2010 only some of the active duty periods less than 30 consecutive days in length were available. In the case of a member of the National Guard, this includes service under a call to active service authorized by the President or the Secretary of Defense under 32 USC § 502(f) for purposes of responding to a national emergency declared by the President and supported by Federal funds. All Active Guard Reserve (AGR) members must be assigned against an authorized mobilization position in the unit they support. This includes Navy Training and Administration of the Reserves (TARs), Marine Corps Active Reserve (ARs) and Coast Guard Reserve Program Administrator (RPAs). Active Duty status also applies to a Uniformed Service member who is an active duty commissioned officer of the U.S. Public Health Service or the National Oceanic and Atmospheric Administration (NOAA Commissioned Corps).

## Coverage Under the SCRA is Broader in Some Cases

Coverage under the SCRA is broader in some cases and includes some categories of persons on active duty for purposes of the SCRA who would not be reported as on Active Duty under this certificate. SCRA protections are for Title 10 and Title 14 active duty records for all the Uniformed Services periods. Title 32 periods of Active Duty are not covered by SCRA, as defined in accordance with 10 USC § 101(d)(1).

Many times orders are amended to extend the period of active duty, which would extend SCRA protections. Persons seeking to rely on this website certification should check to make sure the orders on which SCRA protections are based have not been amended to extend the inclusive dates of service. Furthermore, some protections of the SCRA may extend to persons who have received orders to report for active duty or to be inducted, but who have not actually begun active duty or actually reported for induction. The Last Date on Active Duty entry is important because a number of protections of the SCRA extend beyond the last dates of active duty.

Those who could rely on this certificate are urged to seek qualified legal counsel to ensure that all rights guaranteed to Service members under the SCRA are protected

WARNING: This certificate was provided based on a last name, SSN/date of birth, and active duty status date provided by the requester. Providing erroneous information will cause an erroneous certificate to be provided.

# Cardmember Agreement: Part 1 of 2

As of: 02/22/2016

**SimplyCash® Business Card**
**Issuer:** American Express Bank, FSB
**Credit Limit:** $14,000 (**Cash Advance Limit:** $2,800)

**Company Name:** R R S INC
**Cardmember Name:** ROBERT SCHUMANN
**Account** [REDACTED]1003

## Rates and Fees Table

| Interest Rates | |
|---|---|
| **Annual Percentage Rate (APR) for Purchases** | **0.00%** introductory APR through your billing period that ends in December, 2016.<br><br>After that, your APR will be **12.49%** (Prime Rate + 8.99%). This APR will vary based on the Prime Rate. |
| **APR for Cash Advances** | **25.49%** (Prime Rate + 21.99%)<br>This APR will vary based on the Prime Rate. |
| **Penalty APR and When it Applies** | **29.49%** (Prime Rate + 25.99%)<br><br>This APR will vary based on the Prime Rate.<br><br>This APR will apply to all balances on your account if you:<br>   1) make a payment that is returned<br>   2) make 2 late payments in 12 months; or<br>   3) do not make the Minimum Payment due by the closing date of the billing period in which it is due.<br><br>**How Long Will the Penalty APR Apply?** If the penalty APR is applied for any of these reasons, it will apply, subject to applicable law, for at least 12 billing periods in a row. In addition, the penalty APR will continue to apply until after you have made timely payments with no returned payments for 12 billing periods in a row. |
| **Paying Interest** | Your due date is at least 25 days after the close of each billing period. We will not charge you interest on purchases if you pay your entire balance by the due date each month. We will begin charging interest on cash advances on the transaction date. |

| Fees | |
|---|---|
| **Annual Membership Fee** | **None** |
| **Transaction Fees**<br>·   Cash Advance<br>·   Foreign Transaction | <br>Either **$5** or **3%** of the amount of each cash advance, whichever is greater.<br>**2.7%** of each transaction after conversion to US dollars. |
| **Penalty Fees**<br>·   Late Payment<br>·   Returned Payment<br>·   Overlimit | <br>Up to **$38**.<br>**$38**<br>**None** |

**How we calculate interest:** We use the Average Daily Balance method (including new transactions). See the ***How we calculate interest*** section in Part 2.

**Loss of Introductory APR:** If you make a late payment we will end any introductory APRs and apply the APR for purchases. But if a penalty APR applies to your account for any reason we will end any introductory APRs and a penalty APR will apply to your Account.

## How Rates and Fees Work

| Rates | |
|---|---|
| **Calculating APRs and DPRs** | The Annual Percentage Rate (**APR**) for variable rates is determined by adding an amount (**margin**) to the Prime Rate (see **Determining the Prime Rate** in Part 2). The Daily Periodic Rate (**DPR**) is 1/365th of the APR, rounded to one ten-thousandth of a percentage point. |

| Rate Description | Prime + Margin | APR | DPR |
|---|---|---|---|
| Introductory Purchase | n/a | 0.00% | 0.0000% |
| Purchase | Prime + 8.99% | 12.49% | 0.0342% |
| Cash Advance | Prime + 21.99% | 25.49% | 0.0698% |
| Penalty | Prime + 25.99% | 29.49% | 0.0808% |

| | |
|---|---|
| **When the penalty APR will apply** | The penalty APR applies to all balances on your account if<br>· you do not pay at least the Minimum Payment Due by the Closing Date of the billing period in which it is due;<br>· you do not pay at least the Minimum Payment Due by the Payment Due Date 2 times in 12 billing periods; or<br>· your payment is returned by your bank. |
| **How long the penalty APR will apply** | The penalty APR will continue to apply until after you have made timely payments with no returned payments for 12 billing periods in a row. |

| Fees | |
|---|---|
| We add fees to a purchase balance, unless we tell you otherwise. | |
| **Annual Membership** | This fee is on the **Rates and Fees Table** on page 1 of Part 1. |
| **Late Payment** | Up to $38. If we do not receive the Minimum Payment Due by its Payment Due Date, the fee is $38. However, the late fee will not exceed the Minimum Payment Due. Paying late may also result in a penalty APR. See **When the penalty APR will apply** above. |
| **Returned Payment** | $38 if your payment is returned unpaid the first time we present it to your bank. A returned payment may also result in a penalty APR. See **When the penalty APR will apply** above. |
| **Returned Check** | $38 if you use your card to cash a check at one of our approved locations and the check is returned unpaid. We will also charge you the unpaid amount. |
| **Overlimit** | None. See **Credit limit and cash advance limit** in Part 2. |
| **Balance Transfer** | The fee will be stated in a promotional offer or at the time of a transaction. This fee is a finance charge. We will add it to the same balance as the balance transfer. |
| **Cash Advance** | 3% of the withdrawal and other services you obtain (including any fee charged by the ATM operator), with a minimum of $5. We will add this fee to the cash advance balance. |
| **Foreign Transaction** | 2.7% of the converted U.S. dollar amount. This fee is a finance charge. See Part 2 for **Converting charges made in a foreign currency.** |

**Part 1, Part 2 and any supplements or amendments make up your Cardmember Agreement.**

## Supplement to the Cardmember Agreement

## How Your Reward Program Works

### SimplyCash®

| | | |
|---|---|---|
| **How you earn a rebate** | You will earn a rebate for eligible purchases on your American Express SimplyCash® Business Credit Card *(Card Account)*. The rebate you earn is based on a percentage of the eligible purchases you make during each billing period and will be automatically credited to your account as a statement credit. The rebate will appear on the second billing statement after the billing statement with the eligible purchases. You will not receive the rebate if your Card account is cancelled or in default at the time of fulfillment. | **Available Categories**<br><br>You may select your 3% rebate category from the following seven categories: (1) airfare purchased directly from airlines, (2) hotel stays (excluding timeshares, banquets and events), (3) purchases from select major car rental companies listed at americanexpress.com/rewards-info, (4) purchases at U.S. gas stations, (5) purchases at U.S. restaurants, (6) U.S. purchases for shipping, or (7) U.S. purchases for advertising in select media. For more details on these categories including important terms and limitations, please visit **americanexpress.com/rewards-info.** |
| | **Rebate Percentages**<br><br>A *rebate year* is 12 billing periods, starting with the one that includes February 1. If your billing cycle changes, the length of your rebate year will also change. For each rebate year, you will earn a rebate of:<br>· 5% on your first $25,000 (1% thereafter) of combined eligible purchases made on or at:<br> · monthly wireless telephone services purchased directly from wireless telephone service providers in the U.S. (purchases of hardware and equipment, and purchases from third parties and resellers, are excluded)<br> · office supply stores located in the U.S. (office supplies purchased at other retail stores are excluded);<br>· 3% on your first $25,000 (1% thereafter) of eligible purchases made in the category that you select (see below for more on the available categories and how to make your selection),<br>· 1% on all other eligible purchases. | **Category Selection**<br><br>You may select your 3% rebate category from the list described above within the first two months of Card Membership. Thereafter, you can change your selection during the annual selection period which runs from December 1st to January 31st each year. You can only change your category once annually. You can make your category selection by either calling the number on the back of your Card or going to open.com/cashback. Once you make your selection, it will be applied starting on the day on which you make your selection. If you do not make a selection during the initial enrollment period, you will receive your 3% rebate on purchases at US gas stations. If you do not change your election during the annual selection period, your category will remain the same as the previous year. Only the Basic Card Member or Authorized Account Manager with Full Access may make the selection and their selection will apply to purchases made by all Card Members on the account. |
| | **Eligible Purchases**<br><br>*Eligible purchases* are purchases for goods and services minus returns and other credits. Eligible purchases do NOT include: fees or interest charges, balance transfers, cash advances, purchases of traveler's checks, purchases or reloading of prepaid cards, or purchases of any cash equivalents. Additional terms and restrictions apply. | **Category Disclosure:**<br><br>Merchants are typically assigned codes and categorized based on what they primarily sell. A purchase will not earn a higher percentage rebate if the merchant's code is not eligible. Purchases made through a third-party payment account or on an online marketplace (with multiple retailers) will not earn a higher percentage rebate. A purchase may not earn a higher percentage rebate if the merchant submits the purchase using a mobile or wireless card reader or if you use a mobile or digital wallet. |
| **How you will get your rebate** | You will receive your rebate as a statement credit. The rebate will appear on the second billing statement after the billing statement on which the eligible purchases appear. | |
| **When you will forfeit your rebate** | If the Minimum Payment Due is not paid by the Closing Date of the billing period in which it is due, you will forfeit the rebate earned during that billing period. | You will forfeit your rebate if your Card Account is cancelled before we issue the credit. |

| | | |
|---|---|---|
| **Other things you should know about this program** | You may forfeit some or all of the rebate you have earned for items that are not purchased for use or consumption by the Company in its ordinary course of business.<br><br>We may change the terms of this program at our discretion.<br><br>If you violate or abuse this program, you may forfeit the rebate. | If there is a dispute with any of your purchases, the amount of that purchase will not count toward your rebate until the dispute is resolved.<br><br>If a credit to your Card Account places your annual eligible purchases in a negative status, the rebate on your billing statement will show a zero balance. The statement will show a zero balance until you accumulate eligible purchases equal to the negative balance. |

# Cardmember Agreement: Part 2 of 2

## How Your American Express Account Works

### Introduction

**About your Cardmember Agreement**

This document together with Part 1 make up the Cardmember Agreement *(Agreement)* for the *Account* identified on page 1 of Part 1. Any supplements or amendments are also part of the Agreement.

When you or an Additional Cardmember, as defined below, use the Account (or sign or keep a card), you agree to the terms of the Agreement.

**Words we use in the Agreement**

*We, us,* and *our* mean the issuer shown on page 1 of Part 1. Except as provided below, *Basic Cardmember* means the person who applied for this Account or to whom we address billing statements. *Company* means the business for which the Account is established. *You* and *your* mean the Basic Cardmember and the Company. You agree, jointly and severally, to be bound by the terms of this Agreement.

*Card* means any card or other device that we issue to access the Account. A *charge* is any amount added to the Account, such as purchases, cash advances, balance transfers, fees and interest charges. A *purchase* is a charge for goods or services. A *cash advance* is a charge to get cash or cash equivalents. A *balance transfer* is a charge to pay an amount you owe on another credit card account.

To *pay* by a certain date means to send your payment so that we receive it and credit it to your Account by that date (see *About your payments* in Part 2).

**Additional Cardmembers**

At your request, we may issue cards to *Additional Cardmembers*. They do not have accounts with us but they can use your Account subject to the terms of this Agreement.

You are responsible for all use of the Account by Additional Cardmembers and anyone they allow to use the Account. You must pay for all charges they make. You must share this agreement with all Additional Cardmembers.

You must tell Additional Cardmembers that:
- we may obtain, provide and use information about them.
- their use of the Account is subject to this Agreement.

You authorize us to give Additional Cardmembers information about the Account and to discuss it with them.

If you want to cancel an Additional Cardmember's right to use your Account (and cancel their card) you must tell us.

We may refer to *Additional Card(s)* and *Additional Cardmember(s)* as *Employee Card(s)* and *Employee Cardmember(s)*. All terms and conditions that apply to Additional Cards also apply to Employee Cards.

**Replacement Basic Cardmember**

You must tell us if the Basic Cardmember is no longer an employee or officer of the Company or does not want to be the Basic Cardmember. In that case, you must either close the Account, or propose another person to replace the Basic Cardmember.

If you propose another person to replace the Basic Cardmember, that person must agree to assume the

obligations and liabilities of the Basic Cardmember under this Agreement, as of the date that such person replaces the Basic Cardmember. That person is subject to our approval.

You agree that the Basic Cardmember remains the Basic Cardmember until we approve a replacement or the Account is closed.

### About using your card

**Using the card**

Cards may be used for purchases. At our discretion, we may permit you to make cash advances or balance transfers. You cannot transfer balances from any other account issued by us and/or our affiliates. Each Cardmember acknowledges and agrees that cards are intended to be used for the Company's commercial or business purposes.

You may arrange for certain merchants to store your card number and expiration date, so that, for example:
- the merchant may charge your account at regular intervals; or
- you may make charges using that stored card information.

We may (but are not required to) tell these merchants if your expiration date or card number changes or if your account is cancelled. You must notify the merchants directly if you want them to stop charging your Account.

Keep the cards safe. Do not let anyone use them. If a card is lost or stolen or the Account is being used without permission, contact us right away. The Account may not be used for illegal activities.

**Promise to pay**

You promise to pay all charges, including:
- charges you make, even if you do not present your card or sign for the transaction,
- charges that other people make, whether or not you or an Additional Cardmember intend to let them use the Account, subject to applicable law, and if you let them use your Account, and
- charges that Additional Cardmembers make or permit others to make.

| Credit limit and cash advance limit | We assign a *Credit Limit* to the Account. We may make part of the Credit Limit available for cash advances (*Cash Advance Limit*). There may also be a limit on the amount you can withdraw from ATMs in a given period. The Credit Limit and Cash Advance Limit are shown on page 1 of Part 1 and on each billing statement.

We may increase or reduce the Credit Limit and Cash Advance Limit. We may do so even if you pay on time and the Account is not in default. | You agree to manage the Account so that:
- the Account balance (including fees and interest) is not more than the Credit Limit, and
- the cash advance balance (including fees and interest) is not more than the Cash Advance Limit.

We may approve charges that cause the Account balance to go over the Credit Limit. If we do this, we will not charge an overlimit fee. If we ask you to promptly pay the amount of the Account balance above the Credit Limit, you agree to do so. |
| Declined transactions | We may decline to authorize a charge. Reasons we may do this include suspected fraud and our assessment of your creditworthiness. This may occur even if the charge would not cause you to go over your Credit Limit and your Account is not in default. | We are not responsible for any losses you or any Additional Cardmembers incur if we do not authorize a charge. And we are not responsible if any merchant refuses to accept the card. |

## About your payments

| When you must pay | You must pay at least the Minimum Payment Due by the Payment Due Date. The Minimum Payment Due and Payment Due Date are shown on each billing statement.

Each statement also states the time and manner by which you must make your payment for it to be credited as of the same day it is received. For your payment to be considered on time, we must receive at least the Minimum Payment Due in such time and | manner by the Payment Due Date shown on your billing statement.

Each statement also shows a Closing Date. The Closing Date is the last day of the billing period covered by the statement. Each Closing Date is about 30 days after the previous statement's Closing Date. |
| How to make payments | Make payments to us in U.S. dollars with:
- a single check drawn on a U.S. bank, or
- a single negotiable instrument clearable through the U.S. banking system, for example a money order, or
- an electronic payment that can be cleared through the U.S. banking system.

When making a payment by mail:
- make a separate payment for each Account,
- mail your payment to the address shown on the payment coupon on the billing statement, and
- write the Account number on your check or negotiable instrument and include the payment coupon.

If your payment meets the above requirements, we will credit it to the Account as of the day we receive it, as long as we receive it by the time disclosed in the | billing statement. If we receive it after that time, we will credit the payment on the day after we receive it.

If your payment does not meet the above requirements, there may be a delay in crediting the Account. This may result in late fees and additional interest charges (see *How Rates and Fees Work* on page 2 of Part 1).

If we decide to accept a payment made in a foreign currency, we will choose a rate to convert your payment into U.S. dollars, unless the law requires us to use a particular rate.

If we process a late payment, a partial payment, or a payment marked with any restrictive language, that will have no effect on our rights and will not change this Agreement. |
| How we apply payments and credits | Your Account may have balances with different interest rates. For example, purchases may have a lower interest rate than cash advances. If your Account has balances with different interest rates, here is how we generally apply payments in a billing period:
- We apply your payments, up to the Minimum Payment Due, first to the balance with the lowest interest rate, and then to balances with higher interest rates.
- After the Minimum Payment Due has been paid, we apply your payments to the balance with the highest interest rate, and then to balances with lower interest rates.

In most cases, we apply a credit to the same balance as the related charge. For example, we apply a credit for a purchase to the purchase balance. We may apply payments and credits within balances, and among balances with the same interest rate, in any order we choose. | |

## About your Minimum Payment Due

| How we calculate your Minimum Payment Due | To calculate the Minimum Payment Due for each statement, we start with the *higher* of:

(1) interest charged on the statement plus 1% of the New Balance (excluding any overlimit amount, penalty fees and interest on the statement); or
(2) $35.

Then we add any penalty fees shown on the statement and 1/24th of any overlimit amount, round to the nearest dollar, and add any amount past due.

Your Minimum Payment Due may also include any additional amount specified in a promotional offer. Your Minimum Payment Due will not exceed your New Balance. You may pay more than the Minimum Payment Due, up to your New Balance, at any time. | *EXAMPLE: Assume that your New Balance is $3,000, interest is $29.57, and you have no overlimit amount, penalty fees, or amounts past due.*

(1) *$29.57 + 1% x ($3,000 - $29.57) = $59.27*
(2) *$35*
*The higher of (1) or (2) is $59.27, which rounds to $59.00.* |

## About interest charges

**When we charge interest**

We charge interest beginning on the date of each transaction. You can avoid paying interest on purchases as described below. However, you cannot avoid paying interest on cash advances and balance transfers.

If you pay the New Balance on every statement by the Payment Due Date, we will not charge interest on purchases.

If you do not pay the New Balance on a statement by the Payment Due Date and then you pay the New Balance on the next statement by the Payment Due Date, we will not charge interest on purchases from the date of your payment to the Closing Date of the billing period in which you made that payment. But we will charge interest on purchases from the beginning of that billing period until the date of your payment. If you do not pay the New Balance on a statement by the Payment Due Date and then you pay the New Balance on each of the next two statements by their Payment Due Dates, we will not charge interest on purchases on the following statement.

Also, we will not charge interest on purchases on a statement if the Previous Balance on that statement is zero or a credit balance.

**How we calculate interest**

We calculate interest for a billing period by first calculating interest on each balance. Different categories of transactions--such as purchases and cash advances--may have different interest rates. Balances within each category may also have different interest rates.

We use the **Average Daily Balance method (including new transactions)** to calculate interest charges for each balance. The total interest charged for a billing period is the sum of the interest charged on each balance.

**Interest**
The interest charged for a balance in a billing period, except for variations caused by rounding, equals:
- Average Daily Balance (*ADB*) x
- Daily Periodic Rate (*DPR*) x
- number of days the DPR was in effect.

**ADB**
To get the ADB for a balance, we add up its *daily balances*. Then we divide the result by the number of days the DPR for that balance was in effect. If the daily balance is negative, we treat it as zero.

**DPR**
A DPR is 1/365th of an APR, rounded to one tenthousandth of a percentage point. Your DPRs are shown in *How Rates and Fees Work* on page 2 of Part 1.

*EXAMPLE: Calculating Interest*
*Assume that you have a single interest rate of 15.99%, your ADB is $2,250 and there are 30 days in the billing period.*
*The DPR is 15.99% ÷ 365 days = 0.0438%*
*The Interest is $2,250 x 0.0438% x 30 days = $29.57*

**Daily Balance**
For each day a DPR is in effect, we calculate the daily balance by:
- taking the *beginning balance* for the day,
- adding any new charges,
- subtracting any payments or credits; and
- making any appropriate adjustments.

We add a new charge to a daily balance as of its transaction date.

**Beginning balance**
For the first day of a billing period, the beginning balance is the ending balance for the prior billing period, including unpaid interest. For the rest of the billing period, the beginning balance is the previous day's daily balance *plus an amount of interest equal to the previous day's daily balance multiplied by the DPR for that balance. This method of calculating the beginning balance results in daily compounding of interest.*

When an interest rate changes, the new DPR may come into effect during--not just at the beginning of-- the billing period. When this happens, we will create a new balance and apply the new DPR to it. To get the beginning balance on the first day for this new balance, we multiply the previous day's daily balance by the old DPR and add the result to that day's daily balance.

**Other methods**
To calculate the ADB and interest charges, we may use other formulas or methods that produce equivalent results. Also, we may choose not to charge interest on certain types of charges.

**Determining the Prime Rate**

We use the Prime Rate from the rates section of *The Wall Street Journal*. The Prime Rate for each billing period is the Prime Rate published in *The Wall Street Journal* 2 days before the Closing Date of the billing period.

*The Wall Street Journal* may not publish the Prime Rate on that day. If it does not, we will use the Prime Rate from the previous day it was published. If *The Wall Street Journal* is no longer published, we may use the Prime Rate from any other newspaper of general circulation in New York, New York. Or we may choose to use a similar published rate.

If the Prime Rate increases, variable APRs (and corresponding DPRs) will increase. In that case, you may pay more interest and may have a higher Minimum Payment Due. When the Prime Rate changes, the resulting changes to variable APRs take effect as of the first day of the billing period.

## Other important information

| | | |
|---|---|---|
| **Changing the Agreement** | We may change the terms of, or add new terms to, this Agreement. We may apply any changed or new terms to any existing and future balances on the Account, subject to applicable law. | This written Agreement is a final expression of the agreement governing the Account. The written Agreement may not be contradicted by any alleged oral agreement. |
| **Converting charges made in a foreign currency** | If you make a charge in a foreign currency, we will convert it into U.S. dollars on the date we or our agents process it. Unless a particular rate is required by law, we will choose a conversion rate that is acceptable to us for that date. The rate we use is no more than the highest official rate published by a government agency or the highest interbank rate we identify from customary banking sources on the conversion date or the prior business day. This rate may differ from rates that are in effect on the date of your charge. We will bill charges converted by establishments (such as airlines) at the rates they use. | |
| **Changing your billing address** | You must notify us immediately if you change the:<br>• mailing address, email address, telephone numbers, or fax numbers that we use to send you billing statements, notices or other communications.<br>• legal entity of the Company.<br>• tax identification number. | |
| **Closing your Account** | You may instruct us to close the Account by calling us or writing to us. The Basic Cardmember agrees to inform the Company prior to instructing us to do so. | The Basic Cardmember and the Company remain jointly and severally liable for all Charges made on the Account. |
| **Cancelling or suspending your Account** | We may:<br>• cancel your Account,<br>• suspend the ability to make charges,<br>• cancel or suspend any feature on your Account,<br>• notify merchants that your Account has been cancelled or suspended.<br><br>If we do any of these, you must still pay us for all charges under the terms of this Agreement.<br><br>We may do any of these things at our discretion, even if you pay on time and your Account is not in default. | If your Account is cancelled, you must destroy all cards.<br><br>We may agree to reinstate the Account after a cancellation. If we do this, we may:<br>• reinstate any cards, including additional cards.<br>• charge you any applicable fees, including annual fees.<br>• charge you a fee for reinstating the Account. |
| **About default** | We may consider your Account to be in default if:<br>• you violate a provision of this Agreement,<br>• you give us false information,<br>• you file for bankruptcy,<br>• you default under another agreement you have with us or an affiliate,<br>• you become incapacitated or die, or<br>• we believe you are unable or unwilling to pay your debts when due. | If we consider your Account in default, we may:<br>• suspend your ability to make charges,<br>• cancel or suspend any feature on your Account,<br>• cancel the Account and require you to pay the Account balance immediately.<br>• require you to pay more than your Minimum Payment Due immediately. |
| **Collection costs** | You agree to pay all reasonable costs, including attorneys' fees, that we incur to collect amounts you owe or to protect ourselves from loss, harm or risk relating to default. | |
| **Credit reports** | You agree that we will obtain credit reports about you, investigate your ability to pay, and obtain information about you from other sources including information to verify and re-verify your employment and income. And you agree that we will use such information for any purposes, subject to applicable law.<br><br>You agree that we will give information about the Account to credit reporting agencies. We will tell a credit reporting agency if you fail to comply with any term of this Agreement. This may have a negative impact on your credit report.<br><br>If you believe information we have given to a credit reporting agency is incorrect, write to us at: American Express Credit Bureau Unit, P.O. Box 981537, El Paso, TX 79998-1537. When you write to us, tell us the specific information you believe is incorrect. | |
| **Sending you notices** | We send you notices through the U.S. mail (postage prepaid) or electronically using the information in our records. Any notice we send you is deemed given when deposited in the U.S. mail or when sent electronically. Additionally, we may send notices and information to Additional Cardmembers at their request. | |
| **We may contact you** | **Servicing and collections**<br>If we need to contact you to service your account or to collect amounts you owe, you authorize us (and our affiliates, agents and contractors) to contact you at any number you provide, from which you call us, or at which we believe we can reach you. We may contact you in any way, such as calling or texting. We may contact you using an automated dialer or prerecorded messages. We may contact you on a mobile, wireless or similar device, even if you are charged for it.<br><br>**Call monitoring**<br>We may monitor and record any calls between you and us. | |

FILED DATE: 7/24/2025 3:52:33 PM 2022CH06030

| About insurance products | We or our affiliates may tell you about insurance and non-insurance products, services or features that may have a fee. One of our affiliates may act on behalf of a provider of these products. The affiliate may be compensated for this. The insurance products are not offered or sold by us or on our behalf. Our affiliates may get additional compensation when AMEX Assurance Company or another affiliate is the insurer or reinsurer. Compensation may influence what products and providers we or our affiliates tell you about. | |
|---|---|---|
| | We may share information about you with our affiliates so they can identify products that may interest you. We may be compensated for this information. | |
| How we handle electronic debits from your checking account | When you pay us by check, you authorize us to electronically deduct the amount from your bank or other asset account. We may process the check electronically by transmitting to your financial institution: <br> • the amount, <br> • the routing number, <br> • the account number, and <br> • the check serial number. | If we do this, your payment may be deducted from your bank or other asset account on the same day we receive your check. Also, you will not receive that cancelled check with your bank or asset account billing statement. <br><br> If we cannot collect the funds electronically, we may issue a draft against your bank or other asset account for the amount of the check. |
| ExpressPay | Cards issued on the Account may be equipped with ExpressPay. ExpressPay enables you to make charges without having the card swiped or imprinted. You can call us to deactivate ExpressPay at any time. Also, we may deactivate ExpressPay at any time. | |
| Privacy Act of 1974 notice | Some federal agencies may accept the card under authority of statute. When you or Additional Cardmembers make charges at these agencies, we collect certain charge information. That information may be put to routine uses such as processing, billing and collections. It may also be aggregated for reporting, analysis and marketing use. Other routine uses by agencies may be published in the Federal Register. | |
| Changing the benefits | We have the right to add, modify or delete any benefit, service, or feature of the Account at our discretion. | |
| Assigning the Agreement | We may sell, transfer or assign this Agreement and the Account. We may do so at any time without notifying you. You may not sell, assign or transfer the Account or any of your obligations under this Agreement. | |
| Assigning claims | If you dispute a charge with a merchant, we may credit the Account for all or part of the disputed charge. If we do so, you assign and transfer to us all rights and claims (excluding tort claims) against the merchant. You and any Additional Cardmembers agree not to pursue any claim against the merchant for the credited amount. And you and any Additional Cardmembers must cooperate with us if we decide to do so. | |
| We do not waive our rights | We may choose to delay enforcing or to not exercise rights under this Agreement. If we do this, we do not waive our rights to exercise or enforce them on any other occasion. | |
| Governing law | Utah law and federal law govern this Agreement and the Account. They govern without regard to internal principles of conflicts of law. We are located in Utah. We hold the Account in Utah. We entered into this Agreement with you in Utah. | |
| Notice to Oregon Residents | Service charges not in excess of those permitted by law will be charged on the outstanding balances from month to month. You may pay more than the minimum payment due, up to your entire outstanding balance, at any time. | |
| Notice for residents of Washington State | In accordance with the Revised Code of Washington Statutes, Section 63.14.167, you are not responsible for payment of interest charges that result solely from a merchant's failure to transmit to us within seven working days a credit for goods or services accepted for return or forgiven if you have notified us of the merchant's delay in posting such credit, or our failure to post such credit to your account within three working days of our receipt of the credit. | |

## Claims Resolution

Most customer concerns can be resolved by calling our Customer Service Department at the number listed on the back of your card. In the event Customer Service is unable to resolve a complaint to your satisfaction, this section explains how claims can be resolved through mediation, arbitration or litigation. It includes an arbitration provision. **You may reject the arbitration provision by sending us written notice within 45 days after your first card purchase. See *Your Right to Reject Arbitration* below.**

For this section, *you* and *us* includes any corporate parents, subsidiaries, affiliates or related persons or entities. *Claim* means any current or future claim, dispute or controversy relating to your Account(s), this Agreement, or any agreement or relationship you have or had

with us, except for the validity, enforceability or scope of the Arbitration provision. *Claim* includes but is not limited to: (1) initial claims, counterclaims, crossclaims and third-party claims; (2) claims based upon contract, tort, fraud, statute, regulation, common law and equity; (3) claims by or against any third party using or providing any product, service or benefit in connection with any account; and (4) claims that arise from or relate to (a) any account created under any of the agreements, or any balances on any such account, (b) advertisements, promotions or statements related to any accounts, goods or services financed under any accounts or terms of financing, (c) benefits and services related to card membership (including fee-based or free benefit programs, enrollment services and rewards programs) and (d) your application for any account. You may not sell, assign or transfer a claim.

### Sending a Claim Notice

Before beginning a lawsuit, mediation or arbitration, you and we agree to send a written notice (a *claim notice*) to each party against whom a claim is asserted, in order to provide an opportunity to resolve the claim informally or through mediation. Go to americanexpress.com/claim for a sample claim notice. The claim notice must describe the claim and state the specific relief demanded. Notice to you may be provided by your billing statement or sent to your billing address. Notice to us must include your name, address and Account number and be sent to American Express ADR c/o CT Corporation System, 111 8th Ave., NY, NY 10011. If the claim proceeds to arbitration, the amount of any relief demanded in a claim notice will not be disclosed to the arbitrator until after the arbitrator rules.

## Mediation

In mediation, a neutral mediator helps parties resolve a claim. The mediator does not decide the claim but helps parties reach agreement.

Before beginning mediation, you or we must first send a claim notice. Within 30 days after sending or receiving a claim notice, you or we may submit the claim to JAMS (1-800-352-5267, jamsadr.com) or the American Arbitration Association ("AAA") (1-800-778-7879, adr.org) for mediation. We will pay the fees of the mediator.

All mediation-related communications are confidential, inadmissible in court and not subject to discovery.

All applicable statutes of limitation will be tolled until termination of the mediation. Either you or we may terminate the mediation at any time. The submission or failure to submit a claim to mediation will not affect your or our right to elect arbitration.

## Arbitration

You or we may elect to resolve any claim by individual arbitration. Claims are decided by a neutral arbitrator.

**If arbitration is chosen by any party, neither you nor we will have the right to litigate that claim in court or have a jury trial on that claim. Further, you and we will not have the right to participate in a representative capacity or as a member of any class pertaining to any claim subject to arbitration. Arbitration procedures are generally simpler than the rules that apply in court, and discovery is more limited. The arbitrator's decisions are as enforceable as any court order and are subject to very limited review by a court. Except as set forth below, the arbitrator's decision will be final and binding. Other rights you or we would have in court may also not be available in arbitration.**

### Initiating Arbitration

Before beginning arbitration, you or we must first send a claim notice. Claims will be referred to either JAMS or AAA, as selected by the party electing arbitration. Claims will be resolved pursuant to this Arbitration provision and the selected organization's rules in effect when the claim is filed, except where those rules conflict with this Agreement. If we choose the organization, you may select the other within 30 days after receiving notice of our selection. Contact JAMS or AAA to begin an arbitration or for other information. Claims also may be referred to another arbitration organization if you and we agree in writing or to an arbitrator appointed pursuant to section 5 of the Federal Arbitration Act, 9 U.S.C. §§ 1-16 (*FAA*).

We will not elect arbitration for any claim you file in small claims court, so long as the claim is individual and pending only in that court. You

or we may otherwise elect to arbitrate any claim at any time unless it has been filed in court and trial has begun or final judgment has been entered. Either you or we may delay enforcing or not exercise rights under this Arbitration provision, including the right to arbitrate a claim, without waiving the right to exercise or enforce those rights.

## Limitations on Arbitration

**If either party elects to resolve a claim by arbitration, that claim will be arbitrated on an individual basis. There will be no right or authority for any claims to be arbitrated on a class action basis or on bases involving claims brought in a purported representative capacity on behalf of the general public, other cardmembers or other persons similarly situated.**

The arbitrator's authority is limited to claims between you and us alone. Claims may not be joined or consolidated unless you and we agree in writing. An arbitration award and any judgment confirming it will apply only to the specific case and cannot be used in any other case except to enforce the award.

Notwithstanding any other provision and without waiving the right to appeal such decision, if any portion of these *Limitations on Arbitration* is deemed invalid or unenforceable, then the entire Arbitration provision (other than this sentence) will not apply.

## Arbitration Procedures

This Arbitration provision is governed by the FAA. The arbitrator will apply applicable substantive law, statutes of limitations and privileges. The arbitrator will not apply any federal or state rules of civil procedure or evidence in matters relating to evidence or discovery. Subject to the *Limitations on Arbitration,* the arbitrator may otherwise award any relief available in court. The arbitration will be confidential, but you may notify any government authority of your claim.

If your claim is for $10,000 or less, you may choose whether the arbitration will be conducted solely on the basis of documents, through a telephonic hearing, or by an in-person hearing. At any party's request, the arbitrator will provide a brief written explanation of the award. The arbitrator's award will be final and binding, except for any right of appeal provided by the FAA; however, any party will have 30 days to appeal the award by notifying the arbitration organization and all parties in writing. The organization will appoint a three-arbitrator panel to decide anew, by majority vote based on written submissions, any aspect of the decision objected to. Judgment upon any award may be entered in any court having jurisdiction. At your election, arbitration hearings will take place in the federal judicial district of your residence.

## Arbitration Fees and Costs

You will be responsible for paying your share of any *arbitration fees* (including filing, administrative, hearing or other fees), but only up to the amount of the filing fees you would have incurred if you had brought a claim in court. We will be responsible for any additional arbitration fees. At your written request, we will consider in good faith making a temporary advance of your share of any arbitration fees, or paying for the reasonable fees of an expert appointed by the arbitrator for good cause.

## Additional Arbitration Awards

If the arbitrator rules in your favor for an amount greater than any final offer we made before arbitration, the arbitrator's award will include: (1) any money to which you are entitled, but in no case less than $5,000; and (2) any reasonable attorneys' fees, costs and expert and other witness fees.

## Your Right to Reject Arbitration

You may reject this Arbitration provision by sending a written *rejection notice* to us at: American Express, P.O. Box 981556, El Paso, TX 79998. Go to americanexpress.com/reject for a sample rejection notice. Your rejection notice must be mailed within 45 days after your first card purchase. Your rejection notice must state that you reject the Arbitration provision and include your name, address, Account number and personal signature. No one else may sign the rejection notice. If your rejection notice complies with these requirements, this Arbitration provision and any other arbitration provisions in the cardmember agreements for any other currently open American Express accounts you have will not apply to you, except for Corporate Card accounts and any claims subject to pending litigation or arbitration at the time you send your rejection notice. Rejection of this Arbitration provision will not affect your other rights or responsibilities under this Claims Resolution section or the Agreement. Rejecting this Arbitration provision will not affect your ability to use your card or any other benefit, product or service you may have with your Account.

## Continuation

This section will survive termination of your Account, voluntary payment of your Account balance, any legal proceeding to collect a debt, any bankruptcy and any sale of your Account (in the case of a sale, its terms will apply to the buyer of your Account). If any portion of this Claims Resolution section, except as otherwise provided in the *Limitations on Arbitration* subsection, is deemed invalid or unenforceable, it will not invalidate the remaining portions of this Claims Resolution section.



# Billing Dispute Procedure

**What To Do If You Find a Mistake on Your Statement**

If you think there is an error on your statement, write to us at:

American Express
PO Box 981535
El Paso TX 79998-1535

In your letter, give us the following information:

- *Account information*: Your name and account number.
- *Dollar amount*: The dollar amount of the suspected error.
- *Description of problem*: If you think there is an error on your bill, describe what you believe is wrong and why you believe it is a mistake.

You must contact us:

- Within 60 days after the error appeared on your statement.
- At least 2 business days before an automated payment is scheduled, if you want to stop payment on the amount you think is wrong.

You must notify us of any potential errors *in writing*. You may call us, but if you do we are not required to investigate any potential errors and you may have to pay the amount in question.

**What Will Happen After We Receive Your Letter**

When we receive your letter, we will do two things:

1. Within 30 days of receiving your letter, we will tell you that we received your letter. We will also tell you if we have already corrected the error.

2. We will investigate your inquiry and will either correct the error or explain to you why we believe the bill is correct.

While we investigate whether or not there has been an error:

- We will not try to collect the amount in question, nor report you as delinquent on that amount.
- The charge in question may remain on your statement, and we may continue to charge you interest on that amount.
- While you do not have to pay the amount in question, you are responsible for the remainder of your balance.
- We can apply any unpaid amount against your credit limit.

After we finish our investigation, one of two things will happen:

- *If we made a mistake*: You will not have to pay the amount in question or any interest or other fees related to that amount.
- *If we do not believe there was a mistake*: You will have to pay the amount in question, along with applicable interest and fees. We will send you a statement of the amount you owe and the date payment is due. We may then report you as delinquent if you do not pay the amount we think you owe.

If you receive our explanation but still believe your bill is wrong, you must write to us within *10 days* telling us that you still refuse to pay. If you do so, we will not report you as delinquent without also reporting that you are questioning your bill. We will tell you the name of anyone to whom we reported you as delinquent, and we will let those organizations know when the matter has been settled between us.

# Your Agreement for Transferring Funds Electronically

This *EFT Agreement* is between American Express Travel Related Services Company, Inc. and you, once you enroll in an Electronic Funds Transfer Service of ours (*service*) such as AutoPay, Pay By Computer, or Pay By Phone. This replaces any previous agreement you may have with us for the services.

## Words we use in this agreement

In this EFT Agreement, *you* and *your* mean, in addition to the Basic Cardmember, any Additional Cardmembers who have enrolled in the service. *We, our,* and *us* mean American Express Travel Related Services Company, Inc. Your *card account* means the American Express card account. Your *bank* is the bank, securities firm, or other financial institution that holds your bank account. Your *bank account* is the bank account you use to pay for any transactions you make through the service. *Withdraw or withdrawal* means an electronic debit or deduction of funds from your bank account. Our *business days* are Monday through Friday, excluding holidays.

## AutoPay, Pay By Computer, Pay By Phone

With these services, you can initiate electronic payments to your card account. When you do so, you allow us or our agent to draw a check on or initiate an automated clearing house (*ACH*) withdrawal from your bank account in the amount you authorize.

If your bank returns a check or ACH withdrawal unpaid the first time we submit it for payment, we may cancel your right to use the service. Your bank may charge you a fee if this happens.

## How to contact us about the services

You can call us at 1-800-IPAY-AXP for Pay By Phone questions, at 1-800-528-2122 for Pay By Computer questions, and at 1-800-528-4800 for AutoPay questions. You may also write to us at American Express, Electronic Funds Services, P.O. Box 981531, El Paso, TX 79998-1531.

## How to stop AutoPay payments

The following terms do not apply to certain AutoPay programs and options where a business bank account is used for the transaction; and the specific terms and conditions of those programs and options will define any applicable notice and cancelation terms:

(1) If you have told us to make AutoPay payments from your bank account, you can stop any of these payments by calling us at 1-800-227-4669 or writing to American Express, Electronic Funds Services, P.O. Box 981540, El Paso, TX 79998-1540 in time for us to receive your request at least 2 business days before the payment is scheduled to be made.

(2) We will tell you, at least 10 days before each payment, when it will be made and how much it will be.

(3) If we receive your request to stop one of these payments at least 2 business days before the payment is scheduled to be made and we do not stop it, we will be liable for your losses or damages.

## Unauthorized transactions

Tell us AT ONCE if you believe that a transaction has been made without your permission using your card or information about your card account. Calling is the best way of keeping your possible losses down. You could lose all the money in your bank account (plus your maximum overdraft line of credit, if applicable).

Call anytime at 1-800-528-4800 (or 1-336-393-1111 collect, if not in the U.S.). You may also write to us at American Express, Electronic Funds Services, P.O. Box 981532, El Paso, TX 79998-1532.

## Improper transactions or payments

If we do not complete a transfer to or from your bank account on time or in the correct amount, according to this EFT Agreement, we will be liable for your losses or damages.

There are some exceptions. We are not liable:

- if, through no fault of ours, you do not have enough money in your bank account;
- if the transfer would go over the credit limit on any overdraft line you may have;
- if the funds in your bank account were subject to legal process or other encumbrance that restricted the transaction;
- if circumstances beyond our control (such as fire or flood) prevented the transaction, despite our reasonable precautions; or
- if the terminal or system was not working properly and you knew about the breakdown when you started the transfer.

## Privacy

We will disclose information to third parties about your transactions:

- when necessary for completing transactions;
- to comply with government agency or court orders; or
- as stated in our Privacy Notice, which covers your use of the services.

## Arbitration

The *Arbitration* section, in Part 2 of the Cardmember Agreement, applies to this EFT Agreement and the services.

## In case of errors or questions

If you think your statement or receipt is wrong, or if you need more information about a transaction on your statement or receipt, call or write us as soon as you can. We must hear from you no later than 60 days after we sent the FIRST statement on which the problem or error appeared. If you do not contact us because of certain circumstances (such as you are in the hospital), we may extend the 60-day period for a reasonable time. When you contact us:

- tell us your name and account number.
- describe the error or the transaction you are unsure about. Explain as clearly as you can why you believe it is an error or why you need more information.
- tell us the amount of the suspected error.

If you tell us orally, we may require that you send us your complaint or question in writing within 10 business days after you called us. Within 10 business days after we hear from you we will determine whether an error has occurred. We will correct any error promptly. However, if we need more time, we may take up to 45 calendar days to investigate. If we do take more time, we will credit your bank account within 10 business days for the amount you think is in error so that you will have use of the funds during the time it takes to complete our investigation.

If we ask you to put your complaint or question in writing and we do not receive it within 10 business days, we may not credit your bank account for the amount you question.

We will tell you the results within 3 business days after completing our investigation. If we decide that there was no error, we will send you a written explanation. You may ask for copies of the documents that we used in our investigation. If we have credited your bank account and find no error, we will tell you when we will withdraw that amount from your bank account again. You authorize us to withdraw this amount from your bank account. If your bank account does not have enough funds to cover this withdrawal, we can charge the amount to your card account or collect the amount from you. If this happens, we may cancel your right to use a service.

## We may end the services

We may extend or limit the services at any location without telling you ahead of time. Also, we may stop a service at any time.

We may cancel your participation in a service at any time. If we do, we will write to you, but we may not send you the notice until after we cancel. Also, we may refuse to authorize a transaction at our discretion.

We will end or suspend use of a service if:

- you do not use it for 18 months in a row,
- your card account is in default,
- your card account is cancelled or suspended,
- you cancel the authorization you gave your bank to pay for any transactions you make through the service, or
- your bank account is closed to withdrawals by us or our agents.

You may choose to stop using any service. If you do, you must write to us at: American Express, Electronic Funds Services, P.O. Box 981531, El Paso, TX 79998-1531.

## Assignment

We may assign this EFT Agreement to a subsidiary or affiliate at any time.

## Note for Massachusetts residents

**General disclosure statement:** Any documentation given to you which shows that an electronic funds transfer was made will be admissible as evidence of that transfer and will constitute prima facie proof that the transfer was made.

Except as explained in this EFT Agreement, if you initiate an electronic funds transfer from your bank account, you cannot stop payment of the transfer.

**Unless otherwise provided in this EFT Agreement, you may not stop payment of electronic funds transfers. Therefore, do not use electronic transfers for purchases or service unless you are satisfied that you will not need to stop payment.**

**Disclosure of bank account information to third parties:** If you give us your written authorization to disclose information about you, your bank account, or the transactions that you make to any person, that authorization will automatically expire 45 days after we receive it.

**Optional limit on obtaining cash:** You can ask us to limit the total amount of cash that you may get from ATMs in a single day to $50. If you choose this option, we will take all reasonable steps to comply with your request.



## SimplyCash® Business Credit Card

p. 1/5

R R S INC
ROBERT G SCHUMANN
Closing Date 12/16/22     Next Closing Date 01/17/23
Account[____]6002

| | |
|---|---|
| Customer Care: | 1-800-521-6121 |
| TTY: | Use Relay 711 |
| Website: | americanexpress.com |

| New Balance | **$2,556.83** |
|---|---|
| **Minimum Payment Due** | **$790.65** |
| Includes the past due amount of $716.65 | |
| **Payment Due Date** | **01/11/23** |

**Late Payment Warning:** If we do not receive your Minimum Payment Due by the Payment Due Date of 01/11/23 , you may have to pay a late fee of up to $39.00 and your APRs may be increased to the Penalty APR of 29.99%.

**Minimum Payment Warning:** If you make only the minimum payment each period, you will pay more in interest and it will take you longer to pay off your balance. For example:

| If you make no additional charges and each month you pay... | You will pay off the balance shown on this statement in about... | And you will pay an estimated total of... |
|---|---|---|
| Only the Minimum Payment Due | 7 years | $4,009 |

If you would like information about credit counseling services, call 1-888-733-4139.

See page 2 for important information about your account.

(i) Your account is cancelled.

Please refer to the **IMPORTANT NOTICES** section on **page 5.**

### Get cash back for eligible purchases when you use the Card.

For more details about Rewards, please visit **americanexpress.com/cashbackrewards**

### Account Summary

| Previous Balance | $2,517.83 |
|---|---|
| Payments/Credits | -$0.00 |
| New Charges | +$0.00 |
| Fees | +$39.00 |
| Interest Charged | +$0.00 |

| New Balance | **$2,556.83** |
|---|---|
| **Minimum Payment Due** | **$790.65** |

| Credit Limit | $2,800.00 |
|---|---|
| Available Credit | $243.17 |
| Cash Advance Limit | $0.00 |
| Available Cash | $0.00 |
| Days in Billing Period: 30 | |

↓ Please fold on the perforation below, detach and return with your payment ↓

 **Payment Coupon**
Do not staple or use paper clips

 **Pay by Computer**
americanexpress.com/
business

 **Pay by Phone**
1-800-472-9297

Account[____]6002
Enter 15 digit account # on all payments.
Make check payable to American Express.

ROBERT G SCHUMANN
R R S INC
18505 S STEWART AVE
HOMEWOOD IL 60430-3035

| | |
|---|---|
| Payment Due Date | **01/11/23** |
| New Balance | **$2,556.83** |
| Minimum Payment Due | **$790.65** |

See reverse side for instructions on how to update your address, phone number, or email.

AMERICAN EXPRESS
PO BOX 96001
LOS ANGELES CA 90096-8000

$ _____ . ____
**Amount Enclosed**



ROBERT G SCHUMANN     Account ███████6002     p. 2/5

**Payments:** Your payment must be sent to the payment address shown on your statement and must be received by 5 p.m. local time at that address to be credited as of the day it is received. Payments we receive after 5 p.m. will not be credited to your Account until the next day. Payments must also: (1) include the remittance coupon from your statement; (2) be made with a single check drawn on a US bank and payable in US dollars, or with a negotiable instrument payable in US dollars and clearable through the US banking system; and (3) include your Account number. If your payment does not meet all of the above requirements, crediting may be delayed and you may incur late payment fees and additional interest charges. Electronic payments must be made through an electronic payment method payable in US dollars and clearable through the US banking system. Please do not send post-dated checks as they will be deposited upon receipt. Any restrictive language on a payment we accept will have no effect on us without our express prior written approval. We will re-present to your financial institution any payment that is returned unpaid. You may pay more than the Minimum Payment Due, up to your New Balance, at any time. If you pay in full an unpaid balance that you have been revolving, interest charged on that balance during the billing period in which you paid it will appear on your next statement.

**Permission for Electronic Withdrawal:** (1) When you send a check for payment, you give us permission to electronically withdraw your payment from your deposit or other asset account. We will process checks electronically by transmitting the amount of the check, routing number, account number and check serial number to your financial institution, unless the check is not processable electronically or a less costly process is available. When we process your check electronically, your payment may be withdrawn from your deposit or other asset account as soon as the same day we receive your check, and you will not receive that cancelled check with your financial account statement. If we cannot collect the funds electronically we may issue a draft against your deposit or other asset account for the amount of the check. (2) By using Pay By Computer, Pay By Phone or any other electronic payment service of ours, you give us permission to electronically withdraw funds from the deposit or other asset account you specify in the amount you request. Payments using such services of ours received after 8:00 p.m. MST may not be credited until the next day.

**How We Calculate Your Balance:** We use the Average Daily Balance (ADB) method (including new transactions) to calculate the balance on which we charge interest on your Account. Call the Customer Care number on page 3 for more information about this balance computation method and how resulting interest charges are determined. *The method we use to calculate the ADB and interest results in daily compounding of interest.*

**Paying Interest:** Your due date is at least 25 days after the Closing Date of each billing period. We will not charge you interest on your purchases if you pay the New Balance by the due date each month. We will charge you interest on cash advances and (unless otherwise disclosed) balance transfers beginning on the transaction date.

**Foreign Currency Charges:** If you make a Charge in a foreign currency, we will convert it into US dollars on the date we or our agents process it. **We will charge a fee of 2.70% of the converted US dollar amount.** We will choose a conversion rate that is acceptable to us for that date, unless a

particular rate is required by law. The conversion rate we use is no more than the highest official rate published by a government agency or the highest interbank rate we identify from customary banking sources on the conversion date or the prior business day. This rate may differ from rates in effect on the date of your charge. Charges converted by establishments (such as airlines) will be billed at the rates such establishments use.

**Credit Balance:** A credit balance (designated CR) shown on this statement represents money owed to you. If within the six-month period following the date of the first statement indicating the credit balance you do not request a refund or charge enough to use up the credit balance, we will send you a check for the credit balance within 30 days if the amount is $1.00 or more.

**Credit Reporting:** We may report information about your Account to credit bureaus. Late payments, missed payments, or other defaults on your Account may be reflected in your credit report.

**Billing Dispute Procedures**

**What To Do If You Think You Find A Mistake On Your Statement**
If you think there is an error on your statement, write to us at:
American Express, PO Box 981535, El Paso TX 79998-1535
In your letter, give us the following information:
- *Account information:* Your name and account number.
- *Dollar amount:* The dollar amount of the suspected error.
- *Description of Problem:* Describe what you believe is wrong and why you believe it is a mistake.
You must contact us:
- Within 60 days after the error appeared on your statement.
- At least 2 business days before an automated payment is scheduled, if you want to stop payment on the amount you think is wrong.
You must notify us of any potential errors in writing. You may call us, but if you do we may not follow these procedures and you may have to pay the amount in question.

**What Will Happen After We Receive Your Letter**
When we receive your letter, we will do two things:
1. Within 30 days of receiving your letter, we will tell you that we received your letter. We will also tell you if we have already corrected the error.
2. We will investigate your inquiry and will either correct the error or explain to you why we believe the bill is correct.
While we investigate whether or not there has been an error:
- We will not try to collect the amount in question.
- The charge in question may remain on your statement, and we may continue to charge you interest on that amount.
- While you do not have to pay the amount in question, you are responsible for the remainder of your balance.
- We can apply any unpaid amount against your credit limit.
After we finish our investigation, one of two things will happen:
- If we made a mistake: You will not have to pay the amount in question or any interest or other fees related to that amount.
- If we do not believe there was a mistake: You will have to pay the amount in question, along with applicable interest and fees. We will send you a statement of the amount you owe and the date payment is due. We may report you as delinquent if you do not pay the amount we think you owe.

**Change of Address, phone number, email**

- Online at www.americanexpress.com/updatecontactinfo
- Via mobile device
- Voice automated: call the number on the back of your card
- For name, company name, and foreign address or phone changes, please call Customer Care

**Please do not add any written communication or address change on this stub**

**Pay Your Bill with AutoPay**

Deduct your payment from your bank account automatically each month.

- Avoid late fees
- Save time

Visit **americanexpress.com/autopay** today to enroll.

For information on how we protect your privacy and to set your communication and privacy choices, please visit **www.americanexpress.com/privacy.**



**SimplyCash® Business Credit Card**
R R S INC
ROBERT G SCHUMANN
Closing Date 12/16/22

p. 3/5

Account ▓▓▓▓6002



| **Customer Care & Billing Inquiries** | |
|---|---|
| International Collect | 1-800-521-6 121 |
| Cash Advance at ATMs Inquiries | 1-623-492-7719 |
| **Large Print & Braille Statements** | 1-800-CASH-NOW |
| | 1-800-521-6 121 |

**Hearing Impaired**
Online chat at americanexpress.com or use Relay dial 711 and 1-800-521-6 121

**Website:** americanexpress.com

**Customer Care & Billing Inquiries**
P.O. BOX 981535
EL PASO, TX
79998-1535

**Payments**
PO BOX 96001
LOS ANGELES CA
90096-8000

---

## Fees

| | Amount |
|---|---|
| 12/11/22   Late Payment Fee | $39.00 |
| **Total Fees for this Period** | **$39.00** |

---

## Interest Charged

| | Amount |
|---|---|
| **Total Interest Charged for this Period** | **$0.00** |

### About Trailing Interest

You may see interest on your next statement even if you pay the new balance in full and on time and make no new charges. This is called "trailing interest". Trailing interest is the interest charged when, for example, you didn't pay your previous balance in full. When that happens, we charge interest from the first day of the billing period until we receive your payment in full. You can avoid paying interest on purchases by paying your balance in full and on time each month. Please see the "When we charge interest" sub-section in your Cardmember Agreement for details.

---

## 2022 Fees and Interest Totals Year-to-Date

| | Amount |
|---|---|
| Total Fees in 2022 | -$62.00 |
| Total Interest in 2022 | $478.24 |
| | |

---

## Interest Charge Calculation

Your Annual Percentage Rate (APR) is the annual interest rate on your account.

| | Annual Percentage Rate | Balance Subject to Interest Rate | Interest Charge |
|---|---|---|---|
| Purchases | 29.99% (v) | $0.00 | $0.00 |
| Cash Advances | 29.99% (v) | $0.00 | $0.00 |
| **Total** | | | **$0.00** |
| (v) Variable Rate | | | |

ROBERT G SCHUMANN                Account███████6002                    p. 4/5



R R S INC
ROBERT G SCHUMANN

Closing Date 12/16/22

p. 5/5

Account 6002

## IMPORTANT NOTICES

### EFT Error Resolution Notice

In Case of Errors or Questions About Your Electronic Transfers Telephone us at 1-800-IPAY-AXP for Pay By Phone questions, at 1-800-528-2122 for Pay By Computer questions, and at 1-800-528-4800 for AutoPay and at 1-800-CASH NOW for Express Cash questions. You may also write us at American Express, Electronic Funds Services, P.O. Box 981531, El Paso TX 79998-1531, or contact us online at www.americanexpress.com/inquirycenter as soon as you can, if you think your statement or receipt is wrong or if you need more information about a transfer on the statement or receipt. We must hear from you no later than 60 days after we sent you the FIRST statement on which the error or problem appeared.

1. Tell us your name and account number (if any).
2. Describe the error or the transfer you are unsure about, and explain as clearly as you can why you believe it is an error or why you need more information.
3. Tell us the dollar amount of the suspected error.

We will investigate your complaint and will correct any error promptly. If we take more than 10 business days to do this, we will credit your account for the amount you think is in error, so that you will have the use of the money during the time it takes us to complete our investigation.

*End of Important Notices.*

Order to Expunge and Impound Criminal Records        (12/01/20) CCCR 0331

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

PEOPLE OF THE STATE OF ILLINOIS

or

No. **05301496701**

**06MC3011083**
**SE670297**

_____
A Municipal Corporation

v.

**Nicholas A. Puccio**
Defendant/Petitioner

Date of Birth: **06-07-1989**
Gender: ☒ Male ☐ Female
Race: **White**

### ORDER TO EXPUNGE AND IMPOUND CRIMINAL RECORDS

This Court, having considered all pleadings and any objections thereto, and after an evidentiary hearing, ORDERS THAT:

1. The Petition to Expunge and Impound is granted.

2. The above Arresting Agency and the Chicago Police Department shall expunge the arrest(s) from its records, if any, within sixty (60) days of the date of service of this order. It is further directed that the Arresting Agency shall request the return of all identification materials from any other repositories and custodians of statistics that were previously notified of this arrest(s) by the Arresting Agency.

3. The Circuit Court Clerk shall impound the record of this arrest until further order of the court upon good cause shown and shall obliterate the name of the Petitioner on the official index.

4. The Illinois State Police, Bureau of Identification, shall expunge (or impound, if required by law) their files of the record of this arrest(s) within sixty (60) days of the date of service of this order.

5. This order shall not become effective until thirty (30) days after entry.

6. In accordance with the law, orders of protection, civil no contact orders, civil no contact stalking orders and minor traffic orders shall not be expunged and impounded.

Prepared By: _____

Cook County Attorney Code: _____

Name: _____

Address: _____

City/State/Zip: _____

Telephone: _____

Primary Email: _____

Secondary Email: _____

Tertiary Email: _____

ENTERED: 

**ENTERED**
**JUL 0 1 2025**
MARIYANA T. SPYROPOULOS
CLERK OF THE CIRCUIT COURT
OF COOK COUNTY, IL

Dated: **7.1.25**

**Jerome Marsee** 1931.
Judge        Judge's No.

IRIS Y. MARTINEZ, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

Page 1 of 1

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
**COUNTY DEPARTMENT – PROBATE DIVISION**

ESTATE OF       )
           )
  **JEFFREY A. WEINER,**  ) **No. 2022P003470**
           ) **Calendar 2**
           )
     **Deceased.**   )

**AGREED ORDER**

IT IS HEREBY ORDERED:

This matter is continued to close on August 26, 2025, at 10:00 a.m. in courtroom 1807

without further notice.

         **Enter:**

         **By** _____
            **Judge**

Afton L. Gauron / Samantha M. Contreras
Croke Fairchild Duarte & Beres LLC
180 N. LaSalle Drive, Suite 3400
Chicago, Illinois 60601
(312) 650-8650
Attorney No. 100307
agauron@crokefairchild.com / scontreras@crokefairchild.com

4930-0182-1740, v. 1

4201/4282 - Transfer to Judge   4295 - Close Discovery - Allowed
8201 - Return for Random Assignment
Orders of Transfer, Assignment and Reassignment                    (12/01/24) CCDR 0014 A

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, DOMESTIC RELATIONS DIVISION

IN RE: ☑ Marriage  ☐ Civil Union  ☐ Legal Separation  ☐ Allocation of Parental Responsibilities
☐ Visitation (Non-Parent)  ☐ Support  ☐ Parentage of:

BRIAN WILSON
_____
                                        Petitioner
                    and
ALESA WILSON
_____
                                        Respondent

Case No.  2024 D 009051

Calendar  Judge Patrick Powers / Cal. E

## ORDERS OF TRANSFER, ASSIGNMENT AND REASSIGNMENT

This Cause being properly before the Court, and the Court being advised in the premises:

I.  Transfers (Temporary)

☐  That this cause is transferred to the   ☐ 4852 - Reconciliation Calendar  ☐ 4853 - Military Calendar.

All existing orders shall remain in full force and effect except _____.

☐  That this cause is transferred to the Collaborative Process Calendar. All prior orders of court, including access to the court for enforcement and discovery, shall be considered suspended, and all proceeding shall be stayed, unless other wise expressly provided by law, agreement of the parties, or order by the court.

☐  That this cause be returned from the   ☐ 4752 - Reconciliation Calendar  ☐ 4753 - Military Calendar
                                                        ☐ Collaborative Process Calendar.

☑  4282 IT IS ORDERED that the above entitled cause is transferred to Judge  Rosa Silva

Calendar  52  _____  for  hearing A. Wilson's Petition for Temp. Maint. & to Pay Living Exps.

☐  Pretrial  ☐ Contested Motion for _____
all other matters being retained by the Preliminary Judge.

☐  4201 IT IS ORDERED that this cause is returned to Judge _____

Calendar _____ for further proceedings, the transferred matter being concluded.

II.  Assignment (Trial)

☐  It is Ordered that:

☐  4295  Discovery is closed as of _____ .

☐  4482  This cause is set for Trial before Judge _____

Calendar _____

Instanter. All parties or their counsel shall proceed immediately to courtroom _____ .

Note:  Cases set for trial can only be continued for cause, on motion pursuant to Supreme Court Rule and Domestic Relations General Order 86 D-1.

**Mariyana T. Spyropoulos, Clerk of the Circuit Court of Cook County, Illinois**
**cookcountyclerkofcourt.org**
Page 1 of 2

Orders of Transfer, Assignment and Reassignment                    (12/01/24) CCDR 0014 B

III. Reassignments to or from Presiding Judge

    ☐ 8282 This Cause coming before the court for reassignment, IT IS HEREBY ORDERED that this is assigned to the Presiding Judge for: ☐ Hearing; ☐ Consolidation within the

        Division: Case Number _____ Calendar _____;

        or ☐ Other _____.

    ☐ 8201 Clerk for the Circuit Court for random electronic assignment to a calendar:

        ☐ Preliminary ☐ Individual ☐ Post-Judgment ☐ Expedited Child Support

        ☐ Excluding Calendar(s) _____

ENTERED

Dated: 6-30-25

_____
Judge                              Judge's No.

**ENTERED**

JUN 30 2025

Atty. No.: 40190

Atty Name: Michael C. Craven (Harrison LLP)

Atty. for: ALESA WILSON

Address: 333 West Wacker Drive, Suite #1700

City: Chicago          State: IL

Zip: 60606

Telephone: (312) 621-5234 [Direct]

Primary Email: mcraven@harrisonllp.com

**Mariyana T. Spyropoulos, Clerk of the Circuit Court of Cook County, Illinois**
cookcountyclerkofcourt.org
Page 2 of 2

# SUMMONS
## (PROTECTIVE ORDERS)
### IN THE STATE OF ILLINOIS, CIRCUIT COURT
☐ **Alias Summons**
*Check if this is not the 1st Summons issued for this Respondent.*

**COUNTY:** Cook
*County Where You Are Filing the Case*

*Enter the case information as it appears on your other court documents.*

**PETITIONER:** Miranda Lucas
*Who started the case.       First, Middle, and Last Name*

Filing on behalf of a ☐ minor or ☐ high-risk adult: _____

**RESPONDENT:** Jose Villa Jr.
*Who you are seeking protection from.       First, Middle, and Last Name*

**250P50657**

**Case Number**

---

- ☉ A case has been filed against you. Read all of the documents attached to this Summons.
- ☉ To participate in the case, you must follow the instructions listed below. Also see page 3 for next steps.
- ☉ You must attend court on the date in this Summons. If you do not attend that date or on any subsequent hearing date agreed to by the parties or set by the court, the judge may decide the case without hearing from you. This is called "default."
- ☉ All documents referred to in this Summons can be found at ilcourts.info/forms. Other documents may be available from your local Circuit Court Clerk's office or website.

## 1. Petitioner has filed against you for the following:
☒ Order of Protection            ☐ Stalking No Contact Order
☐ Civil No Contact Order       ☐ Other: _____

## 2. Instructions for person receiving this form (Respondent):
*Your court date is listed below. Information about getting a court date and how to attend is available from the Circuit Clerk. You can find their contact information at ilcourts.info/clerks.*

☐ Go to court on the date in the attached Order.

☐ Go to court in one of the ways checked below on:

_____ at _____ ☐ a.m. ☐ p.m. in _____
*Month, Day, Year*                    *Time*                                    *Courtroom Number*

Court dates may be in-person, remote, or a combination of in-person and remote.

☐ In person at: _____
           *Courtroom Address*                                    *Courtroom Number*

☐ Remotely (video or telephone)

By video conference at: _____
                      *Video Conference Website*

Log-in information: _____
                 *Video Conference Log-in Information, Meeting ID, Password, etc.*

By telephone at: _____
           *Call-in Number for Telephone Remote Appearance*

To find out more about remote court options:

**Phone:** _____   **or**   **Website:** _____
     *Circuit Clerk's Phone Number*                              *Website URL*

*This form is approved by the Illinois Supreme Court and is required to be accepted in all Illinois Circuit Courts. Forms are free at ilcourts.info/forms.*

ATJ 502.6                           Page 1 of 5                                    (05/25)

Case Number **250P50657**

## 3. RESPONDENT'S INFORMATION

a. Respondent's **primary address/information** for service:

Name: **Jose Villa JR.**
*First, Middle, and Last Name, or Business Name*

Street Address: **3412 W. 123rd place**
*Street, Apt #*

City, State, ZIP: **Alsip IL 60803**
*City* *State* *Zip*

Telephone: _____ Email: _____

b. **Second address for this Respondent:**

☒ I do not have another address where the Respondent might be found.
☐ I have another address where this Respondent might be found. It is:

Street Address: _____
*Street, Apt #*

City, State, ZIP: _____
*City* *State* *Zip*

Telephone: _____ Email: _____

c. Person who will serve your documents on this Respondent:

☒ Sheriff in Illinois ☐ Special process server ☐ Licensed private detective
☐ Sheriff outside Illinois: _____
*County & State*

---

**PETITIONER INFORMATION FOR NOTICE PURPOSES:**

*Enter your complete address, telephone number, and email address if you have one. If you need to keep your addresses secret because of domestic violence, you may use another address. Those addresses must be ones at which you can receive mail about the case.*

Name: **Miranda Lucas**
*First, Middle and Last Name*

Street Address: **3949 W. 83rd St**
*Street, Apt #*

City, State, ZIP: **Chicago IL 60652**
*City* *State* *Zip*

Telephone: **312·493·2004** Email: _____

Be sure to check your email every day so you do not miss important information, court dates, or documents from other parties.

---

**STOP** The Circuit Clerk and officer or process server will fill in this section.

To be filled in by the Circuit Clerk:

Witness this Date: _____ Mariyana T. Spyropoulos JUL 0 2 2025

Clerk of the Court: _____ Mariyana T. Spyropoulos _____

*Seal of Court*

To be filled in by an officer or process server:

Date of Service: _____

*Fill in the date above and give this copy of the Summons to the person served.*

---

Note to officer or process server:

○ Complete the attached *Proof of Service* form and file it with the court or return it to the Petitioner.

# PROOF OF SERVICE OF SUMMONS
# FOR PROTECTIVE ORDERS

### IN THE STATE OF ILLINOIS, CIRCUIT COURT

☐ **Alias Summons**
*Check if this is not the 1ˢᵗ Summons issued for this Respondent.*

**COUNTY:** Cook
*County Where You Are Filing the Case*

*Enter the case information as it appears on your other court documents.*

**PETITIONER:** Miranda Lucas
*Who started the case.     First, Middle, and Last Name*

Filing on behalf of a ☐ minor or ☐ high-risk adult: _____

**RESPONDENT:** Jose Villa Jr.
*Who you are seeking protection from.     First, Middle, and Last Name*

**250P50657**

**Case Number**

🛑 **STOP** Do not complete the rest of the form. The sheriff or special process server will fill in the form.

My name is _____ and I state:
*Officer/Process Server First, Middle, Last Name*

## SERVICE INFORMATION

Respondent: _____
*First, Middle, Last Name*

☐ I was not able to serve the *Summons, Petition,* and *Orders* issued in this case on the Respondent named above.

- or -

☐ I served the *Summons, Petition* and *Orders* issued in this case on the Respondent named above as follows:

☐ Personally on the Respondent:

☐ Male ☐ Female ☐ Non-Binary  Approx. Age: _____ Race: _____

On this date: _____ at this time: _____ ☐ a.m. ☐ p.m.

Address, Unit#: _____

City, State, ZIP: _____

☐ On someone else at the Respondent's home who is at least 13 years old and is a family member or lives there:
Name of person served: _____
*First, Middle, Last Name*

☐ Male ☐ Female ☐ Non-Binary  Approx. Age: _____ Race: _____

On this date: _____ at this time: _____ ☐ a.m. ☐ p.m.

Address, Unit#: _____

City, State, ZIP: _____

and by sending a copy to this Respondent in a postage-paid, sealed envelope to the above

address on this date: _____

250P50657



*Case Number* _____

# WHAT'S NEXT

## NEXT STEPS FOR PERSON FILLING OUT THIS FORM:

When you file a case, you must notify the Respondent of the court case by having the *Summons* and *Petition for Order of Protection* delivered to them. This is called "serving" them.

File your *Summons* and *Petition* with the Circuit Clerk in the county where your court case should be filed. The Circuit Clerk will "issue" the *Summons* by putting a court seal on the form.

Have the sheriff or a private process server serve the *Summons* and a copy of the *Petition* and *Order* (if entered) on the Respondent. You cannot serve the *Summons* yourself.



Learn more about each step in the process and how to file in the instructions: ilcourts.info/OP-summons-instructions.

## NEXT STEPS FOR PERSON RECEIVING THIS DOCUMENT:

A case has been filed against you:

- Read all documents attached to this *Summons*.
- All documents referred to in this *Summons* can be found at ilcourts.info/forms. Other documents may be available from your local Circuit Court Clerk's office or website.
- Within 7 days of receiving this Summons you must file a document called an *Appearance*. If you do not file required court documents on time, the judge may decide the case without hearing from you. This is called "default." As a result, you could lose the case and a protective order could be entered against you. You do not have to file a document called an Answer/Response in a protective order case unless ordered to by the judge.
- After you fill out the necessary documents, you need to electronically file (e-file) them with the court. To e-file, you must create an account with an e-filing service provider. For more information, go to ilcourts.info/efiling. If you cannot e-file, you can get an exemption that allows you to file in-person or by mail.
- You may be charged filing fees, but if you cannot pay them, you can file an *Application for Waiver of Court Fees (Civil)*.
- When you go to court, it is possible that the court will allow you to attend the first court date in this case in-person or remotely by video or phone. Contact the Circuit Court Clerk's office or visit the Court's website to find out whether this is possible and, if so, how to do this.

Need Help? ¿Necesita ayuda?

- Call or text Illinois Court Help at 833-411-1121 or go to ilcourthelp.gov for information about going to court, including how to fill out and file documents.
- Llame o envíe un mensaje de texto a Illinois Court Help al 833-411-1121, o visite ilcourthelp.gov para obtener información sobre los casos de la corte y cómo completar y presentar formularios.
- You can also get free legal information and legal referrals at illinoislegalaid.org.
- If there are any words or terms that you do not understand, please visit Illinois Legal Aid Online at ilao.info/glossary. You may also find more information, resources, and the location of your local legal self-help center at: ilao.info/lshc-directory.

*Case Number* 250P50657

## SERVICE ATTEMPTS

I made the following attempts to serve the *Summons* and Petition on the Respondent:

**First Attempt: On this date:** _____ **at this time:** _____ ☐ a.m. ☐ p.m.

Address, Unit#: _____

City, State, ZIP: _____
Other information about service attempt:

_____
_____
_____

**Second Attempt: On this date:** _____ **at this time:** _____ ☐ a.m. ☐ p.m.

Address, Unit#: _____

City, State, ZIP: _____
Other information about service attempt:

_____
_____
_____

**Third Attempt: On this date:** _____ **at this time:** _____ ☐ a.m. ☐ p.m.

Address, Unit#: _____

City, State, ZIP: _____
Other information about service attempt:

_____
_____
_____

### SIGN

I certify under 735 ILCS 5/1-109 that:
1) everything in this document is true and correct, or I have been informed or I believe it to be true and correct, and
2) I understand that making a false statement on this document is perjury and has penalties provided by law.

Your Signature /s/_____ Print Your Name _____

You are: ☐ Sheriff in Illinois
☐ Sheriff outside Illinois: _____   ☐ Special process server
                            *County and State*   ☐ Licensed private detective, license number: _____
                                                                                       *License number*
**FEES:**
Service and Return: $_____ Miles: $_____ Total: $_____

Hearing Date: 9/2/2025 9:45 AM
Location: Court Room 2405
Judge: Reilly, Eve M

FILED DATE: 7/1/2025 3:23 PM   2025CH06932

FILED
7/1/2025 3:23 PM
Mariyana T. Spyropoulos
CIRCUIT CLERK
COOK COUNTY, IL
2025CH06932
Calendar, 7
33389797

# SUMMONS

## IN THE STATE OF ILLINOIS, CIRCUIT COURT

☐ **Alias Summons**
*Check if this is not the 1st Summons issued for this Defendant/Respondent.*

**COUNTY:** Cook ⌄
*County Where You Are Filing the Case*

*Enter the case information as it appears on your other court documents.*

**PLAINTIFF/PETITIONER OR IN RE:** Robert Schumann
*Who started the case.*        *First, Middle, and Last Name or Business Name*

**2025CH06932**
_____
**Case Number**

**DEFENDANTS/RESPONDENTS:** American Express Company; and
*Who the case was filed against.*   American National Bank, Successor by

merger to American Express Bank, FSB
*First, Middle, and Last Name or Business Name*

## The Defendant/Respondent named above has been sued. Read this form for information about how to respond to this lawsuit. Also see page 4 for next steps.

**For the person filling out this form: Read all instructions in this box.**

This *Summons* can only be used for certain types of cases. See the *How To Serve a Summons* Instructions for more information: ilcourts.info/summons-instructions.

Check 1 if this is a 30-day summons, or check 2 if this is a date certain summons. Fill in all the information in 1 or 2.

- Use a **date certain summons** if you are asking for money of $50,000 or less or recovery of your personal property that you think the Defendant has, and for some mandatory arbitration cases. In 2, fill in your court date and how to go to court. You may get the court date when you e-file or you may need to ask the Circuit Clerk's office.

- Use a **30-day summons** for most other case types.

Complete the rest of the form with the Defendant/Respondent's information and information about the lawsuit.

**If you are suing more than 1 Defendant/Respondent**, attach an *Additional Defendant/Respondent Address and Service Information* form for **each** additional Defendant/Respondent.

☑ **1. 30-DAY SUMMONS**

To participate in this case, you must **file** your *Appearance* and *Answer/Response* forms with the court within 30 days after you are served with this *Summons* (not counting the day of service) by e-filing or at:

Court Address: 50 West Washington Street, Chicago, IL 60602
*Courthouse Street Address*

**- or -**

☐ **2. DATE CERTAIN SUMMONS**

*Your court date is listed below. Information about getting a court date and how to attend is available from the Circuit Clerk. You can find their contact information at ilcourts.info/CircuitClerks.*

To respond to this *Summons*, you must **attend court** in one of the ways checked below on:

_____ at _____ ☐ a.m. ☐ p.m. in _____.
*Month, Day, Year*              *Time*                      *Courtroom Number*

Case Number: _____
2025CH06932

## Going to Court for a Date Certain Summons

Court dates may be in-person, remote, or a combination of in-person and remote.

☐ **In person** at: _____
  <span style="padding-left:2em;">*Courtroom Address*</span>          *Courtroom Number*

☑ **Remotely** (video or telephone)

  **By video conference** at: _____
  <span style="padding-left:3em;">*Video Conference Website*</span>

  Log-in information: _____
  <span style="padding-left:3em;">*Video Conference Log-in Information, Meeting ID, Password, etc.*</span>

  **By telephone** at: _____
  <span style="padding-left:3em;">*Call-in Number for Telephone Remote Appearance*</span>

To find out more about remote court options:

  Phone: _____  or  Website: _____
  <span style="padding-left:2em;">*Circuit Clerk's Phone Number*</span>          *Website URL*

_____         _____

## 3. ADDITIONAL INFORMATION ABOUT THE LAWSUIT

a. I am asking for the following amount of money in my *Complaint/Petition*: $ _0_____.
   *(Enter 0 if you are not asking for money)*

b. I am asking for the return of tangible personal property (items in the Defendant/Respondent's possession) in my *Complaint/Petition*.
   ☐ Yes  ☑ No

## 4. DEFENDANT/RESPONDENT'S INFORMATION

a. Number of Defendants/Respondents being served:

   ☑ I am having 1 Defendant/Respondent served and their information is on this form below.

   ☐ I am having more than 1 Defendant/Respondent served. The first is listed below. I have attached *Additional Defendant/Respondent Address and Service Information* forms for the following number of additional Defendants/Respondents: _____.
   <span style="padding-left:10em;">*Number*</span>

b. First Defendant/Respondent's **primary address/information** for service:

   Name: American Express Company _____
   <span style="padding-left:2em;">*First, Middle, and Last Name, or Business Name*</span>

   Registered Agent's Name *(if you are serving the Registered Agent of a business)*:
   CT Corporation _____
   <span style="padding-left:2em;">*First, Middle, and Last Name*</span>

   Street Address: 28 Liberty Street _____
   <span style="padding-left:5em;">*Street, Apt #*</span>

   City, State, ZIP: New York, NY 10005 _____
   <span style="padding-left:5em;">*City*</span>                    *State*          *Zip*

   Telephone: _____  Email: _____

SU-S 1503.7                    Page 2 of 6                    (11/24)

2025CH06932

Case Number: _____

FILED DATE: 7/1/2025 3:23 PM   2025CH06932

c.   **Second address** for this Defendant/Respondent:

☑ I do **not** have another address where the Defendant/Respondent might be found.

☐ I have another address where this Defendant/Respondent might be found. It is:

Street Address: _____
*Street, Apt #*

City, State, ZIP: _____
*City*                                                                    *State*                        *Zip*

Telephone: _____   Email: _____

d.   Person who will serve your documents on this Defendant/Respondent:

☐ Sheriff in Illinois   ☐ Special process server   ☐ Licensed private detective

☑ Sheriff outside Illinois: New York County, New York _____
*County & State*

---

**PLAINTIFF/PETITIONER INFORMATION:**

*Enter your information below.*

Name  Robert Schumann _____
*First, Middle and Last Name*

Registered Agent's name, if any _____
*First, Middle and Last Name*

Street Address_____
*Street, Apt #*

City, State, ZIP: _____
*City*                                                          *State*                        *Zip*

Telephone: _____   Email: _____

Be sure to **check your email every day** so you do not miss important information, court dates, or documents from other parties.

---

**STOP**  The Circuit Clerk and officer or process server will fill in this section.

**To be filled in by the Circuit Clerk:**

Witness this Date: _____

Clerk of the Court: 7/1/2025 3:23 PM Mariyana T. Spyropoulos
_____

**To be filled in by an officer or process server:**

Date of Service: _____

*Fill in the date above and give this copy of the Summons to the person served.*

---

**Note to officer or process server:**

- If 1 is checked, this is a 30-day *Summons* and must be served within 30 days of the witness date.
- If 2 is checked, this is a date certain *Summons* and must be served at least 21 days before the court date, unless 3b is checked yes.
   - If 2 is checked **and** 3b is checked yes, the *Summons* must be served at least 3 days before the court date.
- Fill in the date above and give this copy of the *Summons* to the person served.
- You must also complete the attached *Proof of Service* form and file it with the court or return it to the Plaintiff.

*Case Number:* 2025CH06932 _____



# WHAT'S NEXT

## NEXT STEPS FOR PERSON FILLING OUT THIS FORM:

When you file a lawsuit, you must notify the person or business you are suing of the court case by having the *Summons* and Complaint or Petition delivered to them. This is called "serving" them.

File your *Summons* and Complaint or Petition with the Circuit Clerk in the county where your court case should be filed. The Circuit Clerk will "issue" the *Summons* by putting a court seal on the form.

Have the sheriff or a private process server serve the *Summons* and a copy of the Complaint or Petition on the Defendant/Respondent. You cannot serve the *Summons* yourself.



Learn more about each step in the process and how to file in the instructions:
ilcourts.info/summons-instructions.

## NEXT STEPS FOR PERSON RECEIVING THIS DOCUMENT:



**You have been sued:**
- Read all documents attached to this *Summons*.
- All documents referred to in this *Summons* can be found at ilcourts.info/forms. Other documents may be available from your local Circuit Court Clerk's office or website.
- You may be charged filing fees, but if you cannot pay them, you can file an *Application for Waiver of Court Fees (Civil)*.
- When you go to court, it is possible that the court will allow you to attend the first court date in this case in-person or remotely by video or phone. Contact the Circuit Court Clerk's office or visit the Court's website to find out whether this is possible and, if so, how to do this.

**If Section 1 on page 1 of this *Summons* is checked (30-day summons):**
- You **must** file official documents called an *Appearance* and an *Answer/Response* with the court within 30 days of the date you were served with this *Summons*.
- If you do not file an *Appearance* and *Answer/Response* on time, the judge may decide the case without hearing from you. This is called "default." As a result, you could lose the case.
- After you fill out the necessary documents, you need to electronically file (e-file) them with the court. To e-file, you must create an account with an e-filing service provider. For more information, go to ilcourts.info/efiling. If you cannot e-file, you can get an exemption that allows you to file in-person or by mail.
- You should be notified of any future court dates.

**If Section 2 on page 1 of on this *Summons* is checked (date certain summons):**
- You **must** attend court on the date listed in Section 2 of this *Summons.*
- If you do not attend that court date, the judge may decide the case without hearing from you. This is called "default." As a result, you could lose the case.

**Need Help? ¿Necesita ayuda?**
- Call or text Illinois Court Help at 833-411-1121 or go to ilcourthelp.gov for information about going to court, including how to fill out and file documents.
- Llame o envíe un mensaje de texto a Illinois Court Help al 833-411-1121, o visite ilcourthelp.gov para obtener información sobre los casos de la corte y cómo completar y presentar formularios.
- You can also get free legal information and legal referrals at illinoislegalaid.org.
- If there are any words or terms that you do not understand, please **visit Illinois Legal Aid Online** at ilao.info/glossary. You may also find more information, resources, and the location of your local legal self-help center at: ilao.info/lshc-directory.

FILED DATE: 7/1/2025 3:23 PM 2025CH06932

2025CH06932

*Case Number:* _____

FILED DATE: 7/1/2025 3:23 PM   2025CH06932

# PROOF OF SERVICE OF SUMMONS AND COMPLAINT/PETITION

IN THE STATE OF ILLINOIS, CIRCUIT COURT

☐ **Alias Summons**
*Check if this is not the 1ˢᵗ Summons issued for this Defendant/Respondent.*

**COUNTY:** Cook ⊙
*County Where You Are Filing the Case*

*Enter the case information as it appears on your other court documents.*

**PLAINTIFF/PETITIONER OR IN RE:** Robert Schumann
*Who started the case.*          *First, Middle, and Last Name or Business Name*

**2025CH06932**
_____
**Case Number**

**DEFENDANTS/RESPONDENTS:**   American Express Company; and
*Who the case was filed against.*
American National Bank, Successor by
merger to American Express Bank, FSB
*First, Middle, and Last Name or Business Name*

**STOP** Do not complete the rest of the form. **The sheriff or special process server will fill in the form.**
Give them one copy of this blank *Proof of Service* form for each Defendant/Respondent who will be served.

My name is _____ and I state:
*Officer/Process Server First, Middle, Last Name*

## SERVICE INFORMATION

Defendant/Respondent: _____
*First, Middle, Last Name, or Business Name*

☐ I was not able to serve the *Summons* and Complaint/Petition on the Defendant/Respondent named above.

- or -

☐ I served the *Summons* and Complaint/Petition on the Defendant/Respondent named above as follows:

☐ **Personally** on the Defendant/Respondent:
☐ Male ☐ Female ☐ Non-Binary  Approx. Age: _____ Race: _____

On this date: _____ at this time: _____ ☐ a.m. ☐ p.m.

Address, Unit#: _____

City, State, ZIP: _____

☐ On **someone else at the Defendant/Respondent's home** who is at least 13 years old and is a family member or lives there:
Name of person served: _____
*First, Middle, Last Name*
☐ Male ☐ Female ☐ Non-Binary  Approx. Age: _____ Race: _____

On this date: _____ at this time: _____ ☐ a.m. ☐ p.m.

Address, Unit#: _____

City, State, ZIP: _____
and by sending a copy to this Defendant/Respondent in a postage-paid, sealed envelope to the above

address on this date: _____.

2025CH06932

Case Number: _____

☐ On the **Business's agent:** _____

*First, Middle, Last Name*

☐ Male ☐ Female ☐ Non-Binary  Approx. Age: _____  Race: _____

On this date: _____  at this time: _____ ☐ a.m. ☐ p.m.

Address, Unit#: _____

City, State, ZIP: _____

## SERVICE ATTEMPTS

I made the following attempts to serve the *Summons* and Complaint/Petition on the Defendant/Respondent:

**First Attempt:** On this date: _____  at this time: _____ ☐ a.m. ☐ p.m.

Address, Unit#: _____

City, State, ZIP: _____

Other information about service attempt:

_____
_____
_____

**Second Attempt:** On this date: _____  at this time: _____ ☐ a.m. ☐ p.m.

Address, Unit#: _____

City, State, ZIP: _____

Other information about service attempt:

_____
_____
_____

**Third Attempt:** On this date: _____  at this time: _____ ☐ a.m. ☐ p.m.

Address, Unit#: _____

City, State, ZIP: _____

Other information about service attempt:

_____
_____
_____

---

## SIGN

I certify under 735 ILCS 5/1-109 that:

1) everything in this document is true and correct, or I have been informed or I believe it to be true and correct, and

2) I understand that making a false statement on this form is perjury and has penalties provided by law.

Your Signature /s/ _____  Print Your Name _____

You are: ☐ Sheriff in Illinois
         ☐ Sheriff outside Illinois: _____   ☐ Special process server
                                                            ☐ Licensed private detective, license number: _____

*County and State*                                           *License number*

**FEES:**
   Service and Return: $_____   Miles: $_____   Total: $_____

FILED DATE: 7/1/2025 3:23 PM   2025CH06932

Case: 1:25-cv-09731 Document #: 1-1 Filed: 08/14/25 Page 113 of 415 PageID #:228

FILED
7/1/2025 3:23 PM
Mariyana T. Spyropoulos
CIRCUIT CLERK
COOK COUNTY, IL
2025CH06932
Calendar, 7
33389797

FILED DATE: 7/1/2025 3:23 PM   2025CH06932

# SUMMONS

### IN THE STATE OF ILLINOIS, CIRCUIT COURT

☐ **Alias Summons**
*Check if this is not the 1ˢᵗ Summons issued for this Defendant/Respondent.*

**COUNTY:** Cook ⌄
*County Where You Are Filing the Case*

*Enter the case information as it appears on your other court documents.*

**PLAINTIFF/PETITIONER OR IN RE:** Robert Schumann
*Who started the case.*     *First, Middle, and Last Name or Business Name*

**DEFENDANTS/RESPONDENTS:** American Express Company; and
*Who the case was filed against.*
American Express National Bank, Successor
by merger to American Express Bank, FSB
*First, Middle, and Last Name or Business Name*

**2025CH06932**
_____
**Case Number**

## The Defendant/Respondent named above has been sued. Read this form for information about how to respond to this lawsuit. Also see page 4 for next steps.

**For the person filling out this form: Read all instructions in this box.**

This *Summons* can only be used for certain types of cases. See the *How To Serve a Summons* Instructions for more information: ilcourts.info/summons-instructions.

Check 1 if this is a 30-day summons, or check 2 if this is a date certain summons. Fill in all the information in 1 or 2.

- Use a **date certain summons** if you are asking for money of $50,000 or less or recovery of your personal property that you think the Defendant has, and for some mandatory arbitration cases. In 2, fill in your court date and how to go to court. You may get the court date when you e-file or you may need to ask the Circuit Clerk's office.

- Use a **30-day summons** for most other case types.

Complete the rest of the form with the Defendant/Respondent's information and information about the lawsuit.

**If you are suing more than 1 Defendant/Respondent**, attach an *Additional Defendant/Respondent Address and Service Information* form for **each** additional Defendant/Respondent.

☑ **1. 30-DAY SUMMONS**

To participate in this case, you must **file** your *Appearance* and *Answer/Response* forms with the court within 30 days after you are served with this *Summons* (not counting the day of service) by e-filing or at:

Court Address: 50 West Washington, Chicago, IL 60602 _____
*Courthouse Street Address*

**- or -**

☐ **2. DATE CERTAIN SUMMONS**

*Your court date is listed below. Information about getting a court date and how to attend is available from the Circuit Clerk. You can find their contact information at ilcourts.info/CircuitClerks.*

To respond to this *Summons*, you must **attend court** in one of the ways checked below on:

_____ at _____ ☐ a.m. ☐ p.m. in _____.
*Month, Day, Year*          *Time*                    *Courtroom Number*

Case Number: _____2025CH06932_____

2025CH06932

FILED DATE: 7/1/2025 3:23 PM   2025CH06932

## Going to Court for a Date Certain Summons

Court dates may be in-person, remote, or a combination of in-person and remote.

☐ **In person** at: _____
           *Courtroom Address*            *Courtroom Number*

☑ **Remotely** (video or telephone)

      **By video conference** at: _____
                *Video Conference Website*

      Log-in information: _____
                *Video Conference Log-in Information, Meeting ID, Password, etc.*

      **By telephone** at: _____
                *Call-in Number for Telephone Remote Appearance*

To find out more about remote court options:

    Phone: _____   or   Website: _____
         *Circuit Clerk's Phone Number*          *Website URL*

_____            _____

## 3. ADDITIONAL INFORMATION ABOUT THE LAWSUIT

a. I am asking for the following amount of money in my *Complaint/Petition*: $ _0_____.

                 *(Enter 0 if you are not asking for money)*

b. I am asking for the return of tangible personal property (items in the Defendant/Respondent's possession) in my *Complaint/Petition*.

    ☐ Yes   ☑ No

## 4. DEFENDANT/RESPONDENT'S INFORMATION

a. Number of Defendants/Respondents being served:

    ☑ I am having 1 Defendant/Respondent served and their information is on this form below.

    ☐ I am having more than 1 Defendant/Respondent served. The first is listed below. I have attached *Additional Defendant/Respondent Address and Service Information* forms for the following number of additional Defendants/Respondents: _____.
                   *Number*

b. First Defendant/Respondent's **primary address/information** for service:

    Name: American Express National Ban, Successor by merger to American Express Bank, FSB
       *First, Middle, and Last Name, or Business Name*

    Registered Agent's Name *(if you are serving the Registered Agent of a business)*:

    CT Corporation
     *First, Middle, and Last Name*

    Street Address: 1999 Bryan Street, Suite 900
            *Street, Apt #*

    City, State, ZIP: _____
          *City*          *State*       *Zip*

    Telephone: _____   Email: _____

2025CH06932

Case Number: _____

c. **Second address** for this Defendant/Respondent:
   - ☑ I do **not** have another address where the Defendant/Respondent might be found.
   - ☐ I have another address where this Defendant/Respondent might be found. It is:

Street Address: _____
   *Street, Apt #*

City, State, ZIP: _____
   *City*                                          *State*                    *Zip*

Telephone: _____   Email: _____

d. Person who will serve your documents on this Defendant/Respondent:
   - ☐ Sheriff in Illinois  ☐ Special process server  ☐ Licensed private detective
   - ☑ Sheriff outside Illinois: _____
     *County & State*

---

## PLAINTIFF/PETITIONER INFORMATION:

*Enter your information below.*

Name _____
   *First, Middle and Last Name*

Registered Agent's name, if any _____
   *First, Middle and Last Name*

Street Address_____
   *Street, Apt #*

City, State, ZIP: _____
   *City*                                          *State*                    *Zip*

Telephone: _____   Email: _____

Be sure to **check your email every day** so you do not miss important information, court dates, or documents from other parties.

---

**STOP** The Circuit Clerk and officer or process server will fill in this section.

**To be filled in by the Circuit Clerk:**

Witness this Date: _____

Clerk of the Court: 7/1/2025 3:23 PM Mariyana T. Spyropoulos
_____

**To be filled in by an officer or process server:**

Date of Service: _____

*Fill in the date above and give this copy of the Summons to the person served.*

---

**Note to officer or process server:**
- If 1 is checked, this is a 30-day *Summons* and must be served within 30 days of the witness date.
- If 2 is checked, this is a date certain *Summons* and must be served at least 21 days before the court date, unless 3b is checked yes.
  - If 2 is checked **and** 3b is checked yes, the *Summons* must be served at least 3 days before the court date.
- Fill in the date above and give this copy of the *Summons* to the person served.
- You must also complete the attached *Proof of Service* form and file it with the court or return it to the Plaintiff.

FILED DATE: 7/1/2025 3:23 PM    2025CH06932

*Case Number:* 2025CH06932

FILED DATE: 7/1/2025 3:23 PM   2025CH06932



# WHAT'S NEXT

## NEXT STEPS FOR PERSON FILLING OUT THIS FORM:

When you file a lawsuit, you must notify the person or business you are suing of the court case by having the *Summons* and Complaint or Petition delivered to them. This is called "serving" them.

File your *Summons* and Complaint or Petition with the Circuit Clerk in the county where your court case should be filed. The Circuit Clerk will "issue" the *Summons* by putting a court seal on the form.

Have the sheriff or a private process server serve the *Summons* and a copy of the Complaint or Petition on the Defendant/Respondent. You cannot serve the *Summons* yourself.



Learn more about each step in the process and how to file in the instructions:
ilcourts.info/summons-instructions.



## NEXT STEPS FOR PERSON RECEIVING THIS DOCUMENT:

**You have been sued:**
- Read all documents attached to this *Summons*.
- All documents referred to in this *Summons* can be found at ilcourts.info/forms. Other documents may be available from your local Circuit Court Clerk's office or website.
- You may be charged filing fees, but if you cannot pay them, you can file an *Application for Waiver of Court Fees (Civil)*.
- When you go to court, it is possible that the court will allow you to attend the first court date in this case in-person or remotely by video or phone. Contact the Circuit Court Clerk's office or visit the Court's website to find out whether this is possible and, if so, how to do this.

**If Section 1 on page 1 of this *Summons* is checked (30-day summons*)*:**
- You **must** file official documents called an *Appearance* and an *Answer/Response* with the court within 30 days of the date you were served with this *Summons*.
- If you do not file an *Appearance* and *Answer/Response* on time, the judge may decide the case without hearing from you. This is called "default." As a result, you could lose the case.
- After you fill out the necessary documents, you need to electronically file (e-file) them with the court. To e-file, you must create an account with an e-filing service provider. For more information, go to ilcourts.info/efiling. If you cannot e-file, you can get an exemption that allows you to file in-person or by mail.
- You should be notified of any future court dates.

**If Section 2 on page 1 of on this *Summons* is checked (date certain summons):**
- You **must** attend court on the date listed in Section 2 of this *Summons.*
- If you do not attend that court date, the judge may decide the case without hearing from you. This is called "default." As a result, you could lose the case.

**Need Help? ¿Necesita ayuda?**
- Call or text Illinois Court Help at 833-411-1121 or go to ilcourthelp.gov for information about going to court, including how to fill out and file documents.
- Llame o envíe un mensaje de texto a Illinois Court Help al 833-411-1121, o visite ilcourthelp.gov para obtener información sobre los casos de la corte y cómo completar y presentar formularios.
- You can also get free legal information and legal referrals at illinoislegalaid.org.
- If there are any words or terms that you do not understand, please **visit Illinois Legal Aid Online** at ilao.info/glossary. You may also find more information, resources, and the location of your local legal self-help center at: ilao.info/lshc-directory.

2025CH06932

*Case Number:* _____

# PROOF OF SERVICE OF SUMMONS AND COMPLAINT/PETITION

IN THE STATE OF ILLINOIS, CIRCUIT COURT

☐ **Alias Summons**
*Check if this is not the 1ˢᵗ Summons issued for this Defendant/Respondent.*

**COUNTY:** Cook ⌄
*County Where You Are Filing the Case*

*Enter the case information as it appears on your other court documents.*

**PLAINTIFF/PETITIONER OR IN RE:** Robert Schumann
*Who started the case.*     *First, Middle, and Last Name or Business Name*

**DEFENDANTS/RESPONDENTS:** American Express Company; and
*Who the case was filed against.*     American Express National Bank, Successor
     by merger to American Express Bank, FSB
     *First, Middle, and Last Name or Business Name*

2025CH06932
_____
**Case Number**

**STOP** Do not complete the rest of the form. **The sheriff or special process server will fill in the form.** Give them one copy of this blank *Proof of Service* form for each Defendant/Respondent who will be served.

My name is _____ and I state:
*Officer/Process Server First, Middle, Last Name*

## SERVICE INFORMATION

Defendant/Respondent: _____
*First, Middle, Last Name, or Business Name*

☐ I was not able to serve the *Summons* and Complaint/Petition on the Defendant/Respondent named above.

- or -

☐ I served the *Summons* and Complaint/Petition on the Defendant/Respondent named above as follows:

☐ **Personally** on the Defendant/Respondent:
☐ Male ☐ Female ☐ Non-Binary  Approx. Age: _____  Race: _____

On this date: _____ at this time: _____ ☐ a.m. ☐ p.m.

Address, Unit#: _____

City, State, ZIP: _____

☐ On **someone else at the Defendant/Respondent's home** who is at least 13 years old and is a family member or lives there:
Name of person served: _____
*First, Middle, Last Name*

☐ Male ☐ Female ☐ Non-Binary  Approx. Age: _____  Race: _____

On this date: _____ at this time: _____ ☐ a.m. ☐ p.m.

Address, Unit#: _____

City, State, ZIP: _____
and by sending a copy to this Defendant/Respondent in a postage-paid, sealed envelope to the above

address on this date: _____.

FILED DATE: 7/1/2025 3:23 PM    2025CH06932

2025CH06932

Case Number: _____

☐ On the **Business's agent:** _____

*First, Middle, Last Name*

☐ Male ☐ Female ☐ Non-Binary  Approx. Age: _____  Race: _____

On this date: _____ at this time: _____ ☐ a.m. ☐ p.m.

Address, Unit#: _____

City, State, ZIP: _____

## SERVICE ATTEMPTS

I made the following attempts to serve the *Summons* and Complaint/Petition on the Defendant/Respondent:

**First Attempt:** On this date: _____ at this time: _____ ☐ a.m. ☐ p.m.

Address, Unit#: _____

City, State, ZIP: _____

Other information about service attempt:

_____
_____
_____

**Second Attempt:** On this date: _____ at this time: _____ ☐ a.m. ☐ p.m.

Address, Unit#: _____

City, State, ZIP: _____

Other information about service attempt:

_____
_____
_____

**Third Attempt:** On this date: _____ at this time: _____ ☐ a.m. ☐ p.m.

Address, Unit#: _____

City, State, ZIP: _____

Other information about service attempt:

_____
_____
_____

## SIGN

I certify under 735 ILCS 5/1-109 that:

1) everything in this document is true and correct, or I have been informed or I believe it to be true and correct, and

2) I understand that making a false statement on this form is perjury and has penalties provided by law.

Your Signature /s/ _____  Print Your Name _____

You are: ☐ Sheriff in Illinois
☐ Sheriff outside Illinois: _____
*County and State*

☐ Special process server
☐ Licensed private detective, license number: _____
*License number*

**FEES:**

Service and Return: $_____  Miles: $_____  Total: $_____

FILED DATE: 7/1/2025 3:23 PM  2025CH06932

Hearing Date: 9/2/2025 9:45 AM
Location: Court Room 2405
Judge: Reilly, Eve M

FILED
7/1/2025 3:23 PM
Mariyana T. Spyropoulos
CIRCUIT CLERK
COOK COUNTY, IL
2025CH06932
Calendar, 7
33389797

FILED DATE: 7/1/2025 3:23 PM   2025CH06932

# SUMMONS

## IN THE STATE OF ILLINOIS, CIRCUIT COURT

☐ **Alias Summons**
*Check if this is not the 1ˢᵗ Summons issued for this Defendant/Respondent.*

**COUNTY:** Cook ⬇
*County Where You Are Filing the Case*

Enter the case information as it appears on your other court documents.

**PLAINTIFF/PETITIONER OR IN RE:** Robert Schumann
*Who started the case.*                         *First, Middle, and Last Name or Business Name*

**DEFENDANTS/RESPONDENTS:** American Express Company; and
*Who the case was filed against.*
American National Bank, Successor by

merger to American Express Bank, FSB
*First, Middle, and Last Name or Business Name*

**2025CH06932**
_____
**Case Number**

## The Defendant/Respondent named above has been sued. Read this form for information about how to respond to this lawsuit. Also see page 4 for next steps.

**For the person filling out this form: Read all instructions in this box.**

This *Summons* can only be used for certain types of cases. See the *How To Serve a Summons* Instructions for more information: ilcourts.info/summons-instructions.

Check 1 if this is a 30-day summons, or check 2 if this is a date certain summons. Fill in all the information in 1 or 2.

- Use a **date certain summons** if you are asking for money of $50,000 or less or recovery of your personal property that you think the Defendant has, and for some mandatory arbitration cases. In 2, fill in your court date and how to go to court. You may get the court date when you e-file or you may need to ask the Circuit Clerk's office.

- Use a **30-day summons** for most other case types.

Complete the rest of the form with the Defendant/Respondent's information and information about the lawsuit.

**If you are suing more than 1 Defendant/Respondent**, attach an *Additional Defendant/Respondent Address and Service Information* form for **each** additional Defendant/Respondent.

☑ **1. 30-DAY SUMMONS**

To participate in this case*,* you must **file** your *Appearance* and *Answer/Response* forms with the court within 30 days after you are served with this *Summons* (not counting the day of service) by e-filing or at:

Court Address: 50 West Washington Street, Chicago, IL 60602
*Courthouse Street Address*

**- or -**

☐ **2. DATE CERTAIN SUMMONS**

*Your court date is listed below. Information about getting a court date and how to attend is available from the Circuit Clerk. You can find their contact information at ilcourts.info/CircuitClerks.*

To respond to this *Summons*, you must **attend court** in one of the ways checked below on:

_____ at _____ ☐ a.m. ☐ p.m. in _____.
*Month, Day, Year*                *Time*                        *Courtroom Number*

Case Number: _____
2025CH06932

## Going to Court for a Date Certain Summons

Court dates may be in-person, remote, or a combination of in-person and remote.

☐ **In person** at: _____
                        *Courtroom Address*                   *Courtroom Number*

☑ **Remotely** (video or telephone)

    **By video conference** at: _____
                             *Video Conference Website*

    Log-in information: _____
                   *Video Conference Log-in Information, Meeting ID, Password, etc.*

    **By telephone** at: _____
                 *Call-in Number for Telephone Remote Appearance*

To find out more about remote court options:

Phone: _____ or Website: _____
     *Circuit Clerk's Phone Number*            *Website URL*

_____      _____

## 3. ADDITIONAL INFORMATION ABOUT THE LAWSUIT

a. I am asking for the following amount of money in my *Complaint/Petition*: $ _0_____.
                                 *(Enter 0 if you are not asking for money)*

b. I am asking for the return of tangible personal property (items in the Defendant/Respondent's possession) in my *Complaint/Petition*.

☐ Yes   ☑ No

## 4. DEFENDANT/RESPONDENT'S INFORMATION

a. Number of Defendants/Respondents being served:

☑ I am having 1 Defendant/Respondent served and their information is on this form below.

☐ I am having more than 1 Defendant/Respondent served. The first is listed below. I have attached *Additional Defendant/Respondent Address and Service Information* forms for the following number of additional Defendants/Respondents: _____.
                                *Number*

b. First Defendant/Respondent's **primary address/information** for service:

Name: American Express Company _____
     *First, Middle, and Last Name, or Business Name*

Registered Agent's Name *(if you are serving the Registered Agent of a business)*:

CT Corporation _____
     *First, Middle, and Last Name*

Street Address: 28 Liberty Street _____
             *Street, Apt #*

City, State, ZIP: New York, NY 10005 _____
            *City*            *State*      *Zip*

Telephone: _____ Email: _____

FILED DATE: 7/1/2025 3:23 PM   2025CH06932

2025CH06932

Case Number: _____

c.  **Second address** for this Defendant/Respondent:

☑ I do **not** have another address where the Defendant/Respondent might be found.

☐ I have another address where this Defendant/Respondent might be found. It is:

Street Address: _____
                         *Street, Apt #*

City, State, ZIP: _____
                         *City*                              *State*              *Zip*

Telephone: _____  Email: _____

d.  Person who will serve your documents on this Defendant/Respondent:

☐ Sheriff in Illinois  ☐ Special process server  ☐ Licensed private detective

☑ Sheriff outside Illinois: New York County, New York
                                    *County & State*

---

**PLAINTIFF/PETITIONER INFORMATION:**

*Enter your information below.*

Name  Robert Schumann _____
           *First, Middle and Last Name*

Registered Agent's name, if any _____
                                         *First, Middle and Last Name*

Street Address_____
                    *Street, Apt #*

City, State, ZIP: _____
                         *City*                              *State*              *Zip*

Telephone: _____  Email: _____

Be sure to **check your email every day** so you do not miss important information, court dates, or documents from other parties.

---

**STOP**  The Circuit Clerk and officer or process server will fill in this section.

**To be filled in by the Circuit Clerk:**

Witness this Date: _____

Clerk of the Court: ___7/1/2025 3:23 PM Mariyana T. Spyropoulos___

**To be filled in by an officer or process server:**

Date of Service: _____

*Fill in the date above and give this copy of the Summons to the person served.*

---

**Note to officer or process server:**

- If 1 is checked, this is a 30-day *Summons* and must be served within 30 days of the witness date.
- If 2 is checked, this is a date certain *Summons* and must be served at least 21 days before the court date, unless 3b is checked yes.
  - If 2 is checked **and** 3b is checked yes, the *Summons* must be served at least 3 days before the court date.
- Fill in the date above and give this copy of the *Summons* to the person served.
- You must also complete the attached *Proof of Service* form and file it with the court or return it to the Plaintiff.

*Case Number:* 2025CH06932 _____

FILED DATE: 7/1/2025 3:23 PM   2025CH06932



# NEXT STEPS FOR PERSON FILLING OUT THIS FORM:

When you file a lawsuit, you must notify the person or business you are suing of the court case by having the *Summons* and Complaint or Petition delivered to them. This is called "serving" them.

File your *Summons* and Complaint or Petition with the Circuit Clerk in the county where your court case should be filed. The Circuit Clerk will "issue" the *Summons* by putting a court seal on the form.

Have the sheriff or a private process server serve the *Summons* and a copy of the Complaint or Petition on the Defendant/Respondent. You cannot serve the *Summons* yourself.

 Learn more about each step in the process and how to file in the instructions: ilcourts.info/summons-instructions.



# NEXT STEPS FOR PERSON RECEIVING THIS DOCUMENT:

**You have been sued:**
- Read all documents attached to this *Summons*.
- All documents referred to in this *Summons* can be found at ilcourts.info/forms. Other documents may be available from your local Circuit Court Clerk's office or website.
- You may be charged filing fees, but if you cannot pay them, you can file an *Application for Waiver of Court Fees (Civil)*.
- When you go to court, it is possible that the court will allow you to attend the first court date in this case in-person or remotely by video or phone. Contact the Circuit Court Clerk's office or visit the Court's website to find out whether this is possible and, if so, how to do this.

**If Section 1 on page 1 of this *Summons* is checked (30-day summons):**
- You **must** file official documents called an *Appearance* and an *Answer/Response* with the court within 30 days of the date you were served with this *Summons*.
- If you do not file an *Appearance* and *Answer/Response* on time, the judge may decide the case without hearing from you. This is called "default." As a result, you could lose the case.
- After you fill out the necessary documents, you need to electronically file (e-file) them with the court. To e-file, you must create an account with an e-filing service provider. For more information, go to ilcourts.info/efiling. If you cannot e-file, you can get an exemption that allows you to file in-person or by mail.
- You should be notified of any future court dates.

**If Section 2 on page 1 of on this *Summons* is checked (date certain summons):**
- You **must** attend court on the date listed in Section 2 of this *Summons.*
- If you do not attend that court date, the judge may decide the case without hearing from you. This is called "default." As a result, you could lose the case.

**Need Help? ¿Necesita ayuda?**
- Call or text Illinois Court Help at 833-411-1121 or go to ilcourthelp.gov for information about going to court, including how to fill out and file documents.
- Llame o envíe un mensaje de texto a Illinois Court Help al 833-411-1121, o visite ilcourthelp.gov para obtener información sobre los casos de la corte y cómo completar y presentar formularios.
- You can also get free legal information and legal referrals at illinoislegalaid.org.
- If there are any words or terms that you do not understand, please **visit Illinois Legal Aid Online** at ilao.info/glossary. You may also find more information, resources, and the location of your local legal self-help center at: ilao.info/lshc-directory.

2025CH06932

*Case Number:* _____

# PROOF OF SERVICE OF SUMMONS AND COMPLAINT/PETITION

IN THE STATE OF ILLINOIS, CIRCUIT COURT

☐ **Alias Summons**

*Check if this is not the 1ˢᵗ Summons issued for this Defendant/Respondent.*

**COUNTY:** Cook ▼

*County Where You Are Filing the Case*

*Enter the case information as it appears on your other court documents.*

**PLAINTIFF/PETITIONER OR IN RE:** Robert Schumann

*Who started the case.*        *First, Middle, and Last Name or Business Name*

**DEFENDANTS/RESPONDENTS:** American Express Company; and

*Who the case was filed against.*  American National Bank, Successor by

merger to American Express Bank, FSB

*First, Middle, and Last Name or Business Name*

**2025CH06932**
_____
**Case Number**

🛑 **STOP** Do not complete the rest of the form. **The sheriff or special process server will fill in the form.** Give them one copy of this blank *Proof of Service* form for each Defendant/Respondent who will be served.

My name is _____ and I state:

*Officer/Process Server First, Middle, Last Name*

## SERVICE INFORMATION

Defendant/Respondent: _____

*First, Middle, Last Name, or Business Name*

☐ I was not able to serve the *Summons* and Complaint/Petition on the Defendant/Respondent named above.

- or -

☐ I served the *Summons* and Complaint/Petition on the Defendant/Respondent named above as follows:

☐ **Personally** on the Defendant/Respondent:
  ☐ Male ☐ Female ☐ Non-Binary  Approx. Age: _____ Race: _____

  On this date: _____ at this time: _____ ☐ a.m. ☐ p.m.

  Address, Unit#: _____

  City, State, ZIP: _____

☐ On **someone else at the Defendant/Respondent's home** who is at least 13 years old and is a family member or lives there:
  Name of person served: _____

  *First, Middle, Last Name*

  ☐ Male ☐ Female ☐ Non-Binary  Approx. Age: _____ Race: _____

  On this date: _____ at this time: _____ ☐ a.m. ☐ p.m.

  Address, Unit#: _____

  City, State, ZIP: _____
  and by sending a copy to this Defendant/Respondent in a postage-paid, sealed envelope to the above

  address on this date: _____.

FILED DATE: 7/1/2025 3:23 PM   2025CH06932

2025CH06932

*Case Number:* _____

☐ On the **Business's agent:** _____

*First, Middle, Last Name*

☐ Male ☐ Female ☐ Non-Binary  Approx. Age: _____ Race: _____

On this date: _____ at this time: _____ ☐ a.m. ☐ p.m.

Address, Unit#: _____

City, State, ZIP: _____

## SERVICE ATTEMPTS

I made the following attempts to serve the *Summons* and Complaint/Petition on the Defendant/Respondent:

**First Attempt:** On this date: _____ at this time: _____ ☐ a.m. ☐ p.m.

Address, Unit#: _____

City, State, ZIP: _____

Other information about service attempt:

_____
_____
_____

**Second Attempt:** On this date: _____ at this time: _____ ☐ a.m. ☐ p.m.

Address, Unit#: _____

City, State, ZIP: _____

Other information about service attempt:

_____
_____
_____

**Third Attempt:** On this date: _____ at this time: _____ ☐ a.m. ☐ p.m.

Address, Unit#: _____

City, State, ZIP: _____

Other information about service attempt:

_____
_____
_____

---

## SIGN

I certify under 735 ILCS 5/1-109 that:

1) everything in this document is true and correct, or I have been informed or I believe it to be true and correct, and

2) I understand that making a false statement on this form is perjury and has penalties provided by law.

Your Signature /s/ _____  Print Your Name _____

You are: ☐ Sheriff in Illinois
      ☐ Sheriff outside Illinois: _____
                 *County and State*

☐ Special process server
☐ Licensed private detective, license number: _____
                                *License number*

**FEES:**

  Service and Return: $_____  Miles: $_____  Total: $_____

FILED DATE: 7/1/2025 3:23 PM  2025CH06932

FILED
7/2/2025 12:57 PM
Mariyana T. Spyropoulos
CIRCUIT CLERK
COOK COUNTY, IL
2025L008392
Calendar, E
33405194

FILED DATE: 7/2/2025 12:57 PM    2025L008392

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, LAW DIVISION

DOMINI HENDERSON )
)
    Plaintiff, )
)
    v. )  Case No.  **2025L008392**
)
NAMASTE LABORATORIES, LLC; RNA )
COROPORATION; LUSTER PRODUCTS, )
INC.; AVLON INDUSTRIES INC.; AFAM )
CONCEPT, INC., D/B/A JF LABSM INC.; )
STRENGTH OF NATURE, LLC; GODREJ )
SON HOLDINGS, INC.; L'OREAL USA, )
INC.; L'OREAL USA PRODUCTS, INC.; )
SOFT SHEEN-CARSON LLC, SOFT SHEEN- )
CARSON (W.I.), BEAUTY BELL )
ENTERPRISES, LLC F/K/A HOUSE OF )
CHEATHAM, INC.; HOUSE OF )
CHEATHAM, LLC; and CHAPMAN )
PRODUCTS COMPANY, INC. )
)
    Defendants. )
)

## COMPLAINT

Plaintiff DOMINI HENDERSON through the undersigned counsel, bring this Complaint and Jury Demand for personal injuries against Defendants Namaste Laboratories, LLC, RNA Corporation, Luster Products, Inc., Avlon Industries, Inc., AFAM Concept, Inc. d/b/a JF Labs, Inc., Strength of Nature, LLC, Godrej SON Holdings, Inc., L'Oréal USA Products, Inc., L'Oreal USA, Inc., Soft Sheen-Carson LLC, Soft Sheen-Carson (W.I.), Inc., Beauty Bell Enterprises, LLC f/k/a House of Cheatham, Inc., House of Cheatham, LLC, and Chapman Products Company, Inc., (collectively, "Defendants"), allege on personal knowledge as to themselves, and on information and belief as to all matters as follows:

## INTRODUCTION

1

FILED DATE: 7/2/2025 12:57 PM   2025L008392

1.     This Complaint sets forth allegations of fact and law common to those claims within the consolidated proceeding relating to hair relaxer products. It includes allegations that Defendants manufactured, sold, distributed, advertised, and promoted toxic hair relaxer products that caused Plaintiff HENDERSON to develop uterine fibroids (hereinafter "reproductive harm"). Plaintiff seeks compensatory damages, monetary restitution, medical monitoring and equitable relief, and all other available remedies as a result of reproductive harm incurred by Defendants' defective products and other wrongful practices.

2.     Ms. HENDERSON bring this action against Defendants for injuries and claims arising from the direct and proximate result of Defendants, their directors, agents, heirs and assigns, and/or their corporate predecessors' negligent and wrongful conduct in connection with the design, development, manufacture, testing, packaging, promoting, marketing, distribution, labeling, and/or sale of hair relaxer products.

## NATURE OF THIS ACTION

3.     Ms. HENDERSON seeks compensation and justice for reproductive harm directly and proximately caused by and prolonged exposure to phthalates and other endocrine-disrupting chemicals contained in defective hair relaxer products designed, manufactured, sold, distributed, and marketed by defendants.

4.     Plaintiff HENDERSON's use of toxic chemical straightening products designed or manufactured by the Defendants was a direct result of Defendants' wrongful marketing practices. Defendants systematically misrepresented and continue to misrepresent the significant health impacts of hair relaxer use, all while targeting women of color and taking advantage of centuries of racial discrimination and cultural coercion, which emphasized—both socially and professionally—the necessity of maintaining straight hair.

FILED DATE: 7/2/2025 12:57 PM    2025L008392

5.    Rather than disclosing the risks and warning women and children, Defendants exploited for profit this deep-rooted connection between hair and identity in how they chose to market their hair relaxer products. Defendants' advertising and marketing of their hair relaxer products, and Defendants' failures to take reasonable and necessary steps to protect Plaintiff from harm, (1) exposed Plaintiff to brutally toxic products without warning; and (2) amplified institutionalized systems of discrimination that have minimized the cultural identity and heritage of women of African descent.

6.    Defendants advertised their hair relaxer products as, inter alia, "organic," "safe," "botanical," "natural," and "ultra nourishing" in newspapers, magazines, and media predominantly consumed by Black and Brown women. The advertisements, commercials, and packaging for Defendants' hair relaxer products feature almost exclusively women of color with smooth hair texture.

7.    Indeed, Defendants purposely targeted children to increase sales and ensure generations of dedicated consumers—all while having knowledge that the hair relaxer products they designed, manufactured, advertised, and sold contained toxic carcinogens.

8.    Consumers of hair relaxer products relied on Defendants' misrepresentations and omissions and were misled as to the products' safety, and as a result, have suffered brutal reproductive harms, including the devastating loss of being unable to have children.

**PARTIES VENUE AND JURISDICTION**

9.    Plaintiff HENDERSON has suffered personal injuries as a direct and proximate result of Defendants' conduct and misconduct as described herein in connection with the design, development, manufacture, testing, packaging, promotion, advertising, marketing, distribution, labeling, warning, and sale of their respective hair relaxer products.

3

FILED DATE: 7/2/2025 12:57 PM    2025L008392

10. Plaintiff HENDERSON is and at all times relevant to this action, was a citizen and resident of the State of Illinois, with her place of residence being [Plainfield, Will County, Illinois.

11. Defendant Namaste Laboratories, LLC ["Namaste"] is, and at all times relevant to this action, was a limited liability company with its principal place of business located at 310 S. Racine, 8th Floor, Chicago, Illinois 60607, and process may be served upon its registered agent, Illinois Corporation Service Company, 801 Adlai Stevenson Drive, Springfield, IL 62703.

12. Defendant RNA Corporation ["RNA"] is an Illinois corporation with is principal place of business and headquarters located at 13750 Chatham Street, Blue Island, IL 60406 and process may be served upon its registered agent ZMA Legal, located at 500 Lake Cook Road, Suite 350, Deerfield, IL 60015.

13. At all times relevant, Defendants Namaste and RNA were assigns, affiliates, partners, co-ventures, agents, equitable trustees and/or fiduciaries of and/or were entities engaged in the manufacture, design selling, supplying, labeling, marketing and/or introducing into the stream of commerce certain Hair Relaxer Products.

14. Luster Products Inc, ["Luster"] is, and at all times relevant to this action, was an Illinois corporation with its principal place of business located at 1104 W 43rd Street, Chicago, IL 60609, and process may be served upon its registered agent, Kimberly Palmisano at 3201 Old Glenview Road, Suite 325, Wilmette, Illinois 60091.

15. Defendant Avlon Industries, Inc. ["Avlon"], is, and at all times relevant to this action, was an Illinois corporation and process may be served upon its registered agent, Corporate Services Company Kenneth J. Nemec, Jr., at 835 McClintock Drive, 2nd Floor, Burr Ridge, Illinois 60527.

FILED DATE: 7/2/2025 12:57 PM    2025L008392

16.     Defendant AFAM Concept, Inc d/b/a JF Labs is, ["JF Labs"] is, and at all times relevant to this action, was an Illinois corporation and process may be served upon its registered agent, Akhtar Ali, at 126 Kraml Drive, Burr Ridge, Illinois 60527.

17.     Defendant Strength of Nature, LLC ["Strength of Nature"] is, and at all times relevant to this action, was a corporation with its principal place of business and headquarters located at 64 Ross Road, Savannah, GA 31405 and process may be served upon its registered agent, Karan Sood at 64 Ross Road, Savannah, GA 31405.

18.     Defendant Godrej SON Holdings, Inc. ["Godrej SON"] is, and at all times relevant to this action, was a corporation with is principal place of business and headquarters located at 64 Ross Road, Savannah, GA 31405, and process may be served upon its registered agent Jean Georges Njatsimi at 64 Ross Road, Savannah, GA 31405.

19.     Defendants Strength of Nature, LLC and Godrej SON Holdings, Inc. will hereinafter collectively be referred to as "Strength of Nature Defendants."

20.     Defendant L'Oréal USA, Inc. ["L'Oreal USA"] is, and at all times relevant to this action, was a corporation with its principal place of business and headquarters located at 575 Fifth Avenue, New York, New York 10017, and process may be served upon its registered agent, Corporation Service Company, 80 State Street, Albany, NY 12207.

21.     Defendant L'Oréal USA Products, Inc. ["L'Oreal USA Products"] is, and at all times relevant to this action, was a corporation with its principal place of business and headquarters located at 10 Hudson Yards 347 10th Avenue New York, New York 10001 and process may be served upon its registered agent, Corporation Service Company, 80 State Street, Albany, NY 12207.

FILED DATE: 7/2/2025 12:57 PM    2025L008392

22.     Defendant Soft Sheen-Carson, LLC ["Soft Sheen"], is, and at all times relevant to this action, was a corporation with its principal place of business and headquarters located at 2870 Peachtree Rd. Suite 464, Atlanta GA 40405 and process may be served upon its registered agent, Corporation Service Company, 80 State Street, Albany, NY 12207.

23.     Defendant Soft Sheen-Carson (W.I.), Inc., ["Carson (W.I.)"], is, and at all times relevant to this action, was a corporation and process may be served upon its registered agent, Corporate Services Company 251 Little Falls Drive, Wilmington, Delaware 19808.

24.     Defendants L'Oreal USA, Inc., L'Oreal USA Products, Inc., Soft Sheen-Carson, LLC, and Soft Sheen-Carson (W.I.) will hereinafter collectively be referred to as "L'Oreal USA Defendants."

25.     Defendant Beauty Bell f/k/a House of Cheatham, Inc., ["Beauty Bell"], is, and at all times relevant to this action, was a limited liability corporation with its principal place of business and headquarters located at 647 Mimosa Boulevard, Roswell, GA 30075, and process may be served upon its registered agent, Scroggin & Burns, LLC at 647 Mimosa Boulevard, Roswell, GA 30075.

26.     Defendant Beauty Bell's sole member and interested party is Jay Studdard, who is domiciled in Georgia.

27.     Defendant House of Cheatham, LLC ["House of Cheatham"] is a limited liability company organized in  Georgia with its principal place of business located at 1445 Rock Mountain Boulevard, Stone Mountain, Georgia, and process may be served upon its registered agent, CT Corporation System at 289 S. Culver Street, Lawrenceville, GA, 30046, USA.

28.     Defendants Beauty Bell Enterprises, LLC d/b/a House of Cheatham, Inc. and House of Cheatham, LLC will hereinafter collectively be referred to as "House of Cheatham Defendants."

FILED DATE: 7/2/2025 12:57 PM   2025L008392

29.     Defendant Chapman Products Company, Inc. ["Chapman"] is a South Carolina corporation with its principal place of business and headquarters at 22 Howard Creek Drive, Fountain Inn, South Carolina 29644 and process may be served upon its registered agent Kimberly Chapman, located at 22 Howard Creek Drive, Fountain Inn, SC 29644.

## **STATEMENT OF FACTS**

30.     Each of the preceding paragraphs is incorporated by reference herein.

31.     At all pertinent times, all Defendants were engaged in the research, development, manufacture, design, testing, sale, and marketing of the chemical hair relaxer products ("Products") and introduced such products into interstate commerce with knowledge and intent that such products be sold in the State of Illinois.

32.     At all times material hereto, Defendants Namaste and RNA developed, tested, assembled, manufactured, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold defective chemical hair relaxer Products. Those Products were included in Defendants Namaste and RNA's brands, including but not limited to ORS Olive Oil and Namaste Salon System.

33.     At all times material hereto, Defendant Luster developed, tested, assembled, manufactured, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold the defective chemical hair relaxer Products. Those products were included in Defendant Luster's brands, including but not limited to Luster's Pink Oil, PCJ, and ShortLooks.

34.     At all times material hereto, Defendant Avlon developed, tested, assembled, manufactured, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold the defective chemical hair relaxer Products. Those products were included in Defendant Avlon's brands, including but not limited to Affirm.

FILED DATE: 7/2/2025 12:57 PM 2025L008392

35.     At all times material hereto, Defendant JF Labs developed, tested, assembled, manufactured, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold the defective chemical Hair Relaxer Products. Those Products were included in Defendant JF Labs' brands, including but not limited to Hawaiian Silky and Vitale.

36.     At all times material hereto, the Strength of Nature Defendants developed, tested, assembled, manufactured, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold the defective chemical hair relaxer Products. Those Products were included in the Strength of Nature Defendants' brands, including but not limited to Just For Me, Soft & Beautiful, Motions, African Pride, TCB Naturals, UltraSheen, Dr. Miracle's, Elasta, Gentle Treatment, Profectiv, Smar Perm, and Pro-Line.

37.     At all times material hereto, the L'Oreal USA Defendants developed, tested, assembled, manufactured, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold the defective chemical hair relaxer Products. Those Products were included in the L'Oreal USA Defendants' brands, including but not limited to Dark & Lovely, Optimum, Bantu, Mizani, Ultra Precise, Care Free Curl, and Look of Radiance.

38.     At all times material hereto, the House of Cheatham Defendants developed, tested, assembled, manufactured, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold the defective chemical hair relaxer Products. Those Products were included in the House of Cheatham Defendants' brands, including but not limited to Africa's Best, Originals by Africa's Best, Organics by Africa's Best, and Texture My Way.

39.     At all times material hereto, Defendant Chapman developed, tested, assembled, manufactured, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold the defective chemical hair relaxer Products. Those Products were included in Defendant Chapman's

FILED DATE: 7/2/2025 12:57 PM    2025L008392

brands, including but not limited to Nairobi Professional, Congo Professional, Pamper, Kerafena Natural Hair Smoothing System, Grandma's Secret Portion, and Affair Hair.

40.     Upon information and belief, the hair relaxer Products developed, tested, assembled, manufactured, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold by the Defendant Namaste contained phthalates, including but not limited to diethyl phthalate (DEP), bis(2-ethyhexyl) phthalate (DEHP), and benzylbutyl phthalate; bisphenol A; cyclosiloxanes, including but not limited to octamethylcycloetrasiloxane (D4), decamethylcyclopentasiloxane (D5), and dodecamethylcyclohexylsiloxane (D6); parabens, including but not limited to methyl paraben, ethyl paraben, bis(2-ethylhexyl) adipate, and butyl paraben; antimicrobials including but not limited to o-phenylphenol, triclosan, and triclocarban; ethanolamines, including but not limited to menoethanolamine and diethanolamine; alkylphenols, including but not limited to 4-t-octylphenol, 4-t-nonylphenol, nonylphenol monoethoxylate, and nonylphenol diethoxylate; UV filters including, but not limited to benzophenone, benzophenone-1, benzophenone-2, benzophenone-3, oxtinoxate, and octadimethyl PABA; and fragrances, including but not limited to benzylcetate, eugenol, hexyl cinnemal, limonene, linalool, methyl eugenol, methyl salicylate, pinene, terpineol, AHTN, bucinal, diphenyl ether, DPMI, HHCB, isobornyl acetate, methyl ionone, musk ketone, musk xylene, and phenethyl alcohol.

41.     Upon information and belief, the hair relaxer Products developed, tested, assembled, manufactured, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold by Defendant RNA contained phthalates, including but not limited to diethyl phthalate (DEP), bis(2-ethyhexyl) phthalate (DEHP), and benzylbutyl phthalate; bisphenol A; cyclosiloxanes, including but not limited to octamethylcycloetrasiloxane (D4), decamethylcyclopentasiloxane (D5), and dodecamethylcyclohexylsiloxane (D6); parabens, including but not limited to methyl

FILED DATE: 7/2/2025 12:57 PM   2025L008392

paraben, ethyl paraben, bis(2-ethylhexyl) adipate, and butyl paraben; antimicrobials including but not limited to o-phenylphenol, triclosan, and triclocarban; ethanolamines, including but not limited to menoethanolamine and diethanolamine; alkylphenols, including but not limited to 4-t-octylphenol, 4-t-nonylphenol, nonylphenol monoethoxylate, and nonylphenol diethoxylate; UV filters including, but not limited to benzophenone, benzophenone-1, benzophenone-2, benzophenone-3, oxtinoxate, and octadimethyl PABA; and fragrances, including but not limited to benzylcetate, eugenol, hexyl cinnemal, limonene, linalool, methyl eugenol, methyl salicylate, pinene, terpineol, AHTN, bucinal, diphenyl ether, DPMI, HHCB, isobornyl acetate, methyl ionone, musk ketone, musk xylene, and phenethyl alcohol.

42.     At all times material hereto, Defendants Namaste and RNA placed defective hair Products into the stream of interstate commerce and Plaintiff used the following products:

    a.  ORS Olive Oil New Growth No Lye Hair Relaxer with Olive Oil and Natural Herbs;
    b.  ORS Olive Oil Girls No Lye Conditioning Hair Relaxer System with Olive Oil and Natural Herbs;
    c.  Silk Elements Luxury Moisturizing Relaxer System with Shea Butter – Mild Formula; and
    d.  Silk Elements Luxury No-Lye Sensitive Scalp Relaxer System.

43.     Upon information and belief, the hair relaxer Products developed, tested, assembled, manufactured, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold by Defendant Luster contained phthalates, including but not limited to diethyl phthalate (DEP), bis(2-ethyhexyl) phthalate (DEHP), and benzylbutyl phthalate; bisphenol A; cyclosiloxanes, including but not limited to octamethylcycloetrasiloxane (D4), decamethylcyclopentasiloxane (D5), and dodecamethylcyclohexylsiloxane (D6); parabens, including but not limited to methyl paraben, ethyl paraben, bis(2-ethylhexyl) adipate, and butyl paraben; antimicrobials including but not limited to o-phenylphenol, triclosan, and triclocarban;

FILED DATE: 7/2/2025 12:57 PM    2025L008392

ethanolamines, including but not limited to menoethanolamine and diethanolamine; alkylphenols, including but not limited to 4-t-octylphenol, 4-t-nonylphenol, nonylphenol monoethoxylate, and nonylphenol diethoxylate; UV filters including, but not limited to benzophenone, benzophenone-1, benzophenone-2, benzophenone-3, oxtinoxate, and octadimethyl PABA; and fragrances, including but not limited to benzylcetate, eugenol, hexyl cinnemal, limonene, linalool, methyl eugenol, methyl salicylate, pinene, terpineol, AHTN, bucinal, diphenyl ether, DPMI, HHCB, isobornyl acetate, methyl ionone, musk ketone, musk xylene, and phenethyl alcohol.

44.     At all times material hereto, Defendant Luster placed defective hair Products into the stream of commerce and Plaintiff used the following products:

    a.  Luster's Smooth Touch No Lye New Growth Relaxer Kit Triple Strength with Olive Oil; and
    b.  Luster's Smooth Touch New Growth Relaxer Kit Triple Strength No-Lye with Olive Oil.

45.     Upon information and belief, the hair relaxer Products developed, tested, assembled, manufactured, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold by Defendant Avlon contained phthalates, including but not limited to diethyl phthalate (DEP), bis(2-ethyhexyl) phthalate (DEHP), and benzylbutyl phthalate; bisphenol A; cyclosiloxanes, including but not limited to octamethylcycloetrasiloxane (D4), decamethylcyclopentasiloxane (D5), and dodecamethylcyclohexylsiloxane (D6); parabens, including but not limited to methyl paraben, ethyl paraben, bis(2-ethylhexyl) adipate, and butyl paraben; antimicrobials including but not limited to o-phenylphenol, triclosan, and triclocarban; ethanolamines, including but not limited to menoethanolamine and diethanolamine; alkylphenols, including but not limited to 4-t-octylphenol, 4-t-nonylphenol, nonylphenol monoethoxylate, and nonylphenol diethoxylate; UV filters including, but not limited to benzophenone, benzophenone-1, benzophenone-2, benzophenone-3, oxtinoxate, and octadimethyl PABA; and fragrances,

FILED DATE: 7/2/2025 12:57 PM    2025L008392

including but not limited to benzylcetate, eugenol, hexyl cinnemal, limonene, linalool, methyl eugenol, methyl salicylate, pinene, terpineol, AHTN, bucinal, diphenyl ether, DPMI, HHCB, isobornyl acetate, methyl ionone, musk ketone, musk xylene, and phenethyl alcohol.

46.     At all times material hereto, Defendant Avlon placed defective hair Products into the stream of commerce and Plaintiff used the following products:

        a.   Affirm Conditioning Crème Relaxer System.

47.     Upon information and belief, the hair relaxer Products developed, tested, assembled, manufactured, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold by Defendant JF Labs contained phthalates, including but not limited to diethyl phthalate (DEP), bis(2-ethyhexyl) phthalate (DEHP), and benzylbutyl phthalate; bisphenol A; cyclosiloxanes, including but not limited to octamethylcycloetrasiloxane (D4), decamethylcyclopentasiloxane (D5), and dodecamethylcyclohexylsiloxane (D6); parabens, including but not limited to methyl paraben, ethyl paraben, bis(2-ethylhexyl) adipate, and butyl paraben; antimicrobials including but not limited to o-phenylphenol, triclosan, and triclocarban; ethanolamines, including but not limited to menoethanolamine and diethanolamine; alkylphenols, including but not limited to 4-t-octylphenol, 4-t-nonylphenol, nonylphenol monoethoxylate, and nonylphenol diethoxylate; UV filters including, but not limited to benzophenone, benzophenone-1, benzophenone-2, benzophenone-3, oxtinoxate, and octadimethyl PABA; and fragrances, including but not limited to benzylcetate, eugenol, hexyl cinnemal, limonene, linalool, methyl eugenol, methyl salicylate, pinene, terpineol, AHTN, bucinal, diphenyl ether, DPMI, HHCB, isobornyl acetate, methyl ionone, musk ketone, musk xylene, and phenethyl alcohol.

48.     At all times material hereto, Defendant JF Labs placed defective hair Products into the stream of commerce and Plaintiff used the following products:

a. Vitale Olive Oil No-Lye Conditioning Anti-Breakage Relaxer Kit with Shea Butter and Oatmeal Proteins.

49.     Upon information and belief, the hair relaxer Products developed, tested, assembled, manufactured, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold by the Strength of Nature Defendants contained phthalates, including but not limited to diethyl phthalate (DEP), bis(2-ethyhexyl) phthalate (DEHP), and benzylbutyl phthalate; bisphenol A; cyclosiloxanes, including but not limited to octamethylcycloetrasiloxane (D4), decamethylcyclopentasiloxane (D5), and dodecamethylcyclohexylsiloxane (D6); parabens, including but not limited to methyl paraben, ethyl paraben, bis(2-ethylhexyl) adipate, and butyl paraben; antimicrobials including but not limited to o-phenylphenol, triclosan, and triclocarban; ethanolamines, including but not limited to menoethanolamine and diethanolamine; alkylphenols, including but not limited to 4-t-octylphenol, 4-t-nonylphenol, nonylphenol monoethoxylate, and nonylphenol diethoxylate; UV filters including, but not limited to benzophenone, benzophenone-1, benzophenone-2, benzophenone-3, oxtinoxate, and octadimethyl PABA; and fragrances, including but not limited to benzylcetate, eugenol, hexyl cinnemal, limonene, linalool, methyl eugenol, methyl salicylate, pinene, terpineol, AHTN, bucinal, diphenyl ether, DPMI, HHCB, isobornyl acetate, methyl ionone, musk ketone, musk xylene, and phenethyl alcohol.

50.     At all times material hereto, the Strength of Nature Defendants placed defective hair Products into the stream of commerce and Plaintiff used the following products:

a. Soft & Beautiful's Just For Me No Lye Conditioning Crème Relaxer with Sunflower Oil, Shea Butter, Coconut Milk and Vitamin E;
b. Soft & Beautiful's Just for Me No-Lye Conditioning Crème Relaxer – Children's Formula;
c. Soft & Beautiful No-Lye Conditioning Relaxer System with Hydration Oils, Olive, Argan, and Coconut;
d. Motions Silkening Shine No-Lye Relaxer with Mono Oil and Silk Proteins;
e. Motions No-Lye Relaxer System with Shea Butter, Argan, and Coconut Oil;

f.   African Pride Olive Miracle Anti-Breakage No-Lye Relaxer with Olive Oil;
g.   TCB No Base Relaxer with Protein and DNA – Super Formula;
h.   TCB Naturals No Base Crème Relaxer with Natural Oils and DNA; and
i.   Gentle Treatment No-Lye Conditioning Crème Relaxer System – Regular Formula.

51.    Upon information and belief, the hair relaxer Products developed, tested, assembled, manufactured, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold by the L'Oreal USA Defendants contained phthalates, including but not limited to diethyl phthalate (DEP), bis(2-ethyhexyl) phthalate (DEHP), and benzylbutyl phthalate; bisphenol A; cyclosiloxanes, including but not limited to octamethylcycloetrasiloxane (D4), decamethylcyclopentasiloxane (D5), and dodecamethylcyclohexylsiloxane (D6); parabens, including but not limited to methyl paraben, ethyl paraben, bis(2-ethylhexyl) adipate, and butyl paraben; antimicrobials including but not limited to o-phenylphenol, triclosan, and triclocarban; ethanolamines, including but not limited to menoethanolamine and diethanolamine; alkylphenols, including but not limited to 4-t-octylphenol, 4-t-nonylphenol, nonylphenol monoethoxylate, and nonylphenol diethoxylate; UV filters including, but not limited to benzophenone, benzophenone-1, benzophenone-2, benzophenone-3, oxtinoxate, and octadimethyl PABA; and fragrances, including but not limited to benzylcetate, eugenol, hexyl cinnemal, limonene, linalool, methyl eugenol, methyl salicylate, pinene, terpineol, AHTN, bucinal, diphenyl ether, DPMI, HHCB, isobornyl acetate, methyl ionone, musk ketone, musk xylene, and phenethyl alcohol.

52.    At all times material hereto, the L'Oreal USA Defendants placed defective hair Products into the stream of commerce and Plaintiff used the following products

a.   SoftSheen Carson's Dark & Lovely Healthy Gloss  No-Lye Relaxer with Shea Moisture;
b.   SoftSheen Carson's Dark & Lovely Beautiful Beginnings No Lye No Mistake Crème Relaxer;

14

FILED DATE: 7/2/2025 12:57 PM    2025L008392

    c.    SoftSheen Carson's Dark & Lovely Beautiful Beginnings No Lye Children's Relaxer with Avec;

    d.    SoftSheen Carson's Dark & Lovely Moisture Seal Plus with Shea Butter;

    e.    SoftSheen Carson's Optimum Care Conditioning No Lye Relaxer System with Whipped Oil;

    f.    SoftSheen Carson's Optimum Care Anti-Breakage Therapy with Whipped Oils;

    g.    SoftSheen Carson's Optimum No Mix No Lye Relaxer with Amla Oil;

    h.    Mizani Minimal Moderate Curl Reduction with Shea Butter, Cocoa Butter, and Honey – Medium/Normal Formula; and

    i.    Mizani Sensitive Scalp Curl Reduction Relaxer with Shea Butter, Cocoa Butter and Honey.

53.    Upon information and belief, the hair relaxer Products developed, tested, assembled, manufactured, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold by the House of Cheatham Defendants contained phthalates, including but not limited to diethyl phthalate (DEP), bis(2-ethyhexyl) phthalate (DEHP), and benzylbutyl phthalate; bisphenol A; cyclosiloxanes, including but not limited to octamethylcycloetrasiloxane (D4), decamethylcyclopentasiloxane (D5), and dodecamethylcyclohexylsiloxane (D6); parabens, including but not limited to methyl paraben, ethyl paraben, bis(2-ethylhexyl) adipate, and butyl paraben; antimicrobials including but not limited to o-phenylphenol, triclosan, and triclocarban; ethanolamines, including but not limited to menoethanolamine and diethanolamine; alkylphenols, including but not limited to 4-t-octylphenol, 4-t-nonylphenol, nonylphenol monoethoxylate, and nonylphenol diethoxylate; UV filters including, but not limited to benzophenone, benzophenone-1, benzophenone-2, benzophenone-3, oxtinoxate, and octadimethyl PABA; and fragrances, including but not limited to benzylcetate, eugenol, hexyl cinnemal, limonene, linalool, methyl eugenol, methyl salicylate, pinene, terpineol, AHTN, bucinal, diphenyl ether, DPMI, HHCB, isobornyl acetate, methyl ionone, musk ketone, musk xylene, and phenethyl alcohol.

FILED DATE: 7/2/2025 12:57 PM    2025L008392

54.     At all times material hereto, Defendant House of Cheatham placed defective hair Products into the stream of commerce and Plaintiff used the following products:

a.   Africa's Best Hair Care Relaxer.

55.     Upon information and belief, the hair relaxer Products developed, tested, assembled, manufactured, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold by Defendant Chapman contained phthalates, including but not limited to diethyl phthalate (DEP), bis(2-ethyhexyl) phthalate (DEHP), and benzylbutyl phthalate; bisphenol A; cyclosiloxanes, including but not limited to octamethylcycloetrasiloxane (D4), decamethylcyclopentasiloxane (D5), and dodecamethylcyclohexylsiloxane (D6); parabens, including but not limited to methyl paraben, ethyl paraben, bis(2-ethylhexyl) adipate, and butyl paraben; antimicrobials including but not limited to o-phenylphenol, triclosan, and triclocarban; ethanolamines, including but not limited to menoethanolamine and diethanolamine; alkylphenols, including but not limited to 4-t-octylphenol, 4-t-nonylphenol, nonylphenol monoethoxylate, and nonylphenol diethoxylate; UV filters including, but not limited to benzophenone, benzophenone-1, benzophenone-2, benzophenone-3, oxtinoxate, and octadimethyl PABA; and fragrances, including but not limited to benzylcetate, eugenol, hexyl cinnemal, limonene, linalool, methyl eugenol, methyl salicylate, pinene, terpineol, AHTN, bucinal, diphenyl ether, DPMI, HHCB, isobornyl acetate, methyl ionone, musk ketone, musk xylene, and phenethyl alcohol.

56.     At all times material hereto, Defendant Chapman placed defective hair Products into the stream of commerce and Plaintiff used the following products:

a.   Nairobi Professional Conditioning Sensitive Scalp Relaxer Kit.

**A.  Ms. HENDERSON's Use of Hair Relaxer Products**

FILED DATE: 7/2/2025 12:57 PM    2025L008392

57.     Ms. HENDERSON was first exposed to EDCs and/or phthalate-based products around 1997, at or around the age of 12, when she began using Defendants' Products.

58.     In November 2018 Ms. HENDERSON was diagnosed with uterine fibroids.

59.     As a result of her uterine fibroids diagnosis, Ms. HENDERSON underwent a myomectomy at UChicago Medicine in or around April 2025.

60.     Ms. HENDERSON used Defendants' Products by applying them to her hair or by having a professional at a hair salon apply Defendants' Products exactly as instructed by Defendants.

61.     Ms. HENDERSON kept the Products on her hair for the time allotted in the instructions.

62.     There was never any indication, on the Packaging or otherwise. That this normal use could and would cause her to develop uterine fibroids.

63.     As a result of Defendants' acts and/or omissions Ms. HENDERSON experienced extreme pain and suffering, and emotional distress.

## HAIR STRAIGHTENERS AND RELAXERS

### A. Market for Hair Straightening and Relaxing Products

64.     Black people make up about 13 percent of the U.S. population, but by one estimate, African-American spending accounts for as much as 22 percent of the $42 billion-a-year personal care products market, suggesting that they buy and use more of such products – including those with potentially harmful ingredients– than Americans as a whole.[1]

---

[1] Thandisizwe Chimurenga, *How Toxic is Black Hair Care?*, New America Media, Feb. 2, 2012, americamedia.org/2012/02/skin-deep-in-more-ways-than-one.php; *Personal Care Products Manufacturing Industry Profile*, Dun & Bradstreet First Research, August 2016, www.firstresearch.com/Industry-Research/Personal-Care-Products-Manufacturing.html (This report uses "Black" to describe not only people who identify as African-American, but Black people in the U.S. who come from the Caribbean or other areas. "African American" is used only when a cited source specifies that term).

17

FILED DATE: 7/2/2025 12:57 PM    2025L008392

65.    In an analysis of ingredients in 1,177 beauty and personal care products marketed to Black women, about one in twelve (12) was ranked highly hazardous on the scoring system of EWG's Skin Deep® Cosmetics Database, a free online resource for finding less-hazardous alternatives to personal care products. The worst-scoring products marketed to Black women were hair relaxers, and hair colors and bleaching products. Each of these categories had an average product score indicating high potential hazard.

66.    In the U.S. alone, Black consumers spend over $1 trillion each year, with a significant amount of that spending toward hair care products.

67.    In 2020, the global Black Hair care market was estimated at $2.5 billion, with the hair relaxer market alone estimated at $718 million in 2021, with the expectation of growth to $854 million annually by 2028.

68.    Defendants, aware of the unique history of their target consumers, developed and have long deployed a marketing framework based on misrepresentations that exploit their consumers' social and economic need to maintain straight hair.

**B.  History of Hair Relaxers in America**

69.    Dating back to 1619, Black women have been degraded based upon the texture of their hair and compelled to conform to the Eurocentric beauty standard that furthers the notion that "straight" hair is an indicator of social status, moral virtue, and professional competence. By contrast, hair texture of African heritage ("afro-textured hair") has been characterized as unattractive, unprofessional, and inferior.[2]

---

[2] Shelby Smith, The Evolution of Black Hair in America, Imani Hair Care (Aug. 6, 2020), https://imanihaircare.com/blogs/news/the-evolution-of-black-hair-in-america

FILED DATE: 7/2/2025 12:57 PM    2025L008392

70.     In its natural or virgin state, afro-hair texture is characterized by coily, springing, zigzag, and s-curve curl patters; as well as its density, fullness, texture, and feel.[3]

71.     Afro-textured hair "naturally grows up and out." [4]

72.     In Africa, hair was seen as a source of personal and spiritual power. As the highest point of the body and "most elevated part of the body, some communities believe[d] [their hair] connected them with the divine."[5] For some, hair was the "conduit for spiritual interaction with God." [6]

73.     African hairstyles were also status symbols reflecting one's "marital status, age, religion, and rank in society" and one's tribe. [7] Warriors, kings, and queens wore braids to show their ranking in society.[8] The Wolof tribe in West Africa, wore braided styles when they went to war.[9]

74.     Most styling was extremely intricate and involved days of labor. "Only the mad and mourning did not do their hair." [10]

75.     One of the first things slave masters did to enslaved people brought to American soil was cut their hair. This was a way to "break their spirit and make enslaved people easier to

---

[3] Patrick Obukowcho, *Hair Relaxers: Science, Design, and Application*, 26, 14 (2018).
    [4] Ayana Byrd & Lori Tharps, *When Black Hair Is Against the Rules*, The New York Times, April 30, 2014, https://www.nytimes.com/2014/05/01/opinion/when-black-hair-is-against-the-rules.html.
    [5] Nikki Fox, *6 Things Everyone Should Know About Black Hair History,* Odele, Feb. 22, 2021. https://odelebeauty.com/blogs/the-rinse/black-hair-history-facts.
    [6] Rumeana Jahangir, *How Does Black Hair Reflect Black History?* BBC News. May 31, 2015. https://www.bbc.com/news/uk-england-merseyside-31438273.amp.
    [7] *History of Braids: More Than Just a Hairstyle*, Genesis Career College, https://www.genesiscareer.edu/history-of-braids-more-than-just-a-hairstyle/.
    [8] *Id*.
    [9] *Id*.
    [10] Hlonipha Mokoena, *From Slavery to Colonialism and School Rules, Navigating the History of Myths about Black Hair*, Quartz Africa, Fe., 24, 2018, https://qz.com/africa/1215070/black-hair-myths-from-slavery-to-colonialism-school-rules-and-good-hair/.

FILED DATE: 7/2/2025 12:57 PM   2025L008392

control."[11] What was once a symbol of pride and symbolism became a tool for subordination and degradation. As such, hair cutting was also a common form of punishment.

76.      The very nature of slavery involved working long hours in dire conditions. Enslaved people had "no time to care about one's appearance or one's hair."[12] "Hair that was once a source of pride and expression of identity was often tucked away beneath cloth to cover rough, tangles tresses and shield them from hours spent toiling under the sun."[13] The hair that was once an important spiritual and cultural symbol became tangled and matted.

77.      White Americans did not see African or Black hair as beautiful. Instead, they described it as "closer to sheep wool than human hair."[14] African hair that was once considered an attractive feature became a source of shame, to be covered or cut.

78.      In 1786, the Governor of Louisiana, Don Esteban Miro, passed the "Tignon Law" requiring Black women to wear a tignon (scarf) over their hair as a way of signifying they were members of the enslaved class, *even if they were free*.[15]

79.      "By requiring free Black women to wear the same hair covering, the governor was marking them as related to enslaved women rather than white women."[16]

80.      This law sent a direct signal to Black people that their hair held a symbol of inequality and was a sign of poverty regardless of their actual social status.

---

[11] Brenda A. Randle, *I Am Not My Hair*, Race, Gender and Class, Volume 22, Number 1-2, 114 – 121 (2015).
[12] Nikki Fox, *6 Things Everyone Should Know About Black Hair History,* Odele, Feb. 22, 2021. https://odelebeauty.com/blogs/the-rinse/black-hair-history-facts.
[13] *Id*.
[14] Ayana Byrd & Lori Tharps, *When Black Hair Is Against the Rules*, The New York Times, April 30, 2014. https://www.nytimes.com/2014/05/01/opinion/when-black-hair-is-against-the-rules.html
[15] Nikki Fox, *6 Things Everyone Should Know About Black Hair History*, Odele, Feb. 22, 2021, https://odelebeauty.com/blogs/the-rinse/black-hair-history-facts.
[16] *Fashionable Rebellion*, Women and the American Story, New York Historical Society Museum and Library, https://wams.nyhistory.org/settler-colonialism-and-revolution/settler-colonialism/fashionable-rebellion/.

FILED DATE: 7/2/2025 12:57 PM    2025L008392

81.     Because afro-textured hair was kinky and reflected African heritage rather than European ancestry afro-textured hair was a symbol of low social status.[17]

82.     Enslaved people with lighter skin and less coily hair were favored to work in the home, a far less strenuous position than in the plantation fields. [18]

83.     Texturism, the idea that "good hair" is equated with a straighter hair texture, was cemented into American culture during its period of chattel slavery. "Eurocentric beauty standards dictated that coily hair and dark skin were unattractive and inferior;" "lighter skinned and straighter haired enslaved people were favored and selected for more desirable positions in the house" as opposed to the fields.[19]  Thus, "the texture of an enslaved person's hair could determine their value and working conditions, which in turn might impact their overall health, comfort and chances for freedom."[20] Naturally, Black men and women strived for a better life in America and were taught that the straighter and less kinky their hair was, the better of a life they could have. This fueled the desire for tools and products that could straighten Black hair texture.

84.     Gone were the days of African hairstyles and pride. "The goal of grooming the hair had morphed from the elaborate and symbolic designs of Africa into an imitation of White styles adapted to Black kinks and curls."[21]

85.     In an effort to obtain a better life, many enslaved people would go to "dangerous lengths to straighten their hair."[22]

86.     Black, or afro-textured hair, can be manipulated into a straightened state with the use of hair tools and hair products. Prior to the invention of the chemical relaxer in 1900s,

---

[17] Brenda A. Randle, *I Am Not My Hair*, Race, Gender and Class, Volume 22, Number 1-2, 114 – 121 (2015).
[18] *Id*.
[19] *Id.*
[20] *Id*.
[21] Brenda A. Randle, *I Am Not My Hair*, Race, Gender and Class, Volume 22, Number 1-2, 114 – 121 (2015).
[22] Nikki Fox, *6 Things Everyone Should Know About Black Hair History,* Odele, Feb. 22, 2021. https://odelebeauty.com/blogs/the-rinse/black-hair-history-facts

FILED DATE: 7/2/2025 12:57 PM   2025L008392

individuals would "press" afro-textured hair with metal hair tools such as the "hot comb." Pressing combs or hot combs are metal hair tools that are first heated in a stove or ceramic heater, then pressed into hair strands to temporarily straighten them.[23]

87.     The hot comb was first invented by Frenchman, Marcel Grateau who popularized the hair styling tool in Europe in the 1870s, including advertisements in catalogs of major department stores like Sears and Bloomingdales.[24] The hot comb was later modified by Madam C.J. Walker, a trailblazer in the development of Black hair products, to be manufactured with wider comb teeth.[25] With Walker's system, once the comb was heated a softening ointment was then applied for easier manipulation of Black hair.[26]

88.     Today, afro-textured hair is still often straightened with a hot comb rather than with chemicals. However, pressed hair remains susceptible to "shrinkage." Shrinkage is the process by which curly-kinky hair that has been temporarily straightened coils back into its natural state once the hair interacts with water, humidity, or perspiration,[27], creating a shorter or fuller appearance.

---

[23] Jaclyn Peterson, *The Price of Beauty*, CTI Charlotte Teachers Institute Curriculum (2021).
[24] Henry Louis Gates, *Madam Walker, the First Black American Woman to Be a Self-Made Millionaire*, PBS 100 Amazing Facts About the Negro, https://www.pbs.org/wnet/african-americans-many-rivers-to-cross/history/100-amazing-facts/madam-walker-the-first-black-american-woman-to-be-a-self-made-millionaire/ (last visited October 18, 2022).
[25] Cookie Lommel, Madam C.J. Walker 60 (1993)
[26] *Id*. at 62.
[27] *Id*.

FILED DATE: 7/2/2025 12:57 PM    2025L008392



### i. The Invention of the Chemical Hair Relaxer

89.     African American inventor Garrett Augustus Morgan, discovered and created a system that would permanently straighten afro-textured hair, eliminating the issue of "shrinkage."

90.     In addition to being an inventor, Morgan was also a tailor. In the early 1900s, Morgan was repairing his sewing machines and wanted to find a way to polish the needles to stitch fabrics more smoothly.[28] He applied a chemical solution to the needles and wiped the solution off with a rag and later noticed that the "curly" fibers in the rag were straightened after exposure to the chemical.[29]

---

[28] Patrick Obukowcho, Hair Relaxers: Science, Design, and Application 27 (2018).
[29] Mary N. Oluonye, Garrett Augustus Morgan: Businessman, Inventor, Good Citizen 28 (2008).

23

FILED DATE: 7/2/2025 12:57 PM    2025L008392

91.     Morgan further tested the chemical on a dog with curly hair and eventually on his

own hair. The chemical solution successfully straightened curly hair. He turned his formula into a

gel-hair product, creating the G.A. Morgan Hair Refining Cream which was marketed in 1913.





92.     Morgan's invention paved the way for the alkaline relaxer and later development

of additional chemical based permanent hair straightening products in the Black haircare market.[30]

### ii.     Defendants' Marketing Efforts

---

[30] Patrick Obukowcho, Hair Relaxers: Science, Design, and Application 27 (2018).

FILED DATE: 7/2/2025 12:57 PM    2025L008392

93.     In or about 1971, Dark and Lovely manufactured the first lye relaxer. The formula consisted of sodium hydroxide, water, petroleum jelly, mineral oils, and emulsifiers.[31]

94.     In the 1970s, lye relaxer users and manufacturers noticed that the lye formula stripped proteins from the hair strand, resulting in the hair thinning and breaking.[32] As a result, Johnson and Johnson marketed the first "gentle" hair relaxer in 1981, which used milder chemicals such as potassium hydroxide and lithium hydroxide.[33]



95.     Over time, Soft & Beautiful and other chemical relaxer manufacturers developed herbal and botanical hair relaxer formulas.[34]

96.     For decades, Defendants have marketed their hair relaxer products to African American customers across the United States, and the world, reinforcing the same historical

---

[31]    Cicely A. Richard, *This History of Hair Relaxers*, September 29, 2017, https://classroom.synonym.com/the-history-of-hair-relaxers-12078983.html.
[32]    *Id.*
[33]    *Id.*
[34]    *Id.*

25

FILED DATE: 7/2/2025 12:57 PM    2025L008392

Eurocentric standards of beauty. Defendants' marketing scheme relies heavily relying on branding and slogans that reinforce straight hair as the standard.[35]





---

[35] *Id.*

FILED DATE: 7/2/2025 12:57 PM    2025L008392

97. For example, in the first ad above, L'Oreal touts "how beautiful Black hair *can be*" (emphasis added), implying that in its natural state Black Hair is *not as* beautiful as it *could be* if straightened.

98. Defendant Strength of Nature also markets its Soft & Beautiful and Motions relaxer products, depicting beautiful, happy, fair-skinned African American women with straight hair in seeming perpetual motion.[36]





99. Defendant Strength of Nature also carries a TCB Naturals line that promises "silky smooth relaxed hair."

---

[36] *Id.*

FILED DATE: 7/2/2025 12:57 PM    2025L008392

100. Defendant Strength of Nature's Just for Me brand specifically targets young Black girls with promises of "perfect straightness," grooming the next generation of lifetime consumers of relaxers containing endocrine disrupting chemicals.



101. On the product packaging of Just for Me, Strength of Nature lauded the product as safer by claiming that it was a no-lye formula designed to be "gentle" for children's sensitive scalps, while Defendants knew that the Just for Me product contained more chemicals than, and was equally more toxic than, some adult brands of hair relaxers.



28

FILED DATE: 7/2/2025 12:57 PM   2025L008392

102.    Defendants misrepresented that "no lye" relaxers, or "gentle treatment" relaxers were milder and/or safer than alternative relaxers. This was false. Hair relaxer products marketed as using "gentle treatment" or similar terminology are not any safer than the other hair relaxer products on the market.

103.    Defendant Strength of Nature's Products, such as Soft & Beautiful® are intentionally labeled as "Botanicals" and with "Natural" ingredients that are "Ultra Nourishing," including but not limited to using "Natural Plant Oils and Butters." These representations are intended to suggest to consumers that these "Natural" hair relaxer products are safer or less toxic than alternatives, but that is false.

104.    Defendants Namaste and RNA's hair relaxer products are marketed as "Olive Oil" products to imply that they use natural ingredients and lack toxic chemicals, which is false. Defendants Namaste and RNA's products are also advertised as having "Built in Protection," implying they can be used safely. This is also false.

105.    Defendants Namaste and RNA also targets young Black girls with its Olive Oil Girls line.



FILED DATE: 7/2/2025 12:57 PM    2025L008392

106.    Defendant Namaste's website states that their hair relaxer products use "Rich Olive and Avocado Oils" that they claim, "moisturize and condition" and include "Aloe Vera to help **protect the skin and scalp**." While representing that aloe vera helps "protect the skin and scalp" of children, Defendants Namaste and RNA chose to omit that the other selected chemicals significantly increased the risk of ovarian and uterine cancer.



107.    Finally, Defendant L'Oréal depicts a Black woman with straight hair on each of its Dark and Lovely and Optimum brands of relaxer product.



FILED DATE: 7/2/2025 12:57 PM    2025L008392



108.     Defendant L'Oréal's and Soft Sheen's Dark & Lovely brand hair relaxer products are intentionally labeled as providing a "healthy" gloss and containing "nourishing" shea butter with jojoba and avocado oils. The terms "healthy" and "nourishing" suggest that hair relaxer products are safe and even beneficial for the body when they are not.



FILED DATE: 7/2/2025 12:57 PM    2025L008392

109.    Defendant L'Oréal and Soft Sheen-Carson's Beautiful Beginnings hair relaxer product line, which is targeted to young Black girls, states that it "moisturizes, nourishes, and prevents breakage…**without hurting your scalp**." These representations suggest that their hair relaxer products are safe and even beneficial for children's bodies when they are not.





110.    Defendants regularly updated and continue to update their products by adding, removing, changing, or otherwise altering Product formulas. Often, Defendants even promote and market such updates on the packaging of their Products by using phrases such as: "New," "New and Improved," "New Formula," "Now with [New Ingredient]," "3X More," etc.

FILED DATE: 7/2/2025 12:57 PM    2025L008392








FILED DATE: 7/2/2025 12:57 PM   2025L008392

111.     Upon information and belief, Defendants' research and development departments were constantly looking for ways to improve Defendants' hair relaxer Products or reduce costs by way of modifying the ingredients and formulas in the Products.

112.     Upon information and belief, Defendants occasionally changed suppliers of constituent ingredients and fragrances in Defendants' hair relaxer Products. Each time Defendants changed suppliers, the formulas of Defendants' products were modified, which resulted in different variations of the same Product, even if the ingredient label remained the same.

113.     The Defendants marketed their hair relaxer products without ever disclosing known health risks of the toxic chemicals contained in these products or taking other reasonable steps to ensure their products would not harm consumers.

114.     The Defendants marketed their hair relaxer products without ever disclosing known health risks of the toxic design and chemicals contained in these products.

115.     Defendants' marketing efforts are filled with representations and insinuations that the hair relaxing products are safe and beneficial to the user. The use of words such as organic, natural, nourishing, added protection, or healthy in its marketing can lead a consumer to believing these hair relaxer products are safe when in fact they are not.

116.     The Defendants made these affirmative statements and/or omissions all while they knew or should have known of the true danger of their hair relaxer products when used by a Plaintiff.

117.     Defendants had, or should have had, this knowledge, but nevertheless Defendants continued their marketing efforts without ever attempting to correct the misconceptions it was creating.

**C.  Chemical Relaxer Use**

34

FILED DATE: 7/2/2025 12:57 PM    2025L008392

118.     Hair relaxers are classified as creams or lotions which are specifically marketed to Black and Brown women to "tame" their ethnic hair by making it smoother, straighter, and easier to manage on a daily basis.

119.     Hair relaxing, or lanthionization, can be performed by a professional cosmetologist in a salon or barbershop, or at home with at-home relaxer kits designed for individual use. These home kits are sold in grocery, drug, and beauty supply stores in urban and rural cities throughout the United States.

120.     Relaxers are applied to the base of the hair shaft and left in place for a "cooking" interval, during which the relaxer alters the hair's texture by purposefully damaging the hair's natural protein structure. The effect of this protein damage straightens and smooths the hair. After a period of weeks (4 – 8 weeks on average), depending on the hair's natural growth rate, the treated portion of the hair grows away from the scalp as new growth sprouts from the roots, requiring additional relaxer treatment to smooth the roots. These additional treatments are colloquially referred to in the community as "re-touches", resulting in women relaxing their new growth every four to eight weeks on average, usually for decades.

121.     Hair relaxers can, and often do, cause burns and lesions in the scalp, facilitating entry of hair relaxer constituents into the body. The main ingredient of "lye" relaxers is sodium hydroxide; no-lye relaxers contain calcium hydroxide and guanidine carbonate, and "thio" relaxers contain thioglycolic acid salts. No-lye relaxers are advertised to cause fewer scalp lesions and burns than lye relaxers, but there is little evidence to support this claim.

122.     In some studies, up to 90% of Black and Brown women have used hair relaxants and straighteners, which is more commonplace for these women than for any other race. Hair products such as relaxers contain hormonally active and carcinogenic compounds, such as

phthalates, known to cause endocrine disruption, which are not required to be listed separately as ingredients and are often broadly lumped into the "fragrance" or "perfume" categories. Relaxer habits usually begin in formative childhood years, and adolescence is likely a period of enhanced susceptibility to debilitating conditions resulting from exposure to these chemicals.[37]

123.    In the 1990s, the first relaxer brand for young Black girls, Just for Me, hit the market with a catchy advertising jingle that captured consumer attention.[38] It soon became one of the most popular straightening treatments, touting a no-lye formula designed to be gentler for children's sensitive scalps.

124.    Once relaxer use begins in childhood, it usually becomes a lifetime habit. The frequency of scalp burns with relaxer application can increase the risk of permanent and debilitating diseases associated with long-term exposure to endocrine-disrupting chemicals.

125.    The reasons for Black women's use and dependence upon hair straightening products are associated with various factors, including (1) slavery and internalization of acceptable beauty norms, (2) media and advertisements, (3) assimilation and economic security, (4) ease of hair maintenance, and (5) culture.[39]

126.    In a culture where Black women feel reduced to a lower standard of beauty, these factors impact women of color's decisions to begin and continue using products to alter the natural state of their hair, many times as a protective mechanism against racial discrimination. In the Dove CROWN Study for girls (2021) conducted by JOY Collective, the following statistics were discovered:

---

[37] Patrick Obukowcho, Hair Relaxers: Science, Design, and Application 27 (2018).

[38] Dana Oliver, the '90s Just For Me Hair Relaxer Commercial Song Is Stuck In Our Heads, HuffPost, Feb. 1, 2014. https://www.huffpost.com/entry/just-for-me-hair-relaxer-commercial-song_n_4689981

[39] Chanel Donaldson, Hair Alteration Practices Amongst Black Women and the Assumption of Self-Hatred, Applied Psychology Opus, https://wp.nyu.edu/steinhardt-appsych_opus/hair-alteration-practices-amongst-black-women-and-the-assumption-of-self-hatred/

FILED DATE: 7/2/2025 12:57 PM    2025L008392

a.  100% of Black elementary school girls in majority-white schools who report experiencing hair discrimination state they experience the discrimination by the age of ten (10);

b.  86% of Black teens who experience discrimination state they have experienced discrimination based on their hair by the age of twelve (12);

c.  66% of Black girls in majority-white schools report experiencing hair discrimination compared to 45% of Black girls in all school environments;

d.  53% of Black mothers, whose daughters have experienced hair discrimination, say their daughters experienced discrimination as early as five (5) years old;

e.  47% of Black mothers report having experienced discrimination related to their hair;

f.  Trauma from these experiences cause girls to miss days from school; teenage Black girls are missing a week of school per year due to hair dissatisfaction;

g.  While 90% of Black girls believe their hair is beautiful, the microaggressions and discrimination she endures has an impact on how she sees herself;

h.  Black women are 1.5 times more likely to be sent home from the workplace because of their hair; and

i.  Black women are 89% more likely than white women to agree with this statement, "I have to change my hair from its natural state to fit in at the office." [40]

127.    The CROWN Act of 2021 is a legislative bill introduced in both houses of Congress to address discrimination against protective hair styles worn predominantly by women of color.

---

[40] The CROWN Act was created in 2019 by Dove and the CROWN Coalition, in partnership with then State Senator Holly J. Mitchell of California, to ensure protection against discrimination based on race-based hairstyles by extending statutory protection to hair texture and protective styles such as braids, locks, twists, and knots in the workplace and public schools. https://www.thecrownact.com/

FILED DATE: 7/2/2025 12:57 PM 2025L008392

While the bill has not yet passed fully on a federal level, eighteen states have signed a version of the bill into state law. Unless and until the CROWN Act makes hair discrimination illegal in every state, teenagers and women of color continue to face discriminatory practices related to their hair choices, with relaxing and straightening their hair being a defensive, yet dangerous and toxic option.

### D. Endocrine-Disrupting Chemicals

128.    The endocrine system is indispensable for life and influences nearly every cell, organ, and processes within the body.[41] The endocrine system regulates all biological processes in the body from conception through adulthood, including the development of the brain and nervous system, the growth and function of the reproductive system, as well as the metabolism and blood sugar levels.[42]

129.    The endocrine system is a tightly regulated system made up of glands that produce and release precise amounts of hormones that bind to receptors located on specific target cells throughout the body.[43]

130.    Hormones, such as estrogen, testosterone, progesterone, and androgen, are chemical signals that control or regulate critical biological processes.[44]

131.    When a hormone binds to a target cell's receptor, the receptor carries out the hormone's instructions, the stimulus, and either switches on or switches off specific biological processes in cells, tissues, and organs.[45]

---

[41] *Endocrine System: The Endocrine System Includes the Thyroid, Adrenals, and the Pituitary Gland*, Science Direct, https://www.sciencedirect.com/topics/psychology/endocrine-system

[42] *Endocrine Disruption*, United States Environmental Protection Agency, Mar. 7, 2022, https://www.epa.gov/endocrine-disruption/what-endocrine-system

[43] *Id*.

[44] Id.

[45] Id.

FILED DATE: 7/2/2025 12:57 PM    2025L008392

132.    The precise functioning of the endocrine system is vital to maintain hormonal homeostasis, the body's natural hormonal production and degradation. A slight variation in hormone levels can lead to significant adverse-health effects, including reproductive impairment and infertility, cancer, cognitive deficits, immune disorders, and metabolic syndrome.[46]

133.    Endocrine-disrupting chemicals ("EDCs") are chemicals, or chemical mixtures, which interfere with the normal activity of the endocrine system.

134.    EDCs can act directly on hormone receptors as mimics or antagonists, or on proteins that control hormone delivery.[47]

135.    EDCs disrupt the endocrine system and interfere with the body's hormonal homeostasis in various ways.

136.    EDCs can cause the body to operate as if there were a proliferation of a hormone and thus over-respond to the stimulus or respond when it was not supposed to by mimicking a natural hormone.

137.    EDCs can increase or decrease the levels of the body's hormones by affecting the production, degradation, and storage of hormones.

138.    EDCs can block the hormone's stimulus through inducing epigenetic changes, modifications to DNA that regulate whether genes are turned on or off or altering the structure of target cells' receptors.[48]

---

[46]*Id.*; Michele La Merrill, et al., *Consensus on the Key Characteristics of Endocrine-Disrupting Chemicals as a Basis for Hazard Identification*, Nature Reviews Endocrinol, Nov. 12, 2019, https://www.nature.com/articles/s41574-019-0273-8

[47] Evanthia Diamanti-Kandarakis, et al., *Endocrine-Disrupting Chemicals: An Endocrine Society Scientific Statement*, Endocrine Reviews, June 30, 2009, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2726844/

[48] Luis Daniel Martínez-Razo, et al., *The impact of Di-(2-ethylhexyl) Phthalate and Mono(2-ethylhexyl) Phthalate in placental development, function, and pathophysiology*, Environment International, January 2021, https://www.sciencedirect.com/science/article/pii/S0160412020321838?via%3Dihub

FILED DATE: 7/2/2025 12:57 PM    2025L008392

139.    EDCs are known to cause numerous adverse human health outcomes including endometriosis, impaired sperm quality, abnormalities in reproductive organs, various cancers, altered nervous system and immune function, respiratory problems, metabolic issues, diabetes, obesity, cardiovascular problems, growth, and neurological and learning disabilities.[49]

140.    EDCs that mimic the effects of estrogen in the body may contribute to disease risk because exposure to estrogen, endogenously and exogenously, is associated with a wide variety of reproductive diseases, including reproductive cancers, fibroids and endometriosis. A woman's lifetime risk of developing these disease increases with greater duration and cumulative exposure.

141.    Natural and synthetic EDCs are present in hair products under the guise of "fragrance" and "perfumes," and thus enter the body when these products are exogenously applied to the hair and scalp. Studies exploring this issue have thus far classified EDCs as estrogens, phthalates, and parabens.

142.    Indeed, numerous studies spanning more than two decades have demonstrated the adverse impact EDCs including Di-2-ethylhexylphthalate have on the male and female reproductive systems such as inducing endometriosis, abnormal reproductive tract formation, decreased sperm counts and viability, pregnancy loss, and abnormal puberty onset.[50]

143.    Hair products used by Black women and children have been found to contain multiple chemicals associated with endocrine disruption. In 2018 study testing hair products, including hair relaxers, relaxers marketed to children were found to contain the highest levels of four EDCs prohibited in the European Union (DEHP, nonylphenol, BPA and diethanolamine), as

---

[49]*Endocrine Disrupting Chemicals (EDCs)*, Endocrine Society, Jan. 24, 2022, https://www.endocrine.org/patient-engagement/endocrine-library/edcs#:~:text=EDCs%20can%20disrupt%20many%20different,%2C%20certain%20cancers%2C%20respiratory%20problems%2C

[50] Hee-Su Kim, et al., *Hershberger Assays for Di-2-ethylhexyl Phthalate and Its Substitute Candidates*, Dev Reproduction, Mar. 22, 2018, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5915764/.

FILED DATE: 7/2/2025 12:57 PM    2025L008392

well as California Prop 65 regulated o-phenlyphenol), with one relaxer kit (Just For Me) containing all five of these EDCs.[51]

### i. Phthalates

144.    Phthalates are known EDCs which interfere with natural hormone production and degradation and are detrimental to human health.[52]

145.    Phthalates are used in a variety of cosmetics and personal care products. Phthalates are chemical compounds developed in the last century that are used to make plastics more durable. These colorless, odorless, oily liquids are also referred to as "plasticizers" based on their most common uses.

146.    Phthalates also function as solvents and stabilizers in perfumes and other fragrance preparations. Cosmetics that may contain phthalates include nail polishes, hair sprays, aftershave lotions, cleansers, and shampoos.

147.    Phthalates are chemicals used to improve the stability and retention of fragrances and to help topical products stick to and penetrate skin and hair.[53]

148.    Phthalates are commonly used by cosmetics and hair care product manufacturers to make fragrances and colors last longer, and to make hair more flexible after product is applied, among other uses.

149.    Phthalates can be found in most products that have contact with plastics during production, packaging, or delivery. Despite the short half-lives in tissues, chronic exposure to phthalates will adversely influence the endocrine system and functioning of multiple organs, which

---

[51] Helm Jessica S. et al., *Measurement of endocrine disrupting and asthma-associated chemicals in hair products used by Black women*, Environmental Research, Vol. 165:448-58 (2018), https://doi.org/10.1016/j.envres.2018.03.030.

[52] Yufei Wang & Haifeng Qian, *Phthalates and Their Impacts on Human Health*, Healthcare (Basel) 9, 603, May 9, 2021, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8157593/

[53] Olivia Koski & Sheila Hu, Fighting Phthalates, National Resources Defense Council, April 20, 2022, https://www.nrdc.org/stories/fighting-phthalates

41

FILED DATE: 7/2/2025 12:57 PM    2025L008392

has negative long-term impacts on the success of pregnancy, child growth and development, and reproductive systems in both young children and adolescents. Several countries have established restrictions and regulations on some types of phthalates.[54]

150.    Phthalates are a series of chemical substances, which are mainly used as plasticizers added to polyvinyl chloride ("PVC") plastics for softening effects. Phthalates can potentially disrupt the endocrine system.[55]

151.    Under the authority of the Fair Packaging and Labeling Act ("FPLA"), the FDA requires an ingredient declaration on cosmetic products sold at the retail level to consumers.

152.    However, the regulations do not require the listing of the individual fragrance or flavor, or their specific ingredients, meaning phthalates evade listing when they are misclassified in a fragrance. As a result, consumers, including Plaintiff, are not able to determine from the ingredient declaration on the label if phthalates were present in a fragrance used in the herein referenced hair products used by the Plaintiff and placed into the stream of commerce by Defendants.

153.    Since 1999, the Centers for Disease Control ("CDC") has found phthalates in individuals studied for chemical exposure.[56] Neither IARC nor NTP has evaluated including Di-2-ethylhexylphthalate (DEHP) with respect to human carcinogenicity.

154.    At all relevant times herein, Defendants' products contain phthalates, including DEHP.

    ii.    **Di-2-ethylhexylphthalate**

---

[54] *Id*.
[55] *Id*.
[56] *Biomarker Groups*, National Report on Human Exposure to Environmental Chemicals, Center for Disease Control, https://www.cdc.gov/exposurereport/pdf/Biomarker_Groups_Infographic-508.pdf.

FILED DATE: 7/2/2025 12:57 PM   2025L008392

155.     Di-2-ethylhexylphthalate[57] ("DEHP") is a highly toxic manufactured chemical[58] that is not found naturally in the environment.[59]

156.     DEHP belongs to the family of chemicals called phthalates.[60]

157.     DEHP was first used in 1949 in United States and has been the most abundantly used phthalate derivative in the Twentieth century.[61]

158.     DEHP does not covalently bind to its parent material. Non-covalent bonds are weak and, as a result, DEHP readily leaches into the environment increasing human exposure.[62]

159.     Humans are exposed to DEHP through ingestion, inhalation, and dermal exposure for their lifetimes, including intrauterine life.[63]

160.     The Agency for Toxic Substances and Disease Registry ("ATSDR") estimates that the range of daily human exposure to DEHP is 3–30 µg/kg/day.[64]

---

[57] Also known as Bis(2-ethylhexyl) phthalate.

[58] Sai Rowdhwal & Jiaxiang Chen, *Toxic Effects of Di-2-ethylhexyl Phthalate: An Overview*, Biomed Research International, Feb. 22, 2018, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5842715/#:~:text=DEHP%20is%20noncovalently%20bound%20to, and%20plastic%20waste%20disposal%20sites.

[59] *Toxicological Profile for Di(2-Ethylhexyl) Phthalate (DEHP)*, U.S. Dept of Health and Human Services, January 2022, https://www.atsdr.cdc.gov/ToxProfiles/tp9.pdf (DEHP is listed as hazardous pollutants under the Clean Air Act.; DEHP is on the Proposition 65 list because it can cause cancer and birth defects or other reproductive harm).

[60] *Di(2-ethylhexyl) phthalate (DEHP)*, Proposition 65, California. Gov, https://www.p65warnings.ca.gov/fact-sheets/di2-ethylhexylphthalate-dehp

[61] Pinar Erkekoglu & Belma Kocer-Gumusel, *Environmental Effects of Endocrine-Disrupting Chemicals: A Special Focus on Phthalates and Bisphenol A*, Environmental Health Risk, June 16, 2016, https://www.intechopen.com/chapters/50234

[62] Katelyn H. Wong & Timur Durrani, *Exposures to Endocrine Disrupting Chemicals in Consumer Products – A Guide for Pediatricians*, Current Problems in Pediatric and Adolescent Health Care, Science Direct, May 2017, https://www.sciencedirect.com/science/article/pii/S1538544217300822?via%3Dihub

[63] Schmidt, Juliane-Susanne, et al., *Effects of Di(2-ethylhexyl) Phthalate (DEHP) on Female Fertility and Adipogenesis in C3H/N Mice*, Environmental Health Perspective, May 15, 2012, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3440070/

[64] Hannon, Patrick et. al., *Daily Exposure to Di(2-ethylhexyl) Phthalate Alters Estous Cyclicity and Accelerates Primordial Follicle Recruitment Potentially Via Dysregulation of the Phosphatidylinositol 3-Kinase Signaling Pathway in Adult Mice*, Biology of Reproduction Volume 90, Issue 6, June 2014, 136, 1–11 https://academic.oup.com/biolreprod/article/90/6/136,%201-11/2514356

FILED DATE: 7/2/2025 12:57 PM 2025L008392

161. The no-observed-adverse-effect level for DEHP to humans is 4.8 mg/kg bodyweight/day and the tolerate daily intake (TDI) is 48 µg/kg bodyweight.[65]

| Endpoint | Cancer (NSRL) | | Developmental and Reproductive Toxicity (MADL) | |
| --- | --- | --- | --- | --- |
| Route of Exposure | Oral | Inhalation | Oral | Inhalation |
| TDCIPP | 5.4µg/day | N.C. | N.C. | N.C. |
| DBP | N.C. | N.C. | 8.7µg/day | N.C. |
| DEHP | 310µg/day | N.C. | 410µg/day | N.C. |
| Benzene | 6.4µg/day | 13µg/day | 24µg/day | 49µg/day |
| Formaldehyde | N.C. | 40µg/day | N.C. | N.C. |

Source: OEHHA's safe harbor levels for TDCIPP, DBP, DEHP, benzene, and formaldehyde. N.C. = not calculated by OEHHA as of August 2020.[66]

162. When DEHP enters the human body, it breaks down into specific metabolites. The toxicity of DEHP is mainly attributed to its unique metabolites which include the primary metabolite, mono-(2-ethylhexyl)phthalate (MEHP), and secondary metabolites, mono-(2-ethyl-5-hydroxyhexyl)phthalate (MEHHP), and mono-(2-ethyl-5-oxohexyl)phthlate (MEOHP).[67]

163. DEHP and its metabolites are known to cause significant adverse-health effects including but not limited to endometriosis, developmental abnormalities, reproductive dysfunction

---

[65] Yufei Wang & Haifeng Qian, *Phthalates and Their Impacts on Human Health*, Healthcare (Basel) 9(5):603, May 18, 2021, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8157593/

[66] Aalekhya Reddam & David Volz, *Inhalation of two Prop 65-listed Chemicals Within Vehicles May Be Associated with Increased Cancer Risk*, Environment International Volume 149, April 2021, https://www.sciencedirect.com/science/article/pii/S016041202100026X

[67] Saab, Yolande, et. al., *Risk Assessment of Phthalates and Their Metabolites in Hospitalized Patients: A Focus on Di- and Mono-(2-ethylhexyl) Phthalates Exposure from Intravenous Plastic Bags*. Toxics, 10(7), 357, https://pubmed.ncbi.nlm.nih.gov/35878262/; Ishtaf Sheikh, et. at., *Endocrine disruption: In silico perspectives of interactions of di-(2-ethylhexyl)phthalate and its five major metabolites with progesterone receptor*. BMC Structural Biology Volume 16, Suppl 1, 16, Sept., 30, 2016, https://bmcstructbiol.biomedcentral.com/articles/10.1186/s12900-016-0066-4 (Other secondary metabolites include mono(2-ethyl-5-carboxypentyl)phthalate (5-cx-MEPP) and mono[2-(carboxymethyl)hexyl]phthalate (2-cx-MMHP)).

FILED DATE: 7/2/2025 12:57 PM 2025L008392

and infertility,[68] various cancers, and metabolic syndrome within the human population and their future children.[69]

164.    Most of the available studies on the health effects of DEHP in laboratory animals used oral administration, with an inhalation study and only two dermal exposure studies identified.[70]

165.    The results of the selected animal studies, along with limited human data, suggest potential associations between DEHP exposure and the following health outcomes:

    a.  **Reproductive effects.** Epidemiological studies suggest a potential association between DEHP exposure and decreased serum testosterone and altered sperm parameters in males. Available studies on fertility effects in humans do not indicate an association between DEHP exposure and infertility. In animals, the available oral and inhalation studies provide evidence that the male reproductive system, particularly the testes, is susceptible to DEHP toxicity. Evidence from animal studies indicates decreased male and female fertility at high oral doses.

    b.  **Developmental effects.** Epidemiological studies suggest a potential association between reduced AGD and testicular decent in male infants and prenatal DEHP exposure. In addition, human epidemiological studies provide mixed results for potential relationships between exposure to DEHP and preterm birth, early puberty, and delayed mental and psychomotor development in children. Studies in animals indicate that altered glucose homeostasis and the development of the reproductive system following early life exposure is a particularly sensitive target of DEHP toxicity.

166.    The global consumption of DEHP was estimated at 3.07 million tons (Global demand for plasticizers continues to rise). The estimated global market of phthalates in 2020 is expected to reach 10 billion USD and would still be widely used in plasticizers.[71]

---

[68] Richardson, Kadeem et. al., *Di(2-ethylhexyl) Phthalate (DEHP) Alters Proliferation and Uterine Gland Numbers in the Uterine of Adult Exposed Mice*, Reproductive Toxicology, 77, 70-79, https://pubmed.ncbi.nlm.nih.gov/29458081/

[69] Yufei Wang & Haifeng Qian, *Phthalates and Their Impacts on Human Health*, Healthcare (Basel) 9, 603, May 9, 2021, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8157593/

[70] *Chapter 2: Health Effects*, Toxicological profile for Di(2-ethylhexyl) phthalate (DEHP) (2001), https://www.atsdr.cdc.gov/ToxProfiles/tp9-c2.pdf

[71] *Id.*

FILED DATE: 7/2/2025 12:57 PM    2025L008392

167.    Human epidemiological studies have shown a significant association between phthalate exposures and adverse reproductive outcomes in both women and men.[72]

168.    Evidence found that DEHP was significantly related to insulin resistance and higher systolic blood pressure, and reproduction system problems, including earlier menopause, low birth weight, pregnancy loss, and preterm birth.[73]

169.    When it comes to the impacts on children, epidemiological studies about phthalates toxicity focused on pregnancy outcomes, genital development, semen quality, precocious puberty, thyroid function, respiratory symptoms, and neurodevelopment.[74]

170.    Since the turn of the century, restrictions on phthalates have been proposed in many Asian and Western countries. In 2008, the US Congress announced the Consumer Protection Safety Act (CPSA) that permanently banned the products, especially children's toys and childcare articles, containing DEHP, DBP, and BBP at levels >0.1% by weight.[75]

## E. Regulatory Framework

171.    The law does not require cosmetic products and ingredients, other than color additives, to have FDA approval before they go to market. But there are laws and regulations that apply to cosmetics placed into the market. The two most important laws pertaining to cosmetics marketed in the United States is the Federal Food Drug and Cosmetic Ace ("FD&C Act") and the Fair Packaging and Labeling Act ("FPLA").

172.    The FD&C Act expressly prohibits the marketing of "adulterated" or "misbranded" cosmetics in interstate commerce.

---

[72] Id.

[73] N.M. Grindler, et al., *Exposure to Phthalate, an Endocrine Disrupting Chemical, Alters the First Trimester Placental Methylome and Transcriptome in Women*, Scientific Reports Volume 8, April 17, 2018, https://doi.org/10.1038/s41598-018-24505-w

[74] Id.

[75] Consumer Product Safety Improvement Act of 2008, H.R. 4040, 110th Cong. (2008), https://www.congress.gov/110/plaws/publ314/PLAW-110publ314.pdf

FILED DATE: 7/2/2025 12:57 PM    2025L008392

173.    Adulteration refers to a violation involving product composition whether it results from ingredients, contaminants, processing, packaging, shipping, or handling.

174.    Under the FD&C Act a cosmetic is adulterated if: (1) it bears or contains any poisonous or deleterious substance causing injury to the product user and (2) if its container is composed in whole or in part, of any poisonous or deleterious substance which may render the contents injurious to health.

175.    Misbranding refers to violations involving improperly labeled or deceptively packaged products.

176.    Under the FD&C Act, a cosmetic is misbranded if (1) labeling is false or misleading, (2) the label does not include all required information, (3) required information is not prominent and conspicuous, (4) the packaging and labeling is in violation of an applicable regulation issued pursuant to section 3 and 4 of the Poison Prevention Packaging Act of 1970.[76]

177.    Under U.S. law, cosmetic manufacturers are not required to submit their safety data to the FDA. However, it is against the law to put an ingredient in a cosmetic that makes the cosmetic harmful when used as intended.[77] An example is methylene chloride because it causes cancer in animals and is likely to be harmful to human health, too.[78]

178.    May 19, 2022, the FDA issued a rule to amend its food additive regulations to no longer provide for most previously-authorized phthalates to be used as food additives because these uses have been abandoned by industry.[79] The FDA revoked authorizations for the food

---

[76] Food and Drug Administration Cosmetic Act § 602 (1938).
[77] *Prohibited & Restricted Ingredients in Cosmetics*, U.S. Food and Drug Administration, https://www.fda.gov/cosmetics/cosmetics-laws-regulations/prohibited-restricted-ingredients-cosmetics
[78] 21 Code of Federal Regulations § 700.19.
[79] § 87 FR 31080

FILED DATE: 7/2/2025 12:57 PM    2025L008392

contact use of 23 phthalates and two other substances used as plasticizers, adhesives, defoaming agents, lubricants, resins, and slimicides.[80]

179.    Companies and/or individuals who manufacture or market cosmetics have a legal responsibility and duty to ensure the safety of their own products. Neither the law nor FDA regulations require specific tests to demonstrate the safety of individual products or ingredients, and the law also does not require cosmetic companies to share their safety information with the FDA.

180.    The FDA has consistently advised manufacturers to use whatever testing is necessary to ensure the safety of products and ingredients, which may be substantiated through (a) reliance on already available toxicological test data on individual ingredients and on product formulations that are similar in composition to the particular cosmetic and (b) performance of any additional toxicological and other tests that are appropriate in light of such existing data and information.[81]

181.    Except for color additives and ingredients prohibited or restricted by regulation, a manufacturer may use any ingredient in the formulation of a cosmetic, provided that (1) the ingredient and the finished cosmetic are safe under labeled or customary conditions of use, (2) the product is properly labeled, and (3) the use of the ingredient does not otherwise cause the cosmetic to be adulterated or misbranded under the laws the FDA enforces.[82]

182.    With respect to whether the product is properly labeled, Title 21 of the Code of Federal Regulations defines the establishment of warning statements related to cosmetic products.

---

[80] *Phthalates in Food Packages and Food Contact Applications,* U.S. Food and Drug Administration, https://www.fda.gov/food/food-ingredients-packaging/phthalates-food-packaging-and-food-contact-applications

[81] *FDA Authority Over Cosmetics: How Cosmetics Are Not FDA-Approved, but Are FDA-Regulated*, U.S. Food and Drug Administration, Mar., 3, 2005, https://www.fda.gov/cosmetics/cosmetics-laws-regulations/fda-authority-over-cosmetics-how-cosmetics-are-not-fda-approved-are-fda-regulated

[82] *Id.*

FILED DATE: 7/2/2025 12:57 PM    2025L008392

Section 740.1 states that "[t]he label of a cosmetic product **_shall_** bear a warning statement whenever necessary or appropriate to prevent a health hazard that **_may_** be associated with the product." (Emphasis added). This warning directive directly correlates with the broad authority of manufacturers over their own cosmetic products to ensure that products are safe under labeled or customary conditions of use, properly labeled, and not adulterated or misbranded under FDA laws.

183.    When a manufacturer is unable to adequately substantiate the safety of their product before marketing, the product is considered to be misbranded if the principal display panel does not include the required, "conspicuous statement" from 21 CFR § 740.10: "Warning – The safety of this product has not been determined."

184.    In short, under the current regulatory framework in the United States, it is incumbent upon the manufacturers of cosmetic products, and them alone, to assess the safety and efficacy of their products, and to warn consumers anytime a health hazard may be associated with their products. Here, a wealth of scientific information is available regarding long-term use of hair relaxers, straighteners and hair dyes as containing certain endocrine-disrupting chemicals, which should have alerted manufacturers of these products to the specific and dangerous harms associated with their products when used as intended, particularly in women of color.

185.    It is generally accepted that EDCs like those contained in Defendants' hair relaxer products, act like "hormone mimics" and trick the body into thinking they are hormones.

186.    Products containing hormones that are topically applied, are regulated by the FDA under 21 C.F.R. section 310.530, which states that "any OTC drug product containing an ingredient offered for use as a topically applied hormone cannot be considered generally recognized as safe and effective for its intended use." *See* 21 C.F.A 310.530(a).

FILED DATE: 7/2/2025 12:57 PM    2025L008392

187.    At all relevant times, Defendants' products referenced herein, contained endocrine disrupting chemicals and hormonal agents, and are therefore subject to regulation by the FDA under 21 C.F.R. section 310.530.

188.    One of the main reasons that EDCs do not appear in ingredient labels is that they are typically hidden under the general guise of "fragrance." However, EDCs *do not* meet the definition of what is permitted to be listed as a Fragrance under FDA regulations.

189.    "Fragrance" is defined as "any natural or synthetic substance or substances used solely to impart an odor to a cosmetic product" under 21 C.F.R. § 700.3(d). However, the regulations further provide that "[n]o ingredient may be designated as fragrance … unless it is within the meaning of such term as commonly understood by consumers." 21 C.F.R. § 701.3(a).

190.    Consumers, like Plaintiff, commonly understand fragrance to be a smell—an understanding that is consistent with the definition of fragrance found in 21 C.F.R. § 700.3(d).

191.    The addition of harmful EDCs in Defendants' hair relaxer Products in a catch-all "fragrance" category does not fall within the normal consumer's contemplation of what would simply impart an odor to the product, and the hidden nature of these harmful EDCs, which are not disclosed on the product's packaging, prevents consumers from knowing they are exposing their bodies to potential harm.

192.    Further, 21 C.F.R. § 701.3(c), does not require "incidental ingredients" to be listed on the label. Under this regulation, "incidental ingredients" include "[s[ubstances that have no technical or functional effect in the cosmetic but are present by reason of having been incorporated into the cosmetic as an ingredient of another cosmetic ingredient" and "processing aids." Under § 701.3(c), "processing aids" are substances added used during processing of the cosmetic but are

FILED DATE: 7/2/2025 12:57 PM    2025L008392

either absent from, converted to a different substance, or present at "insignificant" levels in the final product.

193.    EDCs do not fall under the FDA regulations definition of "incidental ingredients." EDCs *are* included in Defendants' hair relaxer Products to serve a functional or technical purpose. For instance, one class of EDCS – phthalates – typically function as solvents, stabilizers, and preservatives. Therefore, their presence in Defendants Products must be disclosed per § 701.3(c).

194.    At all relevant times, Defendants' products referenced herein contained EDCs hidden under the guise of "fragrance" even though these harmful chemicals fall outside of the definition prescribed by 21 C.F.R. § 700.3(d). These EDCs serve a functional purpose in the Products.

195.    Defendants' inclusion of EDCs as "fragrance" is inconsistent with the requirements of 21 C.F.R. § 701.3(a) and 21 C.F.R. § 701.3(c).

196.    Having these regulatory duties, the Defendant failed to:

   a.   Disclose the high risk of unreasonable, dangerous adverse side effects of its hair relaxer products when used as intended; and/or

   b.   Disclose that the hair relaxer products contained potential or known toxic chemicals and carcinogens; and/or

   c.   Disclose it had not properly tested the safety of its hair relaxer products; and/or

   d.   Disclose that it did not research the safety of its hair relaxer products

**F.  Reproductive Harm Caused by Exposure to Endocrine Disrupting Chemicals in Hair Relaxer Products**

   e.   **Uterine Fibroids**

FILED DATE: 7/2/2025 12:57 PM    2025L008392

197.    Uterine fibroids are associated with phthalate metabolites found in chemical hair straightening and hair relaxer products.

198.    Black women have a higher prevalence of uterine fibroids and tumors than any other ethnicity/racial group.[83]

199.    A study looking at over 1 million U.S. women from 2003 to 2014 found that Black women had the highest rate of diagnosed uterine fibroids, with most diagnoses made between the age of 30 – 54 years old.[84]

200.    Studies show that Black women are three to four times more likely to develop uterine fibroids in their lifetime compared to non-Hispanic white women, and an estimated 70-80% of Black women will develop fibroids over their lifetime.[85]

201.    It is estimated that the annual financial impact of uterine fibroids on Black women in the United States is as high as 30 billion dollars, and this number may be an underestimation, as at least one-quarter of women reported losing work due to their disease.[86]

202.    Black women are seven (7) times more likely to undergo a myomectomy compared to non-Hispanic white women.[87]

203.    Uterine fibroids return at higher rates for Black women than white women following surgical treatment, and recurrence can be as high as 59% within 5 years.[88]

---

[83] *Id.*

[84] Yu O, Scholes D, Schulze-Rath R, Grafton J, Hansen K, Reed SD. A US population-based study of uterine fibroid diagnosis incidence, trends, and prevalence: 2005 through 2014. American Journal of Obstetrics and Gynecology. 2018;219(6):591.e1-591.e8.

[85] Al-Hendy A, Salama SA. Ethnic distribution of estrogen receptor-α polymorphism is associated with a higher prevalence of uterine leiomyomas in black Americans. Fertil Steril. 2006;86(3):686-693. Doi:10.1016/j.fertnstert.2006.01.052

[86] Igboeli P, Walker W, McHugh A, Sultan, A, et al. Burden of uterine fibroids: an african perspective, a call for action and opportunity for intervention. COGO. 287-294.

[87] Eltoukhi HM, Modi MN, Weston M, Armstrong AY, Stewart EA. The health disparities of uterine fibroid tumors for African American women: a public health issue. Am J Obstet Gynecol. 2014;210(3):194-199. doi:10.1016/j.ajog.2013.08.008

[88] Donnez J, Dolmans M. Uterine fibroid management: from the present to the future. Hum Reprod Update. 22(06):665–686.

FILED DATE: 7/2/2025 12:57 PM    2025L008392

204.    Given the magnitude of the problem – markedly altered quality of life, the effect on reproductive health, and the costs of health care for this disease – the high prevalence of uterine fibroids in Black women is considered a major public health issue.[89]

205.    A 2012 study in the American Journal of Epidemiology associated fibroid risk with the use of hair relaxers. Shirley McDonald of the Hair and Scalp Clinic says, "We now know that many hair products contain chemicals that are considered carcinogenic and/or hormone disrupters, leading to increased risk of medical issues such as fibroids (non-cancerous tumors that grow in the uterus, potentially damaging fertility and leading to a host of other complications). Trichologists see lots of conditions that are likely to be triggered by hair products, particularly central centrifugal cicatricial alopecia, a type of permanent hair loss to the crown area of the scalp."

206.    More recently, the National Institutes of Health spent eight-years studying over 46,000 women of all races between the ages of 35–74. They were looking for links between chemical hair relaxers and breast cancer. They discovered Black women's breast cancer risk increased risk by 45%. Breast cancer and other reproductive issues, including fibroid development, are often connected. This study suggests there are even more reasons to steer clear of chemical hair straighteners and relaxers. Additionally, a new study from the American Journal of Epidemiology further confirms this link. In their group of 23,000 menstruating Black American women, these participants displayed two to three times higher uterine fibroid incidences.

207.    Concerns around racial disparities in healthcare linked to chemicals found in cosmetic products are not new; previous studies, as far back as 2012, have also suggested a

---

[89]    Eltoukhi HM, Modi MN, Weston M, Armstrong AY, Stewart EA. The health disparities of uterine fibroid tumors for African American women: a public health issue. Am J Obstet Gynecol. 2014;210(3):194-199. doi:10.1016/j.ajog.2013.08.008

correlation between chemical relaxer use and uterine fibroids, a condition that disproportionately affects Black women.[90]

208.     Hair relaxers are used by millions of black women, possibly exposing them to various chemicals through scalp lesions and burns. In the Black Women's Health Study, the authors assessed hair relaxer use in relation to uterine leiomyomata incidence. In 1997, participants reported on hair relaxer use (age at first use, frequency, duration, number of burns, and type of formulation). From 1997 to 2009, 23,580 premenopausal women were followed for incident uterine leiomyomata. The incidence of uterine leiomyomata is 2–3 times higher in US black women than in US white women.

209.     The Houston Fibroids Clinic in Houston, Texas also highlights the association between hair relaxers and uterine fibroids, stating that black women develop fibroids up to three times as often as women of other races, their fibroids develop earlier in age than other races (often times in their twenties), and are more likely to suffer from anemia due to fibroids. They also have a higher risk for fibroid symptoms, including but not limited to, painful intercourse, severe pelvic pain and heavy periods.[91]

### b. Uterine and Endometrial Cancer

210.     Endometrial cancer, a type of uterine cancer, is associated with phthalate metabolites found in chemical hair straightening and hair relaxer products.

211.     Black women have a higher prevalence of uterine cancer and endometrial cancer and tumors than any other ethnicity/racial group.[82]

---

[90]Nadine White, *Campaign urges beauty firms to pull 'toxic' hair products aimed at Black women*, Independent (August 3, 2021), https://www.independent.co.uk/news/uk/home-news/black-hair-lye-no-more-lyes b1893747.html.

[91]     Black Hair Relaxers and Fibroid Risk | Houston Fibroids

FILED DATE: 7/2/2025 12:57 PM    2025L008392

FILED DATE: 7/2/2025 12:57 PM    2025L008392

212.    A study looking at over 1 million U.S. women from 2003 to 2014 found that Black women had the highest rate of diagnosed uterine and endometrial cancer, with most diagnoses made between the age of 30 – 54 years old.[83]

213.    Studies show that Black women are three to four times more likely to develop uterine and endometrial cancer in their lifetime compared to non-Hispanic white women, and an estimated 70-80% of Black women will develop cancer over their lifetime.[84]

214.    It is estimated that the annual financial impact of uterine and endometrial cancer on Black women in the United States is as high as 30 billion dollars, and this number may be an underestimation, as at least one-quarter of women reported losing work due to their disease.[85]

215.    Black women are seven (7) times more likely to undergo a myomectomy compared to non-Hispanic white women.[86]

216.    Uterine and endometrial cancer returns at higher rates for Black women than white women following surgical treatment, and recurrence can be as high as 59% within 5 years.[87]

217.    Given the magnitude of the problem – markedly altered quality of life, the effect on reproductive health, and the costs of health care for this disease – the high prevalence of uterine cancer in Black women is considered a major public health issue.[88]

218.    A 2012 study in the American Journal of Epidemiology associated fibroid risk with the use of hair relaxers. Shirley McDonald of the Hair and Scalp Clinic says, "We now know that many hair products contain chemicals that are considered carcinogenic and/or hormone disrupters, leading to increased risk of medical issues such as cancer (non- cancerous tumors that grow in the uterus, potentially damaging fertility and leading to a host of other complications). Trichologists see lots of conditions that are likely to be triggered by hair products, particularly central centrifugal cicatricial alopecia, a type of permanent hair loss to the crown area of the scalp."

FILED DATE: 7/2/2025 12:57 PM   2025L008392

219.　　More recently, the National Institutes of Health spent eight-years studying over 46,000 women of all races between the ages of 35–74. They were looking for links between chemical hair relaxers and breast cancer. They discovered Black women's breast cancer risk increased risk by 45%. Breast cancer and other reproductive issues, including fibroid development, are often connected. This study suggests there are even more reasons to steer clear of chemical hair straighteners and relaxers. Additionally, a new study from the American Journal of Epidemiology further confirms this link. In their group of 23,000 menstruating Black American women, these participants displayed two to three times higher uterine fibroid incidences.

220.　　Concerns around racial disparities in healthcare linked to chemicals found in cosmetic products are not new; previous studies, as far back as 2012, have also suggested a correlation between chemical relaxer use and uterine and endometrial cancer, a condition that disproportionately affects Black women.[89]

221.　　Hair relaxers are used by millions of black women, possibly exposing them to various chemicals through scalp lesions and burns. In the Black Women's Health Study, the authors assessed hair relaxer use in relation to uterine leiomyomata incidence. In 1997, participants reported on hair relaxer use (age at first use, frequency, duration, number of burns, and type of formulation). From 1997 to 2009, 23,580 premenopausal women were followed for incident uterine leiomyomata. The incidence of uterine leiomyomata is 2–3 times higher in US black women than in US white women.

### c.  Endometriosis

222.　　Endometriosis is associated with phthalate metabolites found in chemical hair straightening and hair relaxer products.

56

FILED DATE: 7/2/2025 12:57 PM   2025L008392

223.    For Black women in the U.S., endometriosis is one of the common indications for major gynecological surgery and hysterectomy and is associated with long hospital stay and high hospital charges.[92]

224.    Phthalate metabolites were related to increased uterine volume, a sign of fibroids on ultrasound, 2018.[93] The sum of DEHP increased volume risk by 33% and the sum of androgenic phthalates increased risk by 27%.[94]

225.    The function of the uterine lining, the endometrium, is based on cell–cell interactions under the instruction of steroid hormones.[95] Endometriosis, a common cause of female infertility, occurs almost exclusively in menstruating women of reproductive age and often results from disruptions of this well-balanced cellular equilibrium.[96]

226.    It is estimated that 20% to 50% of women being treated for infertility have endometriosis.[97]

227.    Endometriosis is a painful, estrogen dependent disease resulting from the growth of endometrial glands and stroma outside the uterus that causes a chronic inflammatory reaction.[98]

---

[92] M. C. Kyama, *The prevalence of endometriosis among African-American and African-indigenous women*. Gynecologic and obstetric investigation, Vol. 57(1) (2004), https://pubmed.ncbi.nlm.nih.gov/14974452/.

[93] Amir R. Zota et al., *Phthalates exposure and uterine fibroid burden among women undergoing surgical treatment for fibroids: a preliminary study*, Fertility and sterility, Vol. 111(1) (2019), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6321778/.

[94] *Id*.

[95] L. Cobellis et al., *High plasma concentrations of di-(2-ethylhexyl)-phthalate in women with endometriosis*, Human Reproduction, Vol. 18, Issue 7 (2003), 1512–1515, https://doi.org/10.1093/humrep/deg208.

[96] D. L. Olive and L. B. Schwartz, *Endometriosis*, The New England J. of Med., Vol. 328(24):1759-69 (1993), https://pubmed.ncbi.nlm.nih.gov/8110213/; K. G. Osteen and E. Sierra-Rivera, *Does disruption of immune and endocrine systems by environmental toxins contribute to development of endometriosis?*, Seminars in Reproductive Endocrinology, Vol. 15(3):301-8 (1997) https://pubmed.ncbi.nlm.nih.gov/9383839/.

[97] *Endometriosis*, World Health Organization (March 31, 2021), https://www.who.int/news-room/fact-sheets/detail/endometriosis.

[98] *Id*.

FILED DATE: 7/2/2025 12:57 PM    2025L008392

228. During the follicular phase of the menstrual cycle, estrogen, working through estrogen receptor α[99], induces growth of the endometrium.[100]

229. The developing fetus and the female reproductive tract are particularly susceptible to EDCs.[101] EDCs are known to interfere with hormonal homeostasis, leading to alteration of estrogen signaling.[102] Specifically, DEHP is known to cause enhanced-estrogenic activity.[103]

230. DEHP is a known estrogen receptor agonist that promotes cell proliferation.[104] An agonist is a chemical that activates a receptor to produce a biological response.

231. Numerous studies, spanning over decades, establish that DEHP leads to the development of endometriosis as it is known to increase the viability, activity, proliferation, migration of endometrial stromal cells, a required precondition of endometriosis.[105]

---

[99] Ilaria Paterni et al., *Estrogen receptors alpha (ERα) and beta (ERβ): subtype-selective ligands and clinical potential*, Steroids, Vol. 90:13-29 (2014), https://pubmed.ncbi.nlm.nih.gov/24971815/.

[100] Kun Yu et al., *Estrogen Receptor Function: Impact on the Human Endometrium*, Frontiers in endocrinology, Vol. 13 (2022), https://pubmed.ncbi.nlm.nih.gov/35295981/.

[101] Saniya Rattan et al., *Di(2-Ethylhexyl) Phthalate Exposure During Prenatal Development Causes Adverse Transgenerational Effects on Female Fertility in Mice*, Toxicol Sci., Vol. 163(2) (2018), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5974785/.

[102] Xueping Chen et al., *Toxicity and Estrogenic Endocrine Disrupting Activity of Phthalates and Their Mixtures*, Int'l J. Envtl. Res. and Pub. Health, 1(3):3156-3168 (2014) https://doi.org/10.3390/ijerph110303156; Pablo A, Pérez et al., *The phthalate DEHP modulates the estrogen receptors α and β increasing lactotroph cell population in female pituitary glands*, Chemosphere, Vol. 258:127304 (2020), https://pubmed.ncbi.nlm.nih.gov/32559490/.

[103] Chon-Kit Chou et al., *Reduced camptothecin sensitivity of estrogen receptor-positive human breast cancer cells following exposure to di(2-ethylhexyl)phthalate (DEHP) is associated with DNA methylation changes*, Envtl. Toxicology, Vol. 3, Issue 4 (2019), https://doi.org/10.1002/tox.22694.

[104] Juhye Kim, et al., *Chronic Low-Dose Nonylphenol or Di-(2-ethylhexyl) Phthalate has a Different Estrogen-like Response in Mouse Uterus*, Development & reproduction, Vol. 22(4):379-391 (2018), https://pubmed.ncbi.nlm.nih.gov/30680337/. ("In the present study, we could see that in vitro treatment with DEHP caused various biological changes of endometrial cells such as increased MMP-2 and -9 activities, increased cell invasion, increased Erk phosphorylation, and increased Pak4 expression. Taken these findings together with our previous in vitro study, we can propose that refluxed endometrial cells could not only survive in the pelvic cavity following retrograde menstruation, but also invade through mesothelial layer, develop vascular supplies, proliferate at ectopic location, and eventually establish endometriotic lesions through various biological alterations caused by exposure to high level of phthalate.")

[105] *Id*.

FILED DATE: 7/2/2025 12:57 PM   2025L008392

232.    Studies have shown that endometriotic women have significantly higher plasma DEHP concentrations than those without the disease.[106] A study that included a sample size of approximately 500 women living in various states observed that DEHP's metabolite, MEHP, a was the only phthalate consistently associated with endometriosis.[107]

### d.  Ovarian Cancer

233.    In a 2021 study funded by NIH and the National Institute on Minority Health Sciences, frequent use of hair relaxers was strongly associated with ovarian cancer.

234.    In fact, the study revealed that those who frequently (four or more times per year) used hair relaxers were more than twice as likely to develop ovarian cancer.

235.    It is estimated that 19,880 women in the United States will be diagnosed with ovarian cancer in 2022, with an estimated 12,810 of those diagnoses resulting in death.

236.    Like uterine cancer, ovarian cancer is also believed to have a hormonally driven etiology, meaning that the insertion of hormonal disrupting compounds and the subsequent disruption of a woman's hormonal balance could lead to ovarian cancer.

237.    Products that are used to relax hair texture have been found to contain an array of EDCs including, but not limited to, phthalates, parabens, cyclosiloxanes, and metals, in addition to formaldehyde.  These chemicals can alter the body's delicate hormonal balance, and cause spikes or drops in levels of estrogens and progesterone (as well as other hormones).

238.    Recent studies have found an association between personal hair care products, including products that contain endocrine disrupting compounds, and ovarian cancer.

---

[106] L. Cobellis et. al, *High plasma concentrations of di-(2-ethylhexyl)-phthalate in women with endometriosis*, Human Reproduction, Vol. 18, Issue 7 (July 1, 2013), 1512–1515, https://doi.org/10.1093/humrep/deg208. Concluded that 92.6% of women with endometriosis tested had detectable levels of DEHP and /or its metabolite, MEHP.

[107] Buck Louis G. M. et al., *Bisphenol A and phthalates and endometriosis: the Endometriosis: Natural History, Diagnosis and Outcomes Study*, Fertility and sterility, Vol. 100(1):162-9.e1-2 (2013), https://pubmed.ncbi.nlm.nih.gov/23579005/.

FILED DATE: 7/2/2025 12:57 PM    2025L008392

239.     Widely used chemical hair products, such as hair relaxers, are a source of exposure to carcinogens and these endocrine disrupters alike.

240.     Other studies have found a positive correlation between the use of hair relaxers and incidents of ovarian cancer. Self-reported frequent use of hair relaxers has been associated with a higher risk of ovarian cancer.  Black and Brown women, the overwhelming majority of consumers of hair relaxer products, are more susceptible to the risk of ovarian cancer associated with the use and distribution of Defendants' products.

### e.  Breast Cancer

241.     Breast cancer is associated with phthalate metabolites found in hair care products.

242.     In Black women, breast cancer is diagnosed earlier and tends to be more aggressive, resulting in Black women having the highest rates of death due to this disease than any other ethnic/racial group.

243.     Academic communities have begun to explore the potential role of environmental exposure to estrogen and EDCs. A growing body of evidence links: (1) environmental estrogen and EDC exposures to breast cancer risk, (2) the presence of such chemicals in personal care products, including hair products, and (3) the use of certain hair products with potential breast cancer risk in African Americans.[108]

244.     Hormonal imbalances and over-activation of the estrogen, progesterone, and epidermal receptors are associated with development and progression of breast cancer.[109]

245.     Numerous Studies have shown that increased breast cancer mortality, poor prognosis, and the recurrence of breast cancer are associated with the higher urinary concentrations

---

[108] Black Hair Relaxers and Fibroid Risk | Houston Fibroids
[109] Laura Stiel, et al., *A Review of Hair Product Use on Breast Cancer Risk in African American Women*, Cancer Medicine, 5(3):597-604, March 2016, https://pubmed.ncbi.nlm.nih.gov/26773423/.

FILED DATE: 7/2/2025 12:57 PM    2025L008392

of DEHP and its metabolite, MEHP.[110]  Studies have also shown that exposure to DEHP increases invasive proprieties of breast cells.[111]

246.    Hormone receptor-negative breast cancer means that cancer cells do not grow in response to the hormones estrogen or progesterone.[112] Receptors are proteins on certain tumor cells that hormones stick to, allowing cancer cells to grow and multiply.

247.    Progesterone is essential for the mammary gland development and has a proliferative effect on epithelial cells.[113] Disruption of the progesterone pathway is known to be a risk factor for breast cancer. Two progesterone receptors are expressed at similar levels in the mammary gland, PR-A and PR-B.

248.    The progesterone receptor gene is an estrogen-regulated gene.[114]

249.    T-47D cells are cancer cells isolated from breast cancer patients and contain the receptors involved in hormone-dependent breast cancer, estrogen and progesterone receptors.

---

[110] Tsung-Hua Hsieh, et al., *DEHP Mediates Drug Resistance by Directly Targeting AhR in Human Breast Cancer*, Biomedicine & Pharmacotherapy, Volume 145, 112400, Nov., 18, 2021, https://pubmed.ncbi.nlm.nih.gov/34801851/

[111] Belinda Crobeddu, et al., *Di(2-ethylhexyl) Phthalate (DEHP) Increases Proliferation of Epithelial Breast Cancer Cells Through Progesterone Receptor Dysregulation*, Environmental Research, Volume 172, 165-173, June 2019, https://www.sciencedirect.com/science/article/abs/pii/S0013935119301653?via%3Dihub#bib82

[112] *Id*.

[113] *Id*.

[114] P.A. Mote, et al., *Loss of Co-ordinate Expression of Progesterone Receptors A and B is an Early Event in Breast Carcinogenesis*, Breast Cancer Research and Treatment, 72, 163-172, 2002, https://link.springer.com/article/10.1023/A:1014820500738#citeas

FILED DATE: 7/2/2025 12:57 PM    2025L008392

250.    DEHP and its metabolite, MEHP, increase cell proliferation of T-47D cancerous cells.[115] DEHP and MEHP induce progesterone receptor stimuli, resulting in increased progesterone receptor levels and T-47D cell proliferation.[116]

251.    Importantly, when progesterone receptors are purposefully inhibited by administration of a pharmacologic antagonist competitor of the progesterone receptor, it decreases the proliferation of T-47D induced by DEHP and MEHP.    Thus, exposure to DEHP and its metabolite increases proliferation of breast cancer cells by activating the progesterone receptor.[117]

252.    Estrogen receptor α drives more than 70 percent of breast cancers.[118]

253.    Estrogen receptor-negative breast cancers are a group of tumors with poor prognosis and fewer cancer prevention and treatment strategies compared to estrogen-positive tumors. [119]

254.    DEHP metabolites were associated with increased risk of breast cancer as well as uterine leiomyoma due to the EDC's influence on estrogen receptors.[120]

255.    Aromatase and estrogen receptor α are two key proteins for the proliferation of endocrine-responsive and endocrine–resistant breast cancers.[121]

---

[115] Mariana Brandao, et al., *Molecular Biology of Breast Cancer*, Essential Concepts in Molexular Pathology, Progesterone Receptor, 2020,https://www.sciencedirect.com/topics/medicine-anddentistry/progesterone-receptor.

[116] Bélinda Crobeddu, et al., *Di(2-ethylhexyl) Phthalate (DEHP) Increases Proliferation of Epithelial Breast Cancer Cells Through Progesterone Receptor Dysregulation*, Environmental Research, Volume 172, 165-173, June 2019, https://www.sciencedirect.com/science/article/abs/pii/S0013935119301653?via%3Dihub#bib82

[117] *Id*.

[118] *Id*.

[119] *Id*.

[120] David G. Hicks M.D. & Susan C. Lester MD, PhD, *Hormone Receptors* (ER/PR), Diagnostic Pathology: Breast, Progesterone Receptor,2016, https://www.sciencedirect.com/topics/medicine-and-dentistry/progesterone-receptor

[121] Thomas C Putti, et al., Estrogen Receptor-Negative Breast Carcinomas: *A Review of Morphology and Immunophenotypical Analysis*, Modern Pathology, 18, 26–35, Aug., 27, 2004, https://www.nature.com/articles/3800255

FILED DATE: 7/2/2025 12:57 PM    2025L008392

256.    Aromatase is an enzyme involved in the conversion of androgen, such as testosterone, to estrogen, such as 17β-estradiol. It is also a very effective therapeutic target for the treatment of endocrine-responsive breast cancer.[122]

257.    Resistance to chemotherapy and hormonal therapy is a major clinical problem in breast cancer medicine, especially for cancer recurrence.

258.    Several mechanisms lead to chemotherapy resistance, including drug inactivation. Drug inactivation refers to metabolic processes that some clinical drugs undergo that decrease their clinical effectiveness.

259.    The aryl hydrocarbon receptor (AhR) can form an estrogen receptor α complex, which activates the receptor's response even in the absence of estrogen.[123]

260.    AhR plays an important role in estrogen receptor-negative breast cancer, including the regulation of tumor growth, metastasis[124] and drug resistance.[125]

261.    AhR functions as a receptor for hormones EDC phthalates and causes drug inactivation. Overexpression of AhR affects cell proliferation and motility and is associated with a poor prognosis in human cancer.[126]

262.    CYP450 is a group of enzymes involved in the estrogen pathway are considered important candidate genes for the susceptibility to breast carcinoma.[127]

---

[122] Zhiqin Fu, et al., *Association Between Urinary Phthalate Metabolites and Risk of Breast Cancer and Uterine Leiomyoma*, Reproductive

[123] *Aromatic Hydrocarbon Receptor*, Comprehensive Toxicology, 2010, https://www.sciencedirect.com/topics/medicine-and-dentistry/aromatic-hydrocarbon-receptor.

[124] The spread of cancer cells from the place where they first formed to another part of the body.

[125] Tsung-Hua Hsieh, et al., DEHP *mediates drug resistance by directly targeting AhR in human breast cancer*, Biomedicine & Pharmacotherapy, Volume145,Jan.https://www.sciencedirect.com/science/article/pii/S0753332221011860?via%3Dihb.

[126] *Id*.

[127] Balraj Mittal, et al*., Chapter 4 – Cytochrome P450 in Chapter Susceptibility and Treatment*, Advances in Clinical Chemistry, Volume 71, 77-139, 2015, https://www.sciencedirect.com/science/article/abs/pii/S0065242315000517.

FILED DATE: 7/2/2025 12:57 PM  2025L008392

263.　CYP1A1 is a CYP450 enzyme, examined extensively for its capacity to activate compounds with carcinogenic properties.[128] Continuous exposure to inhalation chemicals and environmental carcinogens is assumed to increase the level of CYP1A1 through the AhR.[129] CYP1A1 is a known significant risk factor for breast carcinoma.[130]

264.　CYP1B1 is another CYP450 enzyme involved in the metabolism of potential carcinogens.[131] CYP1B1 expression has been shown to be higher in tumors compared to normal tissues, especially in hormone-related cancers including breast, ovary, and prostate tumors.[132]

265.　A recent landmark study provided a clinical outcome demonstrating that DEHP directly binds to AhR and induces downstream CYP1A1 and CYP1B1 expression through the genomic AhR pathway. This study thus revealed new evidence by which DEHP and AhR are co-involved in breast cancer drug resistance.[133]

266.　This same landmark study also evaluated DEHP metabolites in the urine of approximately 500 breast cancer patients and demonstrated that the metabolite concentration was significantly higher in recurrent breast cancer group compared with non-recurrent patients.[134]

267.　Urinary concentrations of mono-ethyl phthalate have been positively associated with breast cancer risk, as well as the number of personal care products used, and the use of hair

---

[128] Vasilis Androutsopoulos, et al., *Cytochrome P450 CYP1A1: Wider Roles in Cancer*

[129] *Id.*

[130] Tsung-Hua Hsieh, et al., DEHP *mediates drug resistance by directly targeting AhR in human breast cancer*, Biomedicine & Pharmacotherapy, Volume 145, Jan. 2022, https://www.sciencedirect.com/science/article/pii/S0753332221011860?via%3Dihub.

[131] Yeo-Jung Kwon, et al., *Enhances Cell Proliferation and Metastasis through Induction of EMT and Activation of Wnt/β-Catenin Signaling via Sp1 Upregulation*, PLoS One, 11(3), March 16, 2016, https://journals.plos.org/plosone/article?id=10.1371/journal.pone.0151598.

[132] *Id.*

[133] Tsung-Hua Hsieh, et al., DEHP *mediates drug resistance by directly targeting AhR in human breast cancer*, Biomedicine & Pharmacotherapy, Volume 145, Jan. 2022, https://www.sciencedirect.com/science/article/pii/S0753332221011860?via%3Dihub.

[134] *Id.*

products, among other personal care products, has been significantly associated with urinary phthalate concentration.

268.    Studies have shown positive correlation increased breast cancer risk and adolescent use of hair products that modify hair texture, specifically hair straighteners, perms, and hair dye in black women in the U.S.[135]  The frequency of use is associated with a higher risk of premenopausal breast cancer.

269.    The use of straighteners in the year prior to baseline was associated with an 18% higher risk of breast cancer.[136]  In the Women's Circle of Health Study (WCHS), a case-control study of women in New York, use of relaxers before age 12 and between the ages of 13–19 years was positively, associated with endocrine receptive breast cancer among African-American women; which is consistent with our finding of a suggestive higher risk for Endocrine Receptive− tumors.[137]  In the Ghana Breast Health study, use of relaxers was associated with a higher risk overall and risk was elevated regardless of age of first use, including in the youngest age category (<21 years).[138]

270.    A recent study, published in the Carcinogenesis Journal by Oxford University, concluded that Black women who used lye-based relaxers at least seven times a year for over 15 years or more had around a 30 per cent increased risk of developing breast cancer, compared with those who used it less frequently.[139]

---

[135] Alexander J. White et al., *Adolescent use of hair dyes, straighteners and perms in relation to breast cancer risk*, Int'l J. of Cancer, Vol. 148(9):2255-2263 (2021), https://pubmed.ncbi.nlm.nih.gov/33252833/.

[136] *Id.*

[137] *Id.*

[138] *Id.*

[139] Patricia F. Coogan et al., *Hair product use and breast cancer incidence in the Black Women's Health Study*, Carcinogenesis, Vol. 42, Issue 7 (July 2021) 924–

FILED DATE: 7/2/2025 12:57 PM    2025L008392

271.    The US-based researchers examined data from Boston University's Black Women's Health Study, which assessed the medical diagnoses of 50,000 African American women over a 25-year time period plus variable factors that could impact upon their wellbeing. Between 1997 and 2017, some 95 percent reported using lye-based relaxers and 2,311 developed breast cancers.[140]

## COUNT ONE
## STRICT LIABILITY v. NAMASTE LABORATORIES, LLC
## (FAILURE TO WARN)

272.    Plaintiff repeats and reallege the allegations in Paragraphs 1-271 above, as if fully set forth herein.

273.    At all pertinent times, Defendant Namaste was manufacturing, marketing, testing, promoting, selling and/or distributing the Products in the regular course of business.

274.    Defendant Namaste's Products were expected to and did reach consumers, including, Plaintiff, without substantial change in the condition in which their Products were manufactured, sold, or otherwise released into the stream of commerce by Defendant Namaste.

275.    At all pertinent times, Plaintiff used the products on their scalp area, which is a reasonably foreseeable use.

276.    At all pertinent times, Defendant Namaste knew or should have known that the use phthalates and other EDCs in hair products significantly increases the risk of diseases including reproductive harm, based upon scientific knowledge dating back for decades.

277.    At all pertinent times, including the time of sale and consumption of the Products, Defendant Namaste was then and is now guilty of one or more of the following acts:

---

[140] Wise, L. A., Palmer, J. R., Reich, D., Cozier, Y. C., & Rosenberg, L. (2012). Hair relaxer use and risk of uterine leiomyomata in African-American women. *American journal of epidemiology*, *175*(5), 432–440. https://doi.org/10.1093/aje/kwr351.

FILED DATE: 7/2/2025 12:57 PM    2025L008392

a. Manufacturing, marketing, testing, promoting, selling, and/or distributing unreasonable dangerous and defective products;

b. Improperly warned of increased risk of diseases as required by C.F.R. § 740.1;

c. Inadequately warned of increased risk of diseases as required by C.F.R. § 740.1;

d. Inadequately warned that the safety of the product has not been determined as required by 21 CFR § 740.10;

e. Inadequately labeled hair relaxer products as containing EDCs that act as hormonal agents as required by 21 C.F.R. § 310.530;

f. Improperly warned and failed to instruct Plaintiff of inherent risks of debilitating and life-altering conditions; or

g. Inadequately warned and failed to instruct Plaintiff of inherent risks of debilitating and life-altering conditions.

278. Plaintiff sustained the following damages as a foreseeable, direct, and proximate result of Defendant Namaste's acts and/or omissions:

a. Economic losses including medical care and lost earnings; and

b. Noneconomic losses including physical and mental pain and suffering, emotional distress, inconvenience, loss of enjoyment and impairment of quality of life, past and future.

WHEREFORE, Plaintiff DOMINI HENDERSON demands judgement against Defendant Namaste Laboratories, LLC in a sum in excess of FIFTY THOUSAND AND 00/100 DOLLARS ($50,000.00) plus costs and any such other relief as this Court deems just and proper.

**COUNT TWO**
**STRICT LIABILITY v. NAMASTE LABORATORIES, LLC**
**(DESIGN AND/OR MANUFACTURING DEFECT)**

FILED DATE: 7/2/2025 12:57 PM    2025L008392

279.    Plaintiff repeats and reallege the allegations in Paragraphs 1-271 above, as if fully set forth herein.

280.    At all relevant times, Defendant Namaste engaged in the design, development, manufacture, marketing, sale, and distribution of the Products in a defective and unreasonably dangerous condition to consumers, including Plaintiff.

281.    Defendant Namaste caused the Products to enter the stream of commerce and to be sold through various retailers, where Plaintiff purchased the Products.

282.    The Products were expected to, and did, reach consumers, including Plaintiff, without change in the condition in which they were manufactured and sold by Defendant Namaste and/or otherwise released into the stream of commerce.

283.    Plaintiff used the Products in a manner normally intended, recommended, promoted, and marketed by Defendant Namaste.

284.    Products failed to perform safely when used by Plaintiff in a reasonably foreseeable manner, specifically increasing their risk of reproductive harm.

285.    The propensity of phthalates and other endocrine receptive chemicals to trigger tumors and cancerous growths in premenopausal women, thereby substantially increasing the risk of reproductive harm, renders the Products unreasonably dangerous when used in the manner they were  intended and to an extent beyond that would be contemplated by the ordinary consumer.

286.    Importantly, the Products are an inessential cosmetic product that do not treat or cure any serious disease. Further, safer alternatives, including fragrance free products, have been readily available for decades.

287.    Defendant Namaste knew, or by the exercise of reasonably care should have known, that the Products are unreasonably dangerous but have continued to design, manufacture, sell,

FILED DATE: 7/2/2025 12:57 PM    2025L008392

distribute, market, promote, and supply the Products to maximize sales and profits at the expense of public health and safety in conscious disregard of the foreseeable harm to the consuming public, including Plaintiff.

288.    Defendant Namaste owed a duty to all reasonably foreseeable users to design a safe product.

289.    At all pertinent times, Defendant Namaste was then and is now guilty of one or more of the following acts and/or omissions:

a.    Designing, manufacturing, selling, distributing, marketing, promoting, and supplying Products that they knew or should have known were unreasonable dangerous;

b.    Failing to use reasonable care in the design and/or manufacturing of their Products; or

c.    Failing to use reasonably feasible alternative designs in the design and/or manufacturing of the Products.

290.    As a direct and proximate result of Defendant Namaste's conduct, including actions, omissions, and misrepresentations, Plaintiff sustained the following damages:

a.    Economic losses including medical care and lost earnings; and

b.    Noneconomic losses including physical and mental pain and suffering, emotional distress, inconvenience, loss of enjoyment and impairment of quality of life, past and future.

WHEREFORE, Plaintiff DOMINI HENDERSON demands judgement against Defendant Namaste Laboratories, LLC in a sum in excess of FIFTY THOUSAND AND 00/100 DOLLARS ($50,000.00) plus costs and any such other relief as this Court deems just and proper.

FILED DATE: 7/2/2025 12:57 PM   2025L008392

## COUNT THREE
### PRODUCTS LIABILITY v. NAMASTE LABORATORIES, LLC
### (NEGLIGENT FAILURE TO WARN)

291.    Plaintiff repeats and reallege the allegations in Paragraphs 1-271 above, as if fully set forth herein.

292.    At all relevant times Defendant Namaste engaged in the design, development, manufacture, marketing, sale, and distribution of the Products in a defective and unreasonably dangerous condition to consumers, including Plaintiff.

293.    Defendant Namaste knew, or by the exercise of reasonable care, should have known use of their Products was dangerous, harmful, and injurious when used by Plaintiff in a reasonably foreseeable manner.

294.    Defendant Namaste knew, or by the exercise of reasonable care, should have known ordinary consumers such as Plaintiff would not have realized the potential risks and dangers of their Products, and that Products were likely to increase the risks of tumors and cancerous growths in premenopausal women, thereby substantially increasing the risk of reproductive harm, when used in the manner it was intended and to an extent beyond that would be contemplated by the ordinary consumer.

295.    Defendant Namaste owed a duty to all reasonably foreseeable consumers to disclose the risks associated with the use of their Products.

296.    At all pertinent times, Defendant Namaste was then and is now guilty of one or more of the following acts and/or omissions:

      a.    Failing to provide adequate warnings on their Products;

      b.    Inadequately providing warnings on their Products;

FILED DATE: 7/2/2025 12:57 PM    2025L008392

c.   Provided misleading advertisements; or

d.   Failed to provide instructions on how to safely use their Products.

297.   As a direct and proximate result of Defendant Namaste's conduct, including actions, omissions, and misrepresentations, Plaintiff sustained the following damages:

a.   Economic losses including medical care and lost earnings; and

b.   Noneconomic losses including physical and mental pain and suffering, emotional distress, inconvenience, loss of enjoyment and impairment of quality of life, past and future.

WHEREFORE, Plaintiff DOMINI HENDERSON demands judgement against Defendant Namaste Laboratories, LLC in a sum in excess of FIFTY THOUSAND AND 00/100 DOLLARS ($50,000.00) plus costs and any such other relief as this Court deems just and proper.

## COUNT FOUR
## GENERAL NEGLIGENCE v. NAMASTE LABORATORIES, LLC

298.   Plaintiff repeats and realleges the allegations in Paragraphs 1-271 above, as if fully set forth herein.

299.   At all relevant times, Defendant Namaste engaged in the design, development, manufacture, marketing, sale, and distribution of the Products in a defective and unreasonably dangerous condition to consumers, including Plaintiff.

300.   Defendant Namaste caused the Products to enter the stream of commerce and to be sold through various retailers, where Plaintiff purchased the Products.

301.   The products were expected to, and did, reach consumers, including Plaintiff, without change in the condition in which they were manufactured and sold by Defendant Namaste and/or otherwise released into the stream of commerce.

FILED DATE: 7/2/2025 12:57 PM    2025L008392

302.    Plaintiff used the Products in a manner normally intended, recommended, promoted, and marketed by Defendant Namaste.

303.    The products failed to perform safely when used by Plaintiff in a reasonably foreseeable manner, specifically increasing her of developing reproductive harm.

304.    The propensity of phthalates and other endocrine receptive chemicals to trigger tumors and cancerous growths in premenopausal women, thereby substantially increasing the risk of diseases including but not limited to cancer, fibroids and/or endometriosis, renders the Products unreasonably dangerous when used in the manner it was intended and to an extent beyond that would be contemplated by the ordinary consumer.

305.    Importantly, the Products are an inessential cosmetic product that do not treat or cure any serious disease. Further, safer alternatives, including fragrance free products, have been readily available for decades.

306.    Defendant Namaste knew, or by the exercise of reasonably care should have known, that the Products are unreasonably dangerous but have continued to design, manufacture, sell, distribute, market, promote, and supply the Products to maximize sales and profits at the expense of public health and safety in conscious disregard of the foreseeable harm to the consuming public, including Plaintiff.

307.    Defendant Namaste owed a duty to all reasonably foreseeable users to exercise reasonable care in the manufacturing, designing, researching, testing, producing, supplying, inspecting, marketing, labeling, packaging, selling, and distributing of its hair relaxer Products.

308.    At all pertinent times, Defendant Namaste was then and is now guilty of one or more of the following acts and/or omissions:

a.    Failing to design safe Products;

FILED DATE: 7/2/2025 12:57 PM    2025L008392

b.   Failing to manufacture safe Products;

c.   Failing to use reasonably feasible alternative deigns in the design of the Product;

d.   Failing to use reasonably feasible alternative deigns in the manufacturing of the Product;

e.   Failing to properly warn of the hazards associated with the Product;

f.   Failing to properly test the Product to determine adequacy and effectiveness or safety measures prior to releasing the Product to consumers, including the Plaintiff;

g.   Failing to properly warn consumers that the safety of the Product had not been determined;

h.   Failing to inform consumers, including the Plaintiff, of the safe and proper methods of handling and using the Product,

i.   Failing to remove the Product from the market when Defendant Namaste knew or reasonably should have known that the Products were defective;

j.   Failing to instruct consumers, including the Plaintiff, as to methods for reducing exposure to the Products;

k.   Failing to properly label the Products as defective; or

l.   Failing to properly market the Products as defective.

309.   Defendant Namaste knew or should have known that consumers, such as Plaintiff, would foreseeably suffer injuries as a result of the Defendant's failure to exercise ordinary care as described above.

73

FILED DATE: 7/2/2025 12:57 PM    2025L008392

310.     As a direct and proximate result of Defendant Namaste's conduct, including actions, omissions, and misrepresentations, Plaintiff sustained the following damages:

   a.   Economic losses including medical care and lost earnings; and

   b.   Noneconomic losses including physical and mental pain and suffering, emotional distress, inconvenience, loss of enjoyment and impairment of quality of life, past and future.

WHEREFORE, Plaintiff DOMINI HENDERSON demands judgement against Defendant Namaste Laboratories, LLC in a sum in excess of FIFTY THOUSAND AND 00/100 DOLLARS ($50,000.00) plus costs and any such other relief as this Court deems just and proper.

## COUNT FIVE

## FRAUD v. NAMASTE LABORATORIES, LLC

307.     Plaintiff repeats and reallege the allegations in Paragraphs 1-271  above, as if fully set forth herein.

308.     Defendant Namaste engaged in the development, manufacture, marketing, sale and distribution of cosmetic and personal care products, including the Products, owed a duty to provide accurate and complete information regarding said products.

309.     Defendant Namaste fraudulently misrepresented the use of the Products as safe and effective, specifically:

   a.   Defendant Namaste's Products are marketed as "Olive Oil" products to imply natural products, and their Products are advertised as being "Build in Protection;"

   b.   Defendant Namaste's website states that their Products use "Rich Olive and Avocado Oils" that they claim, "moisturize and condition while Aloe Vera protects the skin and scalp."

74

FILED DATE: 7/2/2025 12:57 PM    2025L008392

       c.   Defendant Namaste's Products claim that they "use the latest technology to safely elongate tight coils."

310.   Defendant Namaste made these representations on its Product packaging and marketing materials with the intention of assuring consumers that their hair relaxer Products were imbued with ingredients designed to help and improve the condition of their hair while giving the impression that nothing harmful could or would be contained in the product ingredients.

311.   These representations were intended to, and did in fact, induce consumers to believe that its Products could or would not contain harmful ingredients.

312.   Defendant Namaste made these representations on its Product packaging when they knew or should have known that its hair relaxer Products contained phthalates and other EDCs known to increase the risk and/or cause reproductive harms to consumers.

313.   Defendant Namaste's marketing and labeling fraudulently omitted warnings about health hazards, and that the Product's safety had not been established.

314.   Consumers could not ascertain from the packaging or the ingredient listing that anything harmful could or would be present in the Product because the harmful chemicals are contained within a catch-all "fragrance" category on the Product's labels.

315.   Defendant Namaste's products did not disclose the presence of these toxic chemicals pursuant to 21 Code of Federal Regulations § 700.3 and § 701.3, which require that fragrance ingredients that either do not serve to impart a smell or odor, or ingredients that serve a technical or functional purpose in the product must be disclosed, and pursuant to 21 Code of Federal Regulations § 310.530, which requires that ingredients that act or function as hormones in products must be properly disclosed and labelled.

316.    An article was published on October 4, 2022, on MSN and other online news outlets, titled "The Relaxer Box Girls: Where Are They Now." which revealed that many of the young black girls featured on relaxer boxes and in relaxer ads in the 80s, 90s, and 2000s, never actually got their hair relaxed. Instead, they used other straightening tools and styling products to achieve the look of having the relaxer, without having exposed themselves to the dangerous chemicals within relaxers. Many of them are wearing natural hairstyles today.[141]

317.    At all pertinent times, Defendant Namaste was then and is now guilty of one or more of the following acts and/or omissions:

a.    Knowingly and/or negligently made misrepresentations that were material, false, incomplete, misleading, deceptive and deceitful;

b.    Knowingly and/or negligently made omissions that were material, false, incomplete, misleading, deceptive and deceitful;

c.    Knowingly and/or negligently made misrepresentations for the purpose of deceiving and defrauding consumers, including Plaintiff; or

d.    Knowingly and/or negligently made omissions for the purpose of deceiving and defrauding consumers, including Plaintiff.

318.    Plaintiff relied, with reasonable justification, on the misrepresentations by Defendant Namaste, which induced them to purchase and use the Products on a regular basis for decades.

319.    Defendant Namaste profited, significantly, from their unethical and illegal conduct that fraudulently induced Plaintiff, and millions of other consumers, to purchase a dangerous and defective product.

---

[141] The Relaxer Box Girls: Where Are They Now? (msn.com)

FILED DATE: 7/2/2025 12:57 PM    2025L008392

FILED DATE: 7/2/2025 12:57 PM    2025L008392

320.     Defendant Namaste's actions, and Plaintiff's justifiable reliance thereon, were substantial contributing factors in causing injury and incurrence of substantial damages.

321.     As a direct and proximate result of the Defendant Namaste's conduct, Plaintiff sustained the following damages:

    a.  Economic losses including medical care and lost earnings; and

    b.  Noneconomic losses including physical and mental pain and suffering, emotional distress, inconvenience, loss of enjoyment and impairment of quality of life, past and future.

WHEREFORE, Plaintiff DOMINI HENDERSON demands judgement against Defendant Namaste Laboratories, LLC in a sum in excess of FIFTY THOUSAND AND 00/100 DOLLARS ($50,000.00) plus costs and any such other relief as this Court deems just and proper.

## COUNT SIX

### VIOLATION OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE TRADE PRACTICES ACT v. NAMASTE LABORATORIES, LLC

#### (815 ILCS §505/1 et seq.)

322.     Plaintiff repeats and reallege the allegations in Paragraphs 1-271 above, as if fully set forth herein.

323.     The Illinois Consumer Fraud and Deceptive Business Practices Act, 815 Ill. Comp. Stat. 505/2, states that, "[u]nfair methods of competition and unfair or deceptive acts or practices are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby."

324.     Defendant Namaste had a statutory duty to refrain from unfair or deceptive acts or trade practices in the design, labeling, development, manufacture, promotion, and sale of the Products.

FILED DATE: 7/2/2025 12:57 PM    2025L008392

325.     Defendant Namaste's intentional, deceptive, unconscionable, and fraudulent representations and material omissions to the Plaintiff, physicians, and consumers, constituted unfair and deceptive acts and trade practices in violation of the Illinois Consumer Fraud and Deceptive Trade Practices Act.

326.     At all pertinent times, Defendant Namaste was then and is now guilty of one of the following acts and/or omissions:

a.   Engaging in unfair or deceptive acts in violation of the Illinois Consumer Fraud and Deceptive Business Practices Act;

b.   Using false pretenses for a monetary gain from consumers, including Plaintiff;

c.   Engaging in unfair methods of competition and deceptive acts or practices that were proscribed by law;

d.   Representing that goods or services have characteristics, ingredients, uses, benefits, or quantities that they do not have;

e.   Advertising goods or services with the intent not to sell them as advertised;

f.   Engaging in fraudulent or deceptive conduct that creates a likelihood of confusion or misunderstanding;

327.     The actions and omissions of Defendant Namaste alleged herein are uncured or incurable deceptive acts under the statues enacted in the states to protect consumers against unfair, deceptive, fraudulent and unconscionable trade and business practices and false advertising.

328.     Defendant Namaste had actual knowledge of the defective and dangerous condition of Defendant Namaste's Product and failed to take any action to cure such defective and dangerous conditions.

FILED DATE: 7/2/2025 12:57 PM   2025L008392

329.     Plaintiff relied upon Defendant Namaste's misrepresentations and omissions in determining which product to use.

330.     Defendant Namaste's deceptive, unconscionable or fraudulent representations and material omissions to Plaintiff and other consumers constituted deceptive acts and practices.

331.     By reason of the unlawful acts engaged in by Defendant Namaste, and as a direct and proximate result thereof, Plaintiff suffered ascertainable losses and damages.

332.     As a direct and proximate result of Defendant Namaste's violations of the State of Illinois' consumer protection laws, Plaintiff sustained the following damages:

    a.   Economic losses including medical care and lost earnings; and

    b.   Noneconomic losses including physical and mental pain and suffering, emotional distress, inconvenience, loss of enjoyment and impairment of quality of life, past and future.

WHEREFORE, Plaintiff DOMINI HENDERSON demands judgement against Defendant Namaste Laboratories, LLC in a sum in excess of FIFTY THOUSAND AND 00/100 DOLLARS ($50,000.00) plus costs and any such other relief as this Court deems just and proper.

**COUNT SEVEN**
**STRICT LIABILITY v. RNA CORPORATION**
**(FAILURE TO WARN)**

333.     Plaintiff repeats and reallege the allegations in Paragraphs 1-271 above, as if fully set forth herein.

334.     At all pertinent times, Defendant RNA was manufacturing, marketing, testing, promoting, selling and/or distributing the Products in the regular course of business.

FILED DATE: 7/2/2025 12:57 PM   2025L008392

335. Defendant RNA's Products were expected to and did reach consumers, including Plaintiff, without substantial change in the condition in which their Products were manufactured, sold, or otherwise released into the stream of commerce by Defendant RNA.

336. At all pertinent times, Plaintiff used the Products on their scalp area, which is a reasonably foreseeable use.

337. At all pertinent times, Defendant RNA knew or should have known that the use phthalates and other EDCs in hair products significantly increases the risk of diseases including reproductive harm, based upon scientific knowledge dating back for decades.

338. At all pertinent times, including the time of sale and consumption of the Products, Defendant RNA was then and is now guilty of one or more of the following acts:

a. Manufacturing, marketing, testing, promoting, selling, and/or distributing unreasonable dangerous and defective products;

b. Improperly warned of increased risk of diseases as required by C.F.R. § 740.1;

c. Inadequately warned of increased risk of diseases as required by C.F.R. § 740.1;

d. Inadequately warned that the safety of the product has not been determined as required by 21 CFR § 740.10;

e. Inadequately labeled hair relaxer Products as containing EDCs that act as hormonal agents as required by 21 C.F.R. § 310.530;

f. Improperly warned and failed to instruct Plaintiff of inherent risks of debilitating and life-altering conditions; or

g. Inadequately warned and failed to instruct Plaintiff of inherent risks of debilitating and life-altering conditions.

FILED DATE: 7/2/2025 12:57 PM    2025L008392

339.    Plaintiff sustained the following damages as a foreseeable, direct, and proximate result of Defendant RNA's acts and/or omissions:

a.    Economic losses including medical care and lost earnings; and

b.    Noneconomic losses including physical and mental pain and suffering, emotional distress, inconvenience, loss of enjoyment and impairment of quality of life, past and future.

WHEREFORE, Plaintiff DOMINI HENDERSON demands judgement against Defendant RNA Corporation in a sum in excess of FIFTY THOUSAND AND 00/100 DOLLARS ($50,000.00) plus costs and any such other relief as this Court deems just and proper.

## COUNT EIGHT
## STRICT LIABILITY v. RNA CORPORATION
## (DESIGN AND/OR MANUFACTURING DEFECT)

340.    Plaintiff repeats and reallege the allegations in Paragraphs 1-271 above, as if fully set forth herein.

341.    At all relevant times, Defendant RNA engaged in the design, development, manufacture, marketing, sale, and distribution of the Products in a defective and unreasonably dangerous condition to consumers, including Plaintiff.

342.    Defendant RNA caused the Products to enter the stream of commerce and to be sold through various retailers, where Plaintiff purchased the Products.

343.    The Products were expected to, and did, reach consumers, including Plaintiff, without change in the condition in which they were manufactured and sold by Defendant RNA and/or otherwise released into the stream of commerce.

344.    Plaintiff used the Products in a manner normally intended, recommended, promoted, and marketed by Defendant RNA.

FILED DATE: 7/2/2025 12:57 PM    2025L008392

345.    Products failed to perform safely when used by Plaintiff in a reasonably foreseeable manner, specifically increasing their risk of reproductive harm.

346.    The propensity of phthalates and other endocrine receptive chemicals to trigger tumors and cancerous growths in premenopausal women, thereby substantially increasing the risk of reproductive harm, renders the Products unreasonably dangerous when used in the manner it was intended and to an extent beyond that would be contemplated by the ordinary consumer.

347.    Importantly, the Products are an inessential cosmetic product that do not treat or cure any serious disease. Further, safer alternatives, including fragrance free products, have been readily available for decades.

348.    Defendant RNA knew, or by the exercise of reasonably care should have known, that the Products are unreasonably dangerous but have continued to design, manufacture, sell, distribute, market, promote, and supply the Products to maximize sales and profits at the expense of public health and safety in conscious disregard of the foreseeable harm to the consuming public, including Plaintiff.

349.    Defendant RNA owed a duty to all reasonably foreseeable users to design a safe product.

350.    At all pertinent times, Defendant RNA was then and is now guilty of one or more of the following acts and/or omissions:

a.    Designing, manufacturing, selling, distributing, marketing, promoting, and supplying Products that they knew or should have known were unreasonable dangerous;

b.    Failing to use reasonable care in the design and/or manufacturing of their Products; or

c.    Failing to use reasonably feasible alternative designs in the design and/or manufacturing of the Products.

82

FILED DATE: 7/2/2025 12:57 PM    2025L008392

351.     As a direct and proximate result of Defendant RNA's conduct, including actions, omissions, and misrepresentations, Plaintiff sustained the following damages:

    a.   Economic losses including medical care and lost earnings; and

    b.   Noneconomic losses including physical and mental pain and suffering, emotional distress, inconvenience, loss of enjoyment and impairment of quality of life, past and future.

WHEREFORE, Plaintiff DOMINI HENDERSON demands judgement against Defendant RNA Corporation in a sum in excess of FIFTY THOUSAND AND 00/100 DOLLARS ($50,000.00) plus costs and any such other relief as this Court deems just and proper.

**COUNT NINE**
**PRODUCTS LIABILITY v. RNA CORPORATION**
**(NEGLIGENT FAILURE TO WARN)**

352.     Plaintiff repeats and reallege the allegations in Paragraphs 1-271 above, as if fully set forth herein.

353.     At all relevant times Defendant RNA engaged in the design, development, manufacture, marketing, sale, and distribution of the Products in a defective and unreasonably dangerous condition to consumers, including Plaintiff.

354.     Defendant RNA knew, or by the exercise of reasonable care, should have known use of their Products was dangerous, harmful, and injurious when used by Plaintiff in a reasonably foreseeable manner.

355.     Defendant RNA knew, or by the exercise of reasonable care, should have known ordinary consumers, such as Plaintiff, would not have realized the potential risks and dangers of their Products, and that Products were likely to increase the risks of tumors and cancerous growths in premenopausal women, thereby substantially increasing the risk of reproductive harm, when

FILED DATE: 7/2/2025 12:57 PM   2025L008392

used in the manner it was intended and to an extent beyond that would be contemplated by the ordinary consumer.

356.    Defendant RNA owed a duty to all reasonably foreseeable consumers to disclose the risks associated with the use of their Products.

357.    At all pertinent times, Defendant RNA was then and is now guilty of one or more of the following acts and/or omissions:

a.  Failing to provide adequate warnings on their Products;

b.  Inadequately providing warnings on their Products;

c.  Providing misleading advertisements; or

d.  Failing to provide instructions on how to safely use their Products.

358.    As a direct and proximate result of Defendant RNA's conduct, including actions, omissions, and misrepresentations, Plaintiff sustained the following damages:

a.  Economic losses including medical care and lost earnings; and

b.  Noneconomic losses including physical and mental pain and suffering, emotional distress, inconvenience, loss of enjoyment and impairment of quality of life, past and future.

WHEREFORE, Plaintiff DOMINI HENDERSON demands judgement against Defendant RNA Corporation in a sum in excess of FIFTY THOUSAND AND 00/100 DOLLARS ($50,000.00) plus costs and any such other relief as this Court deems just and proper.

## COUNT TEN
## GENERAL NEGLIGENCE v. RNA CORPORATION

359.    Plaintiff repeats and reallege the allegations in Paragraphs 1-271 above, as if fully set forth herein.

FILED DATE: 7/2/2025 12:57 PM    2025L008392

360.    At all relevant times, Defendant RNA engaged in the design, development, manufacture, marketing, sale, and distribution of the Products in a defective and unreasonably dangerous condition to consumers, including Plaintiff.

361.    Defendant RNA caused the Products to enter the stream of commerce and to be sold through various retailers, where Plaintiff purchased the Products.

362.    The Products were expected to, and did, reach consumers, including Plaintiff, without change in the condition in which they were manufactured and sold by Defendant RNA and/or otherwise released into the stream of commerce.

363.    Plaintiff used the Products in a manner normally intended, recommended, promoted, and marketed by Defendant RNA.

364.    Products failed to perform safely when used by Plaintiff in a reasonably foreseeable manner, specifically increasing her of developing reproductive harm.

365.    The propensity of phthalates and other endocrine receptive chemicals to trigger tumors and cancerous growths in premenopausal women, thereby substantially increasing the risk of diseases including but not limited to cancer, fibroids and/or endometriosis, renders the Products unreasonably dangerous when used in the manner it was intended and to an extent beyond that would be contemplated by the ordinary consumer.

366.    Importantly, the Products are an inessential cosmetic product that do not treat or cure any serious disease. Further, safer alternatives, including fragrance free products, have been readily available for decades.

367.    Defendant RNA knew, or by the exercise of reasonably care should have known, that the Products are unreasonably dangerous but have continued to design, manufacture, sell, distribute, market, promote, and supply the Products to maximize sales and profits at the expense

85

of public health and safety in conscious disregard of the foreseeable harm to the consuming public, including Plaintiff.

368.   Defendant RNA owed a duty to all reasonably foreseeable users to exercise reasonable care in the manufacturing, designing, researching, testing, producing, supplying, inspecting, marketing, labeling, packaging, selling, and distributing of its hair relaxer Products.

369.   At all pertinent times, Defendant RNA was then and is now guilty of one or more of the following acts and/or omissions:

    a.  Failing to design safe Products;

    b.  Failing to manufacture safe Products;

    c.  Failing to use reasonably feasible alternative designs in the design of the Product;

    d.  Failing to use reasonably feasible alternative designs in the manufacturing of the Product;

    e.  Failing to properly warn of the hazards associated with the Product;

    f.  Failing to properly test the Product to determine adequacy and effectiveness or safety measures prior to releasing the Product to consumers, including the Plaintiff;

    g.  Failing to properly warn consumers that the safety of the Product had not been determined:

    h.  Failing to inform consumers, including the Plaintiff, of the safe and proper methods of handling and using the Product,

    i.  Failing to remove the Product from the market when Defendant RNA knew or reasonably should have known that the Products were defective;

FILED DATE: 7/2/2025 12:57 PM   2025L008392

j.  Failing to instruct consumers, including the Plaintiff, as to methods for reducing exposure to the Products;

k.  Failing to properly label the Products as defective; or

l.  Failing to properly market the Products as defective.

370.    Defendant RNA knew or should have known that consumers, such as Plaintiff, would foreseeably suffer injuries as a result of the Defendant's failure to exercise ordinary care as described above.

371.    As a direct and proximate result of Defendant RNA's conduct, including actions, omissions, and misrepresentations, Plaintiff sustained the following damages:

a.  Economic losses including medical care and lost earnings; and

b.  Noneconomic losses including physical and mental pain and suffering, emotional distress, inconvenience, loss of enjoyment and impairment of quality of life, past and future.

WHEREFORE, Plaintiff DOMINI HENDERSON demands judgement against Defendant RNA Corporation in a sum in excess of FIFTY THOUSAND AND 00/100 DOLLARS ($50,000.00) plus costs and any such other relief as this Court deems just and proper.

## COUNT ELEVEN

## FRAUD v. RNA CORPORATION

372.    Plaintiff repeats and reallege the allegations in Paragraphs 1-271 above, as if fully set forth herein.

373.    Defendant RNA engaged in the development, manufacture, marketing, sale and distribution of cosmetic and personal care products, including the Products, owed a duty to provide accurate and complete information regarding said products.

87

374. Defendant RNA fraudulently misrepresented the use of the Products as safe and effective.

375. Defendant RNA made these representations on its Product packaging and marketing materials with the intention of assuring consumers that their hair relaxer Products were imbued with ingredients designed to help and improve the condition of their hair while giving the impression that nothing harmful could or would be contained in the product ingredients.

376. These representations were intended to, and did in fact, induce consumers to believe that its Products could or would not contain harmful ingredients.

377. Defendant RNA made these representations on its Product packaging when they knew or should have known that its hair relaxer Products contained phthalates and other EDCs known to increase the risk and/or cause reproductive harms to consumers.

378. Defendant RNA's marketing and labeling fraudulently omitted warnings about health hazards, and that the Product's safety had not been established.

379. Consumers could not ascertain from the packaging or the ingredient listing that anything harmful could or would be present in the Product because the harmful chemicals are contained within a catch-all "fragrance" category on the Product's labels.

380. Defendant RNA's Products did not disclose the presence of these toxic chemicals pursuant to 21 Code of Federal Regulations § 700.3 and § 701.3, which require that fragrance ingredients that either do not serve to impart a smell or odor, or ingredients that serve a technical or functional purpose in the product must be disclosed, and pursuant to 21 Code of Federal Regulations § 310.530, which requires that ingredients that act or function as hormones in products must be properly disclosed and labelled.

FILED DATE: 7/2/2025 12:57 PM    2025L008392

381.    A recent article was published on October 4, 2022, on MSN and other online news outlets, titled "The Relaxer Box Girls: Where Are They Now," which revealed that many of the young black girls featured on relaxer boxes and in relaxer ads in the 80s, 90s, and 2000s, never actually got their hair relaxed. Instead, they used other straightening tools and styling products to achieve the look of having the relaxer, without having exposed themselves to the dangerous chemicals within relaxers. Many of them are wearing natural hairstyles today.[142]

382.    At all pertinent times, Defendant RNA was then and is now guilty of one or more of the following acts and/or omissions:

    a.    Knowingly and/or negligently made misrepresentations that were material, false, incomplete, misleading, deceptive and deceitful;

    b.    Knowingly and/or negligently made omissions that were material, false, incomplete, misleading, deceptive and deceitful;

    c.    Knowingly and/or negligently made misrepresentations for the purpose of deceiving and defrauding consumers, including Plaintiff; or

    d.    Knowingly and/or negligently made omissions for the purpose of deceiving and defrauding consumers, including Plaintiff.

383.    Plaintiff relied, with reasonable justification, on the misrepresentations by Defendant RNA, which induced them to purchase and use the Products on a regular basis for decades.

384.    Defendant RNA profited, significantly, from their unethical and illegal conduct that fraudulently induced Plaintiff, and millions of other consumers, to purchase a dangerous and defective product.

---

[142] The Relaxer Box Girls: Where Are They Now? (msn.com)

FILED DATE: 7/2/2025 12:57 PM   2025L008392

385. Defendant RNA's actions, and Plaintiff's justifiable reliance thereon, were substantial contributing factors in causing injury and incurrence of substantial damages.

386. As a direct and proximate result of the Defendant RNA's conduct, Plaintiff sustained the following damages:

    a. Economic losses including medical care and lost earnings; and

    b. Noneconomic losses including physical and mental pain and suffering, emotional distress, inconvenience, loss of enjoyment and impairment of quality of life, past and future.

WHEREFORE, Plaintiff DOMINI HENDERSON demands judgement against Defendant RNA Corporation in a sum in excess of FIFTY THOUSAND AND 00/100 DOLLARS ($50,000.00) plus costs and any such other relief as this Court deems just and proper.

## COUNT TWELVE

## VIOLATION OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE TRADE PRACTICES ACT v. RNA CORPORATION

### (815 ILCS §505/1 et seq.)

387. Plaintiff repeats and reallege the allegations in Paragraphs 1-271 above, as if fully set forth herein.

388. The Illinois Consumer Fraud and Deceptive Business Practices Act, 815 Ill. Comp. Stat. 505/2, states that, "[u]nfair methods of competition and unfair or deceptive acts or practices are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby."

389. Defendant RNA had a statutory duty to refrain from unfair or deceptive acts or trade practices in the design, labeling, development, manufacture, promotion, and sale of the Products.

FILED DATE: 7/2/2025 12:57 PM 2025L008392

390. Defendant RNA's intentional, deceptive, unconscionable, and fraudulent representations and material omissions to the Plaintiff, physicians, and consumers, constituted unfair and deceptive acts and trade practices in violation of the Illinois Consumer Fraud and Deceptive Trade Practices Act.

391. At all pertinent times, Defendant RNA was then and is now guilty of one of the following acts and/or omissions:

    a. Engaging in unfair or deceptive acts in violation of the Illinois Consumer Fraud and Deceptive Business Practices Act;

    b. Using false pretenses for a monetary gain from consumers, including Plaintiff;

    c. Engaging in unfair methods of competition and deceptive acts or practices that were proscribed by law;

    d. Representing that goods or services have characteristics, ingredients, uses, benefits, or quantities that they do not have;

    e. Advertising goods or services with the intent not to sell them as advertised;

    f. Engaging in fraudulent or deceptive conduct that creates a likelihood of confusion or misunderstanding;

392. The actions and omissions of Defendant RNA alleged herein are uncured or incurable deceptive acts under the statues enacted in the states to protect consumers against unfair, deceptive, fraudulent and unconscionable trade and business practices and false advertising.

393. Defendant RNA had actual knowledge of the defective and dangerous condition of Defendant RNA's Product and failed to take any action to cure such defective and dangerous conditions.

FILED DATE: 7/2/2025 12:57 PM    2025L008392

394.    Plaintiff relied upon Defendant RNA's misrepresentations and omissions in determining which product to use.

395.    Defendant RNA's deceptive, unconscionable or fraudulent representations and material omissions to Plaintiff and other consumers constituted deceptive acts and practices.

396.    By reason of the unlawful acts engaged in by Defendant RNA, and as a direct and proximate result thereof, Plaintiff suffered ascertainable losses and damages.

397.    As a direct and proximate result of Defendant RNA's violations of the State of Illinois' consumer protection laws, Plaintiff sustained the following damages:

a.    Economic losses including medical care and lost earnings; and

b.    Noneconomic losses including physical and mental pain and suffering, emotional distress, inconvenience, loss of enjoyment and impairment of quality of life, past and future.

WHEREFORE, Plaintiff DOMINI HENDERSON demands judgement against Defendant RNA Corporation in a sum in excess of FIFTY THOUSAND AND 00/100 DOLLARS ($50,000.00) plus costs and any such other relief as this Court deems just and proper.

### COUNT THIRTEEN
### STRICT LIABILITY v. LUSTER PRODUCTS, INC.
### (FAILURE TO WARN)

398.    Plaintiff repeats and reallege the allegations in Paragraphs 1-271 above, as if fully set forth herein.

399.    At all pertinent times, Defendant Luster was manufacturing, marketing, testing, promoting, selling and/or distributing the Products in the regular course of business.

FILED DATE: 7/2/2025 12:57 PM   2025L008392

400.     Defendant Luster's Products were expected to and did reach consumers, including Plaintiff, without substantial change in the condition in which their Products were manufactured, sold, or otherwise released into the stream of commerce by Defendant Luster.

401.     At all pertinent times, Plaintiff used the Products on their scalp area, which is a reasonably foreseeable use.

402.     At all pertinent times, Defendant Luster knew or should have known that the use phthalates and other EDCs in hair products significantly increases the risk of diseases including reproductive harm, based upon scientific knowledge dating back for decades.

403.     At all pertinent times, including the time of sale and consumption of the Products, Defendant Luster was then and is now guilty of one or more of the following acts:

a.  Manufacturing, marketing, testing, promoting, selling, and/or distributing unreasonable dangerous and defective products;

b.  Improperly warned of increased risk of diseases as required by C.F.R. § 740.1;

c.  Inadequately warned of increased risk of diseases as required by C.F.R. § 740.1;

d.  Inadequately warned that the safety of the product has not been determined as required by 21 CFR § 740.10;

e.  Inadequately labeled hair relaxer Products as containing EDCs that act as hormonal agents as required by 21 C.F.R. § 310.530;

f.  Improperly warned and failed to instruct Plaintiff of inherent risks of debilitating and life-altering conditions; or

g.  Inadequately warned and failed to instruct Plaintiff of inherent risks of debilitating and life-altering conditions.

FILED DATE: 7/2/2025 12:57 PM    2025L008392

404.     Plaintiff sustained the following damages as a foreseeable, direct, and proximate result of Defendant Luster's acts and/or omissions:

    a.   Economic losses including medical care and lost earnings; and

    b.   Noneconomic losses including physical and mental pain and suffering, emotional distress, inconvenience, loss of enjoyment and impairment of quality of life, past and future.

WHEREFORE, Plaintiff DOMINI HENDERSON demands judgement against Defendant Luster Products, Inc. in a sum in excess of FIFTY THOUSAND AND 00/100 DOLLARS ($50,000.00) plus costs and any such other relief as this Court deems just and proper.

## COUNT FOURTEEN
## STRICT LIABILITY v. LUSTER PRODUCTS, INC
## (DESIGN AND/OR MANUFACTURING DEFECT)

405.     Plaintiff repeats and reallege the allegations in Paragraphs 1-271 above, as if fully set forth herein.

406.     At all relevant times, Defendant Luster engaged in the design, development, manufacture, marketing, sale, and distribution of the Products in a defective and unreasonably dangerous condition to consumers, including Plaintiff.

407.     Defendant Luster caused the Products to enter the stream of commerce and to be sold through various retailers, where Plaintiff purchased the Products.

408.     The Products were expected to, and did, reach consumers, including Plaintiff, without change in the condition in which they were manufactured and sold by Defendant Luster and/or otherwise released into the stream of commerce.

409.     Plaintiff used the Products in a manner normally intended, recommended, promoted, and marketed by Defendant Luster.

FILED DATE: 7/2/2025 12:57 PM   2025L008392

410. Products failed to perform safely when used by Plaintiff in a reasonably foreseeable manner, specifically increasing their risk of reproductive harm.

411. The propensity of phthalates and other endocrine receptive chemicals to trigger tumors and cancerous growths in premenopausal women, thereby substantially increasing the risk of reproductive harm, renders the Products unreasonably dangerous when used in the manner it was intended and to an extent beyond that would be contemplated by the ordinary consumer.

412. Importantly, the Products are an inessential cosmetic product that do not treat or cure any serious disease. Further, safer alternatives, including fragrance free products, have been readily available for decades.

413. Defendant Luster knew, or by the exercise of reasonably care should have known, that the Products are unreasonably dangerous but have continued to design, manufacture, sell, distribute, market, promote, and supply the Products to maximize sales and profits at the expense of public health and safety in conscious disregard of the foreseeable harm to the consuming public, including Plaintiff.

414. Defendant Luster owed a duty to all reasonably foreseeable users to design a safe product.

415. At all pertinent times, Defendant Luster was then and is now guilty of one or more of the following acts and/or omissions:

    a. Designing, manufacturing, selling, distributing, marketing, promoting, and supplying Products that they knew or should have known were unreasonable dangerous;

    b. Failing to use reasonable care in the design and/or manufacturing of their Products; or

95

FILED DATE: 7/2/2025 12:57 PM   2025L008392

c.  Failing to use reasonably feasible alternative designs in the design and/or manufacturing of the Products.

416.   As a direct and proximate result of Defendant Luster's conduct, including actions, omissions, and misrepresentations, Plaintiff sustained the following damages:

a.  Economic losses including medical care and lost earnings; and

b.  Noneconomic losses including physical and mental pain and suffering, emotional distress, inconvenience, loss of enjoyment and impairment of quality of life, past and future.

WHEREFORE, Plaintiff DOMINI HENDERSON demands judgement against Defendant Luster Products, Inc.   in a sum in excess of FIFTY THOUSAND AND 00/100 DOLLARS ($50,000.00) plus costs and any such other relief as this Court deems just and proper.

### COUNT FIFTEEN
### PRODUCTS LIABILITY v. LUSTER PRODUCTS, INC
### (NEGLIGENT FAILURE TO WARN)

417.   Plaintiff repeats and reallege the allegations in Paragraphs 1-271 above, as if fully set forth herein.

418.   At all relevant times Defendant Luster engaged in the design, development, manufacture, marketing, sale, and distribution of the Products in a defective and unreasonably dangerous condition to consumers, including Plaintiff.

419.   Defendant Luster knew, or by the exercise of reasonable care, should have known use of their Products was dangerous, harmful, and injurious when used by Plaintiff in a reasonably foreseeable manner.

420.   Defendant Luster knew, or by the exercise of reasonable care, should have known ordinary consumers, such as Plaintiff, would not have realized the potential risks and dangers of

FILED DATE: 7/2/2025 12:57 PM    2025L008392

their Products, and that Products were likely to increase the risks of tumors and cancerous growths in premenopausal women, thereby substantially increasing the risk of reproductive harm, when used in the manner it was intended and to an extent beyond that would be contemplated by the ordinary consumer.

421.    Defendant Luster owed a duty to all reasonably foreseeable consumers to disclose the risks associated with the use of their Products.

422.    At all pertinent times, Defendant Luster was then and is now guilty of one or more of the following acts and/or omissions:

    a.  Failing to provide adequate warnings on their Products;

    b.  Inadequately providing warnings on their Products;

    c.  Providing misleading advertisements; or

    d.  Failing to provide instructions on how to safely use their Products.

423.    As a direct and proximate result of Defendant Luster's conduct, including actions, omissions, and misrepresentations, Plaintiff sustained the following damages:

    a.  Economic losses including medical care and lost earnings; and

    b.  Noneconomic losses including physical and mental pain and suffering, emotional distress, inconvenience, loss of enjoyment and impairment of quality of life, past and future.

WHEREFORE, Plaintiff DOMINI HENDERSON demands judgement against Defendant Luster Products, Inc. in a sum in excess of FIFTY THOUSAND AND 00/100 DOLLARS ($50,000.00) plus costs and any such other relief as this Court deems just and proper.

**COUNT SIXTEEN**
**GENERAL NEGLIGENCE v. LUSTER PRODUCTS, INC.**

FILED DATE: 7/2/2025 12:57 PM    2025L008392

424. Plaintiff repeats and reallege the allegations in Paragraphs 1-271 above, as if fully set forth herein.

425. At all relevant times, Defendant Luster engaged in the design, development, manufacture, marketing, sale, and distribution of the Products in a defective and unreasonably dangerous condition to consumers, including Plaintiff.

426. Defendant Luster caused the Products to enter the stream of commerce and to be sold through various retailers, where Plaintiff purchased the Products.

427. The Products were expected to, and did, reach consumers, including Plaintiff, without change in the condition in which they were manufactured and sold by Defendant Luster and/or otherwise released into the stream of commerce.

428. Plaintiff used the Products in a manner normally intended, recommended, promoted, and marketed by Defendant Luster.

429. Products failed to perform safely when used by Plaintiff in a reasonably foreseeable manner, specifically increasing her of developing reproductive harm.

430. The propensity of phthalates and other endocrine receptive chemicals to trigger tumors and cancerous growths in premenopausal women, thereby substantially increasing the risk of diseases including but not limited to cancer, fibroids and/or endometriosis, renders the Products unreasonably dangerous when used in the manner it was intended and to an extent beyond that would be contemplated by the ordinary consumer.

431. Importantly, the Products are an inessential cosmetic product that do not treat or cure any serious disease. Further, safer alternatives, including fragrance free products, have been readily available for decades.

FILED DATE: 7/2/2025 12:57 PM    2025L008392

432.     Defendant Luster knew, or by the exercise of reasonably care should have known, that the Products are unreasonably dangerous but have continued to design, manufacture, sell, distribute, market, promote, and supply the Products to maximize sales and profits at the expense of public health and safety in conscious disregard of the foreseeable harm to the consuming public, including Plaintiff.

433.     Defendant Luster owed a duty to all reasonably foreseeable users to exercise reasonable care in the manufacturing, designing, researching, testing, producing, supplying, inspecting, marketing, labeling, packaging, selling, and distributing of its hair relaxer Products.

434.     At all pertinent times, Defendant Luster was then and is now guilty of one or more of the following acts and/or omissions:

a.   Failing to design safe Products;

b.   Failing to manufacture safe Products;

c.   Failing to use reasonably feasible alternative designs in the design of the Product;

d.   Failing to use reasonably feasible alternative designs in the manufacturing of the Product;

e.   Failing to properly warn of the hazards associated with the Product;

f.   Failing to properly test the Product to determine adequacy and effectiveness or safety measures prior to releasing the Product to consumers, including the Plaintiff;

g.   Failing to properly warn consumers that the safety of the Product had not been determined;

FILED DATE: 7/2/2025 12:57 PM    2025L008392

h.   Failing to inform consumers, including the Plaintiff, of the safe and proper methods of handling and using the Product,

i.   Failing to remove the Product from the market when Defendant Luster knew or reasonably should have known that the Products were defective;

j.   Failing to instruct consumers, including the Plaintiff, as to methods for reducing exposure to the Products;

k.   Failing to properly label the Products as defective; or

l.   Failing to properly market the Products as defective.

435.   Defendant Luster knew or should have known that consumers, such as Plaintiff, would foreseeably suffer injuries as a result of the Defendant's failure to exercise ordinary care as described above.

436.   As a direct and proximate result of Defendant Luster's conduct, including actions, omissions, and misrepresentations, Plaintiff sustained the following damages:

a.   Economic losses including medical care and lost earnings; and

b.   Noneconomic losses including physical and mental pain and suffering, emotional distress, inconvenience, loss of enjoyment and impairment of quality of life, past and future.

WHEREFORE, Plaintiff DOMINI HENDERSON demands judgement against Defendant Luster Products, Inc. in a sum in excess of FIFTY THOUSAND AND 00/100 DOLLARS ($50,000.00) plus costs and any such other relief as this Court deems just and proper.

## COUNT SEVENTEEN

## FRAUD v. LUSTER PRODUCTS INC.

437.   Plaintiff repeats and reallege the allegations in Paragraphs 1-271 above, as if fully set forth herein.

FILED DATE: 7/2/2025 12:57 PM    2025L008392

438.    Defendant Luster engaged in the development, manufacture, marketing, sale and distribution of cosmetic and personal care products, including the Products, owed a duty to provide accurate and complete information regarding said products.

439.    Defendant Luster fraudulently misrepresented the use of the Products as safe and effective.

440.    Defendant Luster made these representations on its Product packaging and marketing materials with the intention of assuring consumers that their hair relaxer Products were imbued with ingredients designed to help and improve the condition of their hair while giving the impression that nothing harmful could or would be contained in the product ingredients.

441.    These representations were intended to, and did in fact, induce consumers to believe that its Products could or would not contain harmful ingredients.

442.    Defendant Luster made these representations on its Product packaging when they knew or should have known that its hair relaxer Products contained phthalates and other EDCs known to increase the risk and/or cause reproductive harms to consumers.

443.    Defendant Luster's marketing and labeling fraudulently omitted warnings about health hazards, and that the Product's safety had not been established.

444.    Consumers could not ascertain from the packaging or the ingredient listing that anything harmful could or would be present in the Product because the harmful chemicals are contained within a catch-all "fragrance" category on the Product's labels.

445.    Defendant Luster's Products did not disclose the presence of these toxic chemicals pursuant to 21 Code of Federal Regulations § 700.3 and § 701.3, which require that fragrance ingredients that either do not serve to impart a smell or odor, or ingredients that serve a technical or functional purpose in the product must be disclosed, and pursuant to 21 Code of Federal

FILED DATE: 7/2/2025 12:57 PM    2025L008392

Regulations § 310.530, which requires that ingredients that act or function as hormones in products must be properly disclosed and labelled.

446.     A recent article was published on October 4, 2022, on MSN and other online news outlets, titled "The Relaxer Box Girls: Where Are They Now," which revealed that many of the young black girls featured on relaxer boxes and in relaxer ads in the 80s, 90s, and 2000s, never actually got their hair relaxed. Instead, they used other straightening tools and styling products to achieve the look of having the relaxer, without having exposed themselves to the dangerous chemicals within relaxers. Many of them are wearing natural hairstyles today.[143]

447.     At all pertinent times, Defendant Luster was then and is now guilty of one or more of the following acts and/or omissions:

> a.  Knowingly and/or negligently made misrepresentations that were material, false, incomplete, misleading, deceptive and deceitful;
>
> b.  Knowingly and/or negligently made omissions that were material, false, incomplete, misleading, deceptive and deceitful;
>
> c.  Knowingly and/or negligently made misrepresentations for the purpose of deceiving and defrauding consumers, including Plaintiff; or
>
> d.  Knowingly and/or negligently made omissions for the purpose of deceiving and defrauding consumers, including Plaintiff.

448.     Plaintiff relied, with reasonable justification, on the misrepresentations by Defendant Luster's, which induced them to purchase and use the Products on a regular basis for decades.

---

[143] The Relaxer Box Girls: Where Are They Now? (msn.com)

FILED DATE: 7/2/2025 12:57 PM   2025L008392

449.     Defendant Luster profited, significantly, from their unethical and illegal conduct that fraudulently induced Plaintiff, and millions of other consumers, to purchase a dangerous and defective product.

450.     Defendant Luster's actions, and Plaintiff's justifiable reliance thereon, were substantial contributing factors in causing injury and incurrence of substantial damages.

451.     As a direct and proximate result of the Defendant Luster's conduct, Plaintiff sustained the following damages:

    a.   Economic losses including medical care and lost earnings; and

    b.   Noneconomic losses including physical and mental pain and suffering, emotional distress, inconvenience, loss of enjoyment and impairment of quality of life, past and future.

WHEREFORE, Plaintiff DOMINI HENDERSON demands judgement against Defendant Luster Products, Inc. in a sum in excess of FIFTY THOUSAND AND 00/100 DOLLARS ($50,000.00) plus costs and any such other relief as this Court deems just and proper.

## COUNT EIGHTEEN

## VIOLATION OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE TRADE PRACTICES ACT v. LUSTER PRODUCTS, INC.

## (815 ILCS §505/1 et seq.)

452.     Plaintiff repeats and reallege the allegations in Paragraphs 1-271 above, as if fully set forth herein.

453.     The Illinois Consumer Fraud and Deceptive Business Practices Act, 815 Ill. Comp. Stat. 505/2, states that, "[u]nfair methods of competition and unfair or deceptive acts or practices are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby."

FILED DATE: 7/2/2025 12:57 PM    2025L008392

454. Defendant Luster had a statutory duty to refrain from unfair or deceptive acts or trade practices in the design, labeling, development, manufacture, promotion, and sale of the Products.

455. Defendant Luster intentional, deceptive, unconscionable, and fraudulent representations and material omissions to the Plaintiff, physicians, and consumers, constituted unfair and deceptive acts and trade practices in violation of the Illinois Consumer Fraud and Deceptive Trade Practices Act.

456. At all pertinent times, Defendant Luster was then and is now guilty of one of the following acts and/or omissions:

    a. Engaging in unfair or deceptive acts in violation of the Illinois Consumer Fraud and Deceptive Business Practices Act;

    b. Using false pretenses for a monetary gain from consumers, including Plaintiff;

    c. Engaging in unfair methods of competition and deceptive acts or practices that were proscribed by law;

    d. Representing that goods or services have characteristics, ingredients, uses, benefits, or quantities that they do not have;

    e. Advertising goods or services with the intent not to sell them as advertised;

    f. Engaging in fraudulent or deceptive conduct that creates a likelihood of confusion or misunderstanding;

457. The actions and omissions of Defendant Luster alleged herein are uncured or incurable deceptive acts under the statues enacted in the states to protect consumers against unfair, deceptive, fraudulent and unconscionable trade and business practices and false advertising.

FILED DATE: 7/2/2025 12:57 PM    2025L008392

458.     Defendant Luster had actual knowledge of the defective and dangerous condition of Defendant Luster's Product and failed to take any action to cure such defective and dangerous conditions.

459.     Plaintiff relied upon Defendant Luster's misrepresentations and omissions in determining which product to use.

460.     Defendant Luster's deceptive, unconscionable or fraudulent representations and material omissions to Plaintiff and other consumers constituted deceptive acts and practices.

461.     By reason of the unlawful acts engaged in by Defendant Luster, and as a direct and proximate result thereof, Plaintiff suffered ascertainable losses and damages.

462.     As a direct and proximate result of Defendant Luster's violations of the State of Illinois' consumer protection laws, Plaintiff sustained the following damages:

    a.   Economic losses including medical care and lost earnings; and

    b.   Noneconomic losses including physical and mental pain and suffering, emotional distress, inconvenience, loss of enjoyment and impairment of quality of life, past and future.

WHEREFORE, Plaintiff DOMINI HENDERSON demands judgement against Defendant Luster Products, Inc. in a sum in excess of FIFTY THOUSAND AND 00/100 DOLLARS ($50,000.00) plus costs and any such other relief as this Court deems just and proper.

## COUNT NINETEEN
## STRICT LIABILITY v. AVLON INDUSTRIES, INC.
## (FAILURE TO WARN)

463.     Plaintiff repeats and reallege the allegations in Paragraphs 1-271 above, as if fully set forth herein.

FILED DATE: 7/2/2025 12:57 PM   2025L008392

464. At all pertinent times, Defendant Avlon was manufacturing, marketing, testing, promoting, selling and/or distributing the Products in the regular course of business.

465. Defendant Avlon's Products were expected to and did reach consumers, including Plaintiff, without substantial change in the condition in which their Products were manufactured, sold, or otherwise released into the stream of commerce by Defendant Avlon.

466. At all pertinent times, Plaintiff used the Products on their scalp area, which is a reasonably foreseeable use.

467. At all pertinent times, Defendant Avlon knew or should have known that the use phthalates and other EDCs in hair products significantly increases the risk of diseases including reproductive harm, based upon scientific knowledge dating back for decades.

468. At all pertinent times, including the time of sale and consumption of the Products, Defendant Avlon was then and is now guilty of one or more of the following acts:

a. Manufacturing, marketing, testing, promoting, selling, and/or distributing unreasonable dangerous and defective products;

b. Improperly warned of increased risk of diseases as required by C.F.R. § 740.1;

c. Inadequately warned of increased risk of diseases as required by C.F.R. § 740.1;

d. Inadequately warned that the safety of the product has not been determined as required by 21 CFR § 740.10;

e. Inadequately labeled hair relaxer Products as containing EDCs that act as hormonal agents as required by 21 C.F.R. § 310.530;

f. Improperly warned and failed to instruct Plaintiff of inherent risks of debilitating and life-altering conditions; or

FILED DATE: 7/2/2025 12:57 PM   2025L008392

g.  Inadequately warned and failed to instruct Plaintiff of inherent risks of debilitating and life-altering conditions.

469.  Plaintiff sustained the following damages as a foreseeable, direct, and proximate result of Defendant Avlon's acts and/or omissions:

a.  Economic losses including medical care and lost earnings; and

b.  Noneconomic losses including physical and mental pain and suffering, emotional distress, inconvenience, loss of enjoyment and impairment of quality of life, past and future.

WHEREFORE, Plaintiff DOMINI HENDERSON demands judgement against Defendant Avlon Industries, Inc. in a sum in excess of FIFTY THOUSAND AND 00/100 DOLLARS ($50,000.00) plus costs and any such other relief as this Court deems just and proper.

## COUNT TWENTY
## STRICT LIABILITY v. AVLON INDUSTRIES, INC.
## (DESIGN AND/OR MANUFACTURING DEFECT)

470.  Plaintiff repeats and reallege the allegations in Paragraphs 1-271 above, as if fully set forth herein.

471.  At all relevant times, Defendant Avlon engaged in the design, development, manufacture, marketing, sale, and distribution of the Products in a defective and unreasonably dangerous condition to consumers, including Plaintiff.

472.  Defendant Avlon caused the Products to enter the stream of commerce and to be sold through various retailers, where Plaintiff purchased the Products.

473.  The Products were expected to, and did, reach consumers, including Plaintiff, without change in the condition in which they were manufactured and sold by Defendant Avlon and/or otherwise released into the stream of commerce.

FILED DATE: 7/2/2025 12:57 PM   2025L008392

474. Plaintiff used the Products in a manner normally intended, recommended, promoted, and marketed by Defendant Avlon.

475. Products failed to perform safely when used by Plaintiff in a reasonably foreseeable manner, specifically increasing their risk of reproductive harm.

476. The propensity of phthalates and other endocrine receptive chemicals to trigger tumors and cancerous growths in premenopausal women, thereby substantially increasing the risk of reproductive harm, renders the Products unreasonably dangerous when used in the manner it was intended and to an extent beyond that would be contemplated by the ordinary consumer.

477. Importantly, the Products are an inessential cosmetic product that do not treat or cure any serious disease. Further, safer alternatives, including fragrance free products, have been readily available for decades.

478. Defendant Avlon knew, or by the exercise of reasonably care should have known, that the Products are unreasonably dangerous but have continued to design, manufacture, sell, distribute, market, promote, and supply the Products to maximize sales and profits at the expense of public health and safety in conscious disregard of the foreseeable harm to the consuming public, including Plaintiff.

479. Defendant Avlon owed a duty to all reasonably foreseeable users to design a safe product.

480. At all pertinent times, Defendant Avlon was then and is now guilty of one or more of the following acts and/or omissions:

    a. Designing, manufacturing, selling, distributing, marketing, promoting, and supplying Products that they knew or should have known were unreasonable dangerous;

FILED DATE: 7/2/2025 12:57 PM    2025L008392

b. Failing to use reasonable care in the design and/or manufacturing of their Products; or

c. Failing to use reasonably feasible alternative designs in the design and/or manufacturing of the Products.

481. As a direct and proximate result of Defendant Avlon's conduct, including actions, omissions, and misrepresentations, Plaintiff sustained the following damages:

a. Economic losses including medical care and lost earnings; and

b. Noneconomic losses including physical and mental pain and suffering, emotional distress, inconvenience, loss of enjoyment and impairment of quality of life, past and future.

WHEREFORE, Plaintiff DOMINI HENDERSON demands judgement against Defendant Avlon Industries, Inc. in a sum in excess of FIFTY THOUSAND AND 00/100 DOLLARS ($50,000.00) plus costs and any such other relief as this Court deems just and proper.

## COUNT TWENTY-ONE
## PRODUCTS LIABILITY v. AVLON INDUSTRIES, INC
## (NEGLIGENT FAILURE TO WARN)

482. Plaintiff repeats and reallege the allegations in Paragraphs 1-271 above, as if fully set forth herein.

483. At all relevant times Defendant Avlon engaged in the design, development, manufacture, marketing, sale, and distribution of the Products in a defective and unreasonably dangerous condition to consumers, including Plaintiff.

484. Defendant Avlon knew, or by the exercise of reasonable care, should have known use of their Products was dangerous, harmful, and injurious when used by Plaintiff in a reasonably foreseeable manner.

FILED DATE: 7/2/2025 12:57 PM    2025L008392

485.     Defendant Avlon knew, or by the exercise of reasonable care, should have known ordinary consumers, such as Plaintiff, would not have realized the potential risks and dangers of their Products, and that Products were likely to increase the risks of tumors and cancerous growths in premenopausal women, thereby substantially increasing the risk of reproductive harm, when used in the manner it was intended and to an extent beyond that would be contemplated by the ordinary consumer.

486.     Defendant Avlon owed a duty to all reasonably foreseeable consumers to disclose the risks associated with the use of their Products.

487.     At all pertinent times, Defendant Avlon was then and is now guilty of one or more of the following acts and/or omissions:

a.   Failing to provide adequate warnings on their Products;

b.   Inadequately providing warnings on their Products;

c.   Providing misleading advertisements; or

d.   Failing to provide instructions on how to safely use their Products.

488.     As a direct and proximate result of Defendant Avlon's conduct, including actions, omissions, and misrepresentations, Plaintiff sustained the following damages:

a.   Economic losses including medical care and lost earnings; and

b.   Noneconomic losses including physical and mental pain and suffering, emotional distress, inconvenience, loss of enjoyment and impairment of quality of life, past and future.

WHEREFORE, Plaintiff DOMINI HENDERSON demands judgement against Defendant Avlon Industries, Inc. in a sum in excess of FIFTY THOUSAND AND 00/100 DOLLARS ($50,000.00) plus costs and any such other relief as this Court deems just and proper.

FILED DATE: 7/2/2025 12:57 PM    2025L008392

## COUNT TWENTY-TWO
## GENERAL NEGLIGENCE v. AVLON INDUSTRIES INC.

489.    Plaintiff repeats and reallege the allegations in Paragraphs 1-271 above, as if fully set forth herein.

490.    At all relevant times, Defendant Avlon engaged in the design, development, manufacture, marketing, sale, and distribution of the Products in a defective and unreasonably dangerous condition to consumers, including Plaintiff.

491.    Defendant Avlon caused the Products to enter the stream of commerce and to be sold through various retailers, where Plaintiff purchased the Products.

492.    The Products were expected to, and did, reach consumers, including Plaintiff, without change in the condition in which they were manufactured and sold by Defendant Avlon and/or otherwise released into the stream of commerce.

493.    Plaintiff used the Products in a manner normally intended, recommended, promoted, and marketed by Defendant Avlon.

494.    Products failed to perform safely when used by Plaintiff in a reasonably foreseeable manner, specifically increasing her of developing reproductive harm.

495.    The propensity of phthalates and other endocrine receptive chemicals to trigger tumors and cancerous growths in premenopausal women, thereby substantially increasing the risk of diseases including but not limited to cancer, fibroids and/or endometriosis, renders the Products unreasonably dangerous when used in the manner it was intended and to an extent beyond that would be contemplated by the ordinary consumer.

496.    Importantly, the Products are an inessential cosmetic product that do not treat or cure any serious disease. Further, safer alternatives, including fragrance free products, have been readily available for decades.

FILED DATE: 7/2/2025 12:57 PM    2025L008392

497. Defendant Avlon knew, or by the exercise of reasonably care should have known, that the Products are unreasonably dangerous but have continued to design, manufacture, sell, distribute, market, promote, and supply the Products to maximize sales and profits at the expense of public health and safety in conscious disregard of the foreseeable harm to the consuming public, including Plaintiff.

498. Defendant Avlon owed a duty to all reasonably foreseeable users to exercise reasonable care in the manufacturing, designing, researching, testing, producing, supplying, inspecting, marketing, labeling, packaging, selling, and distributing of its hair relaxer Products.

499. At all pertinent times, Defendant Avlon was then and is now guilty of one or more of the following acts and/or omissions:

    a. Failing to design safe Products;

    b. Failing to manufacture safe Products;

    c. Failing to use reasonably feasible alternative designs in the design of the Product;

    d. Failing to use reasonably feasible alternative designs in the manufacturing of the Product;

    e. Failing to properly warn of the hazards associated with the Product;

    f. Failing to properly test the Product to determine adequacy and effectiveness or safety measures prior to releasing the Product to consumers, including the Plaintiff;

    g. Failing to properly warn consumers that the safety of the Product had not been determined;

FILED DATE: 7/2/2025 12:57 PM   2025L008392

h.   Failing to inform consumers, including the Plaintiff, of the safe and proper methods of handling and using the Product,

i.   Failing to remove the Product from the market when Defendant Avlon knew or reasonably should have known that the Products were defective;

j.   Failing to instruct consumers, including the Plaintiff, as to methods for reducing exposure to the Products;

k.   Failing to properly label the Products as defective; or

l.   Failing to properly market the Products as defective.

500.   Defendant Avlon knew or should have known that consumers, such as Plaintiff, would foreseeably suffer injuries as a result of the Defendant's failure to exercise ordinary care as described above.

501.   As a direct and proximate result of Defendant Avlon's conduct, including actions, omissions, and misrepresentations, Plaintiff sustained the following damages:

a.   Economic losses including medical care and lost earnings; and

b.   Noneconomic losses including physical and mental pain and suffering, emotional distress, inconvenience, loss of enjoyment and impairment of quality of life, past and future.

WHEREFORE, Plaintiff DOMINI HENDERSON demands judgement against Defendant Avlon Industries, Inc. in a sum in excess of FIFTY THOUSAND AND 00/100 DOLLARS ($50,000.00) plus costs and any such other relief as this Court deems just and proper.

## COUNT TWENTY-THREE

## FRAUD v. AVLON INDUSTRIES INC

502.   Plaintiff repeats and reallege the allegations in Paragraphs 1-271 above, as if fully set forth herein.

113

FILED DATE: 7/2/2025 12:57 PM    2025L008392

503. Defendant Avlon engaged in the development, manufacture, marketing, sale and distribution of cosmetic and personal care products, including the Products, owed a duty to provide accurate and complete information regarding said products.

504. Defendant Avlon fraudulently misrepresented the use of the Products as safe and effective.

505. Defendant Avlon made these representations on its Product packaging and marketing materials with the intention of assuring consumers that their hair relaxer Products were imbued with ingredients designed to help and improve the condition of their hair while giving the impression that nothing harmful could or would be contained in the product ingredients.

506. These representations were intended to, and did in fact, induce consumers to believe that its Products could or would not contain harmful ingredients.

507. Defendant Avlon made these representations on its Product packaging when they knew or should have known that its hair relaxer Products contained phthalates and other EDCs known to increase the risk and/or cause reproductive harms to consumers.

508. Defendant Avlon's marketing and labeling fraudulently omitted warnings about health hazards, and that the Product's safety had not been established.

509. Consumers could not ascertain from the packaging or the ingredient listing that anything harmful could or would be present in the Product because the harmful chemicals are contained within a catch-all "fragrance" category on the Product's labels.

510. Defendant Avlon's Products did not disclose the presence of these toxic chemicals pursuant to 21 Code of Federal Regulations § 700.3 and § 701.3, which require that fragrance ingredients that either do not serve to impart a smell or odor, or ingredients that serve a technical or functional purpose in the product must be disclosed, and pursuant to 21 Code of Federal

FILED DATE: 7/2/2025 12:57 PM    2025L008392

Regulations § 310.530, which requires that ingredients that act or function as hormones in products must be properly disclosed and labelled.

511.     A recent article was published on October 4, 2022, on MSN and other online news outlets, titled "The Relaxer Box Girls: Where Are They Now," which revealed that many of the young black girls featured on relaxer boxes and in relaxer ads in the 80s, 90s, and 2000s, never actually got their hair relaxed. Instead, they used other straightening tools and styling products to achieve the look of having the relaxer, without having exposed themselves to the dangerous chemicals within relaxers. Many of them are wearing natural hairstyles today.[144]

512.     At all pertinent times, Defendant Avlon was then and is now guilty of one or more of the following acts and/or omissions:

    a.     Knowingly and/or negligently made misrepresentations that were material, false, incomplete, misleading, deceptive and deceitful;

    b.     Knowingly and/or negligently made omissions that were material, false, incomplete, misleading, deceptive and deceitful;

    c.     Knowingly and/or negligently made misrepresentations for the purpose of deceiving and defrauding consumers, including Plaintiff; or

    d.     Knowingly and/or negligently made omissions for the purpose of deceiving and defrauding consumers, including Plaintiff.

513.     Plaintiff relied, with reasonable justification, on the misrepresentations by Defendant Avlon, which induced them to purchase and use the Products on a regular basis for decades.

---

[144] The Relaxer Box Girls: Where Are They Now? (msn.com)

FILED DATE: 7/2/2025 12:57 PM    2025L008392

514.     Defendant Avlon profited, significantly, from their unethical and illegal conduct that fraudulently induced Plaintiff, and millions of other consumers, to purchase a dangerous and defective product.

515.     Defendant Avlon actions, and Plaintiff's justifiable reliance thereon, were substantial contributing factors in causing injury and incurrence of substantial damages.

516.     As a direct and proximate result of the Defendant Avlon's conduct, Plaintiff sustained the following damages:

    a.  Economic losses including medical care and lost earnings; and

    b.  Noneconomic losses including physical and mental pain and suffering, emotional distress, inconvenience, loss of enjoyment and impairment of quality of life, past and future.

WHEREFORE, Plaintiff DOMINI HENDERSON demands judgement against Defendant Avlon Industries, Inc. in a sum in excess of FIFTY THOUSAND AND 00/100 DOLLARS ($50,000.00) plus costs and any such other relief as this Court deems just and proper.

## COUNT TWENTY-FOUR

### VIOLATION OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE TRADE PRACTICES ACT v. AVLON INDUSTRIES INC

### (815 ILCS §505/1 et seq.)

517.     Plaintiff repeats and reallege the allegations in Paragraphs 1-271 above, as if fully set forth herein.

518.     The Illinois Consumer Fraud and Deceptive Business Practices Act, 815 Ill. Comp. Stat. 505/2, states that, "[u]nfair methods of competition and unfair or deceptive acts or practices are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby."

116

FILED DATE: 7/2/2025 12:57 PM    2025L008392

519.     Defendant Avlon had a statutory duty to refrain from unfair or deceptive acts or trade practices in the design, labeling, development, manufacture, promotion, and sale of the Products.

520.     Defendant Avlon intentional, deceptive, unconscionable, and fraudulent representations and material omissions to the Plaintiff, physicians, and consumers, constituted unfair and deceptive acts and trade practices in violation of the Illinois Consumer Fraud and Deceptive Trade Practices Act.

521.     At all pertinent times, Defendant Avlon was then and is now guilty of one of the following acts and/or omissions:

    a.    Engaging in unfair or deceptive acts in violation of the Illinois Consumer Fraud and Deceptive Business Practices Act;

    b.    Using false pretenses for a monetary gain from consumers, including Plaintiff;

    c.    Engaging in unfair methods of competition and deceptive acts or practices that were proscribed by law;

    d.    Representing that goods or services have characteristics, ingredients, uses, benefits, or quantities that they do not have;

    e.    Advertising goods or services with the intent not to sell them as advertised;

    f.    Engaging in fraudulent or deceptive conduct that creates a likelihood of confusion or misunderstanding;

522.     The actions and omissions of Defendant Avlon alleged herein are uncured or incurable deceptive acts under the statues enacted in the states to protect consumers against unfair, deceptive, fraudulent and unconscionable trade and business practices and false advertising.

FILED DATE: 7/2/2025 12:57 PM    2025L008392

523.     Defendant Avlon had actual knowledge of the defective and dangerous condition of Defendant Avlon's Product and failed to take any action to cure such defective and dangerous conditions.

524.     Plaintiff relied upon Defendant Avlon's misrepresentations and omissions in determining which product to use.

525.     Defendant Avlon's deceptive, unconscionable or fraudulent representations and material omissions to Plaintiff and other consumers constituted deceptive acts and practices.

526.     By reason of the unlawful acts engaged in by Defendant Avlon, and as a direct and proximate result thereof, Plaintiff suffered ascertainable losses and damages.

527.     As a direct and proximate result of Defendant Avlon's violations of the State of Illinois' consumer protection laws, Plaintiff sustained the following damages:

  a.   Economic losses including medical care and lost earnings; and

  b.   Noneconomic losses including physical and mental pain and suffering, emotional distress, inconvenience, loss of enjoyment and impairment of quality of life, past and future.

WHEREFORE, Plaintiff DOMINI HENDERSON demands judgement against Defendant Avlon Industries, Inc. in a sum in excess of FIFTY THOUSAND AND 00/100 DOLLARS ($50,000.00) plus costs and any such other relief as this Court deems just and proper.

## COUNT TWENTY-FIVE
## STRICT LIABILITY v. AFAM CONCEPT, INC. D/B/A JF LABS, INC.
## (FAILURE TO WARN)

528.     Plaintiff repeats and reallege the allegations in Paragraphs 1-271 above, as if fully set forth herein.

FILED DATE: 7/2/2025 12:57 PM   2025L008392

529.     At all pertinent times, Defendant JF Labs was manufacturing, marketing, testing, promoting, selling and/or distributing the Products in the regular course of business.

530.     Defendant JF Labs' Products were expected to and did reach consumers, including Plaintiff, without substantial change in the condition in which their Products were manufactured, sold, or otherwise released into the stream of commerce by Defendant JF Labs.

531.     At all pertinent times, Plaintiff used the Products on their scalp area, which is a reasonably foreseeable use.

532.     At all pertinent times, Defendant JF Labs knew or should have known that the use phthalates and other EDCs in hair products significantly increases the risk of diseases including reproductive harm, based upon scientific knowledge dating back for decades.

533.     At all pertinent times, including the time of sale and consumption of the Products, Defendant JF Labs was then and is now guilty of one or more of the following acts:

   a.  Manufacturing, marketing, testing, promoting, selling, and/or distributing unreasonable dangerous and defective products;

   b.  Improperly warned of increased risk of diseases as required by C.F.R. § 740.1;

   c.  Inadequately warned of increased risk of diseases as required by C.F.R. § 740.1;

   d.  Inadequately warned that the safety of the product has not been determined as required by 21 CFR § 740.10;

   e.  Inadequately labeled hair relaxer Products as containing EDCs that act as hormonal agents as required by 21 C.F.R. § 310.530;

   f.  Improperly warned and failed to instruct Plaintiff of inherent risks of debilitating and life-altering conditions; or

FILED DATE: 7/2/2025 12:57 PM    2025L008392

g.   Inadequately warned and failed to instruct Plaintiff of inherent risks of debilitating and life-altering conditions.

534.   Plaintiff sustained the following damages as a foreseeable, direct, and proximate result of Defendant JF Labs' acts and/or omissions:

a.   Economic losses including medical care and lost earnings; and

b.   Noneconomic losses including physical and mental pain and suffering, emotional distress, inconvenience, loss of enjoyment and impairment of quality of life, past and future.

WHEREFORE, Plaintiff DOMINI HENDERSON demands judgement against Defendant AFAM Concept, Inc. d/b/a JF Labs, Inc. in a sum in excess of FIFTY THOUSAND AND 00/100 DOLLARS ($50,000.00) plus costs and any such other relief as this Court deems just and proper.

### COUNT TWENTY-SIX
### STRICT LIABILITY v. AFAM CONCEPT, INC. D/B/A JF LABS, INC.
### (DESIGN AND/OR MANUFACTURING DEFECT)

535.   Plaintiff repeats and reallege the allegations in Paragraphs 1-271 above, as if fully set forth herein.

536.   At all relevant times, Defendant JF Labs engaged in the design, development, manufacture, marketing, sale, and distribution of the Products in a defective and unreasonably dangerous condition to consumers, including Plaintiff.

537.   Defendant JF Labs caused the Products to enter the stream of commerce and to be sold through various retailers, where Plaintiff purchased the Products.

538.   The Products were expected to, and did, reach consumers, including Plaintiff, without change in the condition in which they were manufactured and sold by Defendant JF Labs and/or otherwise released into the stream of commerce.

FILED DATE: 7/2/2025 12:57 PM   2025L008392

539.    Plaintiff used the Products in a manner normally intended, recommended, promoted, and marketed by Defendant JF Labs.

540.    Products failed to perform safely when used by Plaintiff in a reasonably foreseeable manner, specifically increasing their risk of reproductive harm.

541.    The propensity of phthalates and other endocrine receptive chemicals to trigger tumors and cancerous growths in premenopausal women, thereby substantially increasing the risk of reproductive harm, renders the Products unreasonably dangerous when used in the manner it was intended and to an extent beyond that would be contemplated by the ordinary consumer.

542.    Importantly, the Products are an inessential cosmetic product that do not treat or cure any serious disease. Further, safer alternatives, including fragrance free products, have been readily available for decades.

543.    Defendant JF Labs knew, or by the exercise of reasonably care should have known, that the Products are unreasonably dangerous but have continued to design, manufacture, sell, distribute, market, promote, and supply the Products to maximize sales and profits at the expense of public health and safety in conscious disregard of the foreseeable harm to the consuming public, including Plaintiff.

544.    Defendant JF Labs owed a duty to all reasonably foreseeable users to design a safe product.

545.    At all pertinent times, Defendant JF Labs was then and is now guilty of one or more of the following acts and/or omissions:

    a.  Designing, manufacturing, selling, distributing, marketing, promoting, and supplying Products that they knew or should have known were unreasonable dangerous;

FILED DATE: 7/2/2025 12:57 PM 2025L008392

    b.   Failing to use reasonable care in the design and/or manufacturing of their Products; or

    c.   Failing to use reasonably feasible alternative designs in the design and/or manufacturing of the Products.

546.    As a direct and proximate result of Defendant JF Labs' conduct, including actions, omissions, and misrepresentations, Plaintiff sustained the following damages:

    a.   Economic losses including medical care and lost earnings; and

    b.   Noneconomic losses including physical and mental pain and suffering, emotional distress, inconvenience, loss of enjoyment and impairment of quality of life, past and future.

WHEREFORE, Plaintiff DOMINI HENDERSON demands judgement against Defendant AFAM Concept, Inc. d/b/a JF Labs, Inc. in a sum in excess of FIFTY THOUSAND AND 00/100 DOLLARS ($50,000.00) plus costs and any such other relief as this Court deems just and proper.

## COUNT TWENTY-SEVEN
### PRODUCTS LIABILITY v. AFAM CONCEPT, INC. D/B/A JF LABS, INC. (NEGLIGENT FAILURE TO WARN)

547.    Plaintiff repeats and reallege the allegations in Paragraphs 1-271 above, as if fully set forth herein.

548.    At all relevant times Defendant JF Labs engaged in the design, development, manufacture, marketing, sale, and distribution of the Products in a defective and unreasonably dangerous condition to consumers, including Plaintiff.

549.    Defendant JF Labs knew, or by the exercise of reasonable care, should have known use of their Products was dangerous, harmful, and injurious when used by Plaintiff in a reasonably foreseeable manner.

FILED DATE: 7/2/2025 12:57 PM   2025L008392

550.     Defendant JF Labs knew, or by the exercise of reasonable care, should have known ordinary consumers, such as Plaintiff, would not have realized the potential risks and dangers of their Products, and that Products were likely to increase the risks of tumors and cancerous growths in premenopausal women, thereby substantially increasing the risk of reproductive harm, when used in the manner it was intended and to an extent beyond that would be contemplated by the ordinary consumer.

551.     Defendant JF Labs owed a duty to all reasonably foreseeable consumers to disclose the risks associated with the use of their Products.

552.     At all pertinent times, Defendant JF Labs was then and is now guilty of one or more of the following acts and/or omissions:

   a.   Failing to provide adequate warnings on their Products;

   b.   Inadequately providing warnings on their Products;

   c.   Providing misleading advertisements; or

   d.   Failing to provide instructions on how to safely use their Products.

553.     As a direct and proximate result of Defendant JF Labs' conduct, including actions, omissions, and misrepresentations, Plaintiff sustained the following damages:

   a.   Economic losses including medical care and lost earnings; and

   b.   Noneconomic losses including physical and mental pain and suffering, emotional distress, inconvenience, loss of enjoyment and impairment of quality of life, past and future.

WHEREFORE, Plaintiff DOMINI HENDERSON demands judgement against Defendant AFAM Concept, Inc. d/b/a JF Labs, Inc. in a sum in excess of FIFTY THOUSAND AND 00/100 DOLLARS ($50,000.00) plus costs and any such other relief as this Court deems just and proper.

FILED DATE: 7/2/2025 12:57 PM    2025L008392

## COUNT TWENTY-EIGHT
## GENERAL NEGLIGENCE v. AFAM CONCEPT, INC D/B/A JF LABS

554.    Plaintiff repeats and reallege the allegations in Paragraphs 1-271 above, as if fully set forth herein.

555.    At all relevant times, Defendant JF Labs engaged in the design, development, manufacture, marketing, sale, and distribution of the Products in a defective and unreasonably dangerous condition to consumers, including Plaintiff.

556.    Defendant JF Labs caused the Products to enter the stream of commerce and to be sold through various retailers, where Plaintiff purchased the Products.

557.    The Products were expected to, and did, reach consumers, including Plaintiff, without change in the condition in which they were manufactured and sold by Defendant JF Labs and/or otherwise released into the stream of commerce.

558.    Plaintiff used the Products in a manner normally intended, recommended, promoted, and marketed by Defendant JF Labs.

559.    Products failed to perform safely when used by Plaintiff in a reasonably foreseeable manner, specifically increasing her of developing reproductive harm.

560.    The propensity of phthalates and other endocrine receptive chemicals to trigger tumors and cancerous growths in premenopausal women, thereby substantially increasing the risk of diseases including but not limited to cancer, fibroids and/or endometriosis, renders the Products unreasonably dangerous when used in the manner it was intended and to an extent beyond that would be contemplated by the ordinary consumer.

561.    Importantly, the Products are an inessential cosmetic product that do not treat or cure any serious disease. Further, safer alternatives, including fragrance free products, have been readily available for decades.

124

FILED DATE: 7/2/2025 12:57 PM   2025L008392

562.     Defendant JF Labs knew, or by the exercise of reasonably care should have known, that the Products are unreasonably dangerous but have continued to design, manufacture, sell, distribute, market, promote, and supply the Products to maximize sales and profits at the expense of public health and safety in conscious disregard of the foreseeable harm to the consuming public, including Plaintiff.

563.     Defendant JF Labs owed a duty to all reasonably foreseeable users to exercise reasonable care in the manufacturing, designing, researching, testing, producing, supplying, inspecting, marketing, labeling, packaging, selling, and distributing of its hair relaxer Products.

564.     At all pertinent times, Defendant JF Labs was then and is now guilty of one or more of the following acts and/or omissions:

a.   Failing to design safe Products;

b.   Failing to manufacture safe Products;

c.   Failing to use reasonably feasible alternative designs in the design of the Product;

d.   Failing to use reasonably feasible alternative designs in the manufacturing of the Product;

e.   Failing to properly warn of the hazards associated with the Product;

f.   Failing to properly test the Product to determine adequacy and effectiveness or safety measures prior to releasing the Product to consumers, including the Plaintiff;

g.   Failing to properly warn consumers that the safety of the Product had not been determined;

FILED DATE: 7/2/2025 12:57 PM    2025L008392

h.   Failing to inform consumers, including the Plaintiff, of the safe and proper methods of handling and using the Product,

i.   Failing to remove the Product from the market when Defendant JF Labs knew or reasonably should have known that the Products were defective;

j.   Failing to instruct consumers, including the Plaintiff, as to methods for reducing exposure to the Products;

k.   Failing to properly label the Products as defective; or

l.   Failing to properly market the Products as defective.

565.   Defendant JF Labs knew or should have known that consumers, such as Plaintiff, would foreseeably suffer injuries as a result of the Defendant's failure to exercise ordinary care as described above.

566.   As a direct and proximate result of Defendant JF Labs's conduct, including actions, omissions, and misrepresentations, Plaintiff sustained the following damages:

a.   Economic losses including medical care and lost earnings; and

b.   Noneconomic losses including physical and mental pain and suffering, emotional distress, inconvenience, loss of enjoyment and impairment of quality of life, past and future.

WHEREFORE, Plaintiff DOMINI HENDERSON demands judgement against Defendant AFAM Concept, Inc. d/b/a JF Labs, Inc. in a sum in excess of FIFTY THOUSAND AND 00/100 DOLLARS ($50,000.00) plus costs and any such other relief as this Court deems just and proper.

## COUNT TWENTY-NINE

## FRAUD v. AFAM CONCEPT, INC D/B/A JF LABS

567.   Plaintiff repeats and reallege the allegations in Paragraphs 1-271 above, as if fully set forth herein.

126

FILED DATE: 7/2/2025 12:57 PM    2025L008392

568.    Defendant JF Labs engaged in the development, manufacture, marketing, sale and distribution of cosmetic and personal care products, including the Products, owed a duty to provide accurate and complete information regarding said products.

569.    Defendant JF Labs fraudulently misrepresented the use of the Products as safe and effective.

570.    Defendant JF Labs made these representations on its Product packaging and marketing materials with the intention of assuring consumers that their hair relaxer Products were imbued with ingredients designed to help and improve the condition of their hair while giving the impression that nothing harmful could or would be contained in the product ingredients.

571.    These representations were intended to, and did in fact, induce consumers to believe that its Products could or would not contain harmful ingredients.

572.    Defendant JF Labs made these representations on its Product packaging when they knew or should have known that its hair relaxer Products contained phthalates and other EDCs known to increase the risk and/or cause reproductive harms to consumers.

573.    Defendant JF Labs' marketing and labeling fraudulently omitted warnings about health hazards, and that the Product's safety had not been established.

574.    Consumers could not ascertain from the packaging or the ingredient listing that anything harmful could or would be present in the Product because the harmful chemicals are contained within a catch-all "fragrance" category on the Product's labels.

575.    Defendant JF Lab's Products did not disclose the presence of these toxic chemicals pursuant to 21 Code of Federal Regulations § 700.3 and § 701.3, which require that fragrance ingredients that either do not serve to impart a smell or odor, or ingredients that serve a technical or functional purpose in the product must be disclosed, and pursuant to 21 Code of Federal

FILED DATE: 7/2/2025 12:57 PM    2025L008392

Regulations § 310.530, which requires that ingredients that act or function as hormones in products must be properly disclosed and labelled.

576.    A recent article was published on October 4, 2022, on MSN and other online news outlets, titled "The Relaxer Box Girls: Where Are They Now," which revealed that many of the young black girls featured on relaxer boxes and in relaxer ads in the 80s, 90s, and 2000s, never actually got their hair relaxed. Instead, they used other straightening tools and styling products to achieve the look of having the relaxer, without having exposed themselves to the dangerous chemicals within relaxers. Many of them are wearing natural hairstyles today.[145]

577.    At all pertinent times, Defendant JF Labs was then and is now guilty of one or more of the following acts and/or omissions:

a.    Knowingly and/or negligently made misrepresentations that were material, false, incomplete, misleading, deceptive and deceitful;

b.    Knowingly and/or negligently made omissions that were material, false, incomplete, misleading, deceptive and deceitful;

c.    Knowingly and/or negligently made misrepresentations for the purpose of deceiving and defrauding consumers, including Plaintiff; or

d.    Knowingly and/or negligently made omissions for the purpose of deceiving and defrauding consumers, including Plaintiff.

578.    Plaintiff relied, with reasonable justification, on the misrepresentations by Defendant JF Labs, which induced them to purchase and use the Products on a regular basis for decades.

---

[145] The Relaxer Box Girls: Where Are They Now? (msn.com)

FILED DATE: 7/2/2025 12:57 PM   2025L008392

579.    Defendant JF Labs profited, significantly, from their unethical and illegal conduct that fraudulently induced Plaintiff, and millions of other consumers, to purchase a dangerous and defective product.

580.    Defendant JF Labs's actions, and Plaintiff's justifiable reliance thereon, were substantial contributing factors in causing injury and incurrence of substantial damages.

581.    As a direct and proximate result of the Defendant JF Labs's conduct, Plaintiff sustained the following damages:

    a.   Economic losses including medical care and lost earnings; and

    b.   Noneconomic losses including physical and mental pain and suffering, emotional distress, inconvenience, loss of enjoyment and impairment of quality of life, past and future.

WHEREFORE, Plaintiff DOMINI HENDERSON demands judgement against Defendant AFAM Concept, Inc. d/b/a JF Labs, Inc. in a sum in excess of FIFTY THOUSAND AND 00/100 DOLLARS ($50,000.00) plus costs and any such other relief as this Court deems just and proper.

## COUNT THIRTY

### VIOLATION OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE TRADE PRACTICES ACT v. AFAM CONCEPT, INC D/B/A JF LABS

### (815 ILCS §505/1 et seq.)

582.    Plaintiff repeats and reallege the allegations in Paragraphs 1-271 above, as if fully set forth herein.

583.    The Illinois Consumer Fraud and Deceptive Business Practices Act, 815 Ill. Comp. Stat. 505/2, states that, "[u]nfair methods of competition and unfair or deceptive acts or practices are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby."

FILED DATE: 7/2/2025 12:57 PM    2025L008392

584. Defendant JF Labs had a statutory duty to refrain from unfair or deceptive acts or trade practices in the design, labeling, development, manufacture, promotion, and sale of the Products.

585. Defendant JF Labs intentional, deceptive, unconscionable, and fraudulent representations and material omissions to Plaintiff, physicians, and consumers, constituted unfair and deceptive acts and trade practices in violation of the Illinois Consumer Fraud and Deceptive Trade Practices Act.

586. At all pertinent times, Defendant JF Labs was then and is now guilty of one of the following acts and/or omissions:

    a. Engaging in unfair or deceptive acts in violation of the Illinois Consumer Fraud and Deceptive Business Practices Act;

    b. Using false pretenses for a monetary gain from consumers, including Plaintiff;

    c. Engaging in unfair methods of competition and deceptive acts or practices that were proscribed by law;

    d. Representing that goods or services have characteristics, ingredients, uses, benefits, or quantities that they do not have;

    e. Advertising goods or services with the intent not to sell them as advertised;

    f. Engaging in fraudulent or deceptive conduct that creates a likelihood of confusion or misunderstanding;

587. The actions and omissions of Defendant JF Labs alleged herein are uncured or incurable deceptive acts under the statues enacted in the states to protect consumers against unfair, deceptive, fraudulent and unconscionable trade and business practices and false advertising.

FILED DATE: 7/2/2025 12:57 PM   2025L008392

588.     Defendant JF Labs had actual knowledge of the defective and dangerous condition of Defendant JF Labs' Product and failed to take any action to cure such defective and dangerous conditions.

589.     Plaintiff relied upon Defendant JF Labs' misrepresentations and omissions in determining which product to use.

590.     Defendant JF Labs' deceptive, unconscionable or fraudulent representations and material omissions to Plaintiff and other consumers constituted deceptive acts and practices.

591.     By reason of the unlawful acts engaged in by Defendant JF Labs, and as a direct and proximate result thereof, Plaintiff suffered ascertainable losses and damages.

592.     As a direct and proximate result of Defendant JF Labs' violations of the State of Illinois' consumer protection laws, Plaintiff sustained the following damages:

a.   Economic losses including medical care and lost earnings; and

b.   Noneconomic losses including physical and mental pain and suffering, emotional distress, inconvenience, loss of enjoyment and impairment of quality of life, past and future.

WHEREFORE, Plaintiff DOMINI HENDERSON demands judgement against Defendant AFAM Concept, Inc. d/b/a JF Labs, Inc. in a sum in excess of FIFTY THOUSAND AND 00/100 DOLLARS ($50,000.00) plus costs and any such other relief as this Court deems just and proper.

**COUNT THIRTY-ONE**
**STRICT LIABILITY v. STRENGTH OF NATURE, LLC**
**(FAILURE TO WARN)**

593.     Plaintiff repeats and reallege the allegations in Paragraphs 1-271 above, as if fully set forth herein.

FILED DATE: 7/2/2025 12:57 PM    2025L008392

594.    At all pertinent times, Defendant Strength of Nature was manufacturing, marketing, testing, promoting, selling and/or distributing the Products in the regular course of business.

595.    Defendant Strength of Nature's Products were expected to and did reach consumers, including Plaintiff, without substantial change in the condition in which their Products were manufactured, sold, or otherwise released into the stream of commerce by Defendant Strength of Nature.

596.    At all pertinent times, Plaintiff used the Products on their scalp area, which is a reasonably foreseeable use.

597.    At all pertinent times, Defendant Strength of Nature knew or should have known that the use phthalates and other EDCs in hair products significantly increases the risk of diseases including reproductive harm, based upon scientific knowledge dating back for decades.

598.    At all pertinent times, including the time of sale and consumption of the Products, Defendant Strength of Nature was then and is now guilty of one or more of the following acts:

    a.  Manufacturing, marketing, testing, promoting, selling, and/or distributing unreasonable dangerous and defective products;

    b.  Improperly warned of increased risk of diseases as required by C.F.R. § 740.1;

    c.  Inadequately warned of increased risk of diseases as required by C.F.R. § 740.1;

    d.  Inadequately warned that the safety of the product has not been determined as required by 21 CFR § 740.10;

    e.  Inadequately labeled hair relaxer Products as containing EDCs that act as hormonal agents as required by 21 C.F.R. § 310.530;

    f.  Improperly warned and failed to instruct Plaintiff of inherent risks of debilitating and life-altering conditions; or

FILED DATE: 7/2/2025 12:57 PM    2025L008392

g.  Inadequately warned and failed to instruct Plaintiff of inherent risks of debilitating and life-altering conditions.

599.  Plaintiff sustained the following damages as a foreseeable, direct, and proximate result of Defendant Strength of Nature's acts and/or omissions:

a.  Economic losses including medical care and lost earnings; and

b.  Noneconomic losses including physical and mental pain and suffering, emotional distress, inconvenience, loss of enjoyment and impairment of quality of life, past and future.

WHEREFORE, Plaintiff DOMINI HENDERSON demands judgement against Defendant Strength of Nature, LLC in a sum in excess of FIFTY THOUSAND AND 00/100 DOLLARS ($50,000.00) plus costs and any such other relief as this Court deems just and proper.

## COUNT THIRTY-TWO
## STRICT LIABILITY v. STRENGTH OF NATURE, LLC
## (DESIGN AND/OR MANUFACTURING DEFECT)

600.  Plaintiff repeats and reallege the allegations in Paragraphs 1-271 above, as if fully set forth herein.

601.  At all relevant times, Defendant Strength of Nature engaged in the design, development, manufacture, marketing, sale, and distribution of the Products in a defective and unreasonably dangerous condition to consumers, including Plaintiff.

602.  Defendant Strength of Nature caused the Products to enter the stream of commerce and to be sold through various retailers, where Plaintiff purchased the Products.

603.  The Products were expected to, and did, reach consumers, including Plaintiff, without change in the condition in which they were manufactured and sold by Defendant Strength of Nature and/or otherwise released into the stream of commerce.

FILED DATE: 7/2/2025 12:57 PM    2025L008392

604. Plaintiff used the Products in a manner normally intended, recommended, promoted, and marketed by Defendant Strength of Nature.

605. Products failed to perform safely when used by Plaintiff in a reasonably foreseeable manner, specifically increasing their risk of reproductive harm.

606. The propensity of phthalates and other endocrine receptive chemicals to trigger tumors and cancerous growths in premenopausal women, thereby substantially increasing the risk of reproductive harm, renders the Products unreasonably dangerous when used in the manner it was intended and to an extent beyond that would be contemplated by the ordinary consumer.

607. Importantly, the Products are an inessential cosmetic product that do not treat or cure any serious disease. Further, safer alternatives, including fragrance free products, have been readily available for decades.

608. Defendant Strength of Nature knew, or by the exercise of reasonably care should have known, that the Products are unreasonably dangerous but have continued to design, manufacture, sell, distribute, market, promote, and supply the Products to maximize sales and profits at the expense of public health and safety in conscious disregard of the foreseeable harm to the consuming public, including Plaintiff.

609. Defendant Strength of Nature owed a duty to all reasonably foreseeable users to design a safe product.

610. At all pertinent times, Defendant Strength of Nature was then and is now guilty of one or more of the following acts and/or omissions:

a. Designing, manufacturing, selling, distributing, marketing, promoting, and supplying Products that they knew or should have known were unreasonable dangerous;

FILED DATE: 7/2/2025 12:57 PM    2025L008392

b.  Failing to use reasonable care in the design and/or manufacturing of their Products; or

c.  Failing to use reasonably feasible alternative designs in the design and/or manufacturing of the Products.

611.    As a direct and proximate result of Defendant Strength of Nature conduct, including actions, omissions, and misrepresentations, Plaintiff sustained the following damages:

a.  Economic losses including medical care and lost earnings; and

b.  Noneconomic losses including physical and mental pain and suffering, emotional distress, inconvenience, loss of enjoyment and impairment of quality of life, past and future.

WHEREFORE, Plaintiff DOMINI HENDERSON demands judgement against Defendant Strength of Nature, LLC in a sum in excess of FIFTY THOUSAND AND 00/100 DOLLARS ($50,000.00) plus costs and any such other relief as this Court deems just and proper.

### COUNT THIRTY-THREE
### PRODUCTS LIABILITY v. STRENGTH OF NATURE, LLC
### (NEGLIGENT FAILURE TO WARN)

612.    Plaintiff repeats and reallege the allegations in Paragraphs 1-271 above, as if fully set forth herein.

613.    At all relevant times Defendant Strength of Nature engaged in the design, development, manufacture, marketing, sale, and distribution of the Products in a defective and unreasonably dangerous condition to consumers, including Plaintiff.

614.    Defendant Strength of Nature knew, or by the exercise of reasonable care, should have known use of their Products was dangerous, harmful, and injurious when used by Plaintiff in a reasonably foreseeable manner.

FILED DATE: 7/2/2025 12:57 PM    2025L008392

615.    Defendant Strength of Nature knew, or by the exercise of reasonable care, should have known ordinary consumers, such as Plaintiff, would not have realized the potential risks and dangers of their Products, and that Products were likely to increase the risks of tumors and cancerous growths in premenopausal women, thereby substantially increasing the risk of reproductive harm, when used in the manner it was intended and to an extent beyond that would be contemplated by the ordinary consumer.

616.    Defendant Strength of Nature owed a duty to all reasonably foreseeable consumers to disclose the risks associated with the use of their Products.

617.    At all pertinent times, Defendant Strength of Nature was then and is now guilty of one or more of the following acts and/or omissions:

a.    Failing to provide adequate warnings on their Products;

b.    Inadequately providing warnings on their Products;

c.    Providing misleading advertisements; or

d.    Failing to provide instructions on how to safely use their Products.

618.    As a direct and proximate result of Defendant Strength of Nature's conduct, including actions, omissions, and misrepresentations, Plaintiff sustained the following damages:

a.    Economic losses including medical care and lost earnings; and

b.    Noneconomic losses including physical and mental pain and suffering, emotional distress, inconvenience, loss of enjoyment and impairment of quality of life, past and future.

WHEREFORE, Plaintiff DOMINI HENDERSON demands judgement against Defendant Strength of Nature, LLC in a sum in excess of FIFTY THOUSAND AND 00/100 DOLLARS ($50,000.00) plus costs and any such other relief as this Court deems just and proper.

## COUNT THIRTY-FOUR
## GENERAL NEGLIGENCE v. STRENGTH OF NATURE, LLC

619.     Plaintiff repeats and reallege the allegations in Paragraphs 1-271 above, as if fully set forth herein.

620.     At all relevant times, Defendant Strength of Nature engaged in the design, development, manufacture, marketing, sale, and distribution of the Products in a defective and unreasonably dangerous condition to consumers, including Plaintiff.

621.     Defendant Strength of Nature caused the Products to enter the stream of commerce and to be sold through various retailers, where Plaintiff purchased the Products.

622.     The Products were expected to, and did, reach consumers, including Plaintiff, without change in the condition in which they were manufactured and sold by Defendant Strength of Nature and/or otherwise released into the stream of commerce.

623.     Plaintiff used the Products in a manner normally intended, recommended, promoted, and marketed by Defendant Strength of Nature.

624.     Products failed to perform safely when used by Plaintiff in a reasonably foreseeable manner, specifically increasing her of developing reproductive harm.

625.     The propensity of phthalates and other endocrine receptive chemicals to trigger tumors and cancerous growths in premenopausal women, thereby substantially increasing the risk of diseases including but not limited to cancer, fibroids and/or endometriosis, renders the Products unreasonably dangerous when used in the manner it was intended and to an extent beyond that would be contemplated by the ordinary consumer.

626.     Importantly, the Products are an inessential cosmetic product that do not treat or cure any serious disease. Further, safer alternatives, including fragrance free products, have been readily available for decades.

FILED DATE: 7/2/2025 12:57 PM    2025L008392

FILED DATE: 7/2/2025 12:57 PM    2025L008392

627.    Defendant Strength of Nature knew, or by the exercise of reasonably care should have known, that the Products are unreasonably dangerous but have continued to design, manufacture, sell, distribute, market, promote, and supply the Products to maximize sales and profits at the expense of public health and safety in conscious disregard of the foreseeable harm to the consuming public, including Plaintiff.

628.    Defendant Strength of Nature owed a duty to all reasonably foreseeable users to exercise reasonable care in the manufacturing, designing, researching, testing, producing, supplying, inspecting, marketing, labeling, packaging, selling, and distributing of its hair relaxer Products.

629.    At all pertinent times, Defendant Strength of Nature was then and is now guilty of one or more of the following acts and/or omissions:

   a.   Failing to design safe Products;

   b.   Failing to manufacture safe Products;

   c.   Failing to use reasonably feasible alternative designs in the design of the Product;

   d.   Failing to use reasonably feasible alternative designs in the manufacturing of the Product;

   e.   Failing to properly warn of the hazards associated with the Product;

   f.   Failing to properly test the Product to determine adequacy and effectiveness or safety measures prior to releasing the Product to consumers, including the Plaintiff;

   g.   Failing to properly warn consumers that the safety of the Product had not been determined;

FILED DATE: 7/2/2025 12:57 PM    2025L008392

h.   Failing to inform consumers, including the Plaintiff, of the safe and proper methods of handling and using the Product,

i.   Failing to remove the Product from the market when Defendant Strength of Nature knew or reasonably should have known that the Products were defective;

j.   Failing to instruct consumers, including the Plaintiff, as to methods for reducing exposure to the Products;

k.   Failing to properly label the Products as defective; or

l.   Failing to properly market the Products as defective.

630.   Defendant Strength of Nature knew or should have known that consumers, such as Plaintiff, would foreseeably suffer injuries as a result of the Defendant's failure to exercise ordinary care as described above.

631.   As a direct and proximate result of Defendant Strength of Nature's conduct, including actions, omissions, and misrepresentations, Plaintiff sustained the following damages:

a.   Economic losses including medical care and lost earnings; and

b.   Noneconomic losses including physical and mental pain and suffering, emotional distress, inconvenience, loss of enjoyment and impairment of quality of life, past and future.

WHEREFORE, Plaintiff DOMINI HENDERSON demands judgement against Defendant Strength of Nature, LLC in a sum in excess of FIFTY THOUSAND AND 00/100 DOLLARS ($50,000.00) plus costs and any such other relief as this Court deems just and proper.

## COUNT THIRTY-FIVE

## FRAUD v. STRENGTH OF NATURE, LLC

632.   Plaintiff repeats and reallege the allegations in Paragraphs 1-271 above, as if fully set forth herein.

FILED DATE: 7/2/2025 12:57 PM    2025L008392

633. Defendant Strength of Nature engaged in the development, manufacture, marketing, sale and distribution of cosmetic and personal care products, including the Products, owed a duty to provide accurate and complete information regarding said products.

634. Defendant Strength of Nature fraudulently misrepresented the use of the Products as safe and effective, specifically:

      a. Defendants Godrej SON and Strength of Nature's Soft & Beautiful Products are intentionally labeled as "Botanicals" and with "Natural" ingredients that are "Ultra Nourishing," including but not limited to using "Natural Plant Oils and Butters."

635. Defendant Strength of Nature made these representations on its Product packaging and marketing materials with the intention of assuring consumers that their hair relaxer Products were imbued with ingredients designed to help and improve the condition of their hair while giving the impression that nothing harmful could or would be contained in the product ingredients.

636. These representations were intended to, and did in fact, induce consumers to believe that its Products could or would not contain harmful ingredients.

637. Defendant Strength of Nature made these representations on its Product packaging when they knew or should have known that its hair relaxer Products contained phthalates and other EDCs known to increase the risk and/or cause reproductive harms to consumers.

638. Defendant Strength of Nature's marketing and labeling fraudulently omitted warnings about health hazards, and that the Product's safety had not been established.

639. Consumers could not ascertain from the packaging or the ingredient listing that anything harmful could or would be present in the Product because the harmful chemicals are contained within a catch-all "fragrance" category on the Product's labels.

FILED DATE: 7/2/2025 12:57 PM   2025L008392

640.     Defendant Strength of Nature's Products did not disclose the presence of these toxic chemicals pursuant to 21 Code of Federal Regulations § 700.3 and § 701.3, which require that fragrance ingredients that either do not serve to impart a smell or odor, or ingredients that serve a technical or functional purpose in the product must be disclosed, and pursuant to 21 Code of Federal Regulations § 310.530, which requires that ingredients that act or function as hormones in products must be properly disclosed and labelled.

641.     A recent article was published on October 4, 2022, on MSN and other online news outlets, titled "The Relaxer Box Girls: Where Are They Now," which revealed that many of the young black girls featured on relaxer boxes and in relaxer ads in the 80s, 90s, and 2000s, never actually got their hair relaxed. Instead, they used other straightening tools and styling products to achieve the look of having the relaxer, without having exposed themselves to the dangerous chemicals within relaxers. Many of them are wearing natural hairstyles today.[146]

642.     At all pertinent times, Defendant Strength of Nature was then and is now guilty of one or more of the following acts and/or omissions:

    a.  Knowingly and/or negligently made misrepresentations that were material, false, incomplete, misleading, deceptive and deceitful;

    b.  Knowingly and/or negligently made omissions that were material, false, incomplete, misleading, deceptive and deceitful;

    c.  Knowingly and/or negligently made misrepresentations for the purpose of deceiving and defrauding consumers, including Plaintiff; or

    d.  Knowingly and/or negligently made omissions for the purpose of deceiving and defrauding consumers, including Plaintiff.

---

[146] The Relaxer Box Girls: Where Are They Now? (msn.com)

FILED DATE: 7/2/2025 12:57 PM   2025L008392

643.     Plaintiff relied, with reasonable justification, on the misrepresentations by Defendant Strength of Nature, which induced them to purchase and use the Products on a regular basis for decades.

644.     Defendant Strength of Nature profited, significantly, from their unethical and illegal conduct that fraudulently induced Plaintiff, and millions of other consumers, to purchase a dangerous and defective product.

645.     Defendant Strength of Nature's actions, and Plaintiff's justifiable reliance thereon, were substantial contributing factors in causing injury and incurrence of substantial damages.

646.     As a direct and proximate result of the Defendant Strength of Nature's conduct, Plaintiff sustained the following damages:

   a.   Economic losses including medical care and lost earnings; and

   b.   Noneconomic losses including physical and mental pain and suffering, emotional distress, inconvenience, loss of enjoyment and impairment of quality of life, past and future.

WHEREFORE, Plaintiff DOMINI HENDERSON demands judgement against Defendant Strength of Nature, LLC in a sum in excess of FIFTY THOUSAND AND 00/100 DOLLARS ($50,000.00) plus costs and any such other relief as this Court deems just and proper.

### COUNT THIRTY-SIX

### VIOLATION OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE TRADE PRACTICES ACT v. STRENGTH OF NATURE, LLC

### (815 ILCS §505/1 et seq.)

647.     Plaintiff repeats and reallege the allegations in Paragraphs 1-271 above, as if fully set forth herein.

FILED DATE: 7/2/2025 12:57 PM    2025L008392

648.    The Illinois Consumer Fraud and Deceptive Business Practices Act, 815 Ill. Comp. Stat. 505/2, states that, "[u]nfair methods of competition and unfair or deceptive acts or practices are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby."

649.    Defendant Strength of Nature had a statutory duty to refrain from unfair or deceptive acts or trade practices in the design, labeling, development, manufacture, promotion, and sale of the Products.

650.    Defendant Strength of Nature's intentional, deceptive, unconscionable, and fraudulent representations and material omissions to the Plaintiff, physicians, and consumers, constituted unfair and deceptive acts and trade practices in violation of the Illinois Consumer Fraud and Deceptive Trade Practices Act.

651.    At all pertinent times, Defendant Strength of Nature was then and is now guilty of one of the following acts and/or omissions:

a.    Engaging in unfair or deceptive acts in violation of the Illinois Consumer Fraud and Deceptive Business Practices Act;

b.    Using false pretenses for a monetary gain from consumers, including Plaintiff;

c.    Engaging in unfair methods of competition and deceptive acts or practices that were proscribed by law;

d.    Representing that goods or services have characteristics, ingredients, uses, benefits, or quantities that they do not have;

e.    Advertising goods or services with the intent not to sell them as advertised;

f.    Engaging in fraudulent or deceptive conduct that creates a likelihood of confusion or misunderstanding;

FILED DATE: 7/2/2025 12:57 PM   2025L008392

652.     The actions and omissions of Defendant Strength of Nature alleged herein are uncured or incurable deceptive acts under the statues enacted in the states to protect consumers against unfair, deceptive, fraudulent, and unconscionable trade and business practices and false advertising.

653.     Defendant Strength of Nature had actual knowledge of the defective and dangerous condition of Defendant Strength of Nature's Product and failed to take any action to cure such defective and dangerous conditions.

654.     Plaintiff relied upon Defendant Strength of Nature 's misrepresentations and omissions in determining which product to use.

655.     Defendant Strength of Nature's deceptive, unconscionable, or fraudulent representations and material omissions to Plaintiff and other consumers constituted deceptive acts and practices.

656.     By reason of the unlawful acts engaged in by Defendant Strength of Nature, and as a direct and proximate result thereof, Plaintiff suffered ascertainable losses and damages.

657.     As a direct and proximate result of Defendant Strength of Nature's violations of the State of Illinois' consumer protection laws, Plaintiff sustained the following damages:

    a.   Economic losses including medical care and lost earnings; and

    b.   Noneconomic losses including physical and mental pain and suffering, emotional distress, inconvenience, loss of enjoyment and impairment of quality of life, past and future.

WHEREFORE, Plaintiff DOMINI HENDERSON demands judgement against Defendant Strength of Nature, LLC in a sum in excess of FIFTY THOUSAND AND 00/100 DOLLARS ($50,000.00) plus costs and any such other relief as this Court deems just and proper.

FILED DATE: 7/2/2025 12:57 PM   2025L008392

## COUNT THIRTY-SEVEN
## STRICT LIABILITY v. GODREJ SON HOLDINGS, INC.
## (FAILURE TO WARN)

658.     Plaintiff repeats and reallege the allegations in Paragraphs 1-271 above, as if fully set forth herein.

659.     At all pertinent times, Defendant Godrej SON was manufacturing, marketing, testing, promoting, selling and/or distributing the Products in the regular course of business.

660.     Defendant Godrej SON's Products were expected to and did reach consumers, including Plaintiff, without substantial change in the condition in which their Products were manufactured, sold, or otherwise released into the stream of commerce by Defendant Godrej SON.

661.     At all pertinent times, Plaintiff used the Products on their scalp area, which is a reasonably foreseeable use.

662.     At all pertinent times, Defendant Godrej SON knew or should have known that the use phthalates and other EDCs in hair products significantly increases the risk of diseases including reproductive harm, based upon scientific knowledge dating back for decades.

663.     At all pertinent times, including the time of sale and consumption of the Products, Defendant Godrej SON was then and is now guilty of one or more of the following acts:

   a.  Manufacturing, marketing, testing, promoting, selling, and/or distributing unreasonable dangerous and defective products;

   b.  Improperly warned of increased risk of diseases as required by C.F.R. § 740.1;

   c.  Inadequately warned of increased risk of diseases as required by C.F.R. § 740.1;

   d.  Inadequately warned that the safety of the product has not been determined as required by 21 CFR § 740.10;

FILED DATE: 7/2/2025 12:57 PM   2025L008392

e.   Inadequately labeled hair relaxer Products as containing EDCs that act as hormonal agents as required by 21 C.F.R. § 310.530;

f.   Improperly warned and failed to instruct Plaintiff of inherent risks of debilitating and life-altering conditions; or

g.   Inadequately warned and failed to instruct Plaintiff of inherent risks of debilitating and life-altering conditions.

664.   Plaintiff sustained the following damages as a foreseeable, direct, and proximate result of Defendant Godrej SON's acts and/or omissions:

a.   Economic losses including medical care and lost earnings; and

b.   Noneconomic losses including physical and mental pain and suffering, emotional distress, inconvenience, loss of enjoyment and impairment of quality of life, past and future.

WHEREFORE, Plaintiff DOMINI HENDERSON demands judgement against Defendant Godrej SON Holdings, Inc. in a sum in excess of FIFTY THOUSAND AND 00/100 DOLLARS ($50,000.00) plus costs and any such other relief as this Court deems just and proper.

**COUNT THIRTY-EIGHT**
**STRICT LIABILITY v. GODREJ SON HOLDINGS, INC.**
**(DESIGN AND/OR MANUFACTURING DEFECT)**

665.   Plaintiff repeats and reallege the allegations in Paragraphs 1-271 above, as if fully set forth herein.

666.   At all relevant times, Defendant Godrej SON engaged in the design, development, manufacture, marketing, sale, and distribution of the Products in a defective and unreasonably dangerous condition to consumers, including Plaintiff.

146

FILED DATE: 7/2/2025 12:57 PM    2025L008392

667. Defendant Godrej SON caused the Products to enter the stream of commerce and to be sold through various retailers, where Plaintiff purchased the Products.

668. The Products were expected to, and did, reach consumers, including Plaintiff, without change in the condition in which they were manufactured and sold by Defendant Godrej SON and/or otherwise released into the stream of commerce.

669. Plaintiff used the Products in a manner normally intended, recommended, promoted, and marketed by Defendant Godrej SON.

670. Products failed to perform safely when used by Plaintiff in a reasonably foreseeable manner, specifically increasing their risk of reproductive harm.

671. The propensity of phthalates and other endocrine receptive chemicals to trigger tumors and cancerous growths in premenopausal women, thereby substantially increasing the risk of reproductive harm, renders the Products unreasonably dangerous when used in the manner it was intended and to an extent beyond that would be contemplated by the ordinary consumer.

672. Importantly, the Products are an inessential cosmetic product that do not treat or cure any serious disease. Further, safer alternatives, including fragrance free products, have been readily available for decades.

673. Defendant Godrej SON knew, or by the exercise of reasonably care should have known, that the Products are unreasonably dangerous but have continued to design, manufacture, sell, distribute, market, promote, and supply the Products to maximize sales and profits at the expense of public health and safety in conscious disregard of the foreseeable harm to the consuming public, including Plaintiff.

674. Defendant Godrej SON owed a duty to all reasonably foreseeable users to design a safe product.

FILED DATE: 7/2/2025 12:57 PM    2025L008392

675.    At all pertinent times, Defendant Godrej SON was then and is now guilty of one or more of the following acts and/or omissions:

    a.    Designing, manufacturing, selling, distributing, marketing, promoting, and supplying Products that they knew or should have known were unreasonable dangerous;

    b.    Failing to use reasonable care in the design and/or manufacturing of their Products; or

    c.    Failing to use reasonably feasible alternative designs in the design and/or manufacturing of the Products.

676.    As a direct and proximate result of Defendant Godrej SON's conduct, including actions, omissions, and misrepresentations, Plaintiff sustained the following damages:

    a.    Economic losses including medical care and lost earnings; and

    b.    Noneconomic losses including physical and mental pain and suffering, emotional distress, inconvenience, loss of enjoyment and impairment of quality of life, past and future.

WHEREFORE, Plaintiff DOMINI HENDERSON demands judgement against Defendant Godrej SON Holdings, Inc. in a sum in excess of FIFTY THOUSAND AND 00/100 DOLLARS ($50,000.00) plus costs and any such other relief as this Court deems just and proper.

## COUNT THIRTY-NINE
## PRODUCTS LIABILITY v. GODREJ SON HOLDINGS, INC.
## (NEGLIGENT FAILURE TO WARN)

677.    Plaintiff repeats and reallege the allegations in Paragraphs 1-271 above, as if fully set forth herein.

FILED DATE: 7/2/2025 12:57 PM    2025L008392

678.     At all relevant times Defendant Godrej SON engaged in the design, development, manufacture, marketing, sale, and distribution of the Products in a defective and unreasonably dangerous condition to consumers, including Plaintiff.

679.     Defendant Godrej SON knew, or by the exercise of reasonable care, should have known use of their Products was dangerous, harmful, and injurious when used by Plaintiff in a reasonably foreseeable manner.

680.     Defendant Godrej SON knew, or by the exercise of reasonable care, should have known ordinary consumers, such as Plaintiff, would not have realized the potential risks and dangers of their Products, and that Products were likely to increase the risks of tumors and cancerous growths in premenopausal women, thereby substantially increasing the risk of reproductive harm, when used in the manner it was intended and to an extent beyond that would be contemplated by the ordinary consumer.

681.     Defendant Godrej SON owed a duty to all reasonably foreseeable consumers to disclose the risks associated with the use of their Products.

682.     At all pertinent times, Defendant Godrej SON was then and is now guilty of one or more of the following acts and/or omissions:

     a.  Failing to provide adequate warnings on their Products;

     b.  Inadequately providing warnings on their Products;

     c.  Providing misleading advertisements; or

     d.  Failing to provide instructions on how to safely use their Products.

683.     As a direct and proximate result of Defendant Godrej SON's conduct, including actions, omissions, and misrepresentations, Plaintiff sustained the following damages:

     a.  Economic losses including medical care and lost earnings; and

FILED DATE: 7/2/2025 12:57 PM    2025L008392

b.  Noneconomic losses including physical and mental pain and suffering, emotional distress, inconvenience, loss of enjoyment and impairment of quality of life, past and future.

WHEREFORE, Plaintiff DOMINI HENDERSON demands judgement against Defendant Godrej SON Holdings, Inc. in a sum in excess of FIFTY THOUSAND AND 00/100 DOLLARS ($50,000.00) plus costs and any such other relief as this Court deems just and proper.

## COUNT FORTY
## GENERAL NEGLIGENCE v. GODREJ SON HOLDINGS, INC.

684.   Plaintiff repeats and reallege the allegations in Paragraphs 1-271 above, as if fully set forth herein.

685.   At all relevant times, Defendant Godrej SON engaged in the design, development, manufacture, marketing, sale, and distribution of the Products in a defective and unreasonably dangerous condition to consumers, including Plaintiff.

686.   Defendant Godrej SON caused the Products to enter the stream of commerce and to be sold through various retailers, where Plaintiff purchased the Products.

687.   The Products were expected to, and did, reach consumers, including Plaintiff, without change in the condition in which they were manufactured and sold by Defendant Godrej SON and/or otherwise released into the stream of commerce.

688.   Plaintiff used the Products in a manner normally intended, recommended, promoted, and marketed by Defendant Godrej SON.

689.   Products failed to perform safely when used by Plaintiff in a reasonably foreseeable manner, specifically increasing her of developing reproductive harm.

690.   The propensity of phthalates and other endocrine receptive chemicals to trigger tumors and cancerous growths in premenopausal women, thereby substantially increasing the risk

FILED DATE: 7/2/2025 12:57 PM    2025L008392

of diseases including but not limited to cancer, fibroids and/or endometriosis, renders the Products unreasonably dangerous when used in the manner it was intended and to an extent beyond that would be contemplated by the ordinary consumer.

691.    Importantly, the Products are an inessential cosmetic product that do not treat or cure any serious disease. Further, safer alternatives, including fragrance free products, have been readily available for decades.

692.    Defendant Godrej SON knew, or by the exercise of reasonably care should have known, that the Products are unreasonably dangerous but have continued to design, manufacture, sell, distribute, market, promote, and supply the Products to maximize sales and profits at the expense of public health and safety in conscious disregard of the foreseeable harm to the consuming public, including Plaintiff.

693.    Defendant Godrej SON owed a duty to all reasonably foreseeable users to exercise reasonable care in the manufacturing, designing, researching, testing, producing, supplying, inspecting, marketing, labeling, packaging, selling, and distributing of its hair relaxer Products.

694.    At all pertinent times, Defendant Godrej SON was then and is now guilty of one or more of the following acts and/or omissions:

    a.  Failing to design safe Products;

    b.  Failing to manufacture safe Products;

    c.  Failing to use reasonably feasible alternative designs in the design of the Product;

    d.  Failing to use reasonably feasible alternative designs in the manufacturing of the Product;

    e.  Failing to properly warn of the hazards associated with the Product;

FILED DATE: 7/2/2025 12:57 PM    2025L008392

f.  Failing to properly test the Product to determine adequacy and effectiveness or safety measures prior to releasing the Product to consumers, including the Plaintiff;

g.  Failing to properly warn consumers that the safety of the Product had not been determined;

h.  Failing to inform consumers, including the Plaintiff, of the safe and proper methods of handling and using the Product,

i.  Failing to remove the Product from the market when Defendant Godrej SON knew or reasonably should have known that the Products were defective;

j.  Failing to instruct consumers, including the Plaintiff, as to methods for reducing exposure to the Products;

k.  Failing to properly label the Products as defective; or

l.  Failing to properly market the Products as defective.

695.  Defendant Godrej SON knew or should have known that consumers, such as Plaintiff, would foreseeably suffer injuries as a result of the Defendant's failure to exercise ordinary care as described above.

696.  As a direct and proximate result of Defendant Godrej SON's conduct, including actions, omissions, and misrepresentations, Plaintiff sustained the following damages:

a.  Economic losses including medical care and lost earnings; and

b.  Noneconomic losses including physical and mental pain and suffering, emotional distress, inconvenience, loss of enjoyment and impairment of quality of life, past and future.

FILED DATE: 7/2/2025 12:57 PM   2025L008392

WHEREFORE, Plaintiff DOMINI HENDERSON demands judgement against Defendant Godrej SON Holdings, Inc. in a sum in excess of FIFTY THOUSAND AND 00/100 DOLLARS ($50,000.00) plus costs and any such other relief as this Court deems just and proper.

### COUNT FORTY-ONE
### FRAUD v. GODREJ SON HOLDINGS, INC.

697.    Plaintiff repeats and reallege the allegations in Paragraphs 1-271 above, as if fully set forth herein.

698.    Defendant Godrej SON engaged in the development, manufacture, marketing, sale and distribution of cosmetic and personal care products, including the Products, owed a duty to provide accurate and complete information regarding said products.

699.    Defendant Godrej SON fraudulently misrepresented the use of the Products as safe and effective, specifically:

    a.    Defendants Godrej SON and Strength of Nature's Soft & Beautiful Products are intentionally labeled as "Botanicals" and with "Natural" ingredients that are "Ultra Nourishing," including but not limited to using "Natural Plant Oils and Butters."

700.    Defendant Godrej SON made these representations on its Product packaging and marketing materials with the intention of assuring consumers that their hair relaxer Products were imbued with ingredients designed to help and improve the condition of their hair while giving the impression that nothing harmful could or would be contained in the product ingredients.

701.    These representations were intended to, and did in fact, induce consumers to believe that its Products could or would not contain harmful ingredients.

FILED DATE: 7/2/2025 12:57 PM    2025L008392

702.    Defendant Godrej SON made these representations on its Product packaging when they knew or should have known that its hair relaxer Products contained phthalates and other EDCs known to increase the risk and/or cause reproductive harms to consumers.

703.    Defendant Godrej SON's marketing and labeling fraudulently omitted warnings about health hazards, and that the Product's safety had not been established.

704.    Consumers could not ascertain from the packaging or the ingredient listing that anything harmful could or would be present in the Product because the harmful chemicals are contained within a catch-all "fragrance" category on the Product's labels.

705.    Defendant Godrej SON's Products did not disclose the presence of these toxic chemicals pursuant to 21 Code of Federal Regulations § 700.3 and § 701.3, which require that fragrance ingredients that either do not serve to impart a smell or odor, or ingredients that serve a technical or functional purpose in the product must be disclosed, and pursuant to 21 Code of Federal Regulations § 310.530, which requires that ingredients that act or function as hormones in products must be properly disclosed and labelled.

706.    A recent article was published on October 4, 2022, on MSN and other online news outlets, titled "The Relaxer Box Girls: Where Are They Now," which revealed that many of the young black girls featured on relaxer boxes and in relaxer ads in the 80s, 90s, and 2000s, never actually got their hair relaxed. Instead, they used other straightening tools and styling products to achieve the look of having the relaxer, without having exposed themselves to the dangerous chemicals within relaxers. Many of them are wearing natural hairstyles today.[147]

707.    At all pertinent times, Defendant Godrej SON was then and is now guilty of one or more of the following acts and/or omissions:

---

[147] The Relaxer Box Girls: Where Are They Now? (msn.com)

FILED DATE: 7/2/2025 12:57 PM    2025L008392

a. Knowingly and/or negligently made misrepresentations that were material, false, incomplete, misleading, deceptive and deceitful;

b. Knowingly and/or negligently made omissions that were material, false, incomplete, misleading, deceptive and deceitful;

c. Knowingly and/or negligently made misrepresentations for the purpose of deceiving and defrauding consumers, including Plaintiff; or

d. Knowingly and/or negligently made omissions for the purpose of deceiving and defrauding consumers, including Plaintiff.

708. Plaintiff relied, with reasonable justification, on the misrepresentations by Defendant Godrej SON, which induced them to purchase and use the Products on a regular basis for decades.

709. Defendant Godrej SON profited, significantly, from their unethical and illegal conduct that fraudulently induced Plaintiff, and millions of other consumers, to purchase a dangerous and defective product.

710. Defendant Godrej SON's actions, and Plaintiff's justifiable reliance thereon, were substantial contributing factors in causing injury and incurrence of substantial damages.

711. As a direct and proximate result of the Defendant Godrej SON's conduct, Plaintiff sustained the following damages:

a. Economic losses including medical care and lost earnings; and

b. Noneconomic losses including physical and mental pain and suffering, emotional distress, inconvenience, loss of enjoyment and impairment of quality of life, past and future.

FILED DATE: 7/2/2025 12:57 PM   2025L008392

WHEREFORE, Plaintiff DOMINI HENDERSON demands judgement against Defendant Godrej SON Holdings, Inc. in a sum in excess of FIFTY THOUSAND AND 00/100 DOLLARS ($50,000.00) plus costs and any such other relief as this Court deems just and proper.

**COUNT FORTY-TWO**

**VIOLATION OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE TRADE PRACTICES ACT v. GODREJ SON HOLDINGS, INC.**

**(815 ILCS §505/1 et seq.)**

712.     Plaintiff repeats and reallege the allegations in Paragraphs 1-271 above, as if fully set forth herein.

713.     The Illinois Consumer Fraud and Deceptive Business Practices Act, 815 Ill. Comp. Stat. 505/2, states that, "[u]nfair methods of competition and unfair or deceptive acts or practices are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby."

714.     Defendant Godrej SON had a statutory duty to refrain from unfair or deceptive acts or trade practices in the design, labeling, development, manufacture, promotion, and sale of the Products.

715.     Defendant Godrej SON's intentional, deceptive, unconscionable, and fraudulent representations and material omissions to the Plaintiff, physicians, and consumers, constituted unfair and deceptive acts and trade practices in violation of the Illinois Consumer Fraud and Deceptive Trade Practices Act.

716.     At all pertinent times, Defendant Godrej SON was then and is now guilty of one of the following acts and/or omissions:

      a.   Engaging in unfair or deceptive acts in violation of the Illinois Consumer Fraud and Deceptive Business Practices Act;

156

FILED DATE: 7/2/2025 12:57 PM    2025L008392

    b.   Using false pretenses for a monetary gain from consumers, including Plaintiff;

    c.   Engaging in unfair methods of competition and deceptive acts or practices that were proscribed by law;

    d.   Representing that goods or services have characteristics, ingredients, uses, benefits, or quantities that they do not have;

    e.   Advertising goods or services with the intent not to sell them as advertised;

    f.   Engaging in fraudulent or deceptive conduct that creates a likelihood of confusion or misunderstanding;

717.    The actions and omissions of Defendant Godrej SON alleged herein are uncured or incurable deceptive acts under the statues enacted in the states to protect consumers against unfair, deceptive, fraudulent, and unconscionable trade and business practices and false advertising.

718.    Defendant Godrej SON had actual knowledge of the defective and dangerous condition of Defendant Godrej SON's Product and failed to take any action to cure such defective and dangerous conditions.

719.    Plaintiff relied upon Defendant Godrej SON's misrepresentations and omissions in determining which product to use.

720.    Defendant Godrej SON's deceptive, unconscionable, or fraudulent representations and material omissions to Plaintiff and other consumers constituted deceptive acts and practices.

721.    By reason of the unlawful acts engaged in by Defendant Godrej SON, and as a direct and proximate result thereof, Plaintiff suffered ascertainable losses and damages.

722.    As a direct and proximate result of Defendant Godrej SON's violations of the State of Illinois' consumer protection laws, Plaintiff sustained the following damages:

    a.   Economic losses including medical care and lost earnings; and

FILED DATE: 7/2/2025 12:57 PM    2025L008392

b. Noneconomic losses including physical and mental pain and suffering, emotional distress, inconvenience, loss of enjoyment and impairment of quality of life, past and future.

WHEREFORE, Plaintiff DOMINI HENDERSON demands judgement against Defendant Godrej SON Holdings, Inc. in a sum in excess of FIFTY THOUSAND AND 00/100 DOLLARS ($50,000.00) plus costs and any such other relief as this Court deems just and proper.

## COUNT FORTY-THREE
## STRICT LIABILITY v. L'ORÉAL USA PRODUCTS, INC.
### (FAILURE TO WARN)

723. Plaintiff repeats and reallege the allegations in Paragraphs 1-271 above, as if fully set forth herein.

724. At all pertinent times, Defendant L'Oreal USA Products was manufacturing, marketing, testing, promoting, selling and/or distributing the Products in the regular course of business.

725. Defendant L'Oreal USA Products' Products were expected to and did reach consumers, including Plaintiff, without substantial change in the condition in which their Products were manufactured, sold, or otherwise released into the stream of commerce by Defendant L'Oreal USA Products.

726. At all pertinent times, Plaintiff used the Products on their scalp area, which is a reasonably foreseeable use.

727. At all pertinent times, Defendant L'Oreal USA Products knew or should have known that the use phthalates and other EDCs in hair products significantly increases the risk of diseases including reproductive harm, based upon scientific knowledge dating back for decades.

FILED DATE: 7/2/2025 12:57 PM    2025L008392

728.    At all pertinent times, including the time of sale and consumption of the Products, Defendant L'Oreal USA Products was then and is now guilty of one or more of the following acts:

**a.** Manufacturing, marketing, testing, promoting, selling, and/or distributing unreasonable dangerous and defective products;

**b.** Improperly warned of increased risk of diseases as required by C.F.R. § 740.1;

**c.** Inadequately warned of increased risk of diseases as required by C.F.R. § 740.1;

**d.** Inadequately warned that the safety of the product has not been determined as required by 21 CFR § 740.10;

**e.** Inadequately labeled hair relaxer Products as containing EDCs that act as hormonal agents as required by 21 C.F.R. § 310.530;

**f.** Improperly warned and failed to instruct Plaintiff of inherent risks of debilitating and life-altering conditions; or

**g.** Inadequately warned and failed to instruct Plaintiff of inherent risks of debilitating and life-altering conditions.

729.    Plaintiff sustained the following damages as a foreseeable, direct, and proximate result of Defendant L'Oreal USA Products' acts and/or omissions:

a.  Economic losses including medical care and lost earnings; and

b.  Noneconomic losses including physical and mental pain and suffering, emotional distress, inconvenience, loss of enjoyment and impairment of quality of life, past and future.

WHEREFORE, Plaintiff DOMINI HENDERSON demands judgement against Defendant L'Oréal USA Products, Inc. in a sum in excess of FIFTY THOUSAND AND 00/100 DOLLARS ($50,000.00) plus costs and any such other relief as this Court deems just and proper.

FILED DATE: 7/2/2025 12:57 PM   2025L008392

## COUNT FORTY-FOUR
## STRICT LIABILITY v. L'ORÉAL USA PRODUCTS, INC
## (DESIGN AND/OR MANUFACTURING DEFECT)

730.     Plaintiff repeats and reallege the allegations in Paragraphs 1-271 above, as if fully set forth herein.

731.     At all relevant times, Defendant L'Oreal USA Products engaged in the design, development, manufacture, marketing, sale, and distribution of the Products in a defective and unreasonably dangerous condition to consumers, including Plaintiff.

732.     Defendant L'Oreal USA Products caused the Products to enter the stream of commerce and to be sold through various retailers, where Plaintiff purchased the Products.

733.     The Products were expected to, and did, reach consumers, including Plaintiff, without change in the condition in which they were manufactured and sold by Defendant L'Oreal USA Products and/or otherwise released into the stream of commerce.

734.     Plaintiff used the Products in a manner normally intended, recommended, promoted, and marketed by Defendant L'Oreal USA Products.

735.     Products failed to perform safely when used by Plaintiff in a reasonably foreseeable manner, specifically increasing their risk of reproductive harm.

736.     The propensity of phthalates and other endocrine receptive chemicals to trigger tumors and cancerous growths in premenopausal women, thereby substantially increasing the risk of reproductive harm, renders the Products unreasonably dangerous when used in the manner it was intended and to an extent beyond that would be contemplated by the ordinary consumer.

737.     Importantly, the Products are an inessential cosmetic product that do not treat or cure any serious disease. Further, safer alternatives, including fragrance free products, have been readily available for decades.

FILED DATE: 7/2/2025 12:57 PM    2025L008392

738.     Defendant L'Oreal USA Products knew, or by the exercise of reasonably care should have known, that the Products are unreasonably dangerous but have continued to design, manufacture, sell, distribute, market, promote, and supply the Products to maximize sales and profits at the expense of public health and safety in conscious disregard of the foreseeable harm to the consuming public, including Plaintiff.

739.     Defendant L'Oreal USA Products owed a duty to all reasonably foreseeable users to design a safe product.

740.     At all pertinent times, Defendant L'Oreal USA Products was then and is now guilty of one or more of the following acts and/or omissions:

  a.  Designing, manufacturing, selling, distributing, marketing, promoting, and supplying Products that they knew or should have known were unreasonable dangerous;

  b.  Failing to use reasonable care in the design and/or manufacturing of their Products; or

  c.  Failing to use reasonably feasible alternative designs in the design and/or manufacturing of the Products.

741.     As a direct and proximate result of Defendant L'Oreal USA Products' conduct, including actions, omissions, and misrepresentations, Plaintiff sustained the following damages:

  c.  Economic losses including medical care and lost earnings; and

  d.  Noneconomic losses including physical and mental pain and suffering, emotional distress, inconvenience, loss of enjoyment and impairment of quality of life, past and future.

FILED DATE: 7/2/2025 12:57 PM    2025L008392

WHEREFORE, Plaintiff DOMINI HENDERSON demands judgement against Defendant L'Oreal USA Products, Inc. in a sum in excess of FIFTY THOUSAND AND 00/100 DOLLARS ($50,000.00) plus costs and any such other relief as this Court deems just and proper.

**COUNT FORTY-FIVE**
**PRODUCTS LIABILITY v. L'ORÉAL USA PRODUCTS, INC.**
**(NEGLIGENT FAILURE TO WARN)**

742.     Plaintiff repeats and reallege the allegations in Paragraphs 1-271 above, as if fully set forth herein.

743.     At all relevant times Defendant L'Oreal USA Products engaged in the design, development, manufacture, marketing, sale, and distribution of the Products in a defective and unreasonably dangerous condition to consumers, including Plaintiff.

744.     Defendant L'Oreal USA Products knew, or by the exercise of reasonable care, should have known use of their Products was dangerous, harmful, and injurious when used by Plaintiff in a reasonably foreseeable manner.

745.     Defendant L'Oreal USA Products knew, or by the exercise of reasonable care, should have known ordinary consumers, such as Plaintiff, would not have realized the potential risks and dangers of their Products, and that Products were likely to increase the risks of tumors and cancerous growths in premenopausal women, thereby substantially increasing the risk of reproductive harm, when used in the manner it was intended and to an extent beyond that would be contemplated by the ordinary consumer.

746.     Defendant L'Oreal USA Products owed a duty to all reasonably foreseeable consumers to disclose the risks associated with the use of their Products.

747.     At all pertinent times, Defendant L'Oreal USA Products was then and is now guilty of one or more of the following acts and/or omissions:

FILED DATE: 7/2/2025 12:57 PM   2025L008392

    a.   Failing to provide adequate warnings on their Products;

    b.   Inadequately providing warnings on their Products;

    c.   Providing misleading advertisements; or

    d.   Failing to provide instructions on how to safely use their Products.

748.    As a direct and proximate result of Defendant L'Oreal USA Products' conduct, including actions, omissions, and misrepresentations, Plaintiff sustained the following damages:

    a.   Economic losses including medical care and lost earnings; and

    b.   Noneconomic losses including physical and mental pain and suffering, emotional distress, inconvenience, loss of enjoyment and impairment of quality of life, past and future.

WHEREFORE, Plaintiff DOMINI HENDERSON demands judgement against Defendant L'Oréal USA Products, Inc. in a sum in excess of FIFTY THOUSAND AND 00/100 DOLLARS ($50,000.00) plus costs and any such other relief as this Court deems just and proper.

## COUNT FORTY-SIX
## GENERAL NEGLIGENCE v. L'OREAL USA PRODUCTS, INC.

749.    Plaintiff repeats and reallege the allegations in Paragraphs 1-271 above, as if fully set forth herein.

750.    At all relevant times, Defendant L'Oreal USA Products engaged in the design, development, manufacture, marketing, sale, and distribution of the Products in a defective and unreasonably dangerous condition to consumers, including Plaintiff.

751.    Defendant L'Oreal USA Products caused the Products to enter the stream of commerce and to be sold through various retailers, where Plaintiff purchased the Products.

FILED DATE: 7/2/2025 12:57 PM    2025L008392

752. The Products were expected to, and did, reach consumers, including Plaintiff, without change in the condition in which they were manufactured and sold by Defendant L'Oreal USA Products and/or otherwise released into the stream of commerce.

753. Plaintiff used the Products in a manner normally intended, recommended, promoted, and marketed by Defendant L'Oreal USA Products.

754. Products failed to perform safely when used by Plaintiff in a reasonably foreseeable manner, specifically increasing her of developing reproductive harm.

755. The propensity of phthalates and other endocrine receptive chemicals to trigger tumors and cancerous growths in premenopausal women, thereby substantially increasing the risk of diseases including but not limited to cancer, fibroids and/or endometriosis, renders the Products unreasonably dangerous when used in the manner it was intended and to an extent beyond that would be contemplated by the ordinary consumer.

756. Importantly, the Products are an inessential cosmetic product that do not treat or cure any serious disease. Further, safer alternatives, including fragrance free products, have been readily available for decades.

757. Defendant L'Oreal USA Products knew, or by the exercise of reasonably care should have known, that the Products are unreasonably dangerous but have continued to design, manufacture, sell, distribute, market, promote, and supply the Products to maximize sales and profits at the expense of public health and safety in conscious disregard of the foreseeable harm to the consuming public, including Plaintiff.

758. Defendant L'Oreal USA Products owed a duty to all reasonably foreseeable users to exercise reasonable care in the manufacturing, designing, researching, testing, producing,

FILED DATE: 7/2/2025 12:57 PM    2025L008392

supplying, inspecting, marketing, labeling, packaging, selling, and distributing of its hair relaxer Products.

759.    At all pertinent times, Defendant L'Oreal USA Products was then and is now guilty of one or more of the following acts and/or omissions:

a.  Failing to design safe Products;

b.  Failing to manufacture safe Products;

c.  Failing to use reasonably feasible alternative designs in the design of the Product;

d.  Failing to use reasonably feasible alternative designs in the manufacturing of the Product;

e.  Failing to properly warn of the hazards associated with the Product;

f.  Failing to properly test the Product to determine adequacy and effectiveness or safety measures prior to releasing the Product to consumers, including the Plaintiff;

g.  Failing to properly warn consumers that the safety of the Product had not been determined;

h.  Failing to inform consumers, including the Plaintiff, of the safe and proper methods of handling and using the Product,

i.  Failing to remove the Product from the market when Defendant L'Oreal USA Products knew or reasonably should have known that the Products were defective;

j.  Failing to instruct consumers, including the Plaintiff, as to methods for reducing exposure to the Products;

FILED DATE: 7/2/2025 12:57 PM    2025L008392

k.   Failing to properly label the Products as defective; or

l.   Failing to properly market the Products as defective.

760.    Defendant L'Oreal USA Products knew or should have known that consumers, such as Plaintiff, would foreseeably suffer injuries as a result of the Defendant's failure to exercise ordinary care as described above.

761.    As a direct and proximate result of Defendant L'Oreal USA Products' conduct, including actions, omissions, and misrepresentations, Plaintiff sustained the following damages:

a.   Economic losses including medical care and lost earnings; and

b.   Noneconomic losses including physical and mental pain and suffering, emotional distress, inconvenience, loss of enjoyment and impairment of quality of life, past and future.

WHEREFORE, Plaintiff DOMINI HENDERSON demands judgement against Defendant L'Oréal USA Products, Inc. in a sum in excess of FIFTY THOUSAND AND 00/100 DOLLARS ($50,000.00) plus costs and any such other relief as this Court deems just and proper.

## COUNT FORTY-SEVEN

## FRAUD v. L'OREAL USA PRODUCTS, INC.

762.    Plaintiff repeats and reallege the allegations in Paragraphs 1-271 above, as if fully set forth herein.

763.    Defendant L'Oreal USA Products engaged in the development, manufacture, marketing, sale and distribution of cosmetic and personal care products, including the Products, owed a duty to provide accurate and complete information regarding said products.

764.    Defendant L'Oreal USA Products fraudulently misrepresented the use of the Products as safe and effective, specifically:

FILED DATE: 7/2/2025 12:57 PM   2025L008392

a.   Defendants L'Oreal, L'Oreal USA, Soft Sheen, and Carson (W.I.) omitted, suppressed, and/or concealed material facts concerning the dangers and risk of injuries associated with the use of the Products and the fact that the Product was unreasonably dangerous;

b.   Defendants L'Oreal, L'Oreal USA, Soft Sheen, and Carson (W.I.)'s purpose was willfully blind to, ignored, downplayed, avoided, concealed, and/or otherwise understated the nature of the risks associated with the use of the Products to increase sales; and

c.   Defendants L'Oreal, L'Oreal USA, Soft Sheen, and Carson (W.I.) undertook the concealment of material facts with an intent that consumers, including Plaintiff, rely upon them.

765.   Defendant L'Oreal USA Products made these representations on its Product packaging and marketing materials with the intention of assuring consumers that their hair relaxer Products were imbued with ingredients designed to help and improve the condition of their hair while giving the impression that nothing harmful could or would be contained in the product ingredients.

766.   These representations were intended to, and did in fact, induce consumers to believe that its Products could or would not contain harmful ingredients.

767.   Defendant L'Oreal USA Products made these representations on its Product packaging when they knew or should have known that its hair relaxer Products contained phthalates and other EDCs known to increase the risk and/or cause reproductive harms to consumers.

FILED DATE: 7/2/2025 12:57 PM    2025L008392

768.    Defendant L'Oreal USA Products' marketing and labeling fraudulently omitted warnings about health hazards, and that the Product's safety had not been established.

769.    Consumers could not ascertain from the packaging or the ingredient listing that anything harmful could or would be present in the Product because the harmful chemicals are contained within a catch-all "fragrance" category on the Product's labels.

770.    Defendant L'Oreal USA Products did not disclose the presence of these toxic chemicals pursuant to 21 Code of Federal Regulations § 700.3 and § 701.3, which require that fragrance ingredients that either do not serve to impart a smell or odor, or ingredients that serve a technical or functional purpose in the product must be disclosed, and pursuant to 21 Code of Federal Regulations § 310.530, which requires that ingredients that act or function as hormones in products must be properly disclosed and labelled.

771.    A recent article was published on October 4, 2022, on MSN and other online news outlets, titled "The Relaxer Box Girls: Where Are They Now," which revealed that many of the young black girls featured on relaxer boxes and in relaxer ads in the 80s, 90s, and 2000s, never actually got their hair relaxed. Instead, they used other straightening tools and styling products to achieve the look of having the relaxer, without having exposed themselves to the dangerous chemicals within relaxers. Many of them are wearing natural hairstyles today.[148]

772.    At all pertinent times, Defendant L'Oreal USA Products was then and is now guilty of one or more of the following acts and/or omissions:

    a.    Knowingly and/or negligently made misrepresentations that were material, false, incomplete, misleading, deceptive and deceitful;

---

[148] The Relaxer Box Girls: Where Are They Now? (msn.com)

168

FILED DATE: 7/2/2025 12:57 PM   2025L008392

b. Knowingly and/or negligently made omissions that were material, false, incomplete, misleading, deceptive and deceitful;

c. Knowingly and/or negligently made misrepresentations for the purpose of deceiving and defrauding consumers, including Plaintiff; or

d. Knowingly and/or negligently made omissions for the purpose of deceiving and defrauding consumers, including Plaintiff.

773. Plaintiff relied, with reasonable justification, on the misrepresentations by Defendant L'Oreal USA Products, which induced them to purchase and use the Products on a regular basis for decades.

774. Defendant L'Oreal USA Products profited, significantly, from their unethical and illegal conduct that fraudulently induced Plaintiff, and millions of other consumers, to purchase a dangerous and defective product.

775. Defendant L'Oreal USA Products' actions, and Plaintiff's justifiable reliance thereon, were substantial contributing factors in causing injury and incurrence of substantial damages.

776. As a direct and proximate result of the Defendant L'Oreal USA Products' conduct, Plaintiff sustained the following damages:

a. Economic losses including medical care and lost earnings; and

b. Noneconomic losses including physical and mental pain and suffering, emotional distress, inconvenience, loss of enjoyment and impairment of quality of life, past and future.

169

FILED DATE: 7/2/2025 12:57 PM    2025L008392

WHEREFORE, Plaintiff DOMINI HENDERSON demands judgement against Defendant L'Oréal USA Products, Inc. in a sum in excess of FIFTY THOUSAND AND 00/100 DOLLARS ($50,000.00) plus costs and any such other relief as this Court deems just and proper.

**COUNT FORTY-EIGHT**

**VIOLATION OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE TRADE PRACTICES ACT v. L'OREAL USA PRODUCTS, INC.**

**(815 ILCS §505/1 et seq.)**

777.    Plaintiff repeats and reallege the allegations in Paragraphs 1-271 above, as if fully set forth herein.

778.    The Illinois Consumer Fraud and Deceptive Business Practices Act, 815 Ill. Comp. Stat. 505/2, states that, "[u]nfair methods of competition and unfair or deceptive acts or practices are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby."

779.    Defendant L'Oreal USA Products had a statutory duty to refrain from unfair or deceptive acts or trade practices in the design, labeling, development, manufacture, promotion, and sale of the Products.

780.    Defendant L'Oreal USA Products' intentional, deceptive, unconscionable, and fraudulent representations and material omissions to the Plaintiff, physicians, and consumers, constituted unfair and deceptive acts and trade practices in violation of the Illinois Consumer Fraud and Deceptive Trade Practices Act.

781.    At all pertinent times, Defendant L'Oreal USA Products was then and is now guilty of one of the following acts and/or omissions:

      a.    Engaging in unfair or deceptive acts in violation of the Illinois Consumer Fraud and Deceptive Business Practices Act;

170

FILED DATE: 7/2/2025 12:57 PM    2025L008392

b. Using false pretenses for a monetary gain from consumers, including Plaintiff;

c. Engaging in unfair methods of competition and deceptive acts or practices that were proscribed by law;

d. Representing that goods or services have characteristics, ingredients, uses, benefits, or quantities that they do not have;

e. Advertising goods or services with the intent not to sell them as advertised;

f. Engaging in fraudulent or deceptive conduct that creates a likelihood of confusion or misunderstanding;

782. The actions and omissions of Defendant L'Oreal USA Products alleged herein are uncured or incurable deceptive acts under the statues enacted in the states to protect consumers against unfair, deceptive, fraudulent, and unconscionable trade and business practices and false advertising.

783. Defendant L'Oreal USA Products had actual knowledge of the defective and dangerous condition of Defendant L'Oreal USA Products' Product and failed to take any action to cure such defective and dangerous conditions.

784. Plaintiff relied upon Defendant L'Oreal USA Products' misrepresentations and omissions in determining which product to use.

785. Defendant L'Oreal USA Products' deceptive, unconscionable, or fraudulent representations and material omissions to Plaintiff and other consumers constituted deceptive acts and practices.

786. By reason of the unlawful acts engaged in by Defendant L'Oreal USA Products, and as a direct and proximate result thereof, Plaintiff suffered ascertainable losses and damages.

FILED DATE: 7/2/2025 12:57 PM    2025L008392

787. As a direct and proximate result of Defendant L'Oreal USA Products' violations of the State of Illinois' consumer protection laws, Plaintiff sustained the following damages:

    a. Economic losses including medical care and lost earnings; and

    b. Noneconomic losses including physical and mental pain and suffering, emotional distress, inconvenience, loss of enjoyment and impairment of quality of life, past and future.

WHEREFORE, Plaintiff DOMINI HENDERSON demands judgement against Defendant L'Oréal USA Products, Inc. in a sum in excess of FIFTY THOUSAND AND 00/100 DOLLARS ($50,000.00) plus costs and any such other relief as this Court deems just and proper.

## COUNT FORTY-NINE
## STRICT LIABILITY v. L'OREAL USA, INC.
## (FAILURE TO WARN)

788. Plaintiff repeats and reallege the allegations in Paragraphs 1-271 above, as if fully set forth herein.

789. At all pertinent times, Defendant L'Oreal USA was manufacturing, marketing, testing, promoting, selling and/or distributing the Products in the regular course of business.

790. Defendant L'Oreal USA' Products were expected to and did reach consumers, including Plaintiff, without substantial change in the condition in which their Products were manufactured, sold, or otherwise released into the stream of commerce by Defendant L'Oreal USA.

791. At all pertinent times, Plaintiff used the Products on their scalp area, which is a reasonably foreseeable use.

172

FILED DATE: 7/2/2025 12:57 PM    2025L008392

792.     At all pertinent times, Defendant L'Oreal USA knew or should have known that the use phthalates and other EDCs in hair products significantly increases the risk of diseases including reproductive harm, based upon scientific knowledge dating back for decades.

793.     At all pertinent times, including the time of sale and consumption of the Products, Defendant L'Oreal USA was then and is now guilty of one or more of the following acts:

a. Manufacturing, marketing, testing, promoting, selling, and/or distributing unreasonable dangerous and defective products;

b. Improperly warned of increased risk of diseases as required by C.F.R. § 740.1;

c. Inadequately warned of increased risk of diseases as required by C.F.R. § 740.1;

d. Inadequately warned that the safety of the product has not been determined as required by 21 CFR § 740.10;

e. Inadequately labeled hair relaxer Products as containing EDCs that act as hormonal agents as required by 21 C.F.R. § 310.530;

f. Improperly warned and failed to instruct Plaintiff of inherent risks of debilitating and life-altering conditions; or

g. Inadequately warned and failed to instruct Plaintiff of inherent risks of debilitating and life-altering conditions.

794.     Plaintiff sustained the following damages as a foreseeable, direct, and proximate result of Defendant L'Oreal USA's acts and/or omissions:

a. Economic losses including medical care and lost earnings; and

b. Noneconomic losses including physical and mental pain and suffering, emotional distress, inconvenience, loss of enjoyment and impairment of quality of life, past and future.

FILED DATE: 7/2/2025 12:57 PM    2025L008392

WHEREFORE, Plaintiff DOMINI HENDERSON demands judgement against Defendant L'Oreal USA, Inc. in a sum in excess of FIFTY THOUSAND AND 00/100 DOLLARS ($50,000.00) plus costs and any such other relief as this Court deems just and proper.

### COUNT FIFTY
### STRICT LIABILITY v. L'OREAL USA, INC.
### (DESIGN AND/OR MANUFACTURING DEFECT)

795.    Plaintiff repeats and reallege the allegations in Paragraphs 1-271 above, as if fully set forth herein.

796.    At all relevant times, Defendant L'Oreal USA engaged in the design, development, manufacture, marketing, sale, and distribution of the Products in a defective and unreasonably dangerous condition to consumers, including Plaintiff.

797.    Defendant L'Oreal USA caused the Products to enter the stream of commerce and to be sold through various retailers, where Plaintiff purchased the Products.

798.    The Products were expected to, and did, reach consumers, including Plaintiff, without change in the condition in which they were manufactured and sold by Defendant L'Oreal USA and/or otherwise released into the stream of commerce.

799.    Plaintiff used the Products in a manner normally intended, recommended, promoted, and marketed by Defendant L'Oreal USA.

800.    Products failed to perform safely when used by Plaintiff in a reasonably foreseeable manner, specifically increasing their risk of reproductive harm.

801.    The propensity of phthalates and other endocrine receptive chemicals to trigger tumors and cancerous growths in premenopausal women, thereby substantially increasing the risk of reproductive harm, renders the Products unreasonably dangerous when used in the manner it was intended and to an extent beyond that would be contemplated by the ordinary consumer.

FILED DATE: 7/2/2025 12:57 PM   2025L008392

802.    Importantly, the Products are an inessential cosmetic product that do not treat or cure any serious disease. Further, safer alternatives, including fragrance free products, have been readily available for decades.

803.    Defendant L'Oreal USA knew, or by the exercise of reasonably care should have known, that the Products are unreasonably dangerous but have continued to design, manufacture, sell, distribute, market, promote, and supply the Products to maximize sales and profits at the expense of public health and safety in conscious disregard of the foreseeable harm to the consuming public, including Plaintiff.

804.    Defendant L'Oreal USA owed a duty to all reasonably foreseeable users to design a safe product.

805.    At all pertinent times, Defendant L'Oreal USA was then and is now guilty of one or more of the following acts and/or omissions:

  a.  Designing, manufacturing, selling, distributing, marketing, promoting, and supplying Products that they knew or should have known were unreasonable dangerous;

  b.  Failing to use reasonable care in the design and/or manufacturing of their Products; or

  c.  Failing to use reasonably feasible alternative designs in the design and/or manufacturing of the Products.

806.    As a direct and proximate result of Defendant L'Oreal USA's conduct, including actions, omissions, and misrepresentations, Plaintiff sustained the following damages:

  e.  Economic losses including medical care and lost earnings; and

175

FILED DATE: 7/2/2025 12:57 PM    2025L008392

    f.   Noneconomic losses including physical and mental pain and suffering, emotional distress, inconvenience, loss of enjoyment and impairment of quality of life, past and future.

WHEREFORE, Plaintiff DOMINI HENDERSON demands judgement against Defendant L'Oreal USA, Inc. in a sum in excess of FIFTY THOUSAND AND 00/100 DOLLARS ($50,000.00) plus costs and any such other relief as this Court deems just and proper.

**COUNT FIFTY-ONE**
**PRODUCTS LIABILITY v. L'OREAL USA, INC.**
**(NEGLIGENT FAILURE TO WARN)**

807.    Plaintiff repeats and reallege the allegations in Paragraphs 1-271 above, as if fully set forth herein.

808.    At all relevant times Defendant L'Oreal USA engaged in the design, development, manufacture, marketing, sale, and distribution of the Products in a defective and unreasonably dangerous condition to consumers, including Plaintiff.

809.    Defendant L'Oreal USA knew, or by the exercise of reasonable care, should have known use of their Products was dangerous, harmful, and injurious when used by Plaintiff in a reasonably foreseeable manner.

810.    Defendant L'Oreal USA knew, or by the exercise of reasonable care, should have known ordinary consumers, such as Plaintiff, would not have realized the potential risks and dangers of their Products, and that Products were likely to increase the risks of tumors and cancerous growths in premenopausal women, thereby substantially increasing the risk of reproductive harm, when used in the manner it was intended and to an extent beyond that would be contemplated by the ordinary consumer.

FILED DATE: 7/2/2025 12:57 PM  2025L008392

811.    Defendant L'Oreal USA owed a duty to all reasonably foreseeable consumers to disclose the risks associated with the use of their Products.

812.    At all pertinent times, Defendant L'Oreal USA was then and is now guilty of one or more of the following acts and/or omissions:

a.  Failing to provide adequate warnings on their Products;

b.  Inadequately providing warnings on their Products;

c.  Providing misleading advertisements; or

d.  Failing to provide instructions on how to safely use their Products.

813.    As a direct and proximate result of Defendant L'Oreal USA's conduct, including actions, omissions, and misrepresentations, Plaintiff sustained the following damages:

a.  Economic losses including medical care and lost earnings; and

b.  Noneconomic losses including physical and mental pain and suffering, emotional distress, inconvenience, loss of enjoyment and impairment of quality of life, past and future.

WHEREFORE, Plaintiff DOMINI HENDERSON demands judgement against Defendant L'Oreal USA, Inc. in a sum in excess of FIFTY THOUSAND AND 00/100 DOLLARS ($50,000.00) plus costs and any such other relief as this Court deems just and proper.

## COUNT FIFTY-TWO
## GENERAL NEGLIGENCE v. L'OREAL USA, INC.

814.    Plaintiff repeats and reallege the allegations in Paragraphs 1-271 above, as if fully set forth herein.

815.    At all relevant times, Defendant L'Oreal USA engaged in the design, development, manufacture, marketing, sale, and distribution of the Products in a defective and unreasonably dangerous condition to consumers, including Plaintiff.

FILED DATE: 7/2/2025 12:57 PM    2025L008392

816.    Defendant L'Oreal USA caused the Products to enter the stream of commerce and to be sold through various retailers, where Plaintiff purchased the Products.

817.    The Products were expected to, and did, reach consumers, including Plaintiff, without change in the condition in which they were manufactured and sold by Defendant L'Oreal USA and/or otherwise released into the stream of commerce.

818.    Plaintiff used the Products in a manner normally intended, recommended, promoted, and marketed by Defendant L'Oreal USA.

819.    Products failed to perform safely when used by Plaintiff in a reasonably foreseeable manner, specifically increasing her of developing reproductive harm.

820.    The propensity of phthalates and other endocrine receptive chemicals to trigger tumors and cancerous growths in premenopausal women, thereby substantially increasing the risk of diseases including but not limited to cancer, fibroids and/or endometriosis, renders the Products unreasonably dangerous when used in the manner it was intended and to an extent beyond that would be contemplated by the ordinary consumer.

821.    Importantly, the Products are an inessential cosmetic product that do not treat or cure any serious disease. Further, safer alternatives, including fragrance free products, have been readily available for decades.

822.    Defendant L'Oreal USA  knew, or by the exercise of reasonably care should have known, that the Products are unreasonably dangerous but have continued to design, manufacture, sell, distribute, market, promote, and supply the Products to maximize sales and profits at the expense of public health and safety in conscious disregard of the foreseeable harm to the consuming public, including Plaintiff.

FILED DATE: 7/2/2025 12:57 PM   2025L008392

823.     Defendant L'Oreal USA owed a duty to all reasonably foreseeable users to exercise reasonable care in the manufacturing, designing, researching, testing, producing, supplying, inspecting, marketing, labeling, packaging, selling, and distributing of its hair relaxer Products.

824.     At all pertinent times, Defendant L'Oreal USA was then and is now guilty of one or more of the following acts and/or omissions:

a.   Failing to design safe Products;

b.   Failing to manufacture safe Products;

c.   Failing to use reasonably feasible alternative designs in the design of the Product;

d.   Failing to use reasonably feasible alternative designs in the manufacturing of the Product;

e.   Failing to properly warn of the hazards associated with the Product;

f.   Failing to properly test the Product to determine adequacy and effectiveness or safety measures prior to releasing the Product to consumers, including the Plaintiff;

g.   Failing to properly warn consumers that the safety of the Product had not been determined;

h.   Failing to inform consumers, including the Plaintiff, of the safe and proper methods of handling and using the Product,

i.   Failing to remove the Product from the market when Defendant L'Oreal USA knew or reasonably should have known that the Products were defective;

j.   Failing to instruct consumers, including the Plaintiff, as to methods for reducing exposure to the Products;

FILED DATE: 7/2/2025 12:57 PM    2025L008392

    k.   Failing to properly label the Products as defective; or

    l.    Failing to properly market the Products as defective.

825. Defendant L'Oreal USA knew or should have known that consumers, such as Plaintiff, would foreseeably suffer injuries as a result of the Defendant's failure to exercise ordinary care as described above.

826. As a direct and proximate result of Defendant L'Oreal USA's conduct, including actions, omissions, and misrepresentations, Plaintiff sustained the following damages:

    a.    Economic losses including medical care and lost earnings; and

    b.    Noneconomic losses including physical and mental pain and suffering, emotional distress, inconvenience, loss of enjoyment and impairment of quality of life, past and future.

WHEREFORE, Plaintiff DOMINI HENDERSON demands judgement against Defendant L'Oréal USA, Inc. in a sum in excess of FIFTY THOUSAND AND 00/100 DOLLARS ($50,000.00) plus costs and any such other relief as this Court deems just and proper.

## COUNT FIFTY-THREE

## FRAUD v. L'OREAL USA, INC.

827. Plaintiff repeats and reallege the allegations in Paragraphs 1-271 above, as if fully set forth herein.

828. Defendant L'Oreal USA engaged in the development, manufacture, marketing, sale and distribution of cosmetic and personal care products, including the Products, owed a duty to provide accurate and complete information regarding said products.

829. Defendant L'Oreal USA fraudulently misrepresented the use of the Products as safe and effective, specifically.

FILED DATE: 7/2/2025 12:57 PM    2025L008392

a. Defendants L'Oreal, L'Oreal USA, Soft Sheen, and Carson (W.I.) omitted, suppressed, and/or concealed material facts concerning the dangers and risk of injuries associated with the use of the Products and the fact that the Product was unreasonably dangerous;

b. Defendants L'Oreal, L'Oreal USA, Soft Sheen, and Carson (W.I.)'s purpose was willfully blind to, ignored, downplayed, avoided, concealed and/or otherwise understated the nature of the risks associated with the use of the Products to increase sales; and

c. Defendants L'Oreal, L'Oreal USA, Soft Sheen, and Carson (W.I.) undertook the concealment of material facts with an intent that consumers, including Plaintiff, rely upon them.

830. Defendant L'Oreal USA made these representations on its Product packaging and marketing materials with the intention of assuring consumers that their hair relaxer Products were imbued with ingredients designed to help and improve the condition of their hair while giving the impression that nothing harmful could or would be contained in the product ingredients.

831. These representations were intended to, and did in fact, induce consumers to believe that its Products could or would not contain harmful ingredients.

832. Defendant L'Oreal USA made these representations on its Product packaging when they knew or should have known that its hair relaxer Products contained phthalates and other EDCs known to increase the risk and/or cause reproductive harms to consumers.

833. Defendant L'Oreal USA's marketing and labeling fraudulently omitted warnings about health hazards, and that the Product's safety had not been established.

FILED DATE: 7/2/2025 12:57 PM    2025L008392

834.    Consumers could not ascertain from the packaging or the ingredient listing that anything harmful could or would be present in the Product because the harmful chemicals are contained within a catch-all "fragrance" category on the Product's labels.

835.    Defendant L'Oreal USA's Products did not disclose the presence of these toxic chemicals pursuant to 21 Code of Federal Regulations § 700.3 and § 701.3, which require that fragrance ingredients that either do not serve to impart a smell or odor, or ingredients that serve a technical or functional purpose in the product must be disclosed, and pursuant to 21 Code of Federal Regulations § 310.530, which requires that ingredients that act or function as hormones in products must be properly disclosed and labelled.

836.    A recent article was published on October 4, 2022, on MSN and other online news outlets, titled "The Relaxer Box Girls: Where Are They Now," which revealed that many of the young black girls featured on relaxer boxes and in relaxer ads in the 80s, 90s, and 2000s, never actually got their hair relaxed. Instead, they used other straightening tools and styling products to achieve the look of having the relaxer, without having exposed themselves to the dangerous chemicals within relaxers. Many of them are wearing natural hairstyles today.[149]

837.    At all pertinent times, Defendant L'Oreal USA was then and is now guilty of one or more of the following acts and/or omissions:

      a.    Knowingly and/or negligently made misrepresentations that were material, false, incomplete, misleading, deceptive and deceitful;

      b.    Knowingly and/or negligently made omissions that were material, false, incomplete, misleading, deceptive and deceitful;

---

[149] The Relaxer Box Girls: Where Are They Now? (msn.com)

FILED DATE: 7/2/2025 12:57 PM    2025L008392

    c.   Knowingly and/or negligently made misrepresentations for the purpose of deceiving and defrauding consumers, including Plaintiff; or

    d.   Knowingly and/or negligently made omissions for the purpose of deceiving and defrauding consumers, including Plaintiff.

838.    Plaintiff relied, with reasonable justification, on the misrepresentations by Defendant L'Oreal USA, which induced them to purchase and use the Products on a regular basis for decades.

839.    Defendant L'Oreal USA profited, significantly, from their unethical and illegal conduct that fraudulently induced Plaintiff, and millions of other consumers, to purchase a dangerous and defective product.

840.    Defendant L'Oreal USA's actions, and Plaintiff's justifiable reliance thereon, were substantial contributing factors in causing injury and incurrence of substantial damages.

841.    As a direct and proximate result of the Defendant L'Oreal USA's conduct, Plaintiff sustained the following damages:

    a.   Economic losses including medical care and lost earnings; and

    b.   Noneconomic losses including physical and mental pain and suffering, emotional distress, inconvenience, loss of enjoyment and impairment of quality of life, past and future.

WHEREFORE, Plaintiff DOMINI HENDERSON demands judgement against Defendant L'Oréal USA, Inc. in a sum in excess of FIFTY THOUSAND AND 00/100 DOLLARS ($50,000.00) plus costs and any such other relief as this Court deems just and proper.

## COUNT FIFTY-FOUR

### VIOLATION OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE TRADE PRACTICES ACT v. L'OREAL USA, INC.

FILED DATE: 7/2/2025 12:57 PM   2025L008392

**(815 ILCS §505/1 et seq.)**

842.     Plaintiff repeats and reallege the allegations in Paragraphs 1-271 above, as if fully set forth herein.

843.     The Illinois Consumer Fraud and Deceptive Business Practices Act, 815 Ill. Comp. Stat. 505/2, states that, "[u]nfair methods of competition and unfair or deceptive acts or practices are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby."

844.     Defendant L'Oreal USA had a statutory duty to refrain from unfair or deceptive acts or trade practices in the design, labeling, development, manufacture, promotion, and sale of the Products.

845.     Defendant L'Oreal USA's intentional, deceptive, unconscionable, and fraudulent representations and material omissions to the Plaintiff, physicians, and consumers, constituted unfair and deceptive acts and trade practices in violation of the Illinois Consumer Fraud and Deceptive Trade Practices Act.

846.     At all pertinent times, Defendant L'Oreal USA was then and is now guilty of one of the following acts and/or omissions:

    a.   Engaging in unfair or deceptive acts in violation of the Illinois Consumer Fraud and Deceptive Business Practices Act;

    b.   Using false pretenses for a monetary gain from consumers, including Plaintiff;

    c.   Engaging in unfair methods of competition and deceptive acts or practices that were proscribed by law;

    d.   Representing that goods or services have characteristics, ingredients, uses, benefits, or quantities that they do not have;

    e.   Advertising goods or services with the intent not to sell them as advertised;

FILED DATE: 7/2/2025 12:57 PM    2025L008392

f. Engaging in fraudulent or deceptive conduct that creates a likelihood of confusion or misunderstanding;

847. The actions and omissions of Defendant L'Oreal USA alleged herein are uncured or incurable deceptive acts under the statues enacted in the states to protect consumers against unfair, deceptive, fraudulent and unconscionable trade and business practices and false advertising.

848. Defendant L'Oreal USA had actual knowledge of the defective and dangerous condition of Defendant L'Oreal USA's Product and failed to take any action to cure such defective and dangerous conditions.

849. Plaintiff relied upon Defendant L'Oreal USA's misrepresentations and omissions in determining which product to use.

850. Defendant L'Oreal USA's deceptive, unconscionable or fraudulent representations and material omissions to Plaintiff and other consumers constituted deceptive acts and practices.

851. By reason of the unlawful acts engaged in by Defendant L'Oreal USA, and as a direct and proximate result thereof, Plaintiff suffered ascertainable losses and damages.

852. As a direct and proximate result of Defendant L'Oreal USA's violations of the State of Illinois' consumer protection laws, Plaintiff sustained the following damages:

a. Economic losses including medical care and lost earnings; and

b. Noneconomic losses including physical and mental pain and suffering, emotional distress, inconvenience, loss of enjoyment and impairment of quality of life, past and future.

WHEREFORE, Plaintiff DOMINI HENDERSON demands judgement against Defendant L'Oréal USA, Inc. in a sum in excess of FIFTY THOUSAND AND 00/100 DOLLARS ($50,000.00) plus costs and any such other relief as this Court deems just and proper.

FILED DATE: 7/2/2025 12:57 PM   2025L008392

**COUNT FIFTY-FIVE**
**STRICT LIABILITY v. SOFT SHEEN-CARSON LLC**
**(FAILURE TO WARN)**

853.    Plaintiff repeats and reallege the allegations in Paragraphs 1-271 above, as if fully set forth herein.

854.    At all pertinent times, Defendant Soft Sheen was manufacturing, marketing, testing, promoting, selling and/or distributing the Products in the regular course of business.

855.    Defendant Soft Sheen's Products were expected to and did reach consumers, including Plaintiff, without substantial change in the condition in which their Products were manufactured, sold, or otherwise released into the stream of commerce by Defendant Soft Sheen.

856.    At all pertinent times, Plaintiff used the Products on their scalp area, which is a reasonably foreseeable use.

857.    At all pertinent times, Defendant Soft Sheen knew or should have known that the use phthalates and other EDCs in hair products significantly increases the risk of diseases including reproductive harm, based upon scientific knowledge dating back for decades.

858.    At all pertinent times, including the time of sale and consumption of the Products, Defendant Soft Sheen was then and is now guilty of one or more of the following acts:

a.   Manufacturing, marketing, testing, promoting, selling, and/or distributing unreasonable dangerous and defective products;

b.   Improperly warned of increased risk of diseases as required by C.F.R. § 740.1;

c.   Inadequately warned of increased risk of diseases as required by C.F.R. § 740.1;

d.   Inadequately warned that the safety of the product has not been determined as required by 21 CFR § 740.10;

FILED DATE: 7/2/2025 12:57 PM  2025L008392

    e.   Inadequately labeled hair relaxer Products as containing EDCs that act as hormonal agents as required by 21 C.F.R. § 310.530;

    f.   Improperly warned and failed to instruct Plaintiff of inherent risks of debilitating and life-altering conditions; or

    g.   Inadequately waned and failed to instruct Plaintiff of inherent risks of debilitating and life-altering conditions.

859.    Plaintiff sustained the following damages as a foreseeable, direct, and proximate result of Defendant Soft Sheen's acts and/or omissions:

    a.   Economic losses including medical care and lost earnings; and

    b.   Noneconomic losses including physical and mental pain and suffering, emotional distress, inconvenience, loss of enjoyment and impairment of quality of life, past and future.

WHEREFORE, Plaintiff DOMINI HENDERSON demands judgement against Defendant Soft Sheen-Carson LLC in a sum in excess of FIFTY THOUSAND AND 00/100 DOLLARS ($50,000.00) plus costs and any such other relief as this Court deems just and proper.

## COUNT FIFTY-SIX
## STRICT LIABILITY v. SOFT SHEEN-CARSON LLC
## (DESIGN AND/OR MANUFACTURING DEFECT)

860.    Plaintiff repeats and reallege the allegations in Paragraphs 1-271 above, as if fully set forth herein.

861.    At all relevant times, Defendant Soft Sheen engaged in the design, development, manufacture, marketing, sale, and distribution of the Products in a defective and unreasonably dangerous condition to consumers, including Plaintiff.

FILED DATE: 7/2/2025 12:57 PM    2025L008392

862.    Defendant Soft Sheen caused the Products to enter the stream of commerce and to be sold through various retailers, where Plaintiff purchased the Products.

863.    The Products were expected to, and did, reach consumers, including Plaintiff, without change in the condition in which they were manufactured and sold by Defendant Soft Sheen and/or otherwise released into the stream of commerce.

864.    Plaintiff used the Products in a manner normally intended, recommended, promoted, and marketed by Defendant Soft Sheen.

865.    Products failed to perform safely when used by Plaintiff in a reasonably foreseeable manner, specifically increasing their risk of reproductive harm.

866.    The propensity of phthalates and other endocrine receptive chemicals to trigger tumors and cancerous growths in premenopausal women, thereby substantially increasing the risk of reproductive harm, renders the Products unreasonably dangerous when used in the manner it was intended and to an extent beyond that would be contemplated by the ordinary consumer.

867.    Importantly, the Products are an inessential cosmetic product that do not treat or cure any serious disease. Further, safer alternatives, including fragrance free products, have been readily available for decades.

868.    Defendant Soft Sheen knew, or by the exercise of reasonably care should have known, that the Products are unreasonably dangerous but have continued to design, manufacture, sell, distribute, market, promote, and supply the Products to maximize sales and profits at the expense of public health and safety in conscious disregard of the foreseeable harm to the consuming public, including Plaintiff.

869.    Defendant Soft Sheen owed a duty to all reasonably foreseeable users to design a safe product.

188

FILED DATE: 7/2/2025 12:57 PM   2025L008392

870.     At all pertinent times, Defendant Soft Sheen was then and is now guilty of one or more of the following acts and/or omissions:

    a.   Designing, manufacturing, selling, distributing, marketing, promoting, and supplying Products that they knew or should have known were unreasonable dangerous;

    b.   Failing to use reasonable care in the design and/or manufacturing of their Products; or

    c.   Failing to use reasonably feasible alternative designs in the design and/or manufacturing of the Products.

871.     As a direct and proximate result of Defendant Soft Sheen's conduct, including actions, omissions, and misrepresentations, Plaintiff sustained the following damages:

    g.   Economic losses including medical care and lost earnings; and

    h.   Noneconomic losses including physical and mental pain and suffering, emotional distress, inconvenience, loss of enjoyment and impairment of quality of life, past and future.

WHEREFORE, Plaintiff DOMINI HENDERSON demands judgement against Defendant Soft Sheen-Carson LLC in a sum in excess of FIFTY THOUSAND AND 00/100 DOLLARS ($50,000.00) plus costs and any such other relief as this Court deems just and proper.

**COUNT FIFTY-SEVEN**
**PRODUCTS LIABILITY v. SOFT SHEEN-CARSON LLC**
**(NEGLIGENT FAILURE TO WARN)**

872.     Plaintiff repeats and reallege the allegations in Paragraphs 1-271 above, as if fully set forth herein.

189

FILED DATE: 7/2/2025 12:57 PM    2025L008392

873.    At all relevant times Defendant Soft Sheen engaged in the design, development, manufacture, marketing, sale, and distribution of the Products in a defective and unreasonably dangerous condition to consumers, including Plaintiff.

874.    Defendant Soft Sheen knew, or by the exercise of reasonable care, should have known use of their Products was dangerous, harmful, and injurious when used by Plaintiff in a reasonably foreseeable manner.

875.    Defendant Soft Sheen knew, or by the exercise of reasonable care, should have known ordinary consumers, such as Plaintiff, would not have realized the potential risks and dangers of their Products, and that Products were likely to increase the risks of tumors and cancerous growths in premenopausal women, thereby substantially increasing the risk of reproductive harm, when used in the manner it was intended and to an extent beyond that would be contemplated by the ordinary consumer.

876.    Defendant Soft Sheen owed a duty to all reasonably foreseeable consumers to disclose the risks associated with the use of their Products.

877.    At all pertinent times, Defendant Soft Sheen was then and is now guilty of one or more of the following acts and/or omissions:

      a.    Failing to provide adequate warnings on their Products;

      b.    Inadequately providing warnings on their Products;

      c.    Providing misleading advertisements; or

      d.    Failing to provide instructions on how to safely use their Products.

878.    As a direct and proximate result of Defendant Soft Sheen's conduct, including actions, omissions, and misrepresentations, Plaintiff sustained the following damages:

      a.    Economic losses including medical care and lost earnings; and

FILED DATE: 7/2/2025 12:57 PM    2025L008392

    b.   Noneconomic losses including physical and mental pain and suffering, emotional distress, inconvenience, loss of enjoyment and impairment of quality of life, past and future.

WHEREFORE, Plaintiff DOMINI HENDERSON demands judgement against Defendant Soft Sheen-Carson LLC in a sum in excess of FIFTY THOUSAND AND 00/100 DOLLARS ($50,000.00) plus costs and any such other relief as this Court deems just and proper.

**COUNT FIFTY-EIGHT**
**GENERAL NEGLIGENCE v. SOFT SHEEN-CARSON, LLC**

879.    Plaintiff repeats and reallege the allegations in Paragraphs 1-271 above, as if fully set forth herein.

880.    At all relevant times, Defendant Soft Sheen engaged in the design, development, manufacture, marketing, sale, and distribution of the Products in a defective and unreasonably dangerous condition to consumers, including Plaintiff.

881.    Defendant Soft Sheen caused the Products to enter the stream of commerce and to be sold through various retailers, where Plaintiff purchased the Products.

882.    The Products were expected to, and did, reach consumers, including Plaintiff, without change in the condition in which they were manufactured and sold by Defendant Soft Sheen and/or otherwise released into the stream of commerce.

883.    Plaintiff used the Products in a manner normally intended, recommended, promoted, and marketed by Defendant Soft Sheen.

884.    Products failed to perform safely when used by Plaintiff in a reasonably foreseeable manner, specifically increasing her of developing reproductive harm.

885.    The propensity of phthalates and other endocrine receptive chemicals to trigger tumors and cancerous growths in premenopausal women, thereby substantially increasing the risk

191

FILED DATE: 7/2/2025 12:57 PM    2025L008392

of diseases including but not limited to cancer, fibroids and/or endometriosis, renders the Products unreasonably dangerous when used in the manner it was intended and to an extent beyond that would be contemplated by the ordinary consumer.

886.    Importantly, the Products are an inessential cosmetic product that do not treat or cure any serious disease. Further, safer alternatives, including fragrance free products, have been readily available for decades.

887.    Defendant Soft Sheen knew, or by the exercise of reasonably care should have known, that the Products are unreasonably dangerous but have continued to design, manufacture, sell, distribute, market, promote, and supply the Products to maximize sales and profits at the expense of public health and safety in conscious disregard of the foreseeable harm to the consuming public, including Plaintiff.

888.    Defendant Soft Sheen owed a duty to all reasonably foreseeable users to exercise reasonable care in the manufacturing, designing, researching, testing, producing, supplying, inspecting, marketing, labeling, packaging, selling, and distributing of its hair relaxer Products.

889.    At all pertinent times, Defendant Soft Sheen was then and is now guilty of one or more of the following acts and/or omissions:

      a.   Failing to design safe Products;

      b.   Failing to manufacture safe Products;

      c.   Failing to use reasonably feasible alternative designs in the design of the Product;

      d.   Failing to use reasonably feasible alternative designs in the manufacturing of the Product;

      e.   Failing to properly warn of the hazards associated with the Product;

FILED DATE: 7/2/2025 12:57 PM    2025L008392

f.  Failing to properly test the Product to determine adequacy and effectiveness or safety measures prior to releasing the Product to consumers, including the Plaintiff;

g.  Failing to properly warn consumers that the safety of the Product had not been determined;

h.  Failing to inform consumers, including the Plaintiff, of the safe and proper methods of handling and using the Product,

i.  Failing to remove the Product from the market when Defendant Soft Sheen knew or reasonably should have known that the Products were defective;

j.  Failing to instruct consumers, including the Plaintiff, as to methods for reducing exposure to the Products;

k.  Failing to properly label the Products as defective; or

l.  Failing to properly market the Products as defective.

890.  Defendant Soft Sheen knew or should have known that consumers, such as Plaintiff, would foreseeably suffer injuries as a result of the Defendant's failure to exercise ordinary care as described above.

891.  As a direct and proximate result of Defendant Soft Sheen's conduct, including actions, omissions, and misrepresentations, Plaintiff sustained the following damages:

a.  Economic losses including medical care and lost earnings; and

b.  Noneconomic losses including physical and mental pain and suffering, emotional distress, inconvenience, loss of enjoyment and impairment of quality of life, past and future.

FILED DATE: 7/2/2025 12:57 PM    2025L008392

WHEREFORE, Plaintiff DOMINI HENDERSON demands judgement against Defendant Soft Sheen-Carson LLC in a sum in excess of FIFTY THOUSAND AND 00/100 DOLLARS ($50,000.00) plus costs and any such other relief as this Court deems just and proper.

## COUNT FIFTY-NINE

## FRAUD v. SOFT SHEEN-CARSON, LLC

892.    Plaintiff repeats and reallege the allegations in Paragraphs 1-271 above, as if fully set forth herein.

893.    Defendant Soft Sheen engaged in the development, manufacture, marketing, sale and distribution of cosmetic and personal care products, including the Products, owed a duty to provide accurate and complete information regarding said products.

894.    Defendant Soft Sheen fraudulently misrepresented the use of the Products as safe and effective, specifically:

   a.   Defendants L'Oreal, L'Oreal USA, Soft Sheen, and Carson (W.I.) omitted, suppressed, and/or concealed material facts concerning the dangers and risk of injuries associated with the use of the Products and the fact that the Product was unreasonably dangerous;

   b.   Defendants L'Oreal, L'Oreal USA, Soft Sheen, and Carson (W.I.)'s purpose was willfully blind to, ignored, downplayed, avoided, concealed and/or otherwise understated the nature of the risks associated with the use of the Products to increase sales; and

   c.   Defendants L'Oreal, L'Oreal USA, Soft Sheen, and Carson (W.I.) undertook the concealment of material facts with an intent that consumers, including Plaintiff, rely upon them.

194

FILED DATE: 7/2/2025 12:57 PM    2025L008392

895.    Defendant Soft Sheen made these representations on its Product packaging and marketing materials with the intention of assuring consumers that their hair relaxer Products were imbued with ingredients designed to help and improve the condition of their hair while giving the impression that nothing harmful could or would be contained in the product ingredients.

896.    These representations were intended to, and did in fact, induce consumers to believe that its Products could or would not contain harmful ingredients.

897.    Defendant Soft Sheen made these representations on its Product packaging when they knew or should have known that its hair relaxer Products contained phthalates and other EDCs known to increase the risk and/or cause reproductive harms to consumers.

898.    Defendant Soft Sheen's marketing and labeling fraudulently omitted warnings about health hazards, and that the Product's safety had not been established.

899.    Consumers could not ascertain from the packaging or the ingredient listing that anything harmful could or would be present in the Product because the harmful chemicals are contained within a catch-all "fragrance" category on the Product's labels.

900.    Defendant Soft Sheen's Products did not disclose the presence of these toxic chemicals pursuant to 21 Code of Federal Regulations § 700.3 and § 701.3, which require that fragrance ingredients that either do not serve to impart a smell or odor, or ingredients that serve a technical or functional purpose in the product must be disclosed, and pursuant to 21 Code of Federal Regulations § 310.530, which requires that ingredients that act or function as hormones in products must be properly disclosed and labelled.

901.    A recent article was published on October 4, 2022, on MSN and other online news outlets, titled "The Relaxer Box Girls: Where Are They Now," which revealed that many of the young black girls featured on relaxer boxes and in relaxer ads in the 80s, 90s, and 2000s, never

actually got their hair relaxed. Instead, they used other straightening tools and styling products to achieve the look of having the relaxer, without having exposed themselves to the dangerous chemicals within relaxers. Many of them are wearing natural hairstyles today.[150]

902.    At all pertinent times, Defendant Soft Sheen was then and is now guilty of one or more of the following acts and/or omissions:

    a.    Knowingly and/or negligently made misrepresentations that were material, false, incomplete, misleading, deceptive and deceitful;

    b.    Knowingly and/or negligently made omissions that were material, false, incomplete, misleading, deceptive and deceitful;

    c.    Knowingly and/or negligently made misrepresentations for the purpose of deceiving and defrauding consumers, including Plaintiff; or

    d.    Knowingly and/or negligently made omissions for the purpose of deceiving and defrauding consumers, including Plaintiff.

903.    Plaintiff relied, with reasonable justification, on the misrepresentations by Defendant Soft Sheen, which induced them to purchase and use the Products on a regular basis for decades.

904.    Defendant Soft Sheen profited, significantly, from their unethical and illegal conduct that fraudulently induced Plaintiff, and millions of other consumers, to purchase a dangerous and defective product.

905.    Defendant Soft Sheen's actions, and Plaintiff's justifiable reliance thereon, were substantial contributing factors in causing injury and incurrence of substantial damages.

---

[150] The Relaxer Box Girls: Where Are They Now? (msn.com)

FILED DATE: 7/2/2025 12:57 PM    2025L008392

FILED DATE: 7/2/2025 12:57 PM   2025L008392

906.     As a direct and proximate result of the Defendant Soft Sheen's conduct, Plaintiff sustained the following damages:

  a.  Economic losses including medical care and lost earnings; and

  b.  Noneconomic losses including physical and mental pain and suffering, emotional distress, inconvenience, loss of enjoyment and impairment of quality of life, past and future.

WHEREFORE, Plaintiff DOMINI HENDERSON demands judgement against Defendant Soft Sheen-Carson LLC in a sum in excess of FIFTY THOUSAND AND 00/100 DOLLARS ($50,000.00) plus costs and any such other relief as this Court deems just and proper.

## COUNT SIXTY

## VIOLATION OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE TRADE PRACTICES ACT v. SOFT SHEEN-CARSON, LLC

### (815 ILCS §505/1 et seq.)

907.     Plaintiff repeats and reallege the allegations in Paragraphs 1-271 above, as if fully set forth herein.

908.     The Illinois Consumer Fraud and Deceptive Business Practices Act, 815 Ill. Comp. Stat. 505/2, states that, "[u]nfair methods of competition and unfair or deceptive acts or practices are hereby declared unlawful whether any person has in fact been misled, deceived, or damaged thereby."

909.     Defendant Soft Sheen had a statutory duty to refrain from unfair or deceptive acts or trade practices in the design, labeling, development, manufacture, promotion, and sale of the Products.

910.     Defendant Soft Sheen's intentional, deceptive, unconscionable, and fraudulent representations and material omissions to Plaintiff, physicians, and consumers, constituted unfair

FILED DATE: 7/2/2025 12:57 PM    2025L008392

and deceptive acts and trade practices in violation of the Illinois Consumer Fraud and Deceptive Trade Practices Act.

911.    At all pertinent times, Defendant Soft Sheen was then and is now guilty of one of the following acts and/or omissions:

      a.    Engaging in unfair or deceptive acts in violation of the Illinois Consumer Fraud and Deceptive Business Practices Act;

      b.    Using false pretenses for a monetary gain from consumers, including Plaintiff;

      c.    Engaging in unfair methods of competition and deceptive acts or practices that were proscribed by law;

      d.    Representing that goods or services have characteristics, ingredients, uses, benefits, or quantities that they do not have;

      e.    Advertising goods or services with the intent not to sell them as advertised;

      f.    Engaging in fraudulent or deceptive conduct that creates a likelihood of confusion or misunderstanding;

912.    The actions and omissions of Defendant Soft Sheen alleged herein are uncured or incurable deceptive acts under the statues enacted in the states to protect consumers against unfair, deceptive, fraudulent and unconscionable trade and business practices and false advertising.

913.    Defendant Soft Sheen had actual knowledge of the defective and dangerous condition of Defendant Soft Sheen's Product and failed to take any action to cure such defective and dangerous conditions.

914.    Plaintiff relied upon Defendant Soft Sheen's misrepresentations and omissions in determining which product to use.

FILED DATE: 7/2/2025 12:57 PM    2025L008392

915.    Defendant Soft Sheen's deceptive, unconscionable, or fraudulent representations and material omissions to Plaintiff and other consumers constituted deceptive acts and practices.

916.    By reason of the unlawful acts engaged in by Defendant Soft Sheen, and as a direct and proximate result thereof, Plaintiff ascertainable losses and damages.

917.    As a direct and proximate result of Defendant Soft Sheen's violations of the State of Illinois' consumer protection laws, Plaintiff sustained the following damages:

    a.  Economic losses including medical care and lost earnings; and

    b.  Noneconomic losses including physical and mental pain and suffering, emotional distress, inconvenience, loss of enjoyment and impairment of quality of life, past and future.

WHEREFORE, Plaintiff DOMINI HENDERSON demands judgement against Defendant Soft Sheen-Carson LLC in a sum in excess of FIFTY THOUSAND AND 00/100 DOLLARS ($50,000.00) plus costs and any such other relief as this Court deems just and proper.

### COUNT SIXTY-ONE
### STRICT LIABILITY v. SOFT SHEEN-CARSON (W.I.), INC.
### (FAILURE TO WARN)

918.    Plaintiff repeats and reallege the allegations in Paragraphs 1-271 above, as if fully set forth herein.

919.    At all pertinent times, Defendant Carson (W.I.) was manufacturing, marketing, testing, promoting, selling and/or distributing the Products in the regular course of business.

920.    Defendant Carson (W.I.)'s Products were expected to and did reach consumers, including Plaintiff, without substantial change in the condition in which their Products were manufactured, sold, or otherwise released into the stream of commerce by Defendant Carson (W.I.).

FILED DATE: 7/2/2025 12:57 PM   2025L008392

921.     At all pertinent times, Plaintiff used the Products on their scalp area, which is a reasonably foreseeable use.

922.     At all pertinent times, Defendant Carson (W.I.) knew or should have known that the use phthalates and other EDCs in hair products significantly increases the risk of diseases including reproductive harm, based upon scientific knowledge dating back for decades.

923.     At all pertinent times, including the time of sale and consumption of the Products, Defendant Carson (W.I.) was then and is now guilty of one or more of the following acts:

    a.   Manufacturing, marketing, testing, promoting, selling, and/or distributing unreasonable dangerous and defective products;

    b.   Improperly warned of increased risk of diseases as required by C.F.R. § 740.1;

    c.   Inadequately warned of increased risk of diseases as required by C.F.R. § 740.1;

    d.   Inadequately warned that the safety of the product has not been determined as required by 21 CFR § 740.10;

    e.   Inadequately labeled hair relaxer Products as containing EDCs that act as hormonal agents as required by 21 C.F.R. § 310.530;

    f.   Improperly warned and failed to instruct Plaintiff of inherent risks of debilitating and life-altering conditions; or

    g.   Inadequately warned and failed to instruct Plaintiff of inherent risks of debilitating and life-altering conditions.

924.     Plaintiff sustained the following damages as a foreseeable, direct, and proximate result of Defendant Carson (W.I.)'s acts and/or omissions:

    a.   Economic losses including medical care and lost earnings; and

FILED DATE: 7/2/2025 12:57 PM    2025L008392

    b.   Noneconomic losses including physical and mental pain and suffering, emotional distress, inconvenience, loss of enjoyment and impairment of quality of life, past and future.

WHEREFORE, Plaintiff DOMINI HENDERSON demands judgement against Defendant Soft Sheen-Carson (W.I.), Inc. in a sum in excess of FIFTY THOUSAND AND 00/100 DOLLARS ($50,000.00) plus costs and any such other relief as this Court deems just and proper.

### COUNT SIXTY-TWO
### STRICT LIABILITY v. SOFT SHEEN-CARSON (W.I.), INC.
### (DESIGN AND/OR MANUFACTURING DEFECT)

925.    Plaintiff repeats and reallege the allegations in Paragraphs 1-271 above, as if fully set forth herein.

926.    At all relevant times, Defendant Carson (W.I.) engaged in the design, development, manufacture, marketing, sale, and distribution of the Products in a defective and unreasonably dangerous condition to consumers, including Plaintiff.

927.    Defendant Carson (W.I.) caused the Products to enter the stream of commerce and to be sold through various retailers, where Plaintiff purchased the Products.

928.    The Products were expected to, and did, reach consumers, including Plaintiff, without change in the condition in which they were manufactured and sold by Defendant Carson (W.I.) and/or otherwise released into the stream of commerce.

929.    Plaintiff used the Products in a manner normally intended, recommended, promoted, and marketed by Defendant Carson (W.I.).

930.    Products failed to perform safely when used by Plaintiff in a reasonably foreseeable manner, specifically increasing their risk of reproductive harm.

FILED DATE: 7/2/2025 12:57 PM   2025L008392

931.     The propensity of phthalates and other endocrine receptive chemicals to trigger tumors and cancerous growths in premenopausal women, thereby substantially increasing the risk of reproductive harm, renders the Products unreasonably dangerous when used in the manner it was intended and to an extent beyond that would be contemplated by the ordinary consumer.

932.     Importantly, the Products are an inessential cosmetic product that do not treat or cure any serious disease. Further, safer alternatives, including fragrance free products, have been readily available for decades.

933.     Defendant Carson (W.I.) knew, or by the exercise of reasonably care should have known, that the Products are unreasonably dangerous but have continued to design, manufacture, sell, distribute, market, promote, and supply the Products to maximize sales and profits at the expense of public health and safety in conscious disregard of the foreseeable harm to the consuming public, including Plaintiff.

934.     Defendant Carson (W.I.) owed a duty to all reasonably foreseeable users to design a safe product.

935.     At all pertinent times, Defendant Carson (W.I.) was then and is now guilty of one or more of the following acts and/or omissions:

   a. Designing, manufacturing, selling, distributing, marketing, promoting, and supplying Products that they knew or should have known were unreasonable dangerous;

   b. Failing to use reasonable care in the design and/or manufacturing of their Products; or

   c. Failing to use reasonably feasible alternative designs in the design and/or manufacturing of the Products.

202

FILED DATE: 7/2/2025 12:57 PM    2025L008392

936.    As a direct and proximate result of Defendant Carson (W.I.)'s conduct, including actions, omissions, and misrepresentations, Plaintiff sustained the following damages:

    a.    Economic losses including medical care and lost earnings; and

    b.    Noneconomic losses including physical and mental pain and suffering, emotional distress, inconvenience, loss of enjoyment and impairment of quality of life, past and future.

WHEREFORE, Plaintiff DOMINI HENDERSON demands judgement against Defendant Soft Sheen-Carson (W.I.), Inc. in a sum in excess of FIFTY THOUSAND AND 00/100 DOLLARS ($50,000.00) plus costs and any such other relief as this Court deems just and proper.

## COUNT SIXTY-THREE
## PRODUCTS LIABILITY v. SOFT SHEEN-CARSON (W.I.), INC.
## (NEGLIGENT FAILURE TO WARN)

937.    Plaintiff repeats and reallege the allegations in Paragraphs 1-271 above, as if fully set forth herein.

938.    At all relevant times Defendant Carson (W.I.) engaged in the design, development, manufacture, marketing, sale, and distribution of the Products in a defective and unreasonably dangerous condition to consumers, including Plaintiff.

939.    Defendant Carson (W.I.) knew, or by the exercise of reasonable care, should have known use of their Products was dangerous, harmful, and injurious when used by Plaintiff in a reasonably foreseeable manner.

940.    Defendant Carson (W.I.) knew, or by the exercise of reasonable care, should have known ordinary consumers, such as Plaintiff, would not have realized the potential risks and dangers of their Products, and that Products were likely to increase the risks of tumors and cancerous growths in premenopausal women, thereby substantially increasing the risk of

FILED DATE: 7/2/2025 12:57 PM   2025L008392

reproductive harm, when used in the manner it was intended and to an extent beyond that would be contemplated by the ordinary consumer.

941.    Defendant Carson (W.I.) owed a duty to all reasonably foreseeable consumers to disclose the risks associated with the use of their Products.

942.    At all pertinent times, Defendant Carson (W.I.) was then and is now guilty of one or more of the following acts and/or omissions:

    a.   Failing to provide adequate warnings on their Products;

    b.   Inadequately providing warnings on their Products;

    c.   Providing misleading advertisements; or

    d.   Failing to provide instructions on how to safely use their Products.

943.    As a direct and proximate result of Defendant Carson (W.I.)'s conduct, including actions, omissions, and misrepresentations, Plaintiff sustained the following damages:

    a.   Economic losses including medical care and lost earnings; and

    b.   Noneconomic losses including physical and mental pain and suffering, emotional distress, inconvenience, loss of enjoyment and impairment of quality of life, past and future.

WHEREFORE, Plaintiff DOMINI HENDERSON demands judgement against Defendant Soft Sheen-Carson (W.I.), Inc. in a sum in excess of FIFTY THOUSAND AND 00/100 DOLLARS ($50,000.00) plus costs and any such other relief as this Court deems just and proper.

## COUNT SIXTY-FOUR
## GENERAL NEGLIGENCE v. SOFT SHEEN-CARSON (W.I.), INC.

944.    Plaintiff repeats and reallege the allegations in Paragraphs 1-271 above, as if fully set forth herein.

FILED DATE: 7/2/2025 12:57 PM    2025L008392

945.    At all relevant times, Defendant Carson (W.I.) engaged in the design, development, manufacture, marketing, sale, and distribution of the Products in a defective and unreasonably dangerous condition to consumers, including Plaintiff.

946.    Defendant Carson (W.I.) caused the Products to enter the stream of commerce and to be sold through various retailers, where Plaintiff purchased the Products.

947.    The Products were expected to, and did, reach consumers, including Plaintiff, without change in the condition in which they were manufactured and sold by Defendant Carson (W.I.) and/or otherwise released into the stream of commerce.

948.    Plaintiff used the Products in a manner normally intended, recommended, promoted, and marketed by Defendant Carson (W.I.).

949.    Products failed to perform safely when used by Plaintiff in a reasonably foreseeable manner, specifically increasing her of developing reproductive harm.

950.    The propensity of phthalates and other endocrine receptive chemicals to trigger tumors and cancerous growths in premenopausal women, thereby substantially increasing the risk of diseases including but not limited to cancer, fibroids and/or endometriosis, renders the Products unreasonably dangerous when used in the manner it was intended and to an extent beyond that would be contemplated by the ordinary consumer.

951.    Importantly, the Products are an inessential cosmetic product that do not treat or cure any serious disease. Further, safer alternatives, including fragrance free products, have been readily available for decades.

952.    Defendant Carson (W.I.) knew, or by the exercise of reasonably care should have known, that the Products are unreasonably dangerous but have continued to design, manufacture, sell, distribute, market, promote, and supply the Products to maximize sales and profits at the

FILED DATE: 7/2/2025 12:57 PM    2025L008392

expense of public health and safety in conscious disregard of the foreseeable harm to the consuming public, including Plaintiff.

953.    Defendant Carson (W.I.) owed a duty to all reasonably foreseeable users to exercise reasonable care in the manufacturing, designing, researching, testing, producing, supplying, inspecting, marketing, labeling, packaging, selling, and distributing of its hair relaxer Products.

954.    At all pertinent times, Defendant Carson (W.I.) was then and is now guilty of one or more of the following acts and/or omissions:

  a.  Failing to design safe Products;

  b.  Failing to manufacture safe Products;

  c.  Failing to use reasonably feasible alternative designs in the design of the Product;

  d.  Failing to use reasonably feasible alternative designs in the manufacturing of the Product;

  e.  Failing to properly warn of the hazards associated with the Product;

  f.  Failing to properly test the Product to determine adequacy and effectiveness or safety measures prior to releasing the Product to consumers, including the Plaintiff;

  g.  Failing to properly warn consumers that the safety of the Product had not been determined;

  h.  Failing to inform consumers, including the Plaintiff, of the safe and proper methods of handling and using the Product,

  i.  Failing to remove the Product from the market when Defendant Carson (W.I.) knew or reasonably should have known that the Products were defective;

FILED DATE: 7/2/2025 12:57 PM    2025L008392

j.   Failing to instruct consumers, including the Plaintiff, as to methods for reducing exposure to the Products;

k.   Failing to properly label the Products as defective; or

l.   Failing to properly market the Products as defective.

955.   Defendant Carson (W.I.) knew or should have known that consumers, such as Plaintiff, would foreseeably suffer injuries as a result of the Defendant's failure to exercise ordinary care as described above.

956.   As a direct and proximate result of Defendant Carson (W.I.)'s conduct, including actions, omissions, and misrepresentations, Plaintiff sustained the following damages:

a.   Economic losses including medical care and lost earnings; and

b.   Noneconomic losses including physical and mental pain and suffering, emotional distress, inconvenience, loss of enjoyment and impairment of quality of life, past and future.

WHEREFORE, Plaintiff DOMINI HENDERSON demands judgement against Defendant Soft Sheen-Carson (W.I.), Inc. in a sum in excess of FIFTY THOUSAND AND 00/100 DOLLARS ($50,000.00) plus costs and any such other relief as this Court deems just and proper.

## COUNT SIXTY-FIVE

## FRAUD v. SOFT SHEEN- CARSON (W.I.), INC.

957.   Plaintiff repeats and reallege the allegations in Paragraphs 1-271 above, as if fully set forth herein.

958.   Defendant Carson (W.I.) engaged in the development, manufacture, marketing, sale and distribution of cosmetic and personal care products, including the Products, owed a duty to provide accurate and complete information regarding said products.

FILED DATE: 7/2/2025 12:57 PM    2025L008392

959.     Defendant Carson (W.I.) fraudulently misrepresented the use of the Products as safe and effective, specifically:

    a.  Defendants L'Oreal, L'Oreal USA, Soft Sheen, and Carson (W.I.) omitted, suppressed, and/or concealed material facts concerning the dangers and risk of injuries associated with the use of the Products and the fact that the Product was unreasonably dangerous;

    b.  Defendants L'Oreal, L'Oreal USA, Soft Sheen, and Carson (W.I.)'s purpose was willfully blind to, ignored, downplayed, avoided, concealed and/or otherwise understated the nature of the risks associated with the use of the Products to increase sales; and

    c.  Defendants L'Oreal, L'Oreal USA, Soft Sheen, and Carson (W.I.) undertook the concealment of material facts with an intent that consumers, including Plaintiff, rely upon them.

960.     Defendant Carson (W.I.) made these representations on its Product packaging and marketing materials with the intention of assuring consumers that their hair relaxer Products were imbued with ingredients designed to help and improve the condition of their hair while giving the impression that nothing harmful could or would be contained in the product ingredients.

961.     These representations were intended to, and did in fact, induce consumers to believe that its Products could or would not contain harmful ingredients.

962.     Defendant Carson (W.I.) made these representations on its Product packaging when they knew or should have known that its hair relaxer Products contained phthalates and other EDCs known to increase the risk and/or cause reproductive harms to consumers.

FILED DATE: 7/2/2025 12:57 PM    2025L008392

963.    Defendant Carson (W.I.) marketing and labeling fraudulently omitted warnings about health hazards, and that the Product's safety had not been established.

964.    Consumers could not ascertain from the packaging or the ingredient listing that anything harmful could or would be present in the Product because the harmful chemicals are contained within a catch-all "fragrance" category on the Product's labels.

965.    Defendant Carson (W.I.)'s Products did not disclose the presence of these toxic chemicals pursuant to 21 Code of Federal Regulations § 700.3 and § 701.3, which require that fragrance ingredients that either do not serve to impart a smell or odor, or ingredients that serve a technical or functional purpose in the product must be disclosed, and pursuant to 21 Code of Federal Regulations § 310.530, which requires that ingredients that act or function as hormones in products must be properly disclosed and labelled.

966.    A recent article was published on October 4, 2022, on MSN and other online news outlets, titled "The Relaxer Box Girls: Where Are They Now," which revealed that many of the young black girls featured on relaxer boxes and in relaxer ads in the 80s, 90s, and 2000s, never actually got their hair relaxed. Instead, they used other straightening tools and styling products to achieve the look of having the relaxer, without having exposed themselves to the dangerous chemicals within relaxers. Many of them are wearing natural hairstyles today.[151]

967.    At all pertinent times, Defendant Carson (W.I.) was then and is now guilty of one or more of the following acts and/or omissions:

  a.    Knowingly and/or negligently made misrepresentations that were material, false, incomplete, misleading, deceptive and deceitful;

---

[151] The Relaxer Box Girls: Where Are They Now? (msn.com)

209

FILED DATE: 7/2/2025 12:57 PM   2025L008392

b.  Knowingly and/or negligently made omissions that were material, false, incomplete, misleading, deceptive and deceitful;

c.  Knowingly and/or negligently made misrepresentations for the purpose of deceiving and defrauding consumers, including Plaintiff; or

d.  Knowingly and/or negligently made omissions for the purpose of deceiving and defrauding consumers, including Plaintiff.

968.  Plaintiff relied, with reasonable justification, on the misrepresentations by Defendant Carson (W.I.), which induced them to purchase and use the Products on a regular basis for decades.

969.  Defendant Carson (W.I.) profited, significantly, from their unethical and illegal conduct that fraudulently induced Plaintiff, and millions of other consumers, to purchase a dangerous and defective product.

970.  Defendant Carson (W.I.)'s actions, and Plaintiff's justifiable reliance thereon, were substantial contributing factors in causing injury and incurrence of substantial damages.

971.  As a direct and proximate result of the Defendant Carson (W.I.)'s conduct, Plaintiff sustained the following damages:

a.  Economic losses including medical care and lost earnings; and

b.  Noneconomic losses including physical and mental pain and suffering, emotional distress, inconvenience, loss of enjoyment and impairment of quality of life, past and future.

WHEREFORE, Plaintiff DOMINI HENDERSON demands judgement against Defendant Soft Sheen-Carson (W.I.), Inc. in a sum in excess of FIFTY THOUSAND AND 00/100 DOLLARS ($50,000.00) plus costs and any such other relief as this Court deems just and proper.

FILED DATE: 7/2/2025 12:57 PM    2025L008392

## COUNT SIXTY-SIX

### VIOLATION OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE TRADE PRACTICES ACT v. SOFT SHEEN-CARSON (W.I.), INC.

### (815 ILCS §505/1 et seq.)

972.    Plaintiff repeats and reallege the allegations in Paragraphs 1-271 above, as if fully set forth herein.

973.    The Illinois Consumer Fraud and Deceptive Business Practices Act, 815 Ill. Comp. Stat. 505/2, states that, "[u]nfair methods of competition and unfair or deceptive acts or practices are hereby declared unlawful whether any person has in fact been misled, deceived, or damaged thereby."

974.    Defendant Carson (W.I.) had a statutory duty to refrain from unfair or deceptive acts or trade practices in the design, labeling, development, manufacture, promotion, and sale of the Products.

975.    Defendant Carson (W.I.)'s intentional, deceptive, unconscionable, and fraudulent representations and material omissions to the Plaintiff, physicians, and consumers, constituted unfair and deceptive acts and trade practices in violation of the Illinois Consumer Fraud and Deceptive Trade Practices Act.

976.    At all pertinent times, Defendant Carson (W.I.) was then and is now guilty of one of the following acts and/or omissions:

a.    Engaging in unfair or deceptive acts in violation of the Illinois Consumer Fraud and Deceptive Business Practices Act;

b.    Using false pretenses for a monetary gain from consumers, including Plaintiff;

c.    Engaging in unfair methods of competition and deceptive acts or practices that were proscribed by law;

d. Representing that goods or services have characteristics, ingredients, uses, benefits, or quantities that they do not have;

e. Advertising goods or services with the intent not to sell them as advertised;

f. Engaging in fraudulent or deceptive conduct that creates a likelihood of confusion or misunderstanding;

977. The actions and omissions of Defendant Carson (W.I.) alleged herein are uncured or incurable deceptive acts under the statues enacted in the states to protect consumers against unfair, deceptive, fraudulent, and unconscionable trade and business practices and false advertising.

978. Defendant Carson (W.I.) had actual knowledge of the defective and dangerous condition of Defendant Carson (W.I.)'s Product and failed to take any action to cure such defective and dangerous conditions.

979. Plaintiff relied upon Defendant Carson (W.I.)'s misrepresentations and omissions in determining which product to use.

980. Defendant Carson (W.I.)'s deceptive, unconscionable or fraudulent representations and material omissions to Plaintiff and other consumers constituted deceptive acts and practices.

981. By reason of the unlawful acts engaged in by Defendant Carson (W.I.), and as a direct and proximate result thereof, Plaintiff suffered ascertainable losses and damages.

982. As a direct and proximate result of Defendant Carson (W.I.)'s violations of the State of Illinois' consumer protection laws, Plaintiff sustained the following damages:

a. Economic losses including medical care and lost earnings; and

212

FILED DATE: 7/2/2025 12:57 PM    2025L008392

b.  Noneconomic losses including physical and mental pain and suffering, emotional distress, inconvenience, loss of enjoyment and impairment of quality of life, past and future.

WHEREFORE, Plaintiff DOMINI HENDERSON demands judgement against Defendant Soft Sheen-Carson (W.I.), Inc. in a sum in excess of FIFTY THOUSAND AND 00/100 DOLLARS ($50,000.00) plus costs and any such other relief as this Court deems just and proper.

**COUNT SIXTY-SEVEN**
**STRICT LIABILITY v. BEAUTY BELL ENTERPRISES, LLC F/K/A HOUSE OF CHEATHAM, INC.**
**(FAILURE TO WARN)**

983.    Plaintiff repeats and reallege the allegations in Paragraphs 1-271 above, as if fully set forth herein.

984.    At all pertinent times, Defendant Beauty Bell was manufacturing, marketing, testing, promoting, selling and/or distributing the Products in the regular course of business.

985.    Defendant Beauty Bell's Products were expected to and did reach consumers, including Plaintiff, without substantial change in the condition in which their Products were manufactured, sold, or otherwise released into the stream of commerce by Defendant Beauty Bell.

986.    At all pertinent times, Plaintiff used the Products on their scalp area, which is a reasonably foreseeable use.

987.    At all pertinent times, Defendant Beauty Bell knew or should have known that the use phthalates and other EDCs in hair products significantly increases the risk of diseases including reproductive harm, based upon scientific knowledge dating back for decades.

988.    At all pertinent times, including the time of sale and consumption of the Products, Defendant Beauty Bell was then and is now guilty of one or more of the following acts:

213

FILED DATE: 7/2/2025 12:57 PM    2025L008392

a. Manufacturing, marketing, testing, promoting, selling, and/or distributing unreasonable dangerous and defective products;

b. Improperly warned of increased risk of diseases as required by C.F.R. § 740.1;

c. Inadequately warned of increased risk of diseases as required by C.F.R. § 740.1;

d. Inadequately warned that the safety of the product has not been determined as required by 21 CFR § 740.10;

e. Inadequately labeled hair relaxer Products as containing EDCs that act as hormonal agents as required by 21 C.F.R. § 310.530;

f. Improperly warned and failed to instruct Plaintiff of inherent risks of debilitating and life-altering conditions; or

g. Inadequately warned and failed to instruct Plaintiff of inherent risks of debilitating and life-altering conditions.

989.    Plaintiff sustained the following damages as a foreseeable, direct, and proximate result of Defendant Beauty Bell's acts and/or omissions:

a. Economic losses including medical care and lost earnings; and

b. Noneconomic losses including physical and mental pain and suffering, emotional distress, inconvenience, loss of enjoyment and impairment of quality of life, past and future.

WHEREFORE, Plaintiff DOMINI HENDERSON demands judgement against Defendant Beauty Bell Enterprises, LLC f/k/a House of Cheatham, Inc. in a sum in excess of FIFTY THOUSAND AND 00/100 DOLLARS ($50,000.00) plus costs and any such other relief as this Court deems just and proper.

**COUNT SIXTY-EIGHT**

214

FILED DATE: 7/2/2025 12:57 PM   2025L008392

## STRICT LIABILITY v. BEAUTY BELL ENTERPRISES, LLC F/K/A HOUSE OF CHEATHAM, INC.
### (DESIGN AND/OR MANUFACTURING DEFECT)

990. Plaintiff repeats and reallege the allegations in Paragraphs 1-271 above, as if fully set forth herein.

991. At all relevant times, Defendant Beauty Bell engaged in the design, development, manufacture, marketing, sale, and distribution of the Products in a defective and unreasonably dangerous condition to consumers, including Plaintiff.

992. Defendant Beauty Bell caused the Products to enter the stream of commerce and to be sold through various retailers, where Plaintiff purchased the Products.

993. The Products were expected to, and did, reach consumers, including Plaintiff, without change in the condition in which they were manufactured and sold by Defendant Beauty Bell and/or otherwise released into the stream of commerce.

994. Plaintiff used the Products in a manner normally intended, recommended, promoted, and marketed by Defendant Beauty Bell.

995. Products failed to perform safely when used by Plaintiff in a reasonably foreseeable manner, specifically increasing their risk of reproductive harm.

996. The propensity of phthalates and other endocrine receptive chemicals to trigger tumors and cancerous growths in premenopausal women, thereby substantially increasing the risk of reproductive harm, renders the Products unreasonably dangerous when used in the manner it was intended and to an extent beyond that would be contemplated by the ordinary consumer.

997. Importantly, the Products are an inessential cosmetic product that do not treat or cure any serious disease. Further, safer alternatives, including fragrance free products, have been readily available for decades.

FILED DATE: 7/2/2025 12:57 PM   2025L008392

998. Defendant Beauty Bell knew, or by the exercise of reasonably care should have known, that the Products are unreasonably dangerous but have continued to design, manufacture, sell, distribute, market, promote, and supply the Products to maximize sales and profits at the expense of public health and safety in conscious disregard of the foreseeable harm to the consuming public, including Plaintiff.

999. Defendant Beauty Bell owed a duty to all reasonably foreseeable users to design a safe product.

1000. At all pertinent times, Defendant Beauty Bell was then and is now guilty of one or more of the following acts and/or omissions:

a. Designing, manufacturing, selling, distributing, marketing, promoting, and supplying Products that they knew or should have known were unreasonable dangerous;

b. Failing to use reasonable care in the design and/or manufacturing of their Products; or

c. Failing to use reasonably feasible alternative designs in the design and/or manufacturing of the Products.

1001. As a direct and proximate result of Defendant Beauty Bell's conduct, including actions, omissions, and misrepresentations, Plaintiff sustained the following damages:

a. Economic losses including medical care and lost earnings; and

b. Noneconomic losses including physical and mental pain and suffering, emotional distress, inconvenience, loss of enjoyment and impairment of quality of life, past and future.

FILED DATE: 7/2/2025 12:57 PM   2025L008392

WHEREFORE, Plaintiff DOMINI HENDERSON demands judgement against Defendant Beauty Bell Enterprises, LLC f/k/a House of Cheatham, Inc. in a sum in excess of FIFTY THOUSAND AND 00/100 DOLLARS ($50,000.00) plus costs and any such other relief as this Court deems just and proper.

**COUNT SIXTY-NINE**
**PRODUCTS LIABILITY v. BEAUTY BELL ENTERPRISES, LLC F/K/A HOUSE OF CHEATHAM, INC.**
**(NEGLIGENT FAILURE TO WARN)**

1002.   Plaintiff repeats and reallege the allegations in Paragraphs 1-271 above, as if fully set forth herein.

1003.   At all relevant times Defendant Beauty Bell engaged in the design, development, manufacture, marketing, sale, and distribution of the Products in a defective and unreasonably dangerous condition to consumers, including Plaintiff.

1004.   Defendant Beauty Bell knew, or by the exercise of reasonable care, should have known use of their Products was dangerous, harmful, and injurious when used by Plaintiff in a reasonably foreseeable manner.

1005.   Defendant Beauty Bell knew, or by the exercise of reasonable care, should have known ordinary consumers, such as Plaintiff, would not have realized the potential risks and dangers of their Products, and that Products were likely to increase the risks of tumors and cancerous growths in premenopausal women, thereby substantially increasing the risk of reproductive harm, when used in the manner it was intended and to an extent beyond that would be contemplated by the ordinary consumer.

1006.   Defendant Beauty Bell owed a duty to all reasonably foreseeable consumers to disclose the risks associated with the use of their Products.

FILED DATE: 7/2/2025 12:57 PM    2025L008392

1007. At all pertinent times, Defendant Beauty Bell was then and is now guilty of one or more of the following acts and/or omissions:

    a. Failing to provide adequate warnings on their Products;

    b. Inadequately providing warnings on their Products;

    c. Providing misleading advertisements; or

    d. Failing to provide instructions on how to safely use their Products.

1008. As a direct and proximate result of Defendant Beauty Bell's conduct, including actions, omissions, and misrepresentations, Plaintiff sustained the following damages:

    a. Economic losses including medical care and lost earnings; and

    b. Noneconomic losses including physical and mental pain and suffering, emotional distress, inconvenience, loss of enjoyment and impairment of quality of life, past and future.

WHEREFORE, Plaintiff DOMINI HENDERSON demands judgement against Defendant Beauty Bell Enterprises, LLC f/k/a House of Cheatham, Inc. in a sum in excess of FIFTY THOUSAND AND 00/100 DOLLARS ($50,000.00) plus costs and any such other relief as this Court deems just and proper.

**COUNT SEVENTY**
**GENERAL NEGLIGENCE v. BEAUTY BELL ENTERPRISES, LLC F/K/A**

**HOUSE OF CHEATHAM, INC.**

1009. Plaintiff repeats and reallege the allegations in Paragraphs 1-271 above, as if fully set forth herein.

1010. At all relevant times, Defendant Beauty Bell engaged in the design, development, manufacture, marketing, sale, and distribution of the Products in a defective and unreasonably dangerous condition to consumers, including Plaintiff.

218

FILED DATE: 7/2/2025 12:57 PM    2025L008392

1011.   Defendant Beauty Bell caused the Products to enter the stream of commerce and to be sold through various retailers, where Plaintiff purchased the Products.

1012.   The Products were expected to, and did, reach consumers, including Plaintiff, without change in the condition in which they were manufactured and sold by Defendant Beauty Bell and/or otherwise released into the stream of commerce.

1013.   Plaintiff used the Products in a manner normally intended, recommended, promoted, and marketed by Defendant Beauty Bell.

1014.   Products failed to perform safely when used by Plaintiff in a reasonably foreseeable manner, specifically increasing her of developing reproductive harm.

1015.   The propensity of phthalates and other endocrine receptive chemicals to trigger tumors and cancerous growths in premenopausal women, thereby substantially increasing the risk of diseases including but not limited to cancer, fibroids and/or endometriosis, renders the Products unreasonably dangerous when used in the manner it was intended and to an extent beyond that would be contemplated by the ordinary consumer.

1016.   Importantly, the Products are an inessential cosmetic product that do not treat or cure any serious disease. Further, safer alternatives, including fragrance free products, have been readily available for decades.

1017.   Defendant Beauty Bell knew, or by the exercise of reasonably care should have known, that the Products are unreasonably dangerous but have continued to design, manufacture, sell, distribute, market, promote, and supply the Products to maximize sales and profits at the expense of public health and safety in conscious disregard of the foreseeable harm to the consuming public, including Plaintiff.

FILED DATE: 7/2/2025 12:57 PM    2025L008392

1018.   Defendant Beauty Bell owed a duty to all reasonably foreseeable users to exercise reasonable care in the manufacturing, designing, researching, testing, producing, supplying, inspecting, marketing, labeling, packaging, selling, and distributing of its hair relaxer Products.

1019.   At all pertinent times, Defendant Beauty Bell was then and is now guilty of one or more of the following acts and/or omissions:

a.   Failing to design safe Products;

b.   Failing to manufacture safe Products;

c.   Failing to use reasonably feasible alternative designs in the design of the Product;

d.   Failing to use reasonably feasible alternative designs in the manufacturing of the Product;

e.   Failing to properly warn of the hazards associated with the Product;

f.   Failing to properly test the Product to determine adequacy and effectiveness or safety measures prior to releasing the Product to consumers, including the Plaintiff;

g.   Failing to properly warn consumers that the safety of the Product had not been determined;

h.   Failing to inform consumers, including the Plaintiff, of the safe and proper methods of handling and using the Product,

i.   Failing to remove the Product from the market when Defendant Beauty Bell new or reasonably should have known that the Products were defective;

j.   Failing to instruct consumers, including the Plaintiff, as to methods for reducing exposure to the Products;

220

FILED DATE: 7/2/2025 12:57 PM    2025L008392

k.   Failing to properly label the Products as defective; or

l.   Failing to properly market the Products as defective.

1020.   Defendant Beauty Bell knew or should have known that consumers, such as Plaintiff, would foreseeably suffer injuries as a result of the Defendant's failure to exercise ordinary care as described above.

1021.   As a direct and proximate result of Defendant Beauty Bell's conduct, including actions, omissions, and misrepresentations, Plaintiff sustained the following damages:

a.   Economic losses including medical care and lost earnings; and

b.   Noneconomic losses including physical and mental pain and suffering, emotional distress, inconvenience, loss of enjoyment and impairment of quality of life, past and future.

WHEREFORE, Plaintiff DOMINI HENDERSON demands judgement against Defendant Beauty Bell Enterprises, LLC f/k/a House of Cheatham, Inc. in a sum in excess of FIFTY THOUSAND AND 00/100 DOLLARS ($50,000.00) plus costs and any such other relief as this Court deems just and proper.

## COUNT SEVENTY-ONE

## FRAUD v. BEAUTY BELL ENTERPRISES, LLC F/K/A HOUSE OF CHEATHAM, INC.

1022.   Plaintiff repeats and reallege the allegations in Paragraphs 1-271 above, as if fully set forth herein.

1023.   Defendant Beauty Bell engaged in the development, manufacture, marketing, sale and distribution of cosmetic and personal care products, including the Products, owed a duty to provide accurate and complete information regarding said products.

FILED DATE: 7/2/2025 12:57 PM   2025L008392

1024.   Defendant Beauty Bell fraudulently misrepresented the use of the Products as safe and effective.

1025.   Defendant Beauty Bell made these representations on its Product packaging and marketing materials with the intention of assuring consumers that their hair relaxer Products were imbued with ingredients designed to help and improve the condition of their hair while giving the impression that nothing harmful could or would be contained in the product ingredients.

1026.   These representations were intended to, and did in fact, induce consumers to believe that its Products could or would not contain harmful ingredients.

1027.   Defendant Beauty Bell made these representations on its Product packaging when they knew or should have known that its hair relaxer Products contained phthalates and other EDCs known to increase the risk and/or cause reproductive harms to consumers.

1028.   Defendant Beauty Bell's marketing and labeling fraudulently omitted warnings about health hazards, and that the Product's safety had not been established.

1029.   Consumers could not ascertain from the packaging or the ingredient listing that anything harmful could or would be present in the Product because the harmful chemicals are contained within a catch-all "fragrance" category on the Product's labels.

1030.   Defendant Beauty Bell's Products did not disclose the presence of these toxic chemicals pursuant to 21 Code of Federal Regulations § 700.3 and § 701.3, which require that fragrance ingredients that either do not serve to impart a smell or odor, or ingredients that serve a technical or functional purpose in the product must be disclosed, and pursuant to 21 Code of Federal Regulations § 310.530, which requires that ingredients that act or function as hormones in products must be properly disclosed and labelled.

222

FILED DATE: 7/2/2025 12:57 PM   2025L008392

1031.   A recent article was published on October 4, 2022, on MSN and other online news outlets, titled "The Relaxer Box Girls: Where Are They Now," which revealed that many of the young black girls featured on relaxer boxes and in relaxer ads in the 80s, 90s, and 2000s, never actually got their hair relaxed. Instead, they used other straightening tools and styling products to achieve the look of having the relaxer, without having exposed themselves to the dangerous chemicals within relaxers. Many of them are wearing natural hairstyles today.[152]

1032.   At all pertinent times, Defendant Beauty Bell, was then and is now guilty of one or more of the following acts and/or omissions:

  a.   Knowingly and/or negligently made misrepresentations that were material, false, incomplete, misleading, deceptive and deceitful;

  b.   Knowingly and/or negligently made omissions that were material, false, incomplete, misleading, deceptive and deceitful;

  c.   Knowingly and/or negligently made misrepresentations for the purpose of deceiving and defrauding consumers, including Plaintiff; or

  d.   Knowingly and/or negligently made omissions for the purpose of deceiving and defrauding consumers, including Plaintiff.

1033.   Plaintiff relied, with reasonable justification, on the misrepresentations by Defendant Beauty Bell, which induced them to purchase and use the Products on a regular basis for decades.

1034.   Defendant Beauty Bell profited, significantly, from their unethical and illegal conduct that fraudulently induced Plaintiff, and millions of other consumers, to purchase a dangerous and defective product.

---

[152] The Relaxer Box Girls: Where Are They Now? (msn.com)

FILED DATE: 7/2/2025 12:57 PM   2025L008392

1035.   Defendant Beauty Bell's actions, and Plaintiff's justifiable reliance thereon, were substantial contributing factors in causing injury and incurrence of substantial damages.

1036.   As a direct and proximate result of the Defendant Beauty Bell's conduct, Plaintiff sustained the following damages:

      a.   Economic losses including medical care and lost earnings; and

      b.   Noneconomic losses including physical and mental pain and suffering, emotional distress, inconvenience, loss of enjoyment and impairment of quality of life, past and future.

WHEREFORE, Plaintiff DOMINI HENDERSON demands judgement against Defendant Beauty Bell Enterprises, LLC f/k/a House of Cheatham, Inc. in a sum in excess of FIFTY THOUSAND AND 00/100 DOLLARS ($50,000.00) plus costs and any such other relief as this Court deems just and proper.

## COUNT SEVENTY-TWO

### VIOLATION OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE TRADE PRACTICES ACT v. BEAUTY BELL ENTERPRISES, LLC F/K/A HOUSE OF CHEATHAM, INC.

### (815 ILCS §505/1 et seq.)

1037.   Plaintiff repeats and reallege the allegations in Paragraphs 1-271 above, as if fully set forth herein.

1038.   The Illinois Consumer Fraud and Deceptive Business Practices Act, 815 Ill. Comp. Stat. 505/2, states that, "[u]nfair methods of competition and unfair or deceptive acts or practices are hereby declared unlawful whether any person has in fact been misled, deceived, or damaged thereby."

FILED DATE: 7/2/2025 12:57 PM    2025L008392

1039.   Defendant Beauty Bell had a statutory duty to refrain from unfair or deceptive acts or trade practices in the design, labeling, development, manufacture, promotion, and sale of the Products.

1040.   Defendant Beauty Bell's intentional, deceptive, unconscionable, and fraudulent representations and material omissions to the Plaintiff, physicians, and consumers, constituted unfair and deceptive acts and trade practices in violation of the Illinois Consumer Fraud and Deceptive Trade Practices Act.

1041.   At all pertinent times, Defendant Beauty Bell was then and is now guilty of one of the following acts and/or omissions:

   a.   Engaging in unfair or deceptive acts in violation of the Illinois Consumer Fraud and Deceptive Business Practices Act;

   b.   Using false pretenses for a monetary gain from consumers, including Plaintiff;

   c.   Engaging in unfair methods of competition and deceptive acts or practices that were proscribed by law;

   d.   Representing that goods or services have characteristics, ingredients, uses, benefits, or quantities that they do not have;

   e.   Advertising goods or services with the intent not to sell them as advertised;

   f.   Engaging in fraudulent or deceptive conduct that creates a likelihood of confusion or misunderstanding;

1042.   The actions and omissions of Defendant Beauty Bell alleged herein are uncured or incurable deceptive acts under the statues enacted in the states to protect consumers against unfair, deceptive, fraudulent, and unconscionable trade and business practices and false advertising.

FILED DATE: 7/2/2025 12:57 PM    2025L008392

1043.  Defendant Beauty Bell had actual knowledge of the defective and dangerous condition of Defendant Beauty Bell's Product and failed to take any action to cure such defective and dangerous conditions.

1044.  Plaintiff relied upon Defendant Beauty Bell's misrepresentations and omissions in determining which product to use.

1045.  Defendant Beauty Bell's deceptive, unconscionable or fraudulent representations and material omissions to Plaintiff and other consumers constituted deceptive acts and practices.

1046.  By reason of the unlawful acts engaged in by Defendant Beauty Bell, and as a direct and proximate result thereof, Plaintiff suffered ascertainable losses and damages.

1047.  As a direct and proximate result of Defendant Beauty Bell's violations of the State of Illinois' consumer protection laws, Plaintiff sustained the following damages:

   a.  Economic losses including medical care and lost earnings; and

   b.  Noneconomic losses including physical and mental pain and suffering, emotional distress, inconvenience, loss of enjoyment and impairment of quality of life, past and future.

WHEREFORE, Plaintiff DOMINI HENDERSON demands judgement against Defendant Beauty Bell Enterprises, LLC f/k/a House of Cheatham, Inc. in a sum in excess of FIFTY THOUSAND AND 00/100 DOLLARS ($50,000.00) plus costs and any such other relief as this Court deems just and proper.

### COUNT SEVENTY-THREE
### STRICT LIABILITY v. HOUSE OF CHEATHAM LLC
### (FAILURE TO WARN)

1048.  Plaintiff repeats and reallege the allegations in Paragraphs 1-271 above, as if fully set forth herein.

226

FILED DATE: 7/2/2025 12:57 PM    2025L008392

1049.   At all pertinent times, Defendant House of Cheatham was manufacturing, marketing, testing, promoting, selling and/or distributing the Products in the regular course of business.

1050.   Defendant House of Cheatham's Products were expected to and did reach consumers, including Plaintiff , without substantial change in the condition in which their Products were manufactured, sold, or otherwise released into the stream of commerce by Defendant House of Cheatham.

1051.   At all pertinent times, Plaintiff used the Products on their scalp area, which is a reasonably foreseeable use.

1052.   At all pertinent times, Defendant House of Cheatham knew or should have known that the use phthalates and other EDCs in hair products significantly increases the risk of diseases including reproductive harm, based upon scientific knowledge dating back for decades.

1053.   At all pertinent times, including the time of sale and consumption of the Products, Defendant House of Cheatham was then and is now guilty of one or more of the following acts:

   a.  Manufacturing, marketing, testing, promoting, selling, and/or distributing unreasonable dangerous and defective products;

   b.  Improperly warned of increased risk of diseases as required by C.F.R. § 740.1;

   c.  Inadequately warned of increased risk of diseases as required by C.F.R. § 740.1;

   d.  Inadequately warned that the safety of the product has not been determined as required by 21 CFR § 740.10;

   e.  Inadequately labeled hair relaxer Products as containing EDCs that act as hormonal agents as required by 21 C.F.R. § 310.530;

FILED DATE: 7/2/2025 12:57 PM    2025L008392

 f. Improperly warned and failed to instruct Plaintiff of inherent risks of debilitating and life-altering conditions; or

 g. Inadequately warned and failed to instruct Plaintiff of inherent risks of debilitating and life-altering conditions.

1054. Plaintiff sustained the following damages as a foreseeable, direct, and proximate result of Defendant House of Cheatham's acts and/or omissions:

 a. Economic losses including medical care and lost earnings; and

 b. Noneconomic losses including physical and mental pain and suffering, emotional distress, inconvenience, loss of enjoyment and impairment of quality of life, past and future.

WHEREFORE, Plaintiff DOMINI HENDERSON demands judgement against Defendant House of Cheatham LLC in a sum in excess of FIFTY THOUSAND AND 00/100 DOLLARS ($50,000.00) plus costs and any such other relief as this Court deems just and proper.

**COUNT SEVENTY-FOUR**
**STRICT LIABILITY v. HOUSE OF CHEATHAM LLC**
**(DESIGN AND/OR MANUFACTURING DEFECT)**

1055. Plaintiff repeats and realleges the allegations in Paragraphs 1-271 above, as if fully set forth herein.

1056. At all relevant times, Defendant House of Cheatham engaged in the design, development, manufacture, marketing, sale, and distribution of the Products in a defective and unreasonably dangerous condition to consumers, including Plaintiff.

1057. Defendant House of Cheatham caused the Products to enter the stream of commerce and to be sold through various retailers, where Plaintiff purchased the Products.

228

FILED DATE: 7/2/2025 12:57 PM   2025L008392

1058.   The Products were expected to, and did, reach consumers, including Plaintiff, without change in the condition in which they were manufactured and sold by Defendant House of Cheatham and/or otherwise released into the stream of commerce.

1059.   Plaintiff used the Products in a manner normally intended, recommended, promoted, and marketed by Defendant House of Cheatham.

1060.   Products failed to perform safely when used by Plaintiff in a reasonably foreseeable manner, specifically increasing their risk of reproductive harm.

1061.   The propensity of phthalates and other endocrine receptive chemicals to trigger tumors and cancerous growths in premenopausal women, thereby substantially increasing the risk of reproductive harm, renders the Products unreasonably dangerous when used in the manner it was intended and to an extent beyond that would be contemplated by the ordinary consumer.

1062.   Importantly, the Products are an inessential cosmetic product that do not treat or cure any serious disease. Further, safer alternatives, including fragrance free products, have been readily available for decades.

1063.   Defendant House of Cheatham knew, or by the exercise of reasonably care should have known, that the Products are unreasonably dangerous but have continued to design, manufacture, sell, distribute, market, promote, and supply the Products to maximize sales and profits at the expense of public health and safety in conscious disregard of the foreseeable harm to the consuming public, including Plaintiff.

1064.   Defendant House of Cheatham owed a duty to all reasonably foreseeable users to design a safe product.

1065.   At all pertinent times, Defendant House of Cheatham was then and is now guilty of one or more of the following acts and/or omissions:

FILED DATE: 7/2/2025 12:57 PM    2025L008392

a. Designing, manufacturing, selling, distributing, marketing, promoting, and supplying Products that they knew or should have known were unreasonable dangerous;

b. Failing to use reasonable care in the design and/or manufacturing of their Products; or

c. Failing to use reasonably feasible alternative designs in the design and/or manufacturing of the Products.

1066. As a direct and proximate result of Defendant House of Cheatham's conduct, including actions, omissions, and misrepresentations, Plaintiff sustained the following damages:

a. Economic losses including medical care and lost earnings; and

b. Noneconomic losses including physical and mental pain and suffering, emotional distress, inconvenience, loss of enjoyment and impairment of quality of life, past and future.

WHEREFORE, Plaintiff DOMINI HENDERSON demands judgement against Defendant House of Cheatham, LLC in a sum in excess of FIFTY THOUSAND AND 00/100 DOLLARS ($50,000.00) plus costs and any such other relief as this Court deems just and proper.

**COUNT SEVENTY-FIVE**
**PRODUCTS LIABILITY v. HOUSE OF CHEATHAM LLC**
**(NEGLIGENT FAILURE TO WARN)**

1067. Plaintiff repeats and reallege the allegations in Paragraphs 1-271 above, as if fully set forth herein.

1068. At all relevant times Defendant House of Cheatham engaged in the design, development, manufacture, marketing, sale, and distribution of the Products in a defective and unreasonably dangerous condition to consumers, including Plaintiff.

FILED DATE: 7/2/2025 12:57 PM   2025L008392

1069.   Defendant House of Cheatham knew, or by the exercise of reasonable care, should have known use of their Products was dangerous, harmful, and injurious when used by Plaintiff in a reasonably foreseeable manner.

1070.   Defendant House of Cheatham knew, or by the exercise of reasonable care, should have known ordinary consumers, such as Plaintiff, would not have realized the potential risks and dangers of their Products, and that Products were likely to increase the risks of tumors and cancerous growths in premenopausal women, thereby substantially increasing the risk of reproductive harm, when used in the manner it was intended and to an extent beyond that would be contemplated by the ordinary consumer.

1071.   Defendant House of Cheatham owed a duty to all reasonably foreseeable consumers to disclose the risks associated with the use of their Products.

1072.   At all pertinent times, Defendant House of Cheatham was then and is now guilty of one or more of the following acts and/or omissions:

  a.   Failing to provide adequate warnings on their Products;

  b.   Inadequately providing warnings on their Products;

  c.   Providing misleading advertisements; or

  d.   Failing to provide instructions on how to safely use their Products.

1073.   As a direct and proximate result of Defendant House of Cheatham's conduct, including actions, omissions, and misrepresentations, Plaintiff sustained the following damages:

  a.   Economic losses including medical care and lost earnings; and

  b.   Noneconomic losses including physical and mental pain and suffering, emotional distress, inconvenience, loss of enjoyment and impairment of quality of life, past and future.

FILED DATE: 7/2/2025 12:57 PM    2025L008392

WHEREFORE, Plaintiff DOMINI HENDERSON demands judgement against Defendant House of Cheatham LLC in a sum in excess of FIFTY THOUSAND AND 00/100 DOLLARS ($50,000.00) plus costs and any such other relief as this Court deems just and proper.

## COUNT SEVENTY-SIX
## GENERAL NEGLIGENCE v. HOUSE OF CHEATHAM, LLC

1074.    Plaintiff repeats and reallege the allegations in Paragraphs 1-271 above, as if fully set forth herein.

1075.    At all relevant times, Defendant House of Cheatham engaged in the design, development, manufacture, marketing, sale, and distribution of the Products in a defective and unreasonably dangerous condition to consumers, including Plaintiff.

1076.    Defendant House of Cheatham caused the Products to enter the stream of commerce and to be sold through various retailers, where Plaintiff purchased the Products.

1077.    The Products were expected to, and did, reach consumers, including Plaintiff, without change in the condition in which they were manufactured and sold by Defendant House of Cheatham and/or otherwise released into the stream of commerce.

1078.    Plaintiff used the Products in a manner normally intended, recommended, promoted, and marketed by Defendant House of Cheatham.

1079.    Products failed to perform safely when used by Plaintiff in a reasonably foreseeable manner, specifically increasing her of developing reproductive harm.

1080.    The propensity of phthalates and other endocrine receptive chemicals to trigger tumors and cancerous growths in premenopausal women, thereby substantially increasing the risk of diseases including but not limited to cancer, fibroids and/or endometriosis, renders the Products unreasonably dangerous when used in the manner it was intended and to an extent beyond that would be contemplated by the ordinary consumer.

FILED DATE: 7/2/2025 12:57 PM    2025L008392

1081.   Importantly, the Products are an inessential cosmetic product that do not treat or cure any serious disease. Further, safer alternatives, including fragrance free products, have been readily available for decades.

1082.   Defendant House of Cheatham knew, or by the exercise of reasonably care should have known, that the Products are unreasonably dangerous but have continued to design, manufacture, sell, distribute, market, promote, and supply the Products to maximize sales and profits at the expense of public health and safety in conscious disregard of the foreseeable harm to the consuming public, including Plaintiff.

1083.   Defendant House of Cheatham owed a duty to all reasonably foreseeable users to exercise reasonable care in the manufacturing, designing, researching, testing, producing, supplying, inspecting, marketing, labeling, packaging, selling, and distributing of its hair relaxer Products.

1084.   At all pertinent times, Defendant House of Cheatham was then and is now guilty of one or more of the following acts and/or omissions:

a.   Failing to design safe Products;

b.   Failing to manufacture safe Products;

c.   Failing to use reasonably feasible alternative designs in the design of the Product;

d.   Failing to use reasonably feasible alternative designs in the manufacturing of the Product;

e.   Failing to properly warn of the hazards associated with the Product;

FILED DATE: 7/2/2025 12:57 PM   2025L008392

    f.   Failing to properly test the Product to determine adequacy and effectiveness or safety measures prior to releasing the Product to consumers, including the Plaintiff;

    g.   Failing to properly warn consumers that the safety of the Product had not been determined;

    h.   Failing to inform consumers, including the Plaintiff, of the safe and proper methods of handling and using the Product,

    i.   Failing to remove the Product from the market when Defendant House of Cheatham knew or reasonably should have known that the Products were defective;

    j.   Failing to instruct consumers, including the Plaintiff, as to methods for reducing exposure to the Products;

    k.   Failing to properly label the Products as defective; or

    l.   Failing to properly market the Products as defective.

1085.  Defendant House of Cheatham knew or should have known that consumers, such as Plaintiff, would foreseeably suffer injuries as a result of the Defendant's failure to exercise ordinary care as described above.

1086.  As a direct and proximate result of Defendant House of Cheatham's conduct, including actions, omissions, and misrepresentations, Plaintiff sustained the following damages:

    a.   Economic losses including medical care and lost earnings; and

    b.   Noneconomic losses including physical and mental pain and suffering, emotional distress, inconvenience, loss of enjoyment and impairment of quality of life, past and future.

FILED DATE: 7/2/2025 12:57 PM   2025L008392

WHEREFORE, Plaintiff DOMINI HENDERSON demands judgement against Defendant House of Cheatham LLC in a sum in excess of FIFTY THOUSAND AND 00/100 DOLLARS ($50,000.00) plus costs and any such other relief as this Court deems just and proper.

## COUNT SEVENTY-SEVEN

## FRAUD v. HOUSE OF CHEATHAM, LLC

1087.   Plaintiff repeats and reallege the allegations in Paragraphs 1-271 above, as if fully set forth herein.

1088.   Defendant House of Cheatham engaged in the development, manufacture, marketing, sale and distribution of cosmetic and personal care products, including the Products, owed a duty to provide accurate and complete information regarding said products.

1089.   Defendant House of Cheatham fraudulently misrepresented the use of the Products as safe and effective.

1090.   Defendant House of Cheatham made these representations on its Product packaging and marketing materials with the intention of assuring consumers that their hair relaxer Products were imbued with ingredients designed to help and improve the condition of their hair while giving the impression that nothing harmful could or would be contained in the product ingredients.

1091.   These representations were intended to, and did in fact, induce consumers to believe that its Products could or would not contain harmful ingredients.

1092.   Defendant House of Cheatham made these representations on its Product packaging when they knew or should have known that its hair relaxer Products contained phthalates and other EDCs known to increase the risk and/or cause reproductive harms to consumers.

1093.   Defendant House of Cheatham's marketing and labeling fraudulently omitted warnings about health hazards, and that the Product's safety had not been established.

FILED DATE: 7/2/2025 12:57 PM   2025L008392

1094.   Consumers could not ascertain from the packaging or the ingredient listing that anything harmful could or would be present in the Product because the harmful chemicals are contained within a catch-all "fragrance" category on the Product's labels.

1095.   Defendant House of Cheatham's Products did not disclose the presence of these toxic chemicals pursuant to 21 Code of Federal Regulations § 700.3 and § 701.3, which require that fragrance ingredients that either do not serve to impart a smell or odor, or ingredients that serve a technical or functional purpose in the product must be disclosed, and pursuant to 21 Code of Federal Regulations § 310.530, which requires that ingredients that act or function as hormones in products must be properly disclosed and labelled.

1096.   A recent article was published on October 4, 2022, on MSN and other online news outlets, titled "The Relaxer Box Girls: Where Are They Now," which revealed that many of the young black girls featured on relaxer boxes and in relaxer ads in the 80s, 90s, and 2000s, never actually got their hair relaxed. Instead, they used other straightening tools and styling products to achieve the look of having the relaxer, without having exposed themselves to the dangerous chemicals within relaxers. Many of them are wearing natural hairstyles today.[153]

1097.   At all pertinent times, Defendant House of Cheatham was then and is now guilty of one or more of the following acts and/or omissions:

  a.   Knowingly and/or negligently made misrepresentations that were material, false, incomplete, misleading, deceptive and deceitful;

  b.   Knowingly and/or negligently made omissions that were material, false, incomplete, misleading, deceptive and deceitful;

---

[153] The Relaxer Box Girls: Where Are They Now? (msn.com)

FILED DATE: 7/2/2025 12:57 PM    2025L008392

c.  Knowingly and/or negligently made misrepresentations for the purpose of deceiving and defrauding consumers, including Plaintiff; or

d.  Knowingly and/or negligently made omissions for the purpose of deceiving and defrauding consumers, including Plaintiff.

1098.  Plaintiff relied, with reasonable justification, on the misrepresentations by the Defendant House of Cheatham, which induced them to purchase and use the Products on a regular basis for decades.

1099.  Defendant House of Cheatham profited, significantly, from their unethical and illegal conduct that fraudulently induced Plaintiff, and millions of other consumers, to purchase a dangerous and defective product.

1100.  Defendant House of Cheatham's actions, and Plaintiff's justifiable reliance thereon, were substantial contributing factors in causing injury and incurrence of substantial damages.

1101.  As a direct and proximate result of the Defendant House of Cheatham's conduct, Plaintiff sustained the following damages:

a.  Economic losses including medical care and lost earnings; and

b.  Noneconomic losses including physical and mental pain and suffering, emotional distress, inconvenience, loss of enjoyment and impairment of quality of life, past and future.

WHEREFORE, Plaintiff DOMINI HENDERSON demands judgement against Defendant House of Cheatham LLC in a sum in excess of FIFTY THOUSAND AND 00/100 DOLLARS ($50,000.00) plus costs and any such other relief as this Court deems just and proper.

**COUNT SEVENTY-EIGHT**

**VIOLATION OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE TRADE PRACTICES ACT v. HOUSE OF CHEATHAM, LLC**

237

FILED DATE: 7/2/2025 12:57 PM    2025L008392

**(815 ILCS §505/1 et seq.)**

1102.   Plaintiff repeats and reallege the allegations in Paragraphs 1-271 above, as if fully set forth herein.

1103.   The Illinois Consumer Fraud and Deceptive Business Practices Act, 815 Ill. Comp. Stat. 505/2, states that, "[u]nfair methods of competition and unfair or deceptive acts or practices are hereby declared unlawful whether any person has in fact been misled, deceived, or damaged thereby."

1104.   Defendant House of Cheatham had a statutory duty to refrain from unfair or deceptive acts or trade practices in the design, labeling, development, manufacture, promotion, and sale of the Products.

1105.   Defendant House of Cheatham's intentional, deceptive, unconscionable, and fraudulent representations and material omissions to the Plaintiff, physicians, and consumers, constituted unfair and deceptive acts and trade practices in violation of the Illinois Consumer Fraud and Deceptive Trade Practices Act.

1106.   At all pertinent times, Defendant House of Cheatham was then and is now guilty of one of the following acts and/or omissions:

    a.   Engaging in unfair or deceptive acts in violation of the Illinois Consumer Fraud and Deceptive Business Practices Act;

    b.   Using false pretenses for a monetary gain from consumers, including Plaintiff;

    c.   Engaging in unfair methods of competition and deceptive acts or practices that were proscribed by law;

    d.   Representing that goods or services have characteristics, ingredients, uses, benefits, or quantities that they do not have;

    e.   Advertising goods or services with the intent not to sell them as advertised;

FILED DATE: 7/2/2025 12:57 PM    2025L008392

      f.   Engaging in fraudulent or deceptive conduct that creates a likelihood of confusion or misunderstanding;

1107. The actions and omissions of Defendant House of Cheatham alleged herein are uncured or incurable deceptive acts under the statues enacted in the states to protect consumers against unfair, deceptive, fraudulent, and unconscionable trade and business practices and false advertising.

1108. Defendant House of Cheatham had actual knowledge of the defective and dangerous condition of Defendant House of Cheatham's Product and failed to take any action to cure such defective and dangerous conditions.

1109. Plaintiff relied upon Defendant House of Cheatham's misrepresentations and omissions in determining which product to use.

1110. Defendant House of Cheatham's deceptive, unconscionable or fraudulent representations and material omissions to Plaintiff and other consumers constituted deceptive acts and practices.

1111. By reason of the unlawful acts engaged in by Defendant House of Cheatham, and as a direct and proximate result thereof, Plaintiff suffered ascertainable losses and damages.

1112. As a direct and proximate result of Defendant House of Cheatham's violations of the State of Illinois' consumer protection laws, Plaintiff sustained the following damages:

      a.   Economic losses including medical care and lost earnings; and

      b.   Noneconomic losses including physical and mental pain and suffering, emotional distress, inconvenience, loss of enjoyment and impairment of quality of life, past and future.

FILED DATE: 7/2/2025 12:57 PM   2025L008392

WHEREFORE, Plaintiff DOMINI HENDERSON demands judgement against Defendant House of Cheatham LLC in a sum in excess of FIFTY THOUSAND AND 00/100 DOLLARS ($50,000.00) plus costs and any such other relief as this Court deems just and proper.

**COUNT SEVENTY-NINE**
**STRICT LIABILITY v. CHAPMAN PRODUCTS COMPANY, INC.**
**(FAILURE TO WARN)**

1113.   Plaintiff repeats and reallege the allegations in Paragraphs 1-271 above, as if fully set forth herein.

1114.   At all pertinent times, Defendant Chapman was manufacturing, marketing, testing, promoting, selling and/or distributing the Products in the regular course of business.

1115.   Defendant Chapman's Products were expected to and did reach consumers, including Plaintiff, without substantial change in the condition in which their Products were manufactured, sold, or otherwise released into the stream of commerce by Defendant Chapman.

1116.   At all pertinent times, Plaintiff used the Products on their scalp area, which is a reasonably foreseeable use.

1117.   At all pertinent times, Defendant Chapman knew or should have known that the use phthalates and other EDCs in hair products significantly increases the risk of diseases including reproductive harm, based upon scientific knowledge dating back for decades.

1118.   At all pertinent times, including the time of sale and consumption of the Products, Defendant Chapman was then and is now guilty of one or more of the following acts:

    a.   Manufacturing, marketing, testing, promoting, selling, and/or distributing unreasonable dangerous and defective products.

    b.   Improperly warned of increased risk of diseases as required by C.F.R. § 740.1;

    c.   Inadequately warned of increased risk of diseases as required by C.F.R. § 740.1;

240

FILED DATE: 7/2/2025 12:57 PM   2025L008392

d.  Inadequately warned that the safety of the product has not been determined as required by 21 CFR § 740.10;

e.  Inadequately labeled hair relaxer Products as containing EDCs that act as hormonal agents as required by 21 C.F.R. § 310.530;

f.  Improperly warned and failed to instruct Plaintiff of inherent risks of debilitating and life-altering conditions; or

g.  Inadequately warned and failed to instruct Plaintiff of inherent risks of debilitating and life-altering conditions.

1119.  Plaintiff sustained the following damages as a foreseeable, direct, and proximate result of Defendant Chapman's acts and/or omissions:

a.  Economic losses including medical care and lost earnings; and

b.  Noneconomic losses including physical and mental pain and suffering, emotional distress, inconvenience, loss of enjoyment and impairment of quality of life, past and future.

WHEREFORE, Plaintiff DOMINI HENDERSON demands judgement against Defendant Chapman Products Company, Inc in a sum in excess of FIFTY THOUSAND AND 00/100 DOLLARS ($50,000.00) plus costs and any such other relief as this Court deems just and proper.

## COUNT EIGHTY
## STRICT LIABILITY v. CHAPMAN PRODUCTS COMPANY, INC.
## (DESIGN AND/OR MANUFACTURING DEFECT)

1120.  Plaintiff repeats and reallege the allegations in Paragraphs 1-271 above, as if fully set forth herein.

FILED DATE: 7/2/2025 12:57 PM    2025L008392

1121.   At all relevant times, Defendant Chapman engaged in the design, development, manufacture, marketing, sale, and distribution of the Products in a defective and unreasonably dangerous condition to consumers, including Plaintiff.

1122.   Defendant Chapman caused the Products to enter the stream of commerce and to be sold through various retailers, where Plaintiff purchased the Products.

1123.   The Products were expected to, and did, reach consumers, including Plaintiff, without change in the condition in which they were manufactured and sold by Defendant Chapman and/or otherwise released into the stream of commerce.

1124.   Plaintiff used the Products in a manner normally intended, recommended, promoted, and marketed by Defendant Chapman.

1125.   Products failed to perform safely when used by Plaintiff in a reasonably foreseeable manner, specifically increasing their risk of reproductive harm.

1126.   The propensity of phthalates and other endocrine receptive chemicals to trigger tumors and cancerous growths in premenopausal women, thereby substantially increasing the risk of reproductive harm, renders the Products unreasonably dangerous when used in the manner it was intended and to an extent beyond that would be contemplated by the ordinary consumer.

1127.   Importantly, the Products are an inessential cosmetic product that do not treat or cure any serious disease. Further, safer alternatives, including fragrance free products, have been readily available for decades.

1128.   Defendant Chapman knew, or by the exercise of reasonably care should have known, that the Products are unreasonably dangerous but have continued to design, manufacture, sell, distribute, market, promote, and supply the Products to maximize sales and profits at the

242

FILED DATE: 7/2/2025 12:57 PM   2025L008392

expense of public health and safety in conscious disregard of the foreseeable harm to the consuming public, including Plaintiff.

1129.   Defendant Chapman owed a duty to all reasonably foreseeable users to design a safe product.

1130.   At all pertinent times, Defendant Chapman was then and is now guilty of one or more of the following acts and/or omissions:

    a.   Designing, manufacturing, selling, distributing, marketing, promoting, and supplying Products that they knew or should have known were unreasonable dangerous;

    b.   Failing to use reasonable care in the design and/or manufacturing of their Products; or

    c.   Failing to use reasonably feasible alternative designs in the design and/or manufacturing of the Products.

1131.   As a direct and proximate result of Defendant Chapman's conduct, including actions, omissions, and misrepresentations, Plaintiff sustained the following damages:

    a.   Economic losses including medical care and lost earnings; and

    b.   Noneconomic losses including physical and mental pain and suffering, emotional distress, inconvenience, loss of enjoyment and impairment of quality of life, past and future.

WHEREFORE, Plaintiff DOMINI HENDERSON demands judgement against Defendant Chapman Products Company, Inc. in a sum in excess of FIFTY THOUSAND AND 00/100 DOLLARS ($50,000.00) plus costs and any such other relief as this Court deems just and proper.

## COUNT EIGHTY-ONE
## PRODUCTS LIABILITY v. CHAPMAN PRODUCTS COMPANY, INC.

FILED DATE: 7/2/2025 12:57 PM   2025L008392

**(NEGLIGENT FAILURE TO WARN)**

1132.   Plaintiff repeats and reallege the allegations in Paragraphs 1-271 above, as if fully set forth herein.

1133.   At all relevant times Defendant Chapman engaged in the design, development, manufacture, marketing, sale, and distribution of the Products in a defective and unreasonably dangerous condition to consumers, including Plaintiff.

1134.   Defendant Chapman knew, or by the exercise of reasonable care, should have known use of their Products was dangerous, harmful, and injurious when used by Plaintiff in a reasonably foreseeable manner.

1135.   Defendant Chapman knew, or by the exercise of reasonable care, should have known ordinary consumers, such as Plaintiff, would not have realized the potential risks and dangers of their Products, and that Products were likely to increase the risks of tumors and cancerous growths in premenopausal women, thereby substantially increasing the risk of reproductive harm, when used in the manner it was intended and to an extent beyond that would be contemplated by the ordinary consumer.

1136.   Defendant Chapman owed a duty to all reasonably foreseeable consumers to disclose the risks associated with the use of their Products.

1137.   At all pertinent times, Defendant Chapman was then and is now guilty of one or more of the following acts and/or omissions:

    a.   Failing to provide adequate warnings on their Products.

    b.   Inadequately providing warnings on their Products;

    c.   Providing misleading advertisements; or

    d.   Failing to provide instructions on how to safely use their Products.

FILED DATE: 7/2/2025 12:57 PM    2025L008392

1138.  As a direct and proximate result of Defendant Chapman's conduct, including actions, omissions, and misrepresentations, Plaintiff sustained the following damages:

    a.  Economic losses including medical care and lost earnings; and

    b.  Noneconomic losses including physical and mental pain and suffering, emotional distress, inconvenience, loss of enjoyment and impairment of quality of life, past and future.

WHEREFORE, Plaintiff DOMINI HENDERSON demands judgement against Defendant Chapman Products Company, Inc. in a sum in excess of FIFTY THOUSAND AND 00/100 DOLLARS ($50,000.00) plus costs and any such other relief as this Court deems just and proper.

## COUNT EIGHTY-TWO
## GENERAL NEGLIGENCE v. CHAPMAN PRODUCTS COMPANY, INC.

1139.  Plaintiff repeats and realleges the allegations in Paragraphs 1-271 above, as if fully set forth herein.

1140.  At all relevant times, Defendant Chapman engaged in the design, development, manufacture, marketing, sale, and distribution of the Products in a defective and unreasonably dangerous condition to consumers, including Plaintiff.

1141.  Defendant Chapman caused the Products to enter the stream of commerce and to be sold through various retailers, where Plaintiff purchased the Products.

1142.  The Products were expected to, and did, reach consumers, including Plaintiff, without change in the condition in which they were manufactured and sold by Defendant Chapman and/or otherwise released into the stream of commerce.

1143.  Plaintiff used the Products in a manner normally intended, recommended, promoted, and marketed by Defendant Chapman.

1144.   Products failed to perform safely when used by Plaintiff in a reasonably foreseeable manner, specifically increasing her of developing reproductive harm.

1145.   The propensity of phthalates and other endocrine receptive chemicals to trigger tumors and cancerous growths in premenopausal women, thereby substantially increasing the risk of diseases including but not limited to cancer, fibroids and/or endometriosis, renders the Products unreasonably dangerous when used in the manner it was intended and to an extent beyond that would be contemplated by the ordinary consumer.

1146.   Importantly, the Products are an inessential cosmetic product that do not treat or cure any serious disease. Further, safer alternatives, including fragrance free products, have been readily available for decades.

1147.   Defendant Chapman knew, or by the exercise of reasonably care should have known, that the Products are unreasonably dangerous but have continued to design, manufacture, sell, distribute, market, promote, and supply the Products to maximize sales and profits at the expense of public health and safety in conscious disregard of the foreseeable harm to the consuming public, including Plaintiff.

1148.   Defendant Chapman owed a duty to all reasonably foreseeable users to exercise reasonable care in the manufacturing, designing, researching, testing, producing, supplying, inspecting, marketing, labeling, packaging, selling, and distributing of its hair relaxer Products.

1149.   At all pertinent times, Defendant Chapman was then and is now guilty of one or more of the following acts and/or omissions:

    a.   Failing to design safe Products;

    b.   Failing to manufacture safe Products;

246

FILED DATE: 7/2/2025 12:57 PM    2025L008392

c.  Failing to use reasonably feasible alternative designs in the design of the Product;

d.  Failing to use reasonably feasible alternative designs in the manufacturing of the Product;

e.  Failing to properly warn of the hazards associated with the Product;

f.  Failing to properly test the Product to determine adequacy and effectiveness or safety measures prior to releasing the Product to consumers, including the Plaintiff;

g.  Failing to properly warn consumers that the safety of the Product had not been determined;

h.  Failing to inform consumers, including the Plaintiff, of the safe and proper methods of handling and using the Product,

i.  Failing to remove the Product from the market when Defendant Chapman knew or reasonably should have known that the Products were defective;

j.  Failing to instruct consumers, including the Plaintiff, as to methods for reducing exposure to the Products;

k.  Failing to properly label the Products as defective; or

l.  Failing to properly market the Products as defective.

1150.  Defendant Chapman knew or should have known that consumers, such as Plaintiff, would foreseeably suffer injuries as a result of the Defendant's failure to exercise ordinary care as described above.

1151.  As a direct and proximate result of Defendant Chapman's conduct, including actions, omissions, and misrepresentations, Plaintiff sustained the following damages:

247

FILED DATE: 7/2/2025 12:57 PM 2025L008392

a.  Economic losses including medical care and lost earnings; and

b.  Noneconomic losses including physical and mental pain and suffering, emotional distress, inconvenience, loss of enjoyment and impairment of quality of life, past and future.

WHEREFORE, Plaintiff DOMINI HENDERSON demands judgement against Defendant Chapman Products Company, Inc. in a sum in excess of FIFTY THOUSAND AND 00/100 DOLLARS ($50,000.00) plus costs and any such other relief as this Court deems just and proper.

### COUNT EIGHTY-THREE

### FRAUD v. CHAPMAN PRODUCTS COMPANY, INC.

1152.  Plaintiff repeats and reallege the allegations in Paragraphs 1-271 above, as if fully set forth herein.

1153.  Defendant Chapman engaged in the development, manufacture, marketing, sale and distribution of cosmetic and personal care products, including the Products, owed a duty to provide accurate and complete information regarding said products.

1154.  Defendant Chapman fraudulently misrepresented the use of the Products as safe and effective.

1155.  Defendant Chapman made these representations on its Product packaging and marketing materials with the intention of assuring consumers that their hair relaxer Products were imbued with ingredients designed to help and improve the condition of their hair while giving the impression that nothing harmful could or would be contained in the product ingredients.

1156.  These representations were intended to, and did in fact, induce consumers to believe that its Products could or would not contain harmful ingredients.

FILED DATE: 7/2/2025 12:57 PM    2025L008392

1157.   Defendant Chapman made these representations on its Product packaging when they knew or should have known that its hair relaxer Products contained phthalates and other EDCs known to increase the risk and/or cause reproductive harms to consumers.

1158.   Defendant Chapman's marketing and labeling fraudulently omitted warnings about health hazards, and that the Product's safety had not been established.

1159.   Consumers could not ascertain from the packaging or the ingredient listing that anything harmful could or would be present in the Product because the harmful chemicals are contained within a catch-all "fragrance" category on the Product's labels.

1160.   Defendant Chapman's Products did not disclose the presence of these toxic chemicals pursuant to 21 Code of Federal Regulations § 700.3 and § 701.3, which require that fragrance ingredients that either do not serve to impart a smell or odor, or ingredients that serve a technical or functional purpose in the product must be disclosed, and pursuant to 21 Code of Federal Regulations § 310.530, which requires that ingredients that act or function as hormones in products must be properly disclosed and labelled.

1161.   A recent article was published on October 4, 2022, on MSN and other online news outlets, titled "The Relaxer Box Girls: Where Are They Now," which revealed that many of the young black girls featured on relaxer boxes and in relaxer ads in the 80s, 90s, and 2000s, never actually got their hair relaxed. Instead, they used other straightening tools and styling products to achieve the look of having the relaxer, without having exposed themselves to the dangerous chemicals within relaxers. Many of them are wearing natural hairstyles today.[154]

1162.   At all pertinent times, Defendant Chapman was then and is now guilty of one or more of the following acts and/or omissions:

---

[154] The Relaxer Box Girls: Where Are They Now? (msn.com)

FILED DATE: 7/2/2025 12:57 PM  2025L008392

    a.  Knowingly and/or negligently made misrepresentations that were material, false, incomplete, misleading, deceptive and deceitful;

    b.  Knowingly and/or negligently made omissions that were material, false, incomplete, misleading, deceptive and deceitful;

    c.  Knowingly and/or negligently made misrepresentations for the purpose of deceiving and defrauding consumers, including Plaintiff; or

    d.  Knowingly and/or negligently made omissions for the purpose of deceiving and defrauding consumers, including Plaintiff.

1163.  Plaintiff relied, with reasonable justification, on the misrepresentations by Defendant Chapman, which induced them to purchase and use the Products on a regular basis for decades.

1164.  Defendant Chapman profited, significantly, from their unethical and illegal conduct that fraudulently induced Plaintiff, and millions of other consumers, to purchase a dangerous and defective product.

1165.  Defendant Chapman's actions, and Plaintiff's justifiable reliance thereon, were substantial contributing factors in causing injury and incurrence of substantial damages.

1166.  As a direct and proximate result of the Defendant Chapman's conduct, Plaintiff sustained the following damages:

    a.  Economic losses including medical care and lost earnings; and

    b.  Noneconomic losses including physical and mental pain and suffering, emotional distress, inconvenience, loss of enjoyment and impairment of quality of life, past and future.

FILED DATE: 7/2/2025 12:57 PM   2025L008392

WHEREFORE, Plaintiff DOMINI HENDERSON demands judgement against Defendant Chapman Products Company, Inc. in a sum in excess of FIFTY THOUSAND AND 00/100 DOLLARS ($50,000.00) plus costs and any such other relief as this Court deems just and proper.

## COUNT EIGHTY-FOUR

### VIOLATION OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE TRADE PRACTICES ACT v. CHAPMAN PRODUCTS COMPANY, INC.

### (815 ILCS §505/1 et seq.)

1167.  Plaintiff repeats and reallege the allegations in Paragraphs 1-271 above, as if fully set forth herein.

1168.  The Illinois Consumer Fraud and Deceptive Business Practices Act, 815 Ill. Comp. Stat. 505/2, states that, "[u]nfair methods of competition and unfair or deceptive acts or practices are hereby declared unlawful whether any person has in fact been misled, deceived, or damaged thereby."

1169.  Defendant Chapman had a statutory duty to refrain from unfair or deceptive acts or trade practices in the design, labeling, development, manufacture, promotion, and sale of the Products.

1170.  Defendant Chapman's intentional, deceptive, unconscionable, and fraudulent representations and material omissions to the Plaintiff, physicians, and consumers, constituted unfair and deceptive acts and trade practices in violation of the Illinois Consumer Fraud and Deceptive Trade Practices Act.

1171.  At all pertinent times, Defendant Chapman was then and is now guilty of one of the following acts and/or omissions:

    a.  Engaging in unfair or deceptive acts in violation of the Illinois Consumer Fraud and Deceptive Business Practices Act;

251

FILED DATE: 7/2/2025 12:57 PM    2025L008392

b.  Using false pretenses for a monetary gain from consumers, including Plaintiff;

c.  Engaging in unfair methods of competition and deceptive acts or practices that were proscribed by law;

d.  Representing that goods or services have characteristics, ingredients, uses, benefits, or quantities that they do not have;

e.  Advertising goods or services with the intent not to sell them as advertised;

f.  Engaging in fraudulent or deceptive conduct that creates a likelihood of confusion or misunderstanding;

1172.  The actions and omissions of Defendant Chapman alleged herein are uncured or incurable deceptive acts under the statues enacted in the states to protect consumers against unfair, deceptive, fraudulent, and unconscionable trade and business practices and false advertising.

1173.  Defendant Chapman had actual knowledge of the defective and dangerous condition of Defendant Chapman's Product and failed to take any action to cure such defective and dangerous conditions.

1174.  Plaintiff relied upon Defendant Chapman's misrepresentations and omissions in determining which product to use.

1175.  Defendant Chapman's deceptive, unconscionable or fraudulent representations and material omissions to Plaintiff and other consumers constituted deceptive acts and practices.

1176.  By reason of the unlawful acts engaged in by Defendant Chapman, and as a direct and proximate result thereof, Plaintiff suffered ascertainable losses and damages.

1177.  As a direct and proximate result of Defendant Chapman's violations of the State of Illinois' consumer protection laws, Plaintiff sustained the following damages:

a.  Economic losses including medical care and lost earnings; and

FILED DATE: 7/2/2025 12:57 PM   2025L008392

b. Noneconomic losses including physical and mental pain and suffering, emotional distress, inconvenience, loss of enjoyment and impairment of quality of life, past and future.

WHEREFORE, Plaintiff DOMINI HENDERSON demands judgement against Defendant Chapman Products Company, Inc. in a sum in excess of FIFTY THOUSAND AND 00/100 DOLLARS ($50,000.00) plus costs and any such other relief as this Court deems just and proper.

Respectfully submitted,

By: /s/Ben Crane

Ben Crane
Ervin Nevitt
HaSheana Strong
**COPLAN & CRANE, LTD.**
1111 WESTGATE STREET
OAK PARK, ILLINOIS 60301
(708) 358-8080 (TELEPHONE)
(708) 358-8181 (FACSIMILE)
FIRM NO. 41511
IL.COURT@COPLANCRANE.COM

Danielle Ward Mason (Admitted PHV)
AL State Bar: 6763L75M
LaCrisha McAllister
*Pro Hac Vice to be submitted*
Kristina Aaid Toss
*Pro Hac Vice to be submitted*
**SINGLETON SCHREIBER, LLP**
591 Camino de la Reina, Suite 1025
San Diego, California 92108
(251) 217-9313 (TELEPHONE)
dmason@singletonschreiber.com
lmcallistersingletonschreiber.com

FILED DATE: 7/2/2025 12:57 PM   2025L008392

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, LAW DIVISION

| | |
|---|---|
| DOMINI HENDERSON | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. |
| | ) |
| NAMASTE LABORATORIES, LLC; RNA | ) |
| COROPORATION; LUSTER PRODUCTS, | ) |
| INC.; AVLON INDUSTRIES INC.; AFAM | ) |
| CONCEPT, INC., D/B/A JF LABSM INC.; | ) |
| STRENGTH OF NATURE, LLC; GODREJ | ) |
| SON HOLDINGS, INC.; L'OREAL USA, | ) |
| INC.; L'OREAL USA PRODUCTS, INC.; | ) |
| SOFT SHEEN-CARSON LLC, SOFT SHEEN- | ) |
| CARSON (W.I.), BEAUTY BELL | ) |
| ENTERPRISES, LLC F/K/A HOUSE OF | ) |
| CHEATHAM, INC.; HOUSE OF | ) |
| CHEATHAM, LLC; and CHAPMAN | ) |
| PRODUCTS COMPANY, INC. | ) |
| | ) |
| Defendants. | |

### AFFIDAVIT PURSUANT TO ILLINOIS SUPREME COURT RULE 222

I, Ben Crane, under oath and subject to the penalties of perjury, depose and state that the damages sought in this cause exceed the sum of FIFTY THOUSAND DOLLARS ($50,000.00). Pursuant to 735 ILCS 5/1-109, the undersigned certifies that the foregoing Affidavit is true and correct based upon the personal knowledge of the undersigned.

Respectfully submitted,

By: /s/Ben Crane

Ben Crane
Ervin Nevitt
HaSheana Strong
**COPLAN & CRANE, LTD.**
1111 WESTGATE STREET
OAK PARK, ILLINOIS 60301

FILED DATE: 7/2/2025 12:57 PM   2025L008392

(708) 358-8080 (TELEPHONE)
(708) 358-8181 (FACSIMILE)
FIRM NO. 41511
IL.COURT@COPLANCRANE.COM

Danielle Ward Mason
(Admitted PHV)
LaCrisha McAllister(Admitted PHV)
Kristina Aaid Toss
(Admitted PHV)
**SINGLETON SCHREIBER, LLP**
591 Camino de la Reina, Suite 1025
San Diego, California 92108
(251) 217-9313 (TELEPHONE)
dmason@singletonschreiber.com
lmcallister@singletonschreiber.com
ktoss@singletonschreiber.com

Filer Selected Hearing Date: No hearing scheduled
Location: <<CourtRoomNumber>>
Judge: Courtroom, 0206
System Generated Hearing Date: <<CmsHearingStart>>
Location: <<CmsHearingResource="Location">>
Judge: <<CmsHearingResource="JudicialOfficer">>

FILED
7/2/2025 3:11 PM
Mariyana T. Spyropoulos
CIRCUIT CLERK
COOK COUNTY, IL
20243004309
Courtroom, 0206
33409990

IN THE COOK COUNTY CIRCUIT COURT, STATE OF ILLINOIS

**CAPITAL ONE, N.A.**

Case No.: **20243004309**

Plaintiff/Petitioner

vs.

**JOSIP KLARIC**

AFFIDAVIT OF NON-SERVICE OF
**Summons; Complaint**

Defendant/Respondent

I, **Robert Clarke**, depose and say the following:

I certify that I am over the age of eighteen. I am not a party to the above action. I am a registered employee of ABC Legal Services, LLC 1099 Stewart St, Suite 700, Seattle, WA 98101 License No 117-001765 or I am a registered private detective or a registered employee of a private detective agency.

On the **1st day of July, 2025 at 2:34 PM**, I, **Robert Clarke**, **NON-SERVED JOSIP KLARIC**.

**NON-SERVICE** after due search, careful inquiry and diligent attempts at **8455 W LELAND AVE UNIT 303, CHICAGO, Cook County, IL 60656**, I have been unable to effect process upon the person/entity being served due to the following reason(s):
**7/1/2025 2:34 PM: I spoke with an individual who identified themselves as the resident and they stated subject moved. At the address I observed a call/mail box listing another. I spoke with a neighbor who says not resident.**

Service Fee Total: **$61.89**

Under penalties as provided by law pursuant to Section 1-109 of the Code of Civil Procedure, the undersigned certifies that the statements set forth in this Affidavit of NonService are true and correct.

| NAME: | | | |
|---|---|---|---|
| Robert Clarke | 129-357340 | | 07/01/2025 |
| | Server ID # | | Date |

REF: **4900954**

Page 1 of 1
Tracking #: **0176037799**



FILED DATE: 7/2/2025 3:11 PM     20243004309

Filer Selected Hearing Dates: No matching hearing date is available in Illinois Supreme Court and must be accepted or all future courts.
Forms are free at **ilcourts.info/forms.**

Location: <<CourtRoomNumber>>
Judge: Courtroom <<CourtRoomNumber>>

**STATE OF ILLINOIS,**
System Generated Hearing Date: No hearing information was found.
Location: No hearing information was found.
Judge: No hearing information was found.
**CIRCUIT COURT**

_____ **COOK** _____ **COUNTY**

**SUMMONS**

For Court Use Only

FILED
6/12/2025 2:43 PM
Mariyana T. Spyropoulos
CIRCUIT CLERK
COOK COUNTY, IL
20243004309
Courtroom, 0206
33129589

**Instructions ▼**

| | |
|---|---|
| Enter above the county name where the case was filed. | CAPITAL ONE, N.A. |
| Enter your name as Plaintiff/Petitioner. | **Plaintiff / Petitioner** _(First, middle, last name)_ |
| Below "Defendants/ Respondents," enter the names of all people you are suing. | v. |
| | **Defendants / Respondents** _(First, middle, last name)_ |
| | JOSIP KLARIC |
| Enter the Case Number given by the Circuit Clerk. | |
| | ☒ **Alias Summons** _(Check this box if this is not the 1st Summons issued for this Defendant.)_ |

**20243004309**

**Case Number**

---

# IMPORTANT: You have been sued.

- Read all documents attached to this _Summons_.

- You MUST file an official document with the court within the time stated on this _Summons_ called an _Appearance_ and a document called an _Answer/Response_. If you do not file an _Appearance_ and _Answer/Response_ on time, the judge may decide the case without hearing from you. This is called "default." As a result, you could lose the case.

- All documents referred to in this Summons can be found at ilcourts.info/forms. Other documents may be available from your local Circuit Court Clerk's office or website.

- After you fill out the necessary documents, you need to electronically file (e-file) them with the court. To e-file, you must create an account with an e-filing service provider. For more information, go to ilcourts.info/efiling. If you cannot e-file, you can get an exemption that allows you to file in-person or by mail.

- You may be charged filing fees, but if you cannot pay them, you can file an _Application for Waiver of Court Fees_.

- It is possible that the court will allow you to attend the first court date in this case in-person or remotely by video or phone. Contact the Circuit Court Clerk's office or visit the Court's website to find out whether this is possible and, if so, how to do this.

- Need help? Call or text Illinois Court Help at 833-411-1121 or go to ilcourthelp.gov for information about going to court, including how to fill out and file documents. You can also get free legal information and legal referrals at illinoislegalaid.org. All documents referred to in this Summons can be found at ilcourts.info/forms. Other documents may be available from your local Circuit Court Clerk's office or website.

- ¿Necesita ayuda? Llame o envíe un mensaje de texto a Illinois Court Help al 833-411-1121, o visite ilcourthelp.gov para obtener información sobre los casos de la corte y cómo completar y presentar formularios.

---

**Plaintiff/Petitioner:**

**Do not use this form** in these types of cases:

- All criminal cases
- Detinue
- Order of protection
- Divorce

- Administrative review cases
- Eviction
- Stalking no contact orders
- Paternity

- Adult guardianship
- Foreclosure
- Civil no contact orders
- Small Claims

For eviction, small claims, divorce, and orders of protection, use the forms available at ilcourts.info/forms. If your case is a detinue, visit illinoislegalaid.org for help.

**If you are suing more than 1 Defendant/Respondent**, attach an _Additional Defendant/Respondent Address and Service Information_ form for **each** additional Defendant/Respondent.

FILED DATE: 6/12/2025 3:43 PM    20243004309

---

**1. Defendant/Respondent's address and service information:**

a. Defendant/Respondent's primary address/information for service:

Name *(First, Middle, Last)*: JOSIP KLARIC

Registered Agent's name, if any: _____

Street Address, Unit #: 8455 W Leland Ave Unit 303

City, State, ZIP: Chicago IL 60656-4207

Telephone: _____ Email: _____

b. If you have more than one address where Defendant/Respondent might be found, list that here:

Name *(First, Middle, Last)*: _____

Street Address, Unit #: _____

City, State, ZIP: _____

Telephone: _____ Email: _____

c. Method of service on Defendant/Respondent:

☐ Sheriff    ☐ Sheriff outside Illinois: _____
*County & State*

☒ Special process server    ☐ Licensed private detective

---

☐ **I am serving more than 1 Defendant/Respondent.**

I have attached _____ *Additional Defendant/Respondent Address*
*Number*
*and Service Information* forms.

**2. Information about the lawsuit:**

a. Amount claimed: $ 12,484.89  plus costs

☐ b. I am asking for the return of tangible personal property (items in the Defendant/Respondent's possession).

**3. Contact information for the Plaintiff/Petitioner:**

Name *(First, Middle, Last)*: Mandarich Law Group, LLP

Street Address, Unit #: P.O. Box 109032

City, State, ZIP: Chicago, IL 60610

Telephone: 888.498.2598    Email: Illinois@mandarichlaw.com

**GETTING COURT DOCUMENTS BY EMAIL:** You should use an email account that you do not share with anyone else and that you check every day. If you do not check your email every day, you may miss important information, notice of court dates, or documents from other parties.

**You have been sued.** Read all of the documents attached to this *Summons*.
To participate in the case, you must follow the instructions listed below. If you do not, the court may decide the case without hearing from you and you could lose the case. *Appearance* and *Answer/Response* forms can be found at: ilcourts.info/forms.

**4. Instructions for person receiving this *Summons* (Defendant):**

☒ a. To respond to this *Summons*, you must file *Appearance* and *Answer/Response* forms with the court within 30 days after you have been served (*not counting the day of service*) by e-filing or at:

Address: 50 W. WASHINGTON STREET

City, State, ZIP: CHICAGO IL 60602

---

**Sidebar instructions (left margin):**

In **1a**, enter the name and address of the first Defendant/Respondent you are serving. If you are serving a Registered Agent, include the Registered Agent's name and address here.

In **1b**, enter a second address for the first Defendant/Respondent, if you have one.

In **1c**, check how you are sending your documents to this Defendant/Respondent.

Check here if you are serving more than 1 Defendant/Respondent. Attach an *Additional Defendant/Respondent Address and Service Information* form for each additional Defendant/Respondent and write the number of forms you attached.

In **2a**, enter the amount of money owed to you. Check **2b** if you are asking for the return of tangible personal property.

In **3**, enter your complete address, telephone number, and email address, if you have one.

**Important information for the person getting this form**

Check **4a** or **4b**. If Defendant/Respondent only needs to file an *Appearance* and *Answer/Response* within 30 days, check box **4a**. Otherwise, if the clerk gives you a court date, check box **4b**.

---

SU-S 1503.6                    Page 2 of 5                    (03/24)

In **4a,** fill out the address of the court building where the Defendant may file or e-file their *Appearance* and *Answer/ Response.*

In **4b,** fill out:
- The court date and time the clerk gave you.
- The courtroom and address of the court building.
- The call-in or video information for remote appearances (if applicable).
- The clerk's phone number and website.

All of this information is available from the Circuit Clerk.

☐ b.  Attend court:

On: _____ at _____ ☐ a.m. ☐ p.m. in _____
　　　　*Date*　　　　　　　　　*Time*　　　　　　　　　　　　　　*Courtroom*

**In-person at:**

50 W. WASHINGTON STREET , CHICAGO IL 60602
*Courthouse Address*　　　　　　*City*　　　　　　　*State*　　　*ZIP*

OR

**Remotely** (You may be able to attend this court date by phone or video conference. This is called a "Remote Appearance")**:**

　By telephone: _____
　　　　　　　　　*Call-in number for telephone remote appearance*

　By video conference: _____
　　　　　　　　　　　　　*Video conference website*

　_____
　*Video conference log-in information (meeting ID, password, etc.)*

Call the Circuit Clerk _____ or visit their website
　　　　　　　　　　　*Circuit Clerk's phone number*

at: _____ to find out more about how to do this.
　　*Website*

---

**STOP!**

The Circuit Clerk will fill in this section.

**Witness this Date:** _____

**Clerk of the Court:** _____

*Seal of Court*

---

**STOP! The officer or process server will fill in the Date of Service**

**Note to officer or process server:**
- If 4a is checked, this *Summons* must be served within 30 days of the witness date.
- If 4b is checked, this *Summons* must be served at least 21 days before the court date, unless 2b is also checked.
  - If 4b and 2b are checked, the *Summons* must be served at least 3 days before the court date.

Date of Service: _____
　　　　　　　　　*(Date to be entered by an officer or process server on the copy of this Summons left with the Defendant or other person.)*

**This form is approved by the Illinois Supreme Court and must be accepted in all Illinois Courts.**
**Forms are free at ilcourts.info/forms.**

| | | |
|---|---|---|
| **STATE OF ILLINOIS, CIRCUIT COURT**<br><br>COOK _____ **COUNTY** | **PROOF OF SERVICE OF SUMMONS AND COMPLAINT/PETITION** | *For Court Use Only* |

| **Instructions** | |
|---|---|
| Enter above the county name where the case was filed. | CAPITAL ONE, N.A.<br><br>_____<br>**Plaintiff / Petitioner** *(First, middle, last name)* |
| Enter your name as Plaintiff/Petitioner. | |
| Enter the names of all people you are suing as Defendants/Respondents. | v.<br><br>JOSIP KLARIC<br><br>_____<br>**Defendant / Respondent** *(First, middle, last name)* |
| Enter the Case Number given by the Circuit Clerk. | ☒ **Alias Summons** *(Check this box if this is not the 1st Summons issued for this Defendant.)* |

**20243004309**
_____
**Case Number**

**\*\*Stop. Do not complete the form. The sheriff or special process server will fill in the form. Give them one copy of this blank *Proof of Service* form for each Defendant/Respondent.\*\***

**My name is** _____ **and I state**
*First, Middle, Last*

☐ **I served the** *Summons* **and Complaint/Petition on the Defendant/Respondent**

_____ **as follows:**
*First, Middle, Last*

☐ Personally on the Defendant/Respondent:
☐ Male ☐ Female ☐ Non-Binary Approx. Age: _____ Race: _____
On this date: _____ at this time: _____ ☐ a.m. ☐ p.m.
Address, Unit#: _____
City, State, ZIP: _____

☐ On someone else at the Defendant/Respondent's home who is at least 13 years old and is a family member or lives there:
On this date: _____ at this time: _____ ☐ a.m. ☐ p.m.
Address, Unit#: _____
City, State, ZIP: _____
And left it with: _____
*First, Middle, Last*
☐ Male ☐ Female ☐ Non-Binary Approx. Age: _____ Race: _____
and by sending a copy to this defendant in a postage-paid, sealed envelope to the
above address on this date: _____ .

☐ On the Corporation's agent, _____
*First, Middle, Last*
☐ Male ☐ Female ☐ Non-Binary Approx. Age: _____ Race _____
On this date: _____ at this time: _____ ☐ a.m. ☐ p.m.
Address: _____
City, State, ZIP:

FILED DATE: 6/2/2025 2:43 PM 20243004309

☐ **I was not able to serve the *Summons* and Complaint/Petition on Defendant/Respondent:**

_____
*First, Middle, Last*

I made the following attempts to serve the *Summons* and Complaint/Petition on the Defendant/Respondent:

1. On this date: _____ at this time: _____ ☐ a.m. ☐ p.m.
   Address: _____
   City, State, ZIP: _____
   Other information about service attempt: _____
   _____
   _____
   _____
   _____

2. On this date: _____ at this time: _____ ☐ a.m. ☐ p.m.
   Address: _____
   City, State, ZIP: _____
   Other information about service attempt: _____
   _____
   _____
   _____
   _____

3. On this date: _____ at this time: _____ ☐ a.m. ☐ p.m.
   Address: _____
   City, State, ZIP: _____
   Other information about service attempt: _____
   _____
   _____
   _____
   _____

| | |
|---|---|
| **DO NOT** complete this section. The sheriff or private process server will complete it. | **If you are a special process server, sheriff outside Illinois, or licensed private detective, your signature certifies that everything on the *Proof of Service of Summons* is true and correct to the best of your knowledge. You understand that making a false statement on this form could be perjury.** |

By: _____

Under the Code of Civil Procedure, [735 ILCS 5/1-109](), making a statement on this form that you know to be false is perjury, a Class 3 Felony.

*Signature by:*
☐ Sheriff
☐ Sheriff outside Illinois: _____
_____
*County and State*
☐ Special process server
☐ Licensed private detective

_____
*Print Name*

**FEES**
Service and Return: _____ $ _____
Miles _____ $ _____
Total $ _____

If *Summons* is served by licensed private detective or private detective agency:
License Number: _____

# ZOOM MEETING IDS AND PASSWORDS

**TO ACCESS ZOOM BY VIDEO, FIRST DOWNLOAD ZOOM AT HTTPS://ZOOM.US/DOWNLOAD AND SELECT ZOOM CLIENT FOR MEETINGS.  ONCE DOWNLOADED, SELECT JOIN A ZOOM MEETING, THEN ENTER THE ZOOM ACCESS CODE AND PASSWORD BELOW**

**TO ACCESS ZOOM BY PHONE, CALL  312-626-6799**

| COURTROOM | ZOOM MEETING ID | ZOOM  SESSION PASSWORD |
|-----------|-----------------|------------------------|
| 409 | 924 2449 2824 | 346609 |
| 1101 | 952 3043 8872 | 317905 |
| 1102 | 941 3131 4606 | 361176 |
| 1103 | 940 3976 2351 | 872803 |
| 1104 | 980 6912 3450 | 195933 |
| 1105 | 913 0323 9166 | 858607 |
| 1106 | 912 0010 9326 | 455806 |
| 1107 | 944 9552 6331 | 228046 |
| 1108 | 964 2925 3412 | 241565 |
| 1109 | 997 7936 4780 | 652062 |
| 1110 | 937 6444 5664 | 172880 |
| 1111 | 954 6902 6707 | 121953 |
| 1112 | 939 2925 9564 | 821022 |
| 1302 | 922 8830 9469 | 480525 |
| 1304 | 968 5798 1338 | 593485 |
| 1306 | 920 4115 9796 | 715348 |
| 1307 | 947 9378 9734 | 712192 |
| 1308 | 922 9098 5945 | 499080 |
| 1310 | 954 2504 0966 | 029524 |
| 1401 | 930 9949 4868 | 544388 |
| 1402 | 914 3045 9929 | 898778 |
| 1403 | 944 1848 7325 | 087880 |
| 1404 | 938 9278 5386 | 132873 |
| 1406 | 914 5130 7835 | 826324 |
| 1408 | 953 1943 0522 | 159886 |
| 1409 | 973 7875 2758 | 026297 |
| 1410 | 987 2834 2570 | 467433 |
| 1501 | 970 2938 9818 | 380923 |
| 1503 | 939 9214 4482 | 773102 |
| 1505 | 986 6707 2390 | 532802 |
| 1510 | 919 3031 9452 | 814638 |

**\*\*For up to date or additional information, please visit http://www.cookcountyclerkofcourt.org or call (312) 603-6132\*\***

# Cook County **LEGAL AID** for Housing and Debt

*Helping you resolve eviction, foreclosure, debt, and tax deed issues.*

## FREE LEGAL HELP FOR RESIDENTS OF COOK COUNTY

**Are you dealing with an eviction or unresolved debt issue?**

**Do you live in Cook County?**

**You are not in this alone. You may be eligible for FREE legal help.**

Learn more by calling 855-956-5763 or visiting www.cookcountylegalaid.org

Evictions and unresolved debt issues can have a long-lasting, negative impact on your future. Call the **Early Resolution Program** (ERP) to speak with a lawyer and get connected to other resources. This program is available to all residents of Cook County free of charge. You do not need to have a case in court to get help.

## You can use the program if:

► You are a renter and your landlord is trying to evict you;

► You are a landlord who is not represented by a lawyer;

► You were sued by someone who wants to collect an unpaid debt (for example a credit card company trying to collect unpaid charges); OR

► You need to sue someone who owes you money and do not have a lawyer.

The Early Resolution Program (ERP) includes free legal aid, mediation services, and connections to other resources including rental assistance. Mediation is a chance for a landlord and tenant, or debtor and creditor, to resolve issues with the help of a knowledgeable and neutral person.

The Early Resolution Program is being provided through Cook County Legal Aid for Housing and Debt (CCLAHD), a county-wide initiative to help resolve eviction, foreclosure, debt, and tax deed issues. Visit www.cookcountylegalaid.org for information about other programs and services.

   

CARPLS Legal Aid
Center for Conflict Resolution
Center for Disability & Elder Law
Chicago Volunteer Legal Services

Greater Chicago Legal Clinic
Lawyers' Committee for Better Housing
Legal Aid Chicago
Legal Aid Society

# AYUDA LEGAL
para viviendas y deudas
del Condado de Cook

*Ayuda para resolver problemas de desalojo, ejecución
de hipotecas, deudas y escrituras de impuesto.*

## AYUDA LEGAL GRATUITA PARA RESIDENTES DE CONDADO DE COOK

**¿Está enfrentando un problema de desalojo o deuda no resuelta?**

**¿Vive en el condado de Cook?**

**No está solo en esto. Puede ser elegible para recibir ayuda legal GRATIS.**

Para obtener más información, llame al 855-956-5763 o visite www.cookcountylegalaid.org

Los problemas de desalojo y deudas no resueltas pueden tener un impacto negativo y duradero en su futuro. Llame al **Programa de Resolución Temprana** (ERP, Early Resolution Program) para hablar con un abogado y conectarse con otros recursos. Este programa está disponible para todos los residentes de condado de Cook sin costo. No es necesario que tenga un caso en tribunales para obtener ayuda.

## Puede usar el programa si:

► **es inquilino y el dueño intenta desalojarlo;**

► **es dueño y no tiene un abogado representante;**

► **recibió una demanda de alguien que desea cobrar una deuda no pagada (por ejemplo, una empresa de tarjetas de crédito intenta cobrar cargos no pagados); O BIEN**

► **necesita demandar a alguien que le debe dinero y no tiene un abogado.**

El Programa de Resolución Temprana (ERP) incluye ayuda legal gratuita, servicios de mediación y conexiones con otros recursos, como ayuda de arrendamiento. La mediación es una oportunidad para que un dueño y un inquilino, o un deudor y un acreedor, resuelvan los problemas con la ayuda de una persona neutral y con conocimientos.

El Programa de Resolución Temprana se proporciona a través de Ayuda Legal para Vivienda y Deudas del Condado de Cook (CCLAHD, Cook County Legal Aid for Housing and Debt), una iniciativa en todo el condado para ayudar a resolver problemas de desalojo, ejecución de hipotecas, deudas y certificados de dominio de venta fiscal. Visite www.cookcountylegalaid.org para obtener información acerca de otros programas y servicios.

 

CARPLS Legal Aid
Center for Conflict Resolution
Center for Disability & Elder Law
Chicago Volunteer Legal Services



Greater Chicago Legal Clinic
Lawyers' Committee for Better Housing
Legal Aid Chicago
Legal Aid Society



# Hrabstwo Cook
## POMOC PRAWNA
### na mieszkania i długi

*Pomoc na rzecz rozwiązywania problemów związanych z eksmisją, zajmowaniem obciążonej hipoteki, długami oraz sprawami podatkowymi.*

## BEZPŁATNA POMOC PRAWNA DLA MIESZKAŃCÓW HRABSTWA COOK

**Czy borykasz się z widmem eksmisji lub nierozwiązaną kwestią zadłużenia? Czy mieszkasz w hrabstwie Cook?**

**Nie jesteś w tym sam(a). Może Ci przysługiwać BEZPŁATNA pomoc prawna.**

Uzyskaj więcej informacji, dzwoniąc pod numer 855-956-5763 lub odwiedzając stronę internetową www.cookcountylegalaid.org

Sprawy takie jak eksmisja czy nierozwiązane kwestie zadłużenia mogą mieć długotrwały i negatywny wpływ na Twoją przyszłość. Skontaktuj się z personelem Early Resolution Program (ERP), aby porozmawiać z prawnikiem lub uzyskać dostęp do innych zasobów. Program ten jest nieodpłatnie dostępny dla wszystkich mieszkańców hrabstwa Cook. Nie musisz mieć sprawy w sądzie, aby uzyskać pomoc.

### Możesz skorzystać z programu, jeśli:

▸ Wynajmujesz mieszkanie lub dom, a jego właściciel zamierza Cię eksmitować;

▸ Wynajmujesz komuś mieszkanie lub dom, a nie masz prawnika;

▸ Zostałeś/-aś pozwany/-a do sądu przez kogoś, kto chce od Ciebie ściągnąć niezapłacony dług (na przykład firma obsługująca karty kredytowe, której zalegasz z tytułu nieuiszczonych opłat); LUB

▸ Zamierzasz pozwać kogoś, kto jest Ci dłużny pieniądze, a nie masz prawnika.

W ramach Early Resolution Program (ERP) możesz uzyskać dostęp do bezpłatnej pomocy prawnej, usług mediatora, a także innych form wsparcia, takich jak pomoc z czynszem. Mediacje to dla właściciela i najemcy bądź dłużnika i wierzyciela szansa na rozwiązanie problemów dzięki pomocy kompetentnego i bezstronnego specjalisty.

Projekt Early Resolution Program jest prowadzony w ramach Cook County Legal Aid for Housing and Debt (CCLAHD) — inicjatywy wdrożonej na terenie całego hrabstwa na rzecz rozwiązywania problemów związanych z eksmisją, zajmowaniem obciążonej hipoteki, długami oraz sprawami podatkowymi. Odwiedź stronę www.cookcountylegalaid.org, aby uzyskać informacje o innych programach i usługach.






CARPLS Legal Aid
Center for Conflict Resolution
Center for Disability & Elder Law
Chicago Volunteer Legal Services

Greater Chicago Legal Clinic
Lawyers' Committee for Better Housing
Legal Aid Chicago
Legal Aid Society

Appearance/Jury Demand (05/03/2018) CCG N036

FILED
7/2/2025 11:58 AM
Marcy Yana Spyropoulos
CIRCUIT CLERK
COOK COUNTY, IL
2025L005752
Calendar, 11
33403374

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

## COUNTY DEPARTMENT, LAW DIVISION

Rosaleen McElroy,

Plaintiff,

v.

JOHNSON & JOHNSON; JOHNSON & JOHNSON HOLDCO (NA) INC. F/K/A JOHNSON & JOHNSON CONSUMER INC. f/k/a JOHNSON & JOHNSON CONUMBER COMPANIES, INC.; LLT MANAGEMENT LLC F/K/A LTL MANAGEMENT LLC; J&J SERVICES, INC.; RED RIVER RALC LLC

Defendants.

Case No. 2025-L-005752

Consolidated into: 2025-L-007046

Calendar: 11

### APPEARANCE/JURY DEMAND

☑ General Appearance

○ 0900 - Appearance - Fee Paid

○ 0909 - Appearance- No Fee

○ 0904 - Appearance Filed - Fee Waived

☑ Jury Demand

◉ 1900 - Appearance & Jury Demand - Fee Paid

○ 1909 - Appearance & Jury Demand - No Fee

The undersigned enters the appearance of:      ○ Plaintiff      ◉ Defendant

○ Additional      Party

○ Respondent-in-discovery

Walgreen Co.
_____
Litigant's Name

Iris Y. Martinez, Clerk of the Circuit Court of Cook County, Illinois

cookcountyclerkofcourt.org

/s/ *Kenneth M. Gorenberg*

_____

Signature

☑ INITIAL COUNSEL OF RECORD          ☐ PRO SE
☐ ADDITIONAL APPEARANCE              ☐ SUBSTITUTE APPEARANCE

A copy of this appearance shall be given to all parties who have appeared and have not been found by the Court to be in default.

FILED DATE: 7/2/2025 11:58 AM   2025L005752

Iris Y. Martinez, Clerk of the Circuit Court of Cook County, Illinois

cookcountyclerkofcourt.org

Appearance/Jury Demand
(05/03/21) CCL 0530

FILED DATE: 7/2/2025 11:58 AM    2025L005752

◉ Atty. No.: <u>32715</u>    ○ Pro Se 99500    Pro Se Only:

Name: <u>Kenneth M. Gorenberg (#6203808);</u>

☐ I have read and agree to the terms of the Clerk's Office Electronic Notice Policy and choose to opt in to electronic notice from the Clerk's office for this case at this email address:

<u>Emily E. Dory (#6323830);</u>

<u>Samuel Leist (#6330017)</u>

<u>Barnes & Thornburg LLP</u>

_____

Atty. for (if applicable):

<u>Walgreen Co.</u>

Address: <u>1 N Wacker Drive, Suite 4400</u>

City: <u>Chicago</u>

State: <u>IL</u>  Zip: <u>60606</u>

Telephone: <u>312-214-5639</u>

Primary Email: KGorenberg@btlaw.com

EDory@btlaw.com

Samuel.Leist@btlaw.com

Iris Y. Martinez, Clerk of the Circuit Court of Cook County, Illinois

cookcountyclerkofcourt.org

| COURT BRANCH - CALL **CBC-1** | **COURT COMPLAINT TRANSMITTAL LISTING** CHICAGO POLICE   CPD-11 .551(REV. 9/03) | | Police personnel use unshaded lines, court personnel shaded lines. | | | | FROM (UNIT No) **007** | DATE PREPARED DAY **02** MO. **Jul** YR. **2025** | | | PAGE **1** | OF **1** |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| No. | CB No. | DATE OF ARREST | DEFENDANT (Last - First - M.I) | ADDRESS | | | SEX | RACE | BIRTH DATE | HEIGHT | WEIGHT | COMPLEXION |
| | I.R.No. | Line No. | REFERENCES / Ch-Article-Section / WARRANT- Doc No. - LDS/NCIC No | C | T | DISPOSITION | | BOND No. | BOND $ | CASE No. | DEF/CH No. | |
| | RD No. (If Applicable) | MISCELLANEOUS | | | | | | | A.O.STAR No. | A.O. BEAT | COURT DATE | |
| 1 | 30483166 | 01 JUL 2025 | BROWN, Jessie | 7244 S Wentworth Ave,Chicago, IL 60621 | | | M | BLK | 05 MAY 1979 | 603 | 220 | DBR |
| | 1191658 | 001 | 725 ILCS 225.0/13 | Z | | | | | *25111009901* | | | |
| | | | | | | Wisconsin - | | | | | | |
| | JJ316781 | | | | | | | | 7592 | 0793 | 02 JUL 2025 | |

ANic     PDapt     Police IC

D Phy Incap.

FPC   FW   & Bond

MIS 7-7-2025     Br. 98

ENTERED
JUL 02 2025
MARIYANA I. SPYROPOULOS
CLERK OF THE CIRCUIT COURT
OF COOK COUNTY, IL

| PREPARED BY **LOPEZ JR, Adolfo** | STAR No. **1683** | RECEIVED BY (COURT) | JUDGE |
|---|---|---|---|

Transmittal id: 1940839

**COURT TRANSMITTAL**   DISTRICT: COURT CLERK:   FORWARD TO COURT CLERK WITH OTHER COURT DOCUMENTS. AFTER COURT HEARING, FORWARD TO CHIEF CLERK OF COURT.

System Generated Hearing Date: <<CmsHearingDate>>
Location: <<CmsHearingResource="Location">>
Judge: <<CmsHearingResource="JudicialOfficer">>

FILED
7/2/2025 8:13 AM
Mariyana T. Spyropoulos
CIRCUIT CLERK
COOK COUNTY, IL
20251710325
Courtroom, 1302
33396264

FILED DATE: 7/2/2025 8:13 AM    20251710325

| 2120 - Served | 2220 - Not Served |
|---|---|
| 2121 - Alias Served | 2221 - Alias Not Served |
| 2620 - Sec of State | 2621 - Alias Sec of State |

Eviction Summons

(01/15/21) CCM 0081 A

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

## MUNICIPAL DEPARTMENT, _____FIRST_____ DISTRICT

South AG 26 LLC

_____
Plaintiff(s)

v.

Charity Aaron, & Unknown Occupants

_____
Defendant(s)

1708 W 77th St, Unit #2, Chicago IL, 60620
_____
Address of Defendant(s)

Case No.    20251710325
_____

Rent Amount Claimed: $  Possession Only

Status Date: _____

Time: _____   ○ AM   ○ PM

Court Location: _____

Room or Remote Call Information:

_____

Please serve as follows:  ● Sheriff Service   ○ Alias

### EVICTION SUMMONS
### BEFORE YOU GO TO COURT, YOU MUST PAY YOUR APPEARANCE FEE

The Plaintiff (landlord/property owner), named above, has/have filed a complaint in this Court to have you evicted. A true and correct copy of the complaint is attached.

**YOU ARE HEREBY SUMMONED** to Court and you must appear for an initial case management at the time and place specified above. **YOU CAN (and should) APPEAR REMOTELY BY VIDEO OR TELEPHONE.** If you need help for going to court remotely or you need information for joining court remotely please go to www.cookcountycourt.org.

You are required to pay an appearance fee on or before the date of trial, not less than 7 days nor more than 40 days after issuance of summons. If you are unable to pay your court fees, you can apply for a fee waiver. For more information, you can visit www.illinoislegalaid.org or ask the Circuit Court Clerk's Office for a fee waiver application.

To file your appearance you need access to the internet. Please visit www.cookcountyclerkofcourt.org to initiate this process. Kiosks with internet access are available at all Clerk's Office locations. Please refer to the last page of this document for location information.

**E-FILING IS NOW MANDATORY FOR DOCUMENTS IN CIVIL CASES WITH LIMITED EXEMPTIONS. To electronically file (e-file) your appearance, you need access to the internet. Kiosks with internet access are available at all Clerk's Office locations. More information about e-filing is on Page 2 of this summons.**

**Iris Y. Martinez, Clerk of the Circuit Court of Cook County, Illinois**
**cookcountyclerkofcourt.org**

<u>Eviction Summons</u> **(01/15/21) CCM 0081 B**

**To e-file, you must first create an account with an e-filing service provider. Visit http://efile.illinoiscourts.gov/service-providers.htm to learn more and to select a service provider. If you need additional help or have trouble e-filing, visit http://www.illinoiscourts.gov/FAQ/gethelp.asp, or talk with your local circuit clerk's office. If you cannot e-file, you may be able to get an exemption to file in-person or by mail. Visit www.cookcountyclerkofcourt.org or www.illinoislegalaid.org for exemption information.**

**IF YOU DO NOT FILE AN APPEARANCE** or **APPEAR FOR TRIAL, AN EVICTION ORDER** may be entered against you for the relief requested in the complaint. If an Eviction Order is entered against you, the **SHERIFF MAY EVICT YOU** and, if requested in the Complaint, a money judgment may also be entered against you.

## INSTRUCTIONS TO SHERIFF

This summons must be returned by the officer or other person to whom it was given for service, with endorsement of service and fees, if any, immediately after service and not less than seven (7) days before the trial date. If service cannot be made, this summons shall be returned so endorsed.

Witness: _____

⦿ Atty. No.: <u>42530</u>

○ Pro Se 99500

7/2/2025 8:13 AM Mariyana T. Spyropoulos

Name: <u>Jennifer L. Dean</u>

_____
Iris Y. Martinez, Clerk of Court

Atty. For (if applicable):

<u>South AG 26 LLC</u>

Date of Service: _____
(To be inserted by officer on copy left with Defendant or other person)

Address: <u>433 W. Van Buren St, Suite 1100 H</u>

City: <u>Chicago</u>

State: <u>IL</u>     Zip: <u>60607</u>

Telephone: <u>(773) 305 - 0184</u>

Primary Email: <u>enotices.legal@cymliving.com</u>

For updated information about your case, including hearings, subsequent filings and other case information, please visit our Online Case Search and search for your case: https://casesearch.cookcountyclerkofcourt.org

FILED DATE: 7/2/2025 8:13 AM 20251710325

**Eviction Summons** (01/15/21) CCM 0081 C

FILED DATE: 7/2/2025 8:13 AM 20251710325

## NOTICE TO DEFENDANTS

### THIS IS AN EVICTION SUMMONS

On the date and at the time shown on page 1 of this Summons, the court will decide whether you will have to move or whether you can continue to stay. YOU MUST BE ON TIME FOR COURT, EVEN IF YOU ARE APPEARING REMOTELY BY PHONE OR VIDEOCONFERENCE. HAVING TO GO TO WORK, BEING ILL, OR DOING SOMETHING ELSE DOES NOT MEAN YOU CAN MISS COURT. **YOU MAY ACCESS LEGAL AID HELP BY CALLING 1-855-956-5763 OR BY VISITING COOKCOUNTYLEGALAID.ORG.**

Please file your appearance fee on or before the court date on the Summons Cover.

Any person wishing to sue or defend a case may petition the court to have the fees, costs, and charges associated with the proceedings waived. Additional information may be found at www.cookcountyclerkofcourt.org. Please refer to the last page of this document for Clerk's Office location information.

### IF YOU NOT DO PARTICIPATE IN COURT

The court may order you to move within a short period of time. IF YOU DO NOT MOVE, plaintiff can have you and all of your belongings moved out. The plaintiff will put your property outside and you will have to make arrangements to move it.

### YOU HAVE RIGHTS

1.  You have the right to come to court and tell your side of the case.

2.  You have a right to a trial by jury. A request for a jury trial must be in writing and filed with the Clerk of the Circuit Court prior to your hearing. You must request the jury trial immediately when your case is called, before your trial actually starts.

3.  You may come to court and speak for yourself, or you may have a lawyer represent you. If you want a lawyer, you must get one right away. If you are unable to come to court for any reason, you should talk to a lawyer.

4.  If you do not have a lawyer and are not able to afford one, you may contact one of the following agencies that <u>may</u> be able to provide you with free legal help:

    •   CARPLS Legal Aid Hotline (www.carpls.org/): Call (312) 738-9200 for legal advice and referrals by phone.

    •   Legal Aid Chicago (www.legalaidchicago.org/): Call (312) 341-1070 or apply online for legal help.

    •   Lawyers' Committee for Better Housing (www.lcbh.org/): Call (312) 347-7600 to apply for legal help.

    •   Cabrini Green Legal Aid (http://cgla.net/): Call (312) 738-2452 to apply for legal help if you are facing eviction or voucher termination based on alleged criminal activity or a criminal record.

    You can learn more about eviction court and how to represent yourself by visiting Illinois Legal Aid Online at www.illinoislegalaid.org.

**Iris Y. Martinez, Clerk of the Circuit Court of Cook County, Illinois**
**cookcountyclerkofcourt.org**

# CLERK OF THE CIRCUIT COURT OF COOK COUNTY OFFICE LOCATIONS

FILED DATE: 7/2/2025 8:13 AM    20251710325

- Richard J Daley Center
  50 W Washington
  Chicago, IL 60602

- District 2 - Skokie
  5600 Old Orchard Rd
  Skokie, IL 60077

- District 3 - Rolling Meadows
  2121 Euclid
  Rolling Meadows, IL 60008

- District 4 - Maywood
  1500 Maybrook Ave
  Maywood, IL 60153

- District 5 - Bridgeview
  10220 S 76th Ave
  Bridgeview, IL 60455

- District 6 - Markham
  16501 S Kedzie Pkwy
  Markham, IL 60428

- Domestic Violence Court
  555 W Harrison
  Chicago, IL 60607

- Juvenile Center Building
  2245 W Ogden Ave, Rm 13
  Chicago, IL 60602

- Criminal Court Building
  2650 S California Ave, Rm 526
  Chicago, IL 60608

### Daley Center Divisions/Departments

- Civil Division
  Richard J Daley Center
  50 W Washington, Rm 601
  Chicago, IL 60602
  Hours: 8:30 am - 4:30 pm

- Chancery Division
  Richard J Daley Center
  50 W Washington, Rm 802
  Chicago, IL 60602
  Hours: 8:30 am - 4:30 pm

- Domestic Relations Division
  Richard J Daley Center
  50 W Washington, Rm 802
  Chicago, IL 60602
  Hours: 8:30 am - 4:30 pm

- Civil Appeals
  Richard J Daley Center
  50 W Washington, Rm 801
  Chicago, IL 60602
  Hours: 8:30 am - 4:30 pm

- Criminal Department
  Richard J Daley Center
  50 W Washington, Rm 1006
  Chicago, IL 60602
  Hours: 8:30 am - 4:30 pm

- County Division
  Richard J Daley Center
  50 W Washington, Rm 1202
  Chicago, IL 60602
  Hours: 8:30 am - 4:30 pm

- Probate Division
  Richard J Daley Center
  50 W Washington, Rm 1202
  Chicago, IL 60602
  Hours: 8:30 am - 4:30 pm

- Law Division
  Richard J Daley Center
  50 W Washington, Rm 801
  Chicago, IL 60602
  Hours: 8:30 am - 4:30 pm

- Traffic Division
  Richard J Daley Center
  50 W Washington, Lower Level
  Chicago, IL 60602
  Hours: 8:30 am - 4:30 pm

FILED DATE: 7/2/2025 8:13 AM   20251710325

You may be able to attend this court date by phone or video conference. This is called a 'Remote Appearance.' Call the Circuit Clerk at (312) 603-5030 or visit their website at www.cookcountycourt.org to find out how to do this.

## ZOOM MEETING IDS AND PASSWORDS

TO ACCESS ZOOM BY VIDEO, FIRST DOWNLOAD ZOOM AT HTTPS://ZOOM.US/DOWNLOAD AND SELECT ZOOM CLIENT FOR MEETINGS. ONCE DOWNLOADED, SELECT JOIN A ZOOM MEETING, THEN ENTER THE ZOOM ACCESS CODE AND PASSWORD BELOW

TO ACCESS ZOOM BY PHONE, CALL 312-626-6799

| COURTROOM | ZOOM MEETING ID | ZOOM SESSION PASSWORD |
|---|---|---|
| 409 | 924 2449 2824 | 346609 |
| 1101 | 952 3043 8872 | 317905 |
| 1102 | 941 3131 4606 | 361176 |
| 1103 | 940 3976 2351 | 872803 |
| 1104 | 980 6912 3450 | 195933 |
| 1105 | 913 0323 9166 | 858607 |
| 1106 | 912 0010 9326 | 455806 |
| 1107 | 944 9552 6331 | 228046 |
| 1108 | 964 2925 3412 | 241565 |
| 1109 | 997 7936 4780 | 652062 |
| 1110 | 937 6444 5664 | 172880 |
| 1111 | 954 6902 6707 | 121953 |
| 1112 | 939 2925 9564 | 821022 |
| 1302 | 922 8830 9469 | 480525 |
| 1304 | 968 5798 1338 | 59348S |
| 1306 | 920 4115 9796 | 71S348 |
| 1307 | 947 9378 9734 | 712192 |
| 1308 | 922 9098 9545 | 499080 |
| 1310 | 954 2504 0966 | 029524 |
| 1401 | 930 9949 4868 | 544388 |
| 1402 | 914 3045 9929 | 898778 |
| 1403 | 944 1848 732S | 087880 |
| 1404 | 938 9278 5386 | 132873 |
| 1406 | 914 5130 7835 | 826324 |
| 1408 | 953 1943 0522 | 159886 |
| 1409 | 973 7875 2758 | 026297 |
| 1410 | 987 2834 2S70 | 467433 |
| 1501 | 970 2938 9818 | 380923 |
| 1503 | 939 9214 4482 | 773102 |
| 1505 | 986 6707 2390 | S32802 |
| 1510 | 919 3031 9452 | 814638 |

FILED DATE: 7/2/2025 8:13 AM 20251710325



# Cook County LEGAL AID for Housing and Debt

*Helping you resolve eviction, foreclosure, debt, and tax deed issues.*

## FREE LEGAL HELP FOR RESIDENTS OF COOK COUNTY

**Are you dealing with an eviction or unresolved debt issue?**

**Do you live in Cook County?**

**You are not in this alone. You may be eligible for FREE legal help.**

**Learn more by calling 855-956-5763 or visiting www.cookcountylegalaid.org**

Evictions and unresolved debt issues can have a long-lasting, negative impact on your future. Call the **Early Resolution Program** (ERP) to speak with a lawyer and get connected to other resources. This program is available to all residents of Cook County free of charge. You do not need to have a case in court to get help.

### You can use the program if:

► You are a renter and your landlord is trying to evict you;

► You are a landlord who is not represented by a lawyer;

► You were sued by someone who wants to collect an unpaid debt (for example a credit card company trying to collect unpaid charges); OR

► You need to sue someone who owes you money and do not have a lawyer.

The Early Resolution Program (ERP) includes free legal aid, mediation services, and connections to other resources including rental assistance. Mediation is a chance for a landlord and tenant, or debtor and creditor, to resolve issues with the help of a knowledgeable and neutral person.

The Early Resolution Program is being provided through Cook County Legal Aid for Housing and Debt (CCLAHD), a county-wide initiative to help resolve eviction, foreclosure, debt, and tax deed issues. Visit **www.cookcountylegalaid.org** for information about other programs and services.

   

CARPLS Legal Aid
Center for Conflict Resolution
Center for Disability & Elder Law
Chicago Volunteer Legal Services

Greater Chicago Legal Clinic
Lawyers' Committee for Better Housing
Legal Aid Chicago
Legal Aid Society

FILED DATE: 7/2/2025 8:13 AM    20251710325



# Hrabstwo Cook
## POMOC PRAWNA
### na mieszkania i długi

*Pomoc na rzecz rozwiązywania problemów związanych z eksmisją,
zajmowaniem obciążonej hipoteki, długami oraz sprawami podatkowymi.*

## BEZPŁATNA POMOC PRAWNA DLA MIESZKAŃCÓW HRABSTWA COOK

**Czy borykasz się z widmem eksmisji lub nierozwiązaną kwestią zadłużenia?
Czy mieszkasz w hrabstwie Cook?
Nie jesteś w tym sam(a). Może Ci przysługiwać BEZPŁATNA pomoc prawna.**

### Uzyskaj więcej informacji, dzwoniąc pod numer 855-956-5763
### lub odwiedzając stronę internetową www.cookcountylegalaid.org

Sprawy takie jak eksmisja czy nierozwiązane kwestie zadłużenia mogą mieć długotrwały i negatywny wpływ na Twoją przyszłość. Skontaktuj się z personelem Early Resolution Program (ERP), aby porozmawiać z prawnikiem lub uzyskać dostęp do innych zasobów. Program ten jest nieodpłatnie dostępny dla wszystkich mieszkańców hrabstwa Cook. Nie musisz mieć sprawy w sądzie, aby uzyskać pomoc.

### Możesz skorzystać z programu, jeśli:

► Wynajmujesz mieszkanie lub dom, a jego właściciel zamierza Cię eksmitować;

► Wynajmujesz komuś mieszkanie lub dom, a nie masz prawnika;

► Zostałeś/-aś pozwany/-a do sądu przez kogoś, kto chce od Ciebie ściągnąć niezapłacony dług (na przykład firma obsługująca karty kredytowe, której zalegasz z tytułu nieuiszczonych opłat); LUB

► Zamierzasz pozwać kogoś, kto jest Ci dłużny pieniądze, a nie masz prawnika.

W ramach Early Resolution Program (ERP) możesz uzyskać dostęp do bezpłatnej pomocy prawnej, usług mediatora, a także innych form wsparcia, takich jak pomoc z czynszem. Mediacje to dla właściciela i najemcy bądź dłużnika i wierzyciela szansa na rozwiązanie problemów dzięki pomocy kompetentnego i bezstronnego specjalisty.

Projekt Early Resolution Program jest prowadzony w ramach Cook County Legal Aid for Housing and Debt (CCLAHD) — inicjatywy wdrożonej na terenie całego hrabstwa na rzecz rozwiązywania problemów związanych z eksmisją, zajmowaniem obciążonej hipoteki, długami oraz sprawami podatkowymi. Odwiedź stronę www.cookcountylegalaid.org, aby uzyskać informacje o innych programach i usługach.






CARPLS Legal Aid
Center for Conflict Resolution
Center for Disability & Elder Law
Chicago Volunteer Legal Services

Greater Chicago Legal Clinic
Lawyers' Committee for Better Housing
Legal Aid Chicago
Legal Aid Society

FILED DATE: 7/2/2025 8:13 AM  20251710325



# AYUDA LEGAL
## para viviendas y deudas del Condado de Cook

*Ayuda para resolver problemas de desalojo, ejecución de hipotecas, deudas y escrituras de impuesto.*

## AYUDA LEGAL GRATUITA PARA RESIDENTES DE CONDADO DE COOK

**¿Está enfrentando un problema de desalojo o deuda no resuelta?**

**¿Vive en el condado de Cook?**

**No está solo en esto. Puede ser elegible para recibir ayuda legal GRATIS.**

Para obtener más información, llame al 855-956-5763 o visite www.cookcountylegalaid.org

Los problemas de desalojo y deudas no resueltas pueden tener un impacto negativo y duradero en su futuro. Llame al **Programa de Resolución Temprana** (ERP, Early Resolution Program) para hablar con un abogado y conectarse con otros recursos. Este programa está disponible para todos los residentes de condado de Cook sin costo. No es necesario que tenga un caso en tribunales para obtener ayuda.

## Puede usar el programa si:

► **es inquilino y el dueño intenta desalojarlo;**

► **es dueño y no tiene un abogado representante;**

► **recibió una demanda de alguien que desea cobrar una deuda no pagada (por ejemplo, una empresa de tarjetas de crédito intenta cobrar cargos no pagados); O BIEN**

► **necesita demandar a alguien que le debe dinero y no tiene un abogado.**

El Programa de Resolución Temprana (ERP) incluye ayuda legal gratuita, servicios de mediación y conexiones con otros recursos, como ayuda de arrendamiento. La mediación es una oportunidad para que un dueño y un inquilino, o un deudor y un acreedor, resuelvan los problemas con la ayuda de una persona neutral y con conocimientos.

El Programa de Resolución Temprana se proporciona a través de Ayuda Legal para Vivienda y Deudas del Condado de Cook (CCLAHD, Cook County Legal Aid for Housing and Debt), una iniciativa en todo el condado para ayudar a resolver problemas de desalojo, ejecución de hipotecas, deudas y certificados de dominio de venta fiscal. Visite **www.cookcountylegalaid.org** para obtener información acerca de otros programas y servicios.






CARPLS Legal Aid
Center for Conflict Resolution
Center for Disability & Elder Law
Chicago Volunteer Legal Services

Greater Chicago Legal Clinic
Lawyers' Committee for Better Housing
Legal Aid Chicago
Legal Aid Society

Hearing Date: No hearing scheduled

☐ 2755

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS COUNTY DEPARTMENT – PROBATE DIVISION**

FILED
7/2/2025 11:28 AM
Mariyana T. Spyropoulos
CIRCUIT CLERK
COOK COUNTY, IL
2023P003920
Calendar, 11
33402292

Case No. _____2023P003920_____  Calendar _____11_____

Estate of _____JOHN RICHARD BATTLE_____

Deceased

FILED DATE: 7/2/2025 11:28 AM   2023P003920

## FINAL REPORT OF INDEPENDENT REPRESENTATIVE

_____Brian Battle_____, the independent representative of this estate, states under the penalties of perjury that the administration of this estate has been completed and, in accordance with §28-11 of the Probate Act of 1975 [755 ILCS 5/28-11], further states as follows:

1. Notice of probate has been given in compliance with §6-10 or 9-5 [755 ILCS 5/6-10 or 9/9-5];

2. The notice to creditors required by §18-3 [755 ILCS 5/18-3] has been published, reasonable care was used to determine the creditors of the decedent, and all known creditors have been given notice as required under §18-3;

3. Copies of the inventory and accounting have been mailed or delivered to the extent required by §§28-6 and 28-11 [755 ILCS 5/28-6 and 5/28-11];

* 4. Each claim filed has been allowed, disallowed, compromised or dismissed or is barred; and
  ☑ (a) all claims allowed have been paid in full;
  ☐ (b) the estate was not sufficient to pay all of the claims in full, and all claims allowed have been paid according to their respective priorities pursuant to §18-10 and 18-13 [755 ILCS 5/18-10 and 755 ILCS 5/18-13];

5. Notice was given where required by §§15-1 and 15-2 [755 ILCS 5/15-1 and 755 ILCS 5/15-2]; and
  ** (a) A spouse's award ☐ has been paid. ☐ has been waived. ☐ is barred. ☑ is not applicable.
  ** (b) A child's award ☐ has been paid. ☑ is not applicable.

* 6. ☐ (a) All death taxes have been determined and paid or otherwise provided for;
  ☑ (b) The estate is not subject to death taxes;

* 7. All administration expenses and other liabilities of the estate have been paid and the administration
  ☑ (a) has been completed;
  ☐ (b) has not been completed, but has been provided for (see attached);

8. Notice of probate and release of the estate's interest in real estate has been recorded to the extent required by §§20-24 and 28-10(a) of the Probate Act [755 ILCS 5/20-24 and 5/28-10(a)];

9. The remaining assets of the estate have been distributed to the persons entitled thereto;

** 10. The fees paid or payable to the independent representative and the attorney ☑ have been ☐ have not been approved by all interested persons;

** 11. Receipts have been obtained from all heirs or legatees, and written approvals have been obtained from unpaid creditors and are filed with this **FINAL REPORT** _____ ☐, except as attached. ☑. No exception is attached.

**\*Check the applicable statement.**
**\*\*Complete the sentence by checking the appropriate box.**

Attorney Number _____30375_____

Name _____Angela M. Iaria_____

Firm Name _____Aronberg Goldgehn_____

Attorneys for the representative

Address _____301 S. County Farm Road, Suite A_____

City/State/Zip _____Wheaton, Illinois 60187_____

Telephone _____(312) 923-7334_____

Email _____aiaria@agdglaw.com_____

Dated: _____7/2/2025_____

/s/ _Brian Battle_
DocuSigned by:
1E5CF23059EA43C...
[signature of the independent representative]

/s/ Angela M. Iaria
Attorney Certification

Hearing Date: No hearing scheduled
Location: <<CourtRoomNumber>>
Judge: Calendar, U

FILED DATE: 7/2/2025 3:24 PM 2025L001124

FILED
7/2/2025 3:24 PM
Mariyana T. Spyropoulos
CIRCUIT CLERK
COOK COUNTY, IL
2025L001124
Calendar, U
33410447

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## FIRST DISTRICT LAW DIVISION

HEADWAY CAPITAL, LLC )
        Plaintiff, )
     )
vs. )
     ) No. 25 L 1124
WDUSA OF LOUISVILLE, L.L.C and John Tekulve )
        Defendant, )
     )

**TO:**   Wdusa Of Louisville, L.L.C    John Tekulve
                                      10412 Glenmary Farm Dr
        Agent: John Tekulve     Louisville, KY 40291
        10412 Glenmary Farm Dr
        Louisville, KY 40291

### NOTICE OF MOTION

On  8/7/2025 , at  9:45 AM , or as soon thereafter as counsel may be heard, we shall appear before the Judge Presiding in Room  1907 ZOOM  at 50 W WASHINGTON STREET, CHICAGO, IL 60602, and then and there present Plaintiff's Motion, a copy of which is attached hereto.

### PROOF OF SERVICE BY MAIL

    Under penalties as provided by law pursuant to Section 1-109 of the Code of Civil Procedure (735 ILCS5/109), the undersigned certifies that I am an employee of Zwicker & Associates, P.C., certify that I served this notice by mailing a copy to the above addressee at the above address and depositing the same in the U.S. Mail at 5500 PEARL ST. SUITE 105, ROSEMONT, IL 60018 before 5:00 pm on or before  7/2/2025 , with proper postage prepaid.

                            Respectfully Submitted:

                            *sharon schoiber*

Zwicker & Associates, P.C.
R. RYAN SCARFONE, ESQ. as Lead Attorney for Plaintiff
A Law Firm Engaged in Debt Collection
5500 PEARL ST. SUITE 105
ROSEMONT, IL 60018
847-678-9925/ 800-370-2251
illinoislitigation@zwickerpc.com
Dupage: 229977, Winnebago:7614, Cook: 44826

268568012663

**Law Division Zoom Information
by Daley Center Courtroom**

| Daley Center Courtroom | Zoom Session ID | Zoom Session Password |
|---|---|---|
| 1604 | 949-574-10749 | 272247 |
| 1606 | 918-5334-8901 | 190251 |
| 1610 | 929-7205-6425 | Inquire with Clerk of Court |
| 1904 | 913-6588-1682 | 894316 |
| 1906 | 911-3870-7020 | 035427 |
| 1907 | 768-225-2047 | 902018 |
| 1910 | Inquire with Clerk of Court | |
| 1912 | 921-0771-7798 | 881878 |
| 2001 | 950-5322-1634 | 335113 |
| 2004 | 999-8063-6139 | 645477 |
| 2005 | 898-6851 -8263 | 399275 |
| 2006 | 950-5322-1634 | 335113 |
| 2007 | 994-2739-7392 | 2007 |
| 2010 | 972-4167-2936 | 909053 |
| 2101 | Inquire with Clerk of Court | |
| 2103 | Inquire with Clerk of Court | |
| 2104 | 993-6823-8085 | 472763 |
| 2105 | 983-8877-2807 | 957575 |
| 2106 | Inquire with Clerk of Court | |
| 2110 | 967-4070-0726 | 127803 |
| 2201 | 845 5686 4343 | 450063 |
| 2202 | 929-395-4378 | 123 |
| 2203 | 922-9776-9842 | 184216 |
| 2204 | 915-8674-8536 | 751001 |
| 2205 | 837 7556 6016 | 857329 |
| 2206 | Inquire with Clerk of Court | |
| 2207 | 64 6673 2549 | 231739 |
| 2208 | 933 5984 9795 | 665252 |
| 2209 | 839 5421 9186 | 373619 |
| 2210 | 837 5010 7161 | 075096 |
| 2303 | 943 6230 2347 | 429020 |
| 2304 | 995 4180 7877 | 712952 |
| 2306 | Inquire with Clerk of Court | |
| 2307 | Inquire with Clerk of Court | |
| 2309 | 915 2887 2095 | 594063 |
| 2310 | 992 5804 3343 | 134801 |
| 2401 | Inquire with Clerk of Court | |
| 2404 | 974 4869 8856 | 831827 |

FILED DATE: 7/2/2025 3:24 PM   2025L001124

**Law Division Zoom Information**
**by Daley Center Courtroom**

| | | |
|---|---|---|
| 2406 | 985 1159 0426 | 421891 |
| 2407 | Inquire with Clerk of Court | |
| 2501 | 958 9270 0873 | 312452 |
| 2504 | 988 0065 8228 | 952064 |
| 2506 | Inquire with Clerk of Court | |
| 2507 | Inquire with Clerk of Court | |
| 2508 | Inquire with Clerk of Court | |
| 2603 | Inquire with Clerk of Court | |
| 2605 | 952 3741 2136 | Inquire with Clerk of Court |
| 2606 | 957 3610 6485 | 237960 |
| 2607 | Inquire with Clerk of Court | |
| 2609 | 418-896-0633 | 805052 |
| 2811 | Inquire with Clerk of Court | |
| 2812 | Inquire with Clerk of Court | |
| 2101-A | Inquire with Clerk of Court | |
| 2507-A | Inquire with Clerk of Court | |
| 2503 | 967 3454 1119 | 268697 |
| 2505 | 980 2962 2696 | 138444 |
| 2574 | Inquire with Clerk of Court | |

FILED DATE: 7/2/2025 3:24 PM   2025L001124

FILED DATE: 7/2/2025 3:24 PM          2025L00112

# ZOOM FROM YOUR PHONE

## How to use Zoom on your smart phone for your remote court hearing



---

**1**

### GO TO YOUR APP STORE

On iPhones, it is called the App Store. On Androids, it is called Google Play. If the court gave you a link, click the link and follow the instructions.

 

---

**2**

### DOWNLOAD THE ZOOM APP

Search for the Zoom Cloud Meetings app in the search bar and download the FREE app called "ZOOM Cloud Meetings."


ZOOM Cloud Meetings
Meet Happy
★★★★☆ 965K

---

**3**

### OPEN THE ZOOM APP

You can open the Zoom app immediately after downloading it by clicking the "Open" button in your App Store or you can open the Zoom app that is now on your phone.

 OPEN

---

**4**

### CLICK "JOIN A MEETING"

You do not need to "Sign Up" or "Sign In" to join a meeting.

Join a Meeting

---

**5**

### TYPE YOUR INFORMATION AND CLICK "JOIN"

Type in the Meeting ID the court gives you in the box labeled **A**.
Type in your full name in the box labeled **B**.



---

**6**

### TYPE THE ZOOM MEETING PASSWORD

Type in the Zoom Meeting Password the court gives you in the box labeled **C** and click "Continue."



---

**7**

### CLICK "JOIN WITH VIDEO"

You will be automatically asked to connect to video. If you are not asked, look for the camera symbol and click "Start Video."

Join with Video

---

**8**

### CLICK "JOIN AUDIO" AND CHOOSE "CALL OVER INTERNET" OR "DIAL IN"

You will be automatically asked to connect to audio. If you are not asked, look for the headphones symbol, click "Join Audio," and select "Call Over Internet." "Dial in" requires the phone number the court gives you.



---



**Flip for Computer Instructions and Tips** →

(08/20)

# ZOOM FROM YOUR COMPUTER

**How to use Zoom on your computer or laptop (with a webcam) for your remote court hearing**



FILED DATE: 7/2/2025 3:24 PM          2025L001112

**1** ## GO TO zoom.us/join
If the court gave you a link, click the link and follow the instructions.


**2** ## TYPE YOUR INFORMATION AND CLICK "JOIN"
Type in the Meeting ID the court gives you in the box labeled **A** and click "Join."


**3** ## CLICK "OPEN ZOOM MEETINGS"
If you don't have Zoom installed on your computer, click on "download and run Zoom" and open the .exe file to install Zoom.


**4** ## TYPE YOUR INFORMATION AND CLICK "JOIN"
Type in the Meeting ID the court gives you in the box labeled **B**. Type in your full name in the box labeled **C**.


**5** ## TYPE THE ZOOM MEETING PASSWORD
Type in the Zoom Meeting Password the court gives you in the box labeled **D** and click "Join Meeting."


**6** ## CLICK "JOIN WITH VIDEO"
You will see a video preview before you join with video. If you do not want to appear with video, click "Join without Video."


**7** ## CLICK "JOIN WITH COMPUTER AUDIO"
You can test your speaker and microphone by clicking the words under "Join with Computer Audio."

### Getting Ready for Your Remote Hearing:

- Check your internet or phone connection.
- Charge your computer or phone. Make sure you have enough minutes.
- Use earbuds or headphones if you can. This makes it easier to hear you speak.
- Look for the microphone symbol to mute and un-mute yourself.
- Keep yourself on mute when your case is not before the judge.
- Use an empty, quiet space where no one will interrupt you and with no background noise.
- Set the camera at eye level. If using a phone, prop it up so your hands are free.
- Pause before speaking in case there is audio/video lag.
- Even if you are at home, remember that a remote hearing is still an official court hearing and you should dress and behave appropriately.



ILLINOIS SUPREME COURT COMMISSION ON
**ACCESS TO JUSTICE**
EDUCATION. SUPPORT. EMPOWERMENT.
(08/20)

**Flip for Phone Instructions** →

# ZOOM DESDE SU TELÉFONO

**Cómo usar Zoom en su teléfono inteligente
para su audiencia remota en la corte**



FILED DATE: 7/2/2025 3:24 PM        2025L001112

**1**
## VAYA A SU TIENDA DE *APPS*
En iPhone, se llama App Store. En Android, se llama Google Play.
Si la corte le dio un sitio internet "link," haga clic en el sitio y siga las instrucciones.

 

**2**
## DESCARGUE EL *APP* DE ZOOM
Ponga Zoom Cloud Meetings en la barra de búsqueda de *apps* y descargue
el *app* GRATIS llamada "ZOOM Cloud Meetings."

 
ZOOM Cloud Meetings
Meet Happy
★★★★☆ 985K

**3**
## ABRA EL *APP* DE ZOOM
Puede abrir el *app* de Zoom inmediatamente después de descargarla
haciendo clic en el botón "Open" de su tienda de *apps*, o puede abrir el *app*
de Zoom que está instalada ahora en su teléfono.


OPEN

**4**
## HAGA CLIC EN "JOIN A MEETING"
No hace falta "Sign Up" (registrarse) o "Sign In" (iniciar sesión) para participar
en una reunión.

Join a Meeting

**5**
## PONGA SUS DATOS Y HAGA CLIC EN "JOIN"
Ponga el número asignado a su reunión (Meeting ID) que le dio la corte
en el recuadro **A** . Ponga su nombre completo en el recuadro **B**. Primero su nombre
y luego su apellido.



**6**
## PONGA LA CONTRASEÑA DE LA REUNIÓN DE ZOOM
Ponga la contraseña (Zoom Meeting Password) que le dio la corte en el recuadro **C**
y haga clic en "Continue."

Please enter your meeting password
Password          C
Cancel     Continue

**7**
## HAGA CLIC EN "JOIN WITH VIDEO"
Recibirá automáticamente un mensaje para conectar el video. Si no ve
el mensaje, busque el símbolo de la cámara y haga clic en "Start Video."

Join with Video

**8**
## HAGA CLIC EN "JOIN AUDIO" Y SELECCIONE "CALL OVER INTERNET" O "DIAL IN"
Recibirá automáticamente un mensaje para conectar el audio. Si no ve el mensaje,
busque el símbolo de audífonos, haga clic en "Join Audio" y seleccione "Call Over Internet."
La opción "Dial in" requiere el número de teléfono que le dio la corte.


Join Audio    Start Video    Share Content    Participants    More

To hear others
please join audio
Call Over Internet
Dial in
Cancel



ILLINOIS SUPREME COURT COMMISSION
ACCESS TO JUSTICE
EDUCATION. SUPPORT. EMPOWERMENT.
(08/20)

**Vea instrucciones para conectarse con una computadora y consejos útiles al otro lado.**

FILED DATE: 7/2/2025 3:24 PM    2025L00112

# ZOOM DESDE SU COMPUTADORA

**Cómo usar Zoom en su computadora o portátil (con webcam) para su audiencia remota en la corte**



**1** ## VISITE zoom.us/join
Si la corte le dio un sitio internet "link," haga clic en el sitio "link" y siga las instrucciones.

**2** ## PONGA SUS DATOS Y HAGA CLIC EN "JOIN"
Ponga el número asignado a su reunión (Meeting ID) que le dio la corte en el recuadro **A** y haga clic en "Join."



Join a Meeting

Meeting ID or Personal Link Name  (A)

Join

**3** ## HAGA CLIC EN "OPEN ZOOM MEETINGS"
Si no tiene Zoom instalado en su computadora, haga clic en "download and run Zoom" (descargar y ejecutar Zoom) y abra el archivo .exe para instalar Zoom.

**4** ## PONGA SUS DATOS Y HAGA CLIC EN "JOIN MEETING"
Ponga el número asignado a su reunión (Meeting ID) que le dio la corte en el recuadro **B**. Ponga su nombre completo en el recuadro **C**. Primero su nombre y luego su apellido.



Join Meeting

Meeting ID or Personal Link Nam  (B)
Your Name  (C)

**5** ## PONGA LA CONTRASEÑA DE LA REUNIÓN DE ZOOM
Ponga la contraseña (Zoom Meeting Password) que le dio la corte en el recuadro **D** y haga clic en "Join Meeting."

Enter Meeting Passcode

Meeting Passcode  (D)

**6** ## HAGA CLIC EN "JOIN WITH VIDEO"
Verá una vista previa de video antes de conectar el video. Si no quiere aparecer con video y solo con voz, haga clic en "Join without Video."



**7** ## HAGA CLIC EN "JOIN WITH COMPUTER AUDIO"
Puede probar su volumen y micrófono haciendo clic en las palabras debajo de "Join with Computer Audio."



### Cómo prepararse para su audiencia remota:

- Verifique su conexión de internet o teléfono.
- Cargue su computadora o teléfono. Verifique que tenga minutos suficientes.
- Si puede, use audífonos o auriculares. De esa manera será más fácil escuchar lo que está diciendo.
- Haga clic en el símbolo del micrófono para activar y desactivar el modo silenciar.

- Instálese en un espacio desocupado y tranquilo donde nadie lo interrumpa y que no hayan ruidos de fondo.
- Coloque la cámara al nivel de sus ojos. Si va a usar un teléfono, apóyelo en un soporte para dejar las manos libres.
- Haga una pausa antes de hablar en caso que haya una demora en el audio/video.
- Aunque esté en su casa, recuerde que una audiencia remota sigue siendo una audiencia oficial de la corte. Vístase y compórtese adecuadamente, como si estuviera en la corte.



ILLINOIS SUPREME COURT COMMISSION
ACCESS TO JUSTICE
EDUCATION. SUPPORT. EMPOWERMENT.
(08/20)

Vea instrucciones para teléfonos inteligentes al otro lado →

Addendum to Previous Order                                       (Rev. 10/06/14) CCCR N707

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## CRIMINAL DIVISION/MUNICIPAL DEPARTMENT-DISTRICT

PEOPLE OF THE STATE OF ILLINOIS

v.

ROCHELLE D MCDONALD
                            Defendant

| CASE NUMBER | 25500214701 |
| SID NUMBER | |
| IR NUMBER | 1397170 |

**ADDENDUM TO PREVIOUS ORDER SETTING BAIL AND COMMITTING THE DEFENDANT TO THE COOK COUNTY DEPARTMENT OF CORRECTIONS FOR FAILURE TO DEPOSIT BAIL**

### ORDER

THIS MATTER COMING BEFORE THE COURT AND THE COURT BEING FULLY ADVISED IN THE PREMISES, IT IS HEREBY ORDERED:

### DEFENDANT TO BE RELEASED ON THIS CASE ONLY

NEXT COURT DATE: **8/5/2025**
ROOM 102
RELEASED WITH CONDITIONS-SEE ATTACHED ORDER

DISPOSITION(S) MUST REFLECT WHICH COUNT(S) THE ORDER(S) ARE APPLICABLE TO.

ENTERED:   7/2/2025

DEPUTY CLERK:   S. Desai

VERIFIED BY: _____

Judge **Fahy, William Nicholas**      2298
                                   Judge's No.

ROOM/BRANCH:   Courtroom 103

AT:   9:30 AM

**ENTERED**
7/2/2025
MARIYANA T. SPYROPOULOS
Clerk of the Circuit Court
of Cook County, IL
DEPUTY CLERK S. Desai

MARIYANA T. SPYROPOULOS, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

Printed. 7/2/2025 1:43 PM

COURT COPY - PLEASE PRINT

VIDEO RECORDED:
☐ Incident ☐ Field Sobriety Test

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS, FIRST MUNICIPAL DISTRICT
In the name and by the authority of the
☐ People of the State of Illinois   ☑ City of Chicago, a Municipal Corporation, Plaintiff, vs.

* T Z 3 6 0 0 4 6 *

COMPLAINT NO. **TZ-360-046**

CHICAGO POLICE DEPARTMENT CITATION AND COMPLAINT

| Last Name | First Name | MI | Court Key |
|---|---|---|---|
| Grady | Katrina | | FH |

Street Address: 8039 S Cambell Ave
Apt. No.:
City: Chicago
State: IL
Zip Code: 60652

☑ Oper. License / ☐ CDL: G630506829410
State: IL
Year D.L. Exp.: 28
Date of Birth MO: 11 DAY: 30 YR: 25
Sex: F
Height: 5'03"
Weight: 235

Day of Week: Sat
MO: 06 DAY: 21 YEAR: 2025
Time: 7:59 PM

Did then drive and operate a certain motor vehicle, to wit, a
Make: Honda
Year: 23
Color: Si
☑ Auto ☐ Truck ☐ Bus ☐ Com. Mtr. Veh. ☐ 16 or more Pass. Veh.
☐ Taxi ☐ Mtrcycle ☐ Placarded Haz. Mtr.

Upon a public highway/street of this State, to wit
No.: 9704
Dir.: 65
Street: Western Ave

State License Plate No.: ☑ Perm. ☐ Temp.: DX26233
State: IL
Expires MO/YR: 04/26

☐ Prop. Dam ☐ Personal ☐ Fatal
☐ Defendant Inj. Only

SITUATED WITHIN THE CORPORATE LIMITS OF THE CITY OF CHICAGO AFORESAID AND DID THEN AND THERE COMMIT THE FOLLOWING OFFENSE

Illinois Vehicle Code 625 ILCS 5/:
☐ 3-701 NO VALID STATE REGISTRATION
☐ 3-707 OPERATING UNINSURED VEHICLE
☐ 6-101 NO VALID DRIVER'S LICENSE
☐ 6-303(a) LICENSE SUSPENDED/REVOKED
☐ 6-112 FAILURE TO PRODUCE DRIVER'S LICENSE
☐ 11-501 (a)____ DRIVING UNDER INFLUENCE
☐ 11-502 ILLEGAL TRANSPORTATION ALCOHOL
☐ 12-603.1 FAILURE TO WEAR SEAT BELT(__)D (__)P
☐ 11-601 (a) FAILURE TO REDUCE SPEED/ACCIDENT

☐ RADAR ☐ LASER ☐ LIDAR
☐ 11-601 (b) SPEEDING ____ MPH in ____ MPH ZONE
☐ 11-6015 (a) SPEED 26-34 MPH OVER LIMIT, ____ MPH in ____ MPH Zone
☐ 11-6015 (b) SPEED 35 MPH OR MORE, ____ MPH in ____ MPH Zone
☐ 11-605 (a) SPEEDING IN A SCHOOL ZONE
☐ 11-605.1 SPEEDING IN A CONSTRUCTION ZONE
☐ Not Urban District

Municipal Code of Chicago (MCC)
☐ 9-8-020 (c)(1) DISOBEY SOLID RED SIGNAL
☐ 9-24-010 (b) FAILURE TO STOP AT STOP SIGN

READ YELLOW DRIVER'S INSTRUCTION SHEET
☐ YOU MUST RESPOND/PAY online at www.cookcountyclerkofcourt.org within 14 to 21 days; or mail the envelope within 7 days of receiving this complaint.
☑ YOU MUST APPEAR IN COURT on the date and time below.
☐ or Appear by Virtual Hearing. See www.cookcountycourt.org/HOME/Zoom-Links. See court date & time below.

☐ 625 ILCS   ☑ MCC
CH: 9-76   SEC: 230(a)(1)   OFFENSE: Cellphone

Defendant Email Address (Print clearly):
_____@
☐ gmail.com ☐ yahoo.com ☐ hotmail.com
Other: _____

The undersigned certifies that the statements set forth in this instrument are true and correct.

Star #: 15451
Unit: 008
Booked At:

Concourse Level (CL):   4th Floor
On____ of____ 20__
Day   Month
At____ o'clock ___M.

TRAFFIC COURT IS LOCATED IN THE RICHARD J. DALEY CENTER, 50 WEST WASHINGTON, CHICAGO, IL 60602.

Method of Release: ☐ Pre-trial Release: ☐ Non-Discretionary PRC issued ☐ Other

CRASH WITNESS:
Name of Witness:
Address:
City, State, Zip:
COMPLETE AND ATTACH THE ADDITIONAL WITNESS INFORMATION-PERSONAL SERVICE CITATION FORM

RECEIVED JUL 02 2025
MARIYANA T. SPYROPOULOS
CLERK OF THE CIRCUIT COURT
OF COOK COUNTY, IL

Officer's Signature

COURT COPY OF COMPLAINT

Date: 7/23/2025

CIRCUIT COURT OF COOK COUNTY
CHANCERY DIV., RM. 802 DALEY CENTER.
 CHICAGO IL-60602

Schumann Robert


  -

RitenhouseDamon Robert
dritenhouse@yahoo.com

CASE: 2025CH06932 / CALENDAR: 07

Schumann, Robert  -vs- American Express Company,

YOUR COURT DATE IS ON Tuesday  September  02  2025 AT 09:45 AM
** PLEASE DO NOT COME DOWN TO THE COURTHOUSE **
IN ORDER TO APPEAR BY TELEPHONE OR VIDEO FOR YOUR
 USE THE FOLLOWING ZOOM INFORMATION:

ZOOM ACCESS CODE: 943 7767 4389  PASSWORD: 980847

INSTRUCTIONS FOR ACCESSING ZOOM BY VIDEO ARE AVAILABLE AT
HTTP://WWW.COOKCOUNTYCOURT.ORG/ AND AT HTTPS://ZOOM.US/
TO ACCESS ZOOM BY PHONE, CALL 312-626-6799 THEN ENTER THE
THE ACCESS CODE AND PASSWORD LISTED ABOVE.

IF YOU HAVE ANY QUESTIONS PLEASE CONTACT THE COURT
EMAILING CCC.CHANCERYCALENDAR7@COOKCOUNTYIL.GOV
OR CALLING 312-603-3343

Date: 7/24/2025

CIRCUIT COURT OF COOK COUNTY
CHANCERY DIV., RM. 802 DALEY CENTER.
CHICAGO IL-60602

Schumann Robert


-

RitenhouseDamon Robert
dritenhouse@yahoo.com

CASE: 2025CH06932 / CALENDAR: 07

Schumann, Robert  -vs- American Express Company,

YOUR COURT DATE IS ON Tuesday  September  02  2025 AT 09:45 AM
** PLEASE DO NOT COME DOWN TO THE COURTHOUSE **
IN ORDER TO APPEAR BY TELEPHONE OR VIDEO FOR YOUR
USE THE FOLLOWING ZOOM INFORMATION:

ZOOM ACCESS CODE: 943 7767 4389  PASSWORD: 980847

INSTRUCTIONS FOR ACCESSING ZOOM BY VIDEO ARE AVAILABLE AT
HTTP://WWW.COOKCOUNTYCOURT.ORG/ AND AT HTTPS://ZOOM.US/
TO ACCESS ZOOM BY PHONE, CALL 312-626-6799 THEN ENTER THE
THE ACCESS CODE AND PASSWORD LISTED ABOVE.

IF YOU HAVE ANY QUESTIONS PLEASE CONTACT THE COURT
EMAILING CCC.CHANCERYCALENDAR7@COOKCOUNTYIL.GOV
OR CALLING 312-603-3343

FILED
8/12/2025 4:28 PM
Mariyana T. Spyropoulos
CIRCUIT CLERK
COOK COUNTY, IL
2025CH06932
Calendar, 7
33985344

Hearing Date: No hearing scheduled
Location: <<CourtRoomNumber>>
Judge: Calendar, 7

FILED DATE: 8/12/2025 4:28 PM  2025CH06932

## CONSTABLE'S RETURN

**Style of Case:**   ROBERT SCHUMANN  VS.   AMERICAN EXPRESS COMPANY; AND AMERICAN EXPRESS NATIONAL BANK

Came into hand, this   **15**   day of   **JULY**   , 20 **25**   AT   **8:18**

o'clock   **A**   M. by executing and delivering a   **SUMMONS**   issued out of the

state of   **ILLINOIS**   under cause number:   **2025CH06932**   On this   **15**   Day

Of   **JULY**   , 20 **25**   , at   **2:01**   o'clock   **P**   M., to:

☐ _____ personally delivered/served true and correct copies of same.

**OTHER NOTES:** _____

☐ _____ pursuant to Rule 106/Rule 536, to an occupant:

_____ over the age of 16 years.

☐ _____ pursuant to Rule 106/Rule 536, by securely attaching

and/or affixing to the _____ of the defendant's last known place of

☐ business   ☐ abode.

☒ **AMERICAN EXPRESS COMPANY; AND AMERICAN EXPRESS NATIONAL BANK, SUCCESSOR BY MERGER TO AMERICAN EXPRESS BANK, FSB**   ☐ A Corporation   ☐ A Business

**Name:**   CT CORPORATION SYSTEM   ☐ President ☐ Vice-President ☒ Registered Agent

☒ **By delivering to the defendant's registered agent for service, CT CORPORATION SYSTEM, through Their authorized agent to accept service:  ZACHARY ROUSE; SERVICE OF PROCESS INTAKE ASSOCIATE**

**at 1999 BRYAN ST STE 900 Dallas, Texas 75201.**

**Service Address:   1999 BRYAN ST STE 900 DALLAS TEXAS 75201   DALLAS COUNTY**

☐ **RETURNED TO COURT AND/OR PLAINTIFF FOR THE FOLLOWING REASONS:**

_____

**Service Fees: $**   **80.00**

*P. CLARK #116, DEPUTY CONSTABLE*
**TRACEY L. GULLEY, CONSTABLE**
**DALLAS COUNTY PRECINCT 1**

**COUNTY OF DALLAS**

**STATE OF TEXAS**

**SIGNED AND SWORN BY SAID**   P. Clark#116   , before me, this   16

**Day Of**   July   20 25 , to certify which, witness my hand and seal of office.

SHUNTAVIA SIMS
Notary Public
Notary ID # 133654179
My Commission Expires
April 28, 2026

_NOTARY PUBLIC-IN AND FOR THE STATE OF TEXAS_

FILED DATE: 8/12/2025 4:28 PM   2025CH06932

EV Has, LLC
11757 SW Hwy
Palos Heights, IL 60463

FOREVER

NORTH TEXAS TX P&DC
DALLAS TX 750
18 JUL 2025   PM 8   L

EV Has, LLC
11757 SW Hwy
Palos Heights, IL 60463
ATTN: GINA GERAGHTY

60463-101557

Schumann Service